UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                                    Chapter 11

CINEMEX USA REAL ESTATE                      Case No.: 20-bk-14695
HOLDINGS, INC.,

         Debtor.
_____/

### NOTICE OF FILING ORDER OF U.S. DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS, AND DEBTORS' BRIEF FILED IN ACCORDANCE WITH SAME

Cinemex USA Real Estate Holdings, Inc. ("Debtor"), by and through undersigned counsel, hereby files this Notice of Filing of the *Order* entered on April 25, 2020 by the U.S. District Court, Southern District of Texas, in *Khan v. Cinemex Holdings USA, Inc. et al*, [1] Case No. 20-cv-01178, attached hereto as **Exhibit "A"**, and the *Debtor-Defendants' Response Regarding Effect of the Automatic Stay on This Court's Jurisdiction,* filed in the same action on April 26, 2020, attached hereto as **Exhibit "B"**.

The Debtor(s) shall continue to keep the Court apprised of this action.

Respectfully submitted: April 26, 2020.

---

[1] The Debtor's affiliate, Cinemex Holdings USA, Inc., joint defendant in the U.S.D.C. action cited above, filed a Chapter 11 voluntary petition (Case No. 20-bk-14696) concurrently with this case, and a motion for joint administration will be filed with the Court.

BAST AMRON LLP
SunTrust International Center
One Southeast Third Avenue, Suite 1400
Miami, Florida 33131
Telephone: 305.379.7904
Facsimile: 305.379.7905
Email: jbast@bastamron.com
Email: bamron@bastamron.com
Email: jleggett@bastamron.com

By: */s/ Brett M. Amron*
    Jeffrey P. Bast (FBN 996343)
    Brett M. Amron (FBN 148342)
    Jaime B. Leggett (FBN 1016585)

-and-

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Eric Winston (*pro hac vice* to be filed)
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213-443-3000
Facsimile: 213-443-3100
Email: ericwinston@quinnemanuel.com

-and-

Juan P Morillo *pro hac vice* to be filed)
1300 I Street, NW, Suite 900
Washington, D.C.  20005
Telephone: 202-538-8000
Facsimile: 202-538-8100
Email: juanmorillo@quinnemanuel.com

-and-

Patricia B. Tomasco (*pro hac vice* to be filed)
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100
Email: pattytomasco@quinnemanuel.com

PROPOSED COUNSEL FOR CINEMEX
USA REAL ESTATE HOLDINGS, INC.,
and CINEMEX HOLDINGS USA, INC.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 26, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day by transmission of Notices of Electronic Filing generated by CM/ECF to any parties registered to receive electronic notices of filing in this case.

*/s/ Brett M. Amron*
Brett M. Amron

# EXHIBIT "A"

United States District Court
Southern District of Texas
**ENTERED**
April 25, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

OMAR KHAN, *et al*,          §
                            §
    Plaintiffs,      §
VS.                         §    CIVIL ACTION NO. 4:20-CV-1178
                            §
CINEMEX HOLDINGS USA, INC., *et al*,   §
                            §
    Defendants.      §

## ORDER

Pending before the Court is a motion for expedited injunctive relief and specific performance filed by Plaintiffs. (Doc. No. 6). Defendants have filed a notice of bankruptcy in this matter. (Doc. No. 39). In consideration of the automatic stay issued pursuant to 11 U.S.C. §362(a), the Court hereby ORDERS the parties to submit short briefs addressing whether Court may issue injunctive relief of any kind, but specifically the two forms of relief sought here,[1] while the automatic stay is in effect or whether such relief must be sought from the judge overseeing the bankruptcy proceedings. The parties should not address the merits of the requested relief but should focus on the narrow question of the effect of the automatic stay on this Court's jurisdiction. Briefs must be filed by April 27, 2020 at 9:00 AM.

Signed at Houston, Texas, this 25 day of April, 2020.

Andrew S. Hanen
United States District Judge

---

[1] Plaintiffs have requested both that the Court order (1) Defendants to specifically perform the equity purchase agreement (the "EPA"); and (2) that Defendants be enjoined from exercising the drop-dead provision found in Section 9.1(F) of the EPA.

1

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OMAR KHAN, et al. | § | |
| | § | |
| vs. | § | Civil Action No. 4:20-cv-01178 |
| | § | |
| CINEMEX USA REAL ESTATE | § | Hon. Andrew S. Hanen |
| HOLDINGS, INC., et al. | § | |

## DEBTOR-DEFENDANTS' RESPONSE REGARDING EFFECT OF THE AUTOMATIC STAY ON THIS COURT'S JURISDICTION

## SUMMARY OF THE ARGUMENT

Defendants Cinemex Holdings USA, Inc. ("Cinemex Holdings") and Cinemex USA Real Estate Holdings, Inc. ("Cinemex Real Estate" and, with Cinemex Holdings, the "Debtors") respectfully submit this Response to this Court's Order entered on April 25, 2020 (ECF No. 40) (the "April 25 Order"), directing the parties to address whether this Court may issue two forms of relief sought by Plaintiffs and to focus on the narrow question of the effect of the automatic stay on this Court's jurisdiction.[1] Under well-settled law, the automatic stay of 11 U.S.C. § 362(a) forecloses this Court from granting any relief or conducting any further proceedings on Plaintiffs' breach-of-contract claim. No exception to the automatic stay might plausibly apply here, where Plaintiffs are bringing a civil claim for monetary relief and for an injunction that would dictate the Debtors' exercise of their property rights. Such a case falls within the established heartland of those covered by the automatic stay. Accordingly, this Court should stay all further proceedings in this Court.

## BACKGROUND

On April 25, 2020 (the "Petition Date"), Cinemex Holdings and Cinemex Real Estate each commenced cases under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Florida, which is where each has its principal place of business. The Debtors are operating as debtors in possession. Subsequent to

---

[1] The Debtors respectfully file this Response in compliance with this Court's April 25 Order directing submissions on or before 9:00 a.m. CT on April 27, 2020. In so doing, and in complying with any ensuing directives by this Court, the Debtors do not waive or release any rights, claims, and defenses arising under the Equity Purchase Agreements or any rights, claims, and defenses arising as a result of the Debtors commencing their bankruptcy cases, including 11 U.S.C. §§ 362 and 365. To the contrary, the Debtors respectfully contend that the relevant bankruptcy provisions are controlling, as stated herein, and they expressly reserve all rights, claims, and defenses thereunder, including relative to these Plaintiffs.

1

the filing, the Debtors filed in this Court a notice of the commencement of the bankruptcy filings. (ECF No. 39.)

As described in the April 25 Order, Plaintiffs are asking this Court to order the Debtors to specifically perform the "Equity Purchase Agreements" (the "EPA[s]"), which means to close the transaction, pay to Plaintiffs the cash purchase price under the EPA, and to enjoin the Debtors from exercising a provision to terminate the EPA pursuant to Section 9.1(F) of the EPA.[2]

## STATEMENT OF THE ISSUES

Does the Bankruptcy Code's automatic stay preclude this Court from continuing this proceeding by conducting a hearing on or providing relief for Plaintiffs' breach-of-contract claim against the Debtors?

## ARGUMENT

This Court has jurisdiction to determine if the automatic stay provisions of 11 U.S.C. § 362(a) apply to an action pending before this Court, insomuch as both the Bankruptcy Court and this Court have concurrent jurisdiction to determine whether the automatic stay applies. *See, e.g.*, *Arnold v. Garlock Inc.*, 288 F.3d 234, 236 (5th Cir. 2002) ("[D]istrict courts retain jurisdiction to determine the applicability of the stay to litigation pending before them, and to enter orders not inconsistent with the terms of the stay."). Even as to this threshold inquiry, it is appropriate, and often preferable, for a non-bankruptcy court to defer to a bankruptcy court on any question whether the automatic stay applies. *See Erti v. Pain Webber Jackson & Cutis Inc. (In re Baldwin-United Corp. Litigation)*, 765 F.2d 343, 349 (2d Cir. 1985)

---

[2] There are two EPAs related to the transaction, both dated March 10, 2020. (Compl. ("ECF No. 1") ¶ 2.) Unless otherwise indicated, the cited provisions herein are the same in each EPA.

("The necessary uniformity is best achieved by centralizing construction of the automatic stay in the Bankruptcy Court, subject to review in the Sixth Circuit, with ultimate review in the Supreme Court available if warranted."); *see also In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1070 n.24 (5th Cir. 1997) ("Our unremarkable statement … that district courts retain jurisdiction to determine the applicability of the [ Section 362(a) automatic] stay to litigation pending before them … did not, of course, foreclose a debtor's ability to redress violations of the automatic stay through contempt proceedings in the bankruptcy court, nor was it intended to diminish the ability of a bankruptcy court to entertain actions to enforce or construe the effects of its own orders."). Deferring to the bankruptcy court avoids the circumstance where a non-bankruptcy court incorrectly determines the automatic stay does not apply, which can necessitate appellate intervention. *See, e.g.*, *In re Long*, 318 Fed. App'x 891, 894 (9th Cir. 2008) ("Because the September 23 order violated the automatic stay, we grant the petition for a writ of mandamus and direct the district court to vacate that order."). Nonetheless, to the extent this Court might address the issue in the first instance, governing law does not admit of any plausible argument that the automatic stay is somehow inapplicable.

## I.   THE AUTOMATIC STAY APPLIES SQUARELY TO THIS LITIGATION

There are multiple provisions of the Bankruptcy Code establishing that the automatic stay necessarily applies here.

*First*, Bankruptcy Code Section 362(a)(1) provides that the stay applies to the "commencement or continuation … of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). This is an action against the Debtors that arose

3

prior to the Petition Date, and Plaintiffs are seeking to recover a claim against the Debtors.  The Bankruptcy Code defines "claim" broadly as:

> (A) **right to payment**, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) **right to an equitable remedy for breach of performance** if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5) (emphasis added).  Here, Plaintiffs plainly seek a **right to payment** (including of the purchase price), and their proposed **equitable relief** likewise concerns an alleged breach that supposedly gives them a right to payment.  *See, e.g.*, *In re Udell*, 18 F.3d 403, 407 (7th Cir. 1994) (holding "one example of a 'claim' is a right to an equitable remedy that can be satisfied by an 'alternative' right to payment").  Lest there be any doubt, courts routinely apply the automatic stay to claims for equitable relief.  *See, e.g.*, *Municipality of San Juan v. Puerto Rico*, 919 F.3d 565, 576-77 (1st Cir. 2019) ("The stay includes actions seeking injunctive relief or similar relief as well as actions seeking money judgments. … The stay provision of subsection (a)(1) is drafted so broadly that it encompasses all types of legal proceedings, subject only to the exceptions provided in section 362(b).") (quoting 3 Collier on Bankruptcy ¶ 362.03 (16th ed. 2018)); *Ledo Pizza Sys., Inc. v. Singh*, Civil No. WDQ-13-2365, 2013 WL 5604339, at *2 (D. Md. Oct. 10, 2013) ("Although Tri-Bro has filed for bankruptcy, Ledo seeks injunctive relief against it.  … The plain text of the statute suggests that the automatic stay provision applies to suits for equitable relief.  … Because Ledo seeks injunctive relief against Tri-Bro for behavior that arose before and after the petition was filed, the Court will reject Ledo's request for injunctive relief against Tri-Bro."); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969, 976 (N.D. Ill. 1992) (Easterbrook, J., sitting by designation) ("Nothing in

§ 362(a)(1) suggests any difference between legal and equitable relief.  Section 362(b) supports this conclusion, for a number of its subsections exclude from the stay certain equitable proceedings.  These exceptions are unnecessary if § 362(a) does not apply in the first place to requests for injunctions.");[3] *In re Clark*, 49 B.R. 704, 707 (Bankr. D. Guam 1985) ("[F]or Paik and Sanchez to proceed on May 3 to seek the injunctive relief, after being notified of the filing of the Petition in the Bankruptcy Court, is a violation of the automatic stay, especially where the real purpose of the action in the Superior Court was to force Debtor to pay Mr. and Mrs. Wilson their pre-petition debts.").

Notably, Section 362(a)(1) does not limit itself to barring particular forms of relief; it bars "continuation" of the "proceeding."  No matter how Plaintiffs may frame their request for a preliminary injunction, the proceeding as a whole is obviously one in which Plaintiffs seek to recover a claim against the Debtors.  For Plaintiffs now to advance legal arguments and evidence for obtaining an injunction, or for this Court to issue one, would plainly be a "continuation" of the proceeding.  *See, e.g.*, *Pope v. Manville Forest Prods. Corp.*, 778 F.2d 238, 239 (5th Cir. 1985) ("First, if either of the parties takes any step to obtain dismissal, such as motion to dismiss or motion for summary judgment, there is clearly a continuation of the judicial proceeding. Second, in the more technical sense, just the entry of an order of dismissal, even if entered sua sponte, constitutes a judicial act toward the disposition of the case and hence may be construed as a 'continuation' of a judicial proceeding."); *Ledet v. K-Mart Corp.*, No. CIV.A. 01-2485, 2005 WL 357174, at *2 (E.D. La. Feb. 11, 2005) ("The Fifth Circuit has broadly construed

---

[3]  Judge Easterbrook explained why this "is not only good law but also good sense": "One pressing task [in bankruptcy] is to prevent creditors' actions that grab one aspect of the business and squeeze it for value that, while assisting a single creditor, may depress the collective value of the assets.  Injunctions requiring debtors to abandon one part of their business or dramatically change their methods of doing business have a high holdup value for creditors and therefore may lead to this unfortunate consequence." *Mahurkar*, 140 B.R. at 976.

'continuation' in subsection (a)(1) to encompass any change or occurrence in the action."); *see also, e.g.*, *In re Soares*, 107 F.3d 969, 974 (1st Cir. 1997) ("[A]cts undertaken in the course of carrying out the core judicial function are not ministerial and, if essayed after bankruptcy filing, will be deemed to violate the automatic stay.").  It follows that the proceeding simply cannot be continued, and the litigation must be stayed.  *See In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1146 (5th Cir. 1987) ("The automatic stay thus imposes a moratorium on all actions against the debtor or its property and assets.  It ensures a respite for the debtor so that it may attempt to reorganize or decide to liquidate and promotes the overriding bankruptcy policy of equal distribution of a debtor's assets among creditors." (citing *GATX Aircraft Corp. v. M/V Courtney Leigh*, 768 F.2d 711, 716 (5th Cir. 1985)).

*Second*, Bankruptcy Code Section 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3); *see S.I. Acquisition*, 817 F.2d at 1148 (quoting 11 U.S.C. § 362(a)(3)).  Plaintiffs' requested relief falls squarely within Section 362(a)(3) because it seeks to force the Debtors to consummate the EPAs (which means to close the transaction and pay the purchase price without regard to defenses the Debtors may have) and to enjoin the Debtors from exercising a potential right under the EPAs, which right constitutes property of the Debtors' estates.  *See In re AMR Corp.*, 730 F.3d 88, 102-03 (2d Cir. 2013) ("[C]ontract rights are property of the estate ... protected by the automatic stay.") (quoting *In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003); *In re Elder-Beerman Stores Corp.*, 195 B.R. 1019, 1023 (Bankr. S.D. Ohio 1996) ("Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay.") (citing cases).

*Third*, Bankruptcy Code Section 362(a)(6) bars "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6).  Again, that is the relief being sought by the Plaintiffs:  to recover a claim against the Debtors that arose prior to the Petition Date.  *See, e.g.*, *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 355 (5th Cir. 2008) ("The stay prevents creditors from taking any collection actions against the debtor or the property of the debtor's estate for pre-petition debts").

*Finally*, none of the enumerated exceptions to the automatic stay provision is even remotely applicable here.  Those listed exceptions—which include, for example, "criminal proceedings," 11 U.S.C. § 362(b)(1), and certain family-law proceedings, *id.* § 362(b)(2)—plainly do not apply to this action for breach of contract.  Not only does no such exception find colorable application, but no case law known to these Debtors hints that any such exception might arguably obtain in a case like this one.

## II.    ONLY THE BANKRUPTCY COURT HAS AUTHORITY TO LIFT THE AUTOMATIC STAY

Once this Court determines that the automatic stay applies, its jurisdiction is at an end. "Only the bankruptcy court may grant relief from the automatic stay."  *Farley v. Henson*, 2 F.3d 273, 275 (8th Cir. 1993); *In re Mosher*, 578 B.R. 765, 771 (Bankr. S.D. Tex. 2017) ("Prosecution of a motion to lift the automatic stay pursuant to § 362(d) can only occur in a bankruptcy court."); *In re Gandy*, 327 B.R. 796, 801 n.5 (Bankr. S.D. Tex. 2005) ("The Code allows only the bankruptcy court to annul or modify the automatic stay."); *In re Edwin A. Epstein, Jr. Operating Co., Inc.*, 314 B.R. 591, 600 (Bankr. S.D. Tex. 2004) ("It is undisputed that only a bankruptcy court has jurisdiction to terminate, annul or modify the automatic stay."); *see also, e.g.*, *In re Cont'l Airlines*, 928 F.2d 127, 129 (5th Cir. 1991) ("Only the Delaware bankruptcy court may

grant relief from the effect of the automatic stay provision."); *Jones v. Garcia,* 63 F.3d 411, 412 n.3 (5th Cir. 1995) ("It is the effect of the stay itself which is voidable, subject to the broad discretion afforded a bankruptcy judge under section 362." (emphasis removed)); *Sikes v. Glob. Marine, Inc.*, 881 F.2d 176, 178-79 (5th Cir. 1989) ("Our colleagues in the Eleventh Circuit … declar[ed] that section 362(d) expressly grants bankruptcy courts the option, in fashioning appropriate relief, of 'annulling' the automatic stay, in addition to merely 'terminating' it. [] We agree.").

As such, any arguments these Plaintiffs might make for lifting the automatic stay belong before the Bankruptcy Court, and only there. Because the automatic stay applies to protect the Debtors, their estates and their creditors, employees, and other stakeholders, Plaintiffs are obliged to direct their arguments and requests for relief exclusively to the Bankruptcy Court. *Campbell*, 545 F.3d at 353 ("While the automatic stay halts collection efforts, the Bankruptcy Code provides creditors a procedure to assert claims against the debtor's estate. The Bankruptcy Code entitles each creditor of the bankruptcy 'to file a proof of claim—*i.e.*, a document providing proof of a 'right to payment' against the debtor's estate.") (quoting *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449 (2007) (in turn quoting 11 U.S.C. § 101(5)(a))).

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should abide by the automatic stay and stay all further proceedings in this Court, including but not limited to the hearing previously set for April 27, 2020.

Dated:     April 26, 2020                    Respectfully submitted,

/s/ Patricia B. Tomasco
Patricia B. Tomasco (attorney in charge)
Texas State Bar No. (01797600)
Federal ID No. (10521)
Email: pattytomasco@quinnemanuel.com

QUINN, EMANUEL, URQUHART &
SULLIVAN, LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
Telephone:     (713) 221-7010
Facsimile:     (713) 221-7100

/s/ Juan P. Morillo
Juan P. Morillo
*Pro Hac Vice* granted.
Email: juanmorillo@quinnemanuel.com

/s/ Derek L. Shaffer
Derek L. Shaffer
*Pro Hac Vice* granted.
Email: derekshaffer@quinnemanuel.com

/s/ Gabriel F. Soledad
Gabriel F. Soledad
*Pro Hac Vice* granted.
Email: gabrielsoledad@quinnemanuel.com

QUINN, EMANUEL, URQUHART &
SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone:     (202) 538-8000
Facsimile:     (202) 538-8100

*Attorneys for Defendants Cinemex USA Real Estate*
*Holdings, Inc. and Cinemex Holdings USA, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that this Response has been served on counsel of record by the Court's ECF system on April 26, 2020.

/s/ Juan P. Morillo
By: Juan P. Morillo

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OMAR KHAN, et al. | § | |
| | § | |
| vs. | § | Civil Action No. 4:20-cv-01178 |
| | § | |
| CINEMEX USA REAL ESTATE | § | Hon. Andrew S. Hanen |
| HOLDINGS, INC., et al. | § | |

**APPENDIX TO DEBTOR-DEFENDANTS' RESPONSE REGARDING
EFFECT OF THE AUTOMATIC STAY ON THIS COURT'S JURISDICTION**

| TABLE OF CONTENTS | |
|---|---|
| **TAB** | **CASE** |
| A-1 | *In re Clark*, 49 B.R. 704 (Bankr. D. Guam 1985) |
| A-2 | *In re Edwin A. Epstein, Jr. Operating Co., Inc.*, 314 B.R. 591 (Bankr. S.D. Tex. 2004) |
| A-3 | *In re Elder-Beerman Stores Corp.*, 195 B.R. 1019 (Bankr. S.D. Ohio 1996) |
| A-4 | *In re Gandy*, 327 B.R. 796 (Bankr. S.D. Tex. 2005) |
| A-5 | *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969 (N.D. Ill. 1992) |
| A-6 | *In re Mosher*, 578 B.R. 765 (Bankr. S.D. Tex. 2017) |
| A-7 | *Ledet v. K-Mart Corp.*, No. CIV.A. 01-2485, 2005 WL 357174 (E.D. La. Feb. 11, 2005) |
| A-8 | *Ledo Pizza Sys., Inc. v. Singh*, No. CIV. WDQ-13-2365, 2013 WL 5604339 (D. Md. Oct. 10, 2013) |

Case 20-31695-LMI Doc 4 Filed 04/26/20 Page 19 of 80

# APPENDIX A-1

49 B.R. 704
United States Bankruptcy Court,
D. Guam.

In re Cynthia A. CLARK, Debtor.

Bankruptcy No. 83–00018.
|
March 25, 1985.

**Synopsis**

Contempt proceedings were brought against creditors' counsel. The Bankruptcy Court, Jon J. Chinen, J., held that: (1) filing of complaint for injunctive relief on behalf of creditors prior to filing a petition for relief in bankruptcy court did not violate any automatic stay; however, creditors' counsel, in proceeding to seek injunctive relief after having been notified of the filing of the petition in bankruptcy court, violated automatic stay, and (2) creditors' counsel would be held jointly and severally liable for attorney fees and costs incurred by debtor's attorney in bringing order to show cause.

Judgment accordingly.

**Attorneys and Law Firms**

**\*705** Russell H. Tansey, Agana, Guam, for debtor.

Ricky Sanchez, pro se.

Ladd A. Baumann, GMF, Guam, for Sam Paik.

## MEMORANDUM DECISION

JON J. CHINEN, Bankruptcy Judge.

The contempt proceedings against Sam S. Paik, Esq., ("Paik") and Ricky Sanchez, Esq., ("Sanchez") were separated and held on two separate days. The hearing for Sanchez was held on November 9, 1983 and the hearing for Paik was held on February 28, 1985. At the hearing for Sanchez, present were Russell H. Tansey, Esq., special counsel for Cynthia Clark ("Debtor") in the contempt proceedings, and Sanchez representing himself. Present as an observer was Paik's attorney, Ladd Bauman, who had just returned to Guam from off-island. At the hearing for Paik, present were J. Cook, substitute counsel for Debtor in the bankruptcy proceeding, R. Tansey, special counsel for Debtor in the

contempt proceedings, Paik, one of the respondents, Ladd Bauman, Esq., counsel for Paik, and Timothy Stewart, Esq., the Chapter 13 Trustee. Based upon the evidence presented, the records in the file and arguments of counsel, the Court finds as follows:

FINDINGS OF FACT

On April 13, 1983, a Motion for Injunction Relief, together with a Memorandum in Support of Request for Preliminary Injunction, and a Complaint were filed in the Superior Court of Guam in Civil Case No. 273–83, Milton O. Wilson and Beverly H. Wilson v. Cynthia Clark, et al. All of the documents were executed by Paik as attorney for Mr. and Mrs. Wilson. The Superior Court set May 3, 1983 at 9:00 a.m. for the hearing on the Motion for Injunction.

On May 2, 1983 at 4:22 p.m., Tansey, on behalf of Debtor, filed a Petition for Relief under Chapter 13 in the Bankruptcy Court of the District of Guam. Then, at 4:40 p.m., a Notice of Filing Petition in Bankruptcy, and a Notice of Filing Petition were served by the then legal secretary of Tansey upon the legal secretary of Paik at Paik's office. The first notice was addressed to "Clerk of Court (of the Superior Court) and All Parties and their Counsel of Record", and the second notice was addressed to "Creditors of the Above-Named Debtor, Attorneys for Said Creditors and Marshall, Superior Court of the Territory of Guam".

On May 3, 1983, in Civil Case No. 273–83, in the Superior Court of Guam, both Paik and Sanchez appeared on behalf of Mr. and Mrs. Wilson. No one appeared on behalf of Debtor. Paik addressed the Court at the start of the hearing and stated, "My associate counsel, Mr. Sanchez, will argue the case, your honor."

After Mr. Sanchez argued that the automatic stay did not apply in the particular case because Mr. and Mrs. Wilson were merely trying to prevent the Debtor from receiving the rent and dissipating same, **\*706** Paik actively joined in the argument in an effort to convince the Superior Court that it should issue an injunction to prevent the rent from being paid over to the Debtor.

The Superior Court expressed concern over the matter of jurisdiction because of the Notice of the Stay. The Court stated: "I'm going to study this, continued till tomorrow at nine o'clock."

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 1

On May 3, 1983, following the morning hearing in the Superior Court, at 3:10 p.m., the then legal secretary of Tansey served upon the legal secretary of Paik a letter dated May 3, 1983 addressed to Paik and Sanchez, in which Tansey stated that he was preparing documents to hold Paik and Sanchez in contempt, especially if they continued to pursue the action in the Superior Court for injunctive relief.

On May 4, 1983, at the outset of the hearing, Sanchez appeared on behalf of Mr. and Mrs. Wilson and Tansey appeared on behalf of Debtor. Sanchez acknowledged receipt of the letter dated May 3, 1983 from Tansey, which was forwarded to him that morning. During the course of arguments by Tansey and Sanchez, Paik who was handling another case in another court, appeared at the hearing and sat at counsel's table next to Sanchez, but did not argue. After arguments of counsel, the Court stated: "The Court orders the proceeding stayed pending bankruptcy disposition."

On July 6, 1983, Tansey filed a Motion for Issuance of Order to Show Cause and for Contempt Judgment against both Paik and Sanchez for attempting to proceed with the Motion for Injunctive relief in the Superior Court. Because Sanchez was leaving Guam and because Paik's counsel, L. Bauman, was off-island, at Sanchez' request for an early hearing, the cases were separated as above-mentioned.

The primary defense of both Paik and Sanchez is that they should not be found guilty of contempt for the reason that their violation of the stay order, if any, was not intentional and that they were seeking to prevent the dissipation of the assets of the Debtor by denying Debtor access to the rents from a dwelling that was being rented by Debtor to a third party.

At the hearing on November 9, 1983, Sanchez, who testified on his own behalf, claimed that the injunctive proceeding in the Superior Court was merely to preserve the status quo. However, on examination by the Court, Sanchez acknowledged that the proceeding against Debtor was brought to collect debts which had been incurred prior to the filing of Debtor's petition in the Bankruptcy Court. It is also uncontroverted that, in 1983, Sanchez was an employee of Paik, that he was a recent law school graduate and was admitted to the bar of Guam only shortly prior to April, 1983.

CONCLUSIONS OF LAW

Section 362(a) of 11 U.S.C. provides as follows:

§ 362. Automatic Stay.

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), operates as a stay, applicable to all entities, of—

(1) the commencement of continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

(4) any act to create, perfect, or enforce any lien against property of the estate;

**707** (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

The Complaint for Injunctive Relief having been filed prior to the filing of the Petition for Relief in the Bankruptcy Court, it is undisputed that filing of such complaint does not violate any automatic stay. Also, because the May 3, 1983 hearing had been scheduled in April of 1983 by the Superior Court of Guam, it was incumbent upon Paik and Sanchez to at

In re Clark, 49 B.R. 704 (1985)

Case 4:20-bk-xxxxx-LMI   Doc 4   Filed 04/26/20   Page 22 of 80
Case 4:20-bk-xxxxx-LMI   Document 41-1   Filed 04/26/20 in TXSB   Page 5 of 63

least appear in the Superior Court on May 3. However, for Paik and Sanchez to proceed on May 3 to seek the injunctive relief, after being notified of the filing of the Petition in the Bankruptcy Court, is a violation of the automatic stay, especially where the real purpose of the action in the Superior Court was to force Debtor to pay Mr. and Mrs. Wilson their pre-petition debts.

Instead of researching the matter on the effect of the automatic stay, Paik relied on his employee, Sanchez, a young recent law school graduate, who had informed him that the stay did not apply and Paik made no effort to suspend the action for injunction relief pending the bankruptcy proceeding. On the contrary, Paik actively participated at the May 3rd hearing, and at the May 4th hearing, Paik sat at counsel's table, and permitted Sanchez to argue for the injunctive relief.

Where there is uncertainty about an order of the Bankruptcy Court, or applicability of the automatic stay, a creditor should petition the court for clarification. If the creditor does not, he takes a calculated risk of being held in contempt. *In re Pody,* 42 B.R. 570 (Bkrtcy.N.D.Ala.1984).

In the instant case, where both Paik and Sanchez were inexperienced in the field of bankruptcy, in addition to the research by Sanchez, one or the other should have contacted an attorney with expertise in the field of bankruptcy. In failing to do so, they took a calculated risk and violated the automatic stay.

And when an individual violates the automatic stay, the bankruptcy court may award damages, costs and attorney's fees to debtor's attorney. *In re O'Connor,* 42 B.R. 390 (Bkrtcy.E.D.Ark.1984).

Having found both Paik and Sanchez in violation of the automatic stay, the Court assesses both attorneys' fees and costs incurred by R. Tansey in bringing this Order to Show Cause. Paik and Sanchez are liable jointly and severally for attorney's fees and costs incurred up to and including November 8, 1983, when the contempt proceeding against Sanchez was heard, as follows:

For hearing in the Superior Court in Guam

| | | |
|---|---|---|
| Attorney's fees | | $500.00 |
| 5 hours @ 80.00 | $400.00 | |
| 1 hour @ $100.00 | $100.00 | |
| | $500.00 | |
| Costs | | $136.50 |
| Duplication of taped proceedings | $ 10.00 | |
| Transcript | $ 40.00 | |
| xerox copies | 44.00 | |
| Witness & mileage fee | 30.00 | |
| Service of subpoena | 12.50 | |
| | $136.50 | |

For hearing in Bankruptcy Court:

| | | |
|---|---|---|
| Attorney's Fees | | $630.00 |
| 5 hours @ $ 80.00 | $400.00 | |

2.3 hours @ $100.00                              $230.00
                                                 _____
                                                 $630.00

                                          Total      $1,266.50

The Court, at this time, is denying five (5) hours of "research" time (7/11/83, 7/12/83 and 11/08/83) for the November 9, 1983 hearing. The Court is unable to determine **708** from the time-sheet submitted how the "research" was related to the contempt proceeding. Where there is no clear statement as to the nature of the attorney's services and the relation it bears to the issue at hand, compensation may be denied, *In re Tolan,* 41 B.R. 751 (Bkrtcy.M.D.Tenn.1984).

Tansey is granted 20 days from the date of this order to file a supplemental time-sheet to show the reasons for the time spent on "research". In addition, when Tansey submits his time-sheets for the February 28, 1985 hearing, the Court will issue a supplemental order covering the additional time spent on this matter of contempt proceeding.

Let Judgment be entered accordingly.

**All Citations**

49 B.R. 704

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:07-bk-16085-LMI Doc 4 Filed 04/26/20 Page 24 of 80

APPENDIX A-4

Case 4:20 Case 207-1685-LMI Document 1 Filed 04/26/20 Page 85 of 80 in TXSD Page 8 of 63

314 B.R. 591
United States Bankruptcy Court,
S.D. Texas,
Houston Division.

In re EDWIN A. EPSTEIN, JR.
OPERATING CO., INC., Involuntary Debtor.

No. 04–50106–H1–7.
|
May 27, 2004.

**Synopsis**

**Background:** Following favorable postpetition ruling by arbitration panel, involuntary Chapter 7 debtor sought determination that stay did not apply to prevent it from pursuing its claims before arbitrators or, in alternative, moved for order annulling stay.

**Holdings:** The Bankruptcy Court, Marvin Isgur, J., held that:

automatic stay applied, not only to prevent other party to arbitration proceeding from asserting claims against debtor for its alleged tortious interference and slander of title in asserting an interest in oil and gas wells, but also to prevent arbitrators from hearing debtor's claims to replace this other party as operator of wells based on debtor's asserted ownership interest therein;

regardless of whether arbitrators had concurrent jurisdiction to decide whether automatic stay applied, their exercise of such jurisdiction was automatically stayed;

postpetition order of arbitration panel regarding effect of stay on arbitration, having been entered in violation of stay, was mere nullity, which had no binding effect on bankruptcy court under *Rooker–Feldman* doctrine; and

bankruptcy court would not annul stay to retroactively validate action taken by arbitrators at debtor's request.

Motion denied.

**Attorneys and Law Firms**

**\*593** Patrick D. Devine, Ware, Snow, Fogel & Jackson, LLP, William D. Wood, Adam T. Schramek, Fulbright & Jaworski, LLP, Houston, TX, for debtor.

Ronald J. Johnson, Attorney at Law, San Antonio, TX, for Supply Solutions of Texas, Inc., L.G.H. Inc. and Spinnsoft, Inc.

Richard L. Fuqua, Fuqua & Keim, LLP, Houston, TX, for Morningstar Gas, Inc.

Jonnie Patterson, Walker & Patterson, P.C., for Edward Abell, Jr. and Leo LeBlanc.

Diane G. Livingstone, Office of U.S. Trustee, Nancy Lynne Holley, U.S. Trustee, Houston, TX, for U.S. Trustee.

### MEMORANDUM OPINION

MARVIN ISGUR, Bankruptcy Judge.

By separate orders, this Court has (i) voided a determination made by an arbitration panel; and (ii) authorized the Involuntary Debtor to prosecute an interlocutory appeal of that same order. This memorandum opinion sets forth the basis for those decisions.

### Factual background.

In 1995, the Edwin A. Epstein, Jr. Operating Co., Inc. ("EEOC") obtained interests/leases in several oil and gas wells in Starr County, Texas. At the time, EEOC was solely owned by Edwin A. Epstein, Jr. In 2001, EEOC transferred its assets to Morningstar Gas, Inc. ("Morningstar"), resigned as the working interest operator, and named Morningstar as the successor operator. Morningstar is wholly owned by Veronica Epstein (Edwin A. Epstein's wife).

**\*594** On December 4, 2001, the David Clark Trust (the "Trust") executed on a judgment [1] against EEOC resulting in a sheriff's sale of EEOC's property interests in the leases of the oil and gas wells. On March 8, 2002, Baker Hughes Oilfield Operations, Inc. ("Baker Hughes") foreclosed on a security interest it held on the shares of EEOC. Baker Hughes is now the sole shareholder of EEOC. [2] After Baker Hughes installed

new management in EEOC, Baker Hughes discovered the 2001 sheriff's sale.

Less than a month after the foreclosure by Baker Hughes, EEOC filed for relief under chapter 11 of the bankruptcy code. [3] EEOC then filed adversary proceedings against Morningstar and the Trust for turnover. The Trust settled this dispute and EEOC dismissed the bankruptcy. The terms of the settlement were that the Trust and EEOC would each have a percentage of ownership in the Trust *res*. The Trust *res* consisted of the oil and gas interests executed on by the Trust. [4]

On May 10, 2002, EEOC attempted to remove Morningstar as the operator of the wells and appoint PetroReal, Inc. as operator. After Morningstar refused to relinquish the property, EEOC sued in the 169th District Court of Bell County, Texas. The litigation was then sent to compulsory arbitration by the state court on December 2, 2002. On September 9, 2003, before the arbitration panel could hear the merits of the dispute, Morningstar filed a petition for relief under chapter 11 and the arbitration was stayed by 11 U.S.C. § 362. [5] On October 10, 2003, Bankruptcy Judge Greendyke modified the automatic stay to allow the arbitration to proceed. [Case no. 03–42936 docket no. 30]. [6] The arbitration was again stopped on March 26, 2004 when an involuntary petition for relief was filed against EEOC. [7]

The filing of the involuntary petition under 11 U.S.C. § 303 invoked the automatic stay arising under 11 U.S.C. § 362. 2 COLLIER ON BANKRUPTCY ¶ 303.12 (15th ed.2004). Without seeking relief from the stay imposed by the EEOC involuntary petition, EEOC and Morningstar argued to the arbitration panel whether the automatic stay applied to the arbitration proceedings.

 **\*595** After considering legal arguments, the arbitration panel ruled that the stay did not apply to the pending action and proceeded to decide the merits of the dispute. Morningstar took the position that it could not participate without violating the stay. Accordingly, although Morningstar did not participate in the proceeding on the merits, the arbitration panel proceeded to hear the evidence presented by EEOC. Not surprisingly, EEOC prevailed.

Thereafter, on April 14, 2004, EEOC filed a Motion for Declaratory Ruling That No Stay Was In Effect, or Alternatively, For Order Annulling Stay, or Alternatively For

Relief From Stay in its own case [docket no. 94]. [8] The Court held an evidentiary hearing to determine EEOC's Motion for a Declaratory Ruling and made a preliminary determination that the automatic stay *did* apply to the arbitration proceeding. Nevertheless, the Court advised the parties that it would consider whether the Court should enforce or otherwise defer to the arbitration panel's determination.

The Court requested briefing on whether the arbitration panel had authority to determine the applicability of the automatic stay and if so, what level of deference should be given by the Court to the arbitration panel's determination that the stay did not apply.

After substantial briefing, these issues were taken up at a subsequent hearing in which the Court ruled that the automatic stay barred the panel from determining whether the automatic stay applied. EEOC later filed a motion for leave to appeal. The findings and conclusions in this memorandum opinion apply with equal force to the Court's determination to void the arbitration panel's decision and the Court's determination that EEOC should be allowed an interlocutory appeal. *See Federal Trade Comm'n. v. Enforma Natural Products, Inc.,* 362 F.3d 1204, 1216 n. 11 (9th Cir.2004); *Bodin v. Gulf Oil Corp.,* 877 F.2d 438, 440 (5th Cir.1989).

### *Was the arbitration proceeding subject to the stay?*

 EEOC stridently argues in it briefs and memoranda that the arbitration proceeding was not stayed because § 362 only stays actions *against* the debtor that could harm the estate. EEOC cites *Taraska v. Carmel,* 223 B.R. 200 (D.Ariz.1998) for the proposition that the automatic stay does not prevent the debtor from prosecuting a case that it instigated before the bankruptcy because such actions are not actions against the debtor. *See id.* at 202. EEOC then asserts:

> The only issues before the arbitration panel were the appointment of a temporary operator being requested by David Clark and EEOC to preserve the properties. There was no claim even before the arbitration panel which could have negatively affected EEOC's estate, as Morningstar has

already wrongfully misappropriated operations from EEOC.

[docket no. 7 at ¶ 43]. Therefore, EEOC reasons that because it had nothing to lose in the arbitration, the proceeding was not an action against the debtor.

While the logic of EEOC's argument is sound, it is inapposite to the evidence presented to the Court. Before EEOC was compelled to arbitration, Morningstar made a written demand for arbitration to EEOC.[9] Morningstar's written demand for arbitration requested the arbitration panel **\*596** to decide: (1) whether EEOC retained any title to the oil and gas; and (2) whether EEOC is liable for damages and the extent of those damages for:

(a) violating its obligations and agreements to submit all disputes to arbitration;

(b) interfering with the operation and development of the properties;

(c) interfering with the contractual rights and prospective business relations of Morningstar;

(d) making false and disparaging representations to third parties;

(e) violating its obligations respecting the confidentiality of information about the operation and development of the properties; and

(f) slander of title.

After this demand was made, the Bell County court issued its order compelling EEOC to arbitrate in accordance with the provisions of the specified letter agreement. This letter agreement expressly requires arbitration of all disputes "of any kind." Accordingly, the disputes raised in Morningstar's demand were included in the arbitration. Furthermore, title was put in issue by EEOC's pleadings in the state court suit and Morningstar's arbitration demand.[10]

In the EEOC/Morningstar arbitration proceeding, the arbitration panel was authorized by Judge Greendyke's order to consider all issues between the parties.[11] The only limitation on the arbitration was that the parties were instructed to return to the Court to confirm the arbitration panel's rulings. Therefore, at the time of the EEOC

involuntary petition, there was no restriction on the arbitration panel's ability to adjudicate the disputes between Morningstar and EEOC. Furthermore, on February 5, 2004—after the Morningstar stay was modified—the arbitration panel issued a letter ruling outlining the issues it would decide.[12] This letter ruling evidences the arbitration panel's specific intent to determine the "ownership issues." Finally, the demand for arbitration and the governing arbitration agreement show that the arbitration panel had *carte blanche* to determine all issues between the parties.

After the stay was lifted and the arbitration panel began hearing the disputes between the parties, EEOC requested the arbitration panel replace Morningstar as operator with a temporary operator. This temporary operatorship issue was the subject of the hearing that was interrupted by the involuntary petition. EEOC contends that even if the overall action is stayed, this specific sub-issue was not subject to the automatic stay and therefore the action did not constitute an action against the debtor. This argument basically assumes that the stay can be selectively applied to portions of a proceeding resulting in certain issues in a single action being stayed while others are not.

The Court recognizes authority stemming from *First Wisconsin National Bank v. Grandlich Development Corp.* (the "*First Wisconsin* authority") which is cited for the proposition that debtor's counterclaims are not stayed because they are not proceedings against the debtor. *See e.g.* **\*597** *Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1206 (3d Cir.1991) (citing *First Wisconsin National Bank v. Grandlich Development Corp.,* 565 F.2d 879 (5th Cir.1978)) (*per curiam*). Thus, the *First Wisconsin* authority envisions a bifurcation or severing of an action into stayed and non-stayed claims. While the Court recognizes that this approach may be appropriate for severable claims, it does not apply to situations involving non-severable compulsory counterclaims.

Federal Rule of Bankruptcy Procedure 7013 specifically incorporates FED. R.CIV. P. 13(a) to mandate parties to assert compulsory counterclaims in the principal suit. *See* FED. R. BANKR.P. 7013; *New York Life Ins. Co. v. Deshotel,* 142 F.3d 873, 882 (5th Cir.1998) ("[i]t is well settled that a failure to plead a compulsory counterclaim bars a party from bringing a later independent action on that claim") (citations omitted). Therefore the Court distinguishes the *First Wisconsin* authority to the extent that the authority does not consider the effect of a compulsory counterclaim

on the stayed action because such claims present the Court with an inextricably intertwined action that must be heard as a unit. Additionally, the purpose of Rule 13 is to prevent multiple actions and to achieve resolution in single lawsuit of all disputes arising out of common matters. *See Southern Const. Co. v. Pickard,* 371 U.S. 57, 61, 83 S.Ct. 108, 9 L.Ed.2d 31 (1962). Therefore, the Court finds it inapposite of the stated purpose of Rule 13 to divide the case into stayed/nonstayed segments when claims arise from the same transaction or occurrence as the underlying dispute. In any event, no severance occurred in the arbitration.

In the present case, the EEOC claims are subject to Morningstar's counterclaims discussed *supra.* Under FED. R. BANK. P. 7013 these counterclaims would be compulsory counterclaims because they arise out of the same transaction or occurrence and do not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. Therefore, the suit is of a type not considered in *First Wisconsin.*

Despite the Court's hesitancy to recognize the applicability of the *First Wisconsin* authority in situations involving compulsory counterclaims, even if the Court did accept it, the Court finds that EEOC's request for a temporary operator is merely an interlocutory request for relief and therefore not within the gambit of *First Wisconsin.* In this case, EEOC was seeking an interlocutory order replacing Morningstar temporarily as operator. Such interlocutory relief is a "continuation of a proceeding" under the plain language of § 362(a)(1) and not a separate proceeding that would be controlled by *First Wisconsin.*

However, even if the Court extended the *First Wisconsin* authority to compulsory counterclaim actions, and further found the interlocutory relief fit into this extension, the action would still be stayed because the Court finds that the temporary operator issue itself was subject to the stay along with the rest of the proceeding.

The temporary operatorship issue was EEOC's attempt to eject Morningstar as operator and insert PetroReal, because of the irreparable harm allegedly caused by Morningstar's continued operation of the leases. EEOC contends that this sub-issue was not an action against the debtor because if EEOC was not the operator, and the only relief sought was to appoint EEOC's selection as the operator, how could the action detract from the estate? Morningstar contends that there was more than just this temporary operatorship issue

at the hearing because it was necessary to make findings on the title issue to **\*598** determine the temporary operatorship issue. This claim is strengthened by the arbitration panel's letter ruling made on the temporary operatorship issue. In the letter ruling, the arbitration panel considered the title issue and found EEOC has a working interest in the lease.

Consequently, EEOC's assertion that the arbitration panel was only considering the temporary operatorship issue is inconsistent with the actual results. Instead, the arbitration proceedings both in their entirety and in this particular interlocutory sub-issue pertained to matters affecting title and claims for affirmative relief against EEOC. Had Morningstar participated in the arbitration, the arbitration panel may have made findings that EEOC did not have a working interest in the lease. Such a finding could then serve as the basis for not only a denial of PetroReal as the temporary operator, but as the predicate for the other issue including the tortious interference and other damage claims. These would constitute both actions against the debtor and actions against the estate under § 362(a)(1) and (6). Specifically § 362(a)(1) stays the "commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding *against the debtor* that was or could have been commenced before the commencement of the case under this title, or to recover a claim *against the debtor* that arose before the commencement of the case under this title." *Id.* (emphasis added). The working interest decision in the operatorship hearing and the totality of issues before the arbitration panel were subject to the automatic stay.

The working interest decision by the arbitration panel forms the basis of the business tort claims against EEOC because Morningstar alleges EEOC is slandering Morningstar and interfering with its business through EEOC's title claims. Accordingly, an adverse decision on the working interest issue decided by the arbitration panel would serve as the predicate to the business tort claims. This in turn means that the hearing that EEOC asserts was not against the debtor, was really a decision on the pivotal fact issue to EEOC's ultimate liability.

### *Did the arbitration panel have authority to determine whether the automatic stay applied?*

 Because the proceeding was subject to the automatic stay, the Court must consider whether the arbitration panel had the authority to determine the applicability of the stay. [13]

The U.S. Constitution gives Congress plenary power over bankruptcy thus allowing Congress to limit the jurisdiction that courts can exercise over the person and property of a debtor who duly invokes the bankruptcy law. U.S. CONST., art. I, § 8; *Kalb v. Feuerstein,* 308 U.S. 433, 439, 60 S.Ct. 343, 84 L.Ed. 370 (1940). The current bankruptcy jurisdictional statute, 28 U.S.C. § 1334, defines the role of the federal district courts in bankruptcy. Section 1334(a) provides, "[e]xcept as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). Section 1334(b) then provides:

> (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall **\*599** have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.
> 28 U.S.C. § 1334(b).

In light of this statutory backdrop, the Court is faced with the issue of what other tribunals are vested with jurisdiction to determine whether the automatic stay applies.

EEOC quotes *Coho Resources,* for the proposition that " 'the majority of jurisdictions have held concurrent jurisdiction to decide whether the stay applies to prepetition state court actions' ". [14] *See* Supplemental Brief, [docket no. 19] at pg. 3 (citing *Chapman v. Bituminous Ins. Co.* (*In re Coho Resources, Inc.*), 345 F.3d 338, 345 n. 24 (5th Cir.2003)). The Court disagrees with EEOC's implicit expansion of *Coho.*

*Coho* presented the Court *inter alia* with the narrow issue of whether an action against a chapter 11 debtor's indemnitor and its insurance companies were stayed by the debtor's petition for relief under the bankruptcy Code. *See id.* at 344–45.

When Coho filed bankruptcy, Coho's insurers removed a garnishment against them to federal court. The federal court required the plaintiff/tort creditor to petition the bankruptcy court for permission to execute the state court judgment. *Id.* at 340. On appeal from the bankruptcy court, the district court allowed the tort creditor to execute against the insurers but not the debtor. *Id.* at 342.

On appeal from the district court, the insurer ineffectively argued that the district court improperly delegated appellate authority to the Mississippi state courts regarding the

applicability of the automatic stay. *Id.* at 345. The Fifth Circuit denounced this proposition noting that state courts routinely rule on the applicability of the automatic stay in such situations. *Id.*

*Coho* stands for the proposition that state courts are authorized to rule on the effect of the automatic stay on third party non-debtors since the stay never applied to them in the first place. This is a much narrower reading than that assigned by EEOC. [15] Thus, while EEOC is correct that state courts have jurisdiction to rule on the applicability of the automatic stay to non-debtors, they do not have authority to do so when the automatic stay precludes the continuation of the proceeding against the debtor.

EEOC also cites *Sanders v. City of Brady (In re Brady, Texas Mun. Gas Corp.*), 936 F.2d 212, 217 (5th Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 748 (1991) for the proposition that state courts are entitled to make decisions regarding bankruptcy court matters unless the Bankruptcy Code specifically disallows them. Of relevance, *Sanders* states:

> [T]he only aspect of the bankruptcy proceeding over which the district courts and their bankruptcy units have exclusive jurisdiction is "the bankruptcy petition itself." *See In re Wood,* 825 F.2d 90, 92 (5th Cir.1987). In other matters arising in or related to title 11 cases, *unless the Code provides otherwise,* state courts have concurrent jurisdiction ... and bankruptcy courts are prohibited **\*600** from relitigating these matters if the state courts have already resolved them

*Sanders,* 936 F.2d at 218 (emphasis added; footnote omitted). In the context of the automatic stay the code *does provide otherwise.* It is undisputed that only a bankruptcy court has jurisdiction to terminate, annul or modify the automatic stay. 11 U.S.C. § 362(d); *see Farley v. Henson,* 2 F.3d 273 (8th Cir.1993); *Continental Cas., Co. v. Gullett,* 253 B.R. 796 (S.D.Tex.1999).

Thus, even though a state court has jurisdiction to unilaterally decide whether the automatic stay applies, and thus bind

the bankruptcy court by that decision through *res judicata* or the *Rooker–Feldman doctrine,* the issue of whether a state court has jurisdiction does not affect the outcome of this case. The issue is whether the exercise of that concurrent jurisdiction was automatically stayed by act of Congress. "[B]ecause only an order of the bankruptcy court can authorize any further progress in the stayed proceedings, it follows that the continuation of the [stayed] proceeding can derive legitimacy only from the bankruptcy court order." *Casperone v. Landmark Oil & Gas Corp.,* 819 F.2d 112, 114 (5th Cir.1987). Consequently, EEOC's reliance on *Coho and Sanders* is misplaced because concurrent jurisdiction is not the controlling question.

### *What is the effect of the automatic stay on the arbitration panel's power to determine whether the automatic stay applies?*

The automatic stay is effective upon the filing of the voluntary or involuntary bankruptcy petition. *See* 2 COLLIER ON BANKRUPTCY 303.12, (15th ed.2004); 11 U.S.C. §§ 303, 362(a); *In re Pierce,* 272 B.R. 198, 209 (Bankr.S.D.Tex.2001). It operates to enjoin the commencement or continuation of any judicial, administrative, or other proceedings against the debtor, enforcement of prior judgments, perfection of liens, and "any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case." § 362(a) (6). Specifically, the automatic stay applies to arbitration proceedings. [16]

When proceedings are stayed, only an order of the bankruptcy court can annul, modify, or terminate the stay. *See In re Cueva,* 371 F.3d 232, 236–37 (5th Cir.2004) ("[t]hrough the broad discretion granted bankruptcy courts ... § 362(d) provides that under certain conditions, when a party pursues retroactive annulment or modification of the automatic stay, a court may grant relief from a stay by 'terminating, annulling, modifying, or conditioning such stay.' ") (quoting § 362); *see also Farley,* 2 F.3d at 276.

Before the court can grant this relief, the court must find that there is "cause" to lift/modify/annul the stay. *In re Pierce,* 272 B.R. at 209 (citing § 362(d)). If the court annuls the stay, the annulment has the effect of eliminating it (or terminating it retroactively). *See Sikes v. Global Marine, Inc.,* 881 F.2d 176, 178 (5th Cir.1989) ("[t]he power to annul authorizes retroactive relief even unto the date of the filing of the petition

giving rise to the automatic stay"). Absent "cause" however, **\*601** the stay continues as follows: "in case of act against property of estate, until property is no longer property of estate, or, in case of other acts, until earliest of closing of case, dismissal of case, or time discharge is granted or denied." *Browning v. Navarro,* 743 F.2d 1069, 1083 (5th Cir.1984) (citations omitted). [17]

While the stay is in place, an act in violation of the stay is voidable. *See Sikes v. Global Marine, Inc.,* 881 F.2d 176, 178 (5th Cir.1989). While "voidable" appears to mean valid subject to being made invalid, it actually stands for the proposition that acts are invalid subject to subsequent validation. This distinction was endorsed by the Fifth Circuit's 1989 decision in *Sikes v. Global Marine, Inc.,* 881 F.2d 176 (5th Cir.1989). In *Sikes,* the court held that actions violative of the automatic stay are *voidable,* not void. In so holding, the court was simply using the correct terminology to indicate that, under some circumstances (like a bankruptcy court granting retroactive relief from the stay), an act that was originally null could be rendered valid by judicial act. *Id.* at 178. Where an action is violative of the stay and the action is not annulled, the "violation of the stay (is void), of no effect, and incurable." *In re Pierce,* 272 B.R. at 206 n. 16 (interpreting *Sikes,* 881 F.2d at 176). "And '[a]lthough it can be made valid by retroactive relief from the [automatic] stay, no one has a right to rely on the transaction until and unless it is validated by court action.' " *Cueva,* at 236–37 (quoting *Pierce,* at 208).

As applied to the facts of this case, the arbitration panel's decision to make a determination regarding the applicability of the automatic stay was itself a "continuation of a proceeding" as prohibited by § 362(a)(1) that was subject to the automatic stay as discussed *supra.* Therefore, the action of the arbitration panel is invalid unless the Court annuls the violation of the stay. *See Id.; Sikes,* 881 F.2d at 176. Absent such an annulment however, the decision remains invalid and is now declared to be void. *See Cueva,* at 236–37; *Sikes,* 881 F.2d at 176.

### *Does the Rooker–Feldman doctrine preclude the Court's consideration of stay issues?*

After concluding that the arbitration panel's decision was stayed, the next issue is whether the arbitration panel's erroneous decision that the stay did not apply has a preclusive

effect on the Court's ability to enforce § 362(a). This issue is often characterized as the *Rooker–Feldman* doctrine.

The *Rooker–Feldman* doctrine, named after two Supreme Court cases,[18] holds that the inferior federal courts lack jurisdiction to exercise appellate review over state court decisions. *See Reitnauer v. Tex. Exotic Feline Found., Inc. (In re Reitnauer),* 152 F.3d 341, 343 (5th Cir.1998) (describing the doctrine). As the Fifth Circuit explains:

**\*602** [F]ederal district courts, as courts of original jurisdiction, lack appellate jurisdiction to review, modify, or nullify final orders of state courts. If a state trial court errs the judgment is not void, it is to be reviewed and corrected by the appropriate state appellate court. Thereafter, recourse at the federal level is limited solely to an application for a writ of certiorari to the United States Supreme Court.

*Weekly v. Morrow,* 204 F.3d 613, 615 (5th Cir.2000) (quotations and citations omitted).

When presented with the identical question of whether a state court decision on applicability of the automatic stay has a preclusive effect on the bankruptcy court, the *en banc* Ninth Circuit decision *In re Gruntz,* 202 F.3d 1074 (9th Cir.2000) reasoned that it did not. The opinion reads:

In sum, by virtue of the power vested in them by Congress, the federal courts have the final authority to determine the scope and applicability of the automatic stay. "The States cannot, in the exercise of control over local laws and practice, vest State courts with power to violate the supreme law of the land." *Kalb,* 308 U.S. at 439, 60 S.Ct. 343, 84 L.Ed. 370. Thus, the *Rooker–Feldman* doctrine is not implicated by collateral challenges to the automatic stay in bankruptcy.[19] *A bankruptcy court simply does not conduct an improper appellate review of a state court when it enforces an automatic stay that issues from its own federal statutory authority.* In fact, a reverse *Rooker–Feldman* situation is presented when state courts decide to proceed in derogation of the stay, because it is the state court which is attempting impermissibly to modify the federal court's injunction.

*Gruntz,* 202 F.3d at 1083 (emphasis added).

Like the Ninth Circuit, the Court finds enforcement of the automatic stay does not implicate the *Rooker–Feldman* doctrine because enforcement of § 362 is not a review of a

state court decision, but rather a refusal to annul a violation of the stay. *Sikes,* 881 F.2d at 176. Consequently the arbitration panel's letter ruling does not have a preclusive effect on the bankruptcy court because the order was a nullity when made.

### Should the Court annul the violation of the stay to retroactively validate the arbitration panel's decision?

EEOC alternatively requests the Court to retroactively annul the violation of the stay under § 362(d) to validate the arbitration panel's letter ruling. While the Bankruptcy Code grants a bankruptcy judge the equitable discretion to annul the automatic stay "for cause," it is unique because it asks the court to approve post-petition action which violated the automatic stay. 11 U.S.C. § 362(d); *In re Elder–Beerman Stores Corp.,* 195 B.R. 1012 (Bankr.S.D.Ohio 1996). In the present case, Morningstar refused to participate in the arbitration proceeding because it correctly determined the proceeding violated the automatic stay. Under these circumstances, the Court finds that it would be **\*603** inequitable to annul the stay violation to the detriment of a party that respected and relied on the stay. Therefore, the Court refuses to annul the violation of the automatic stay.

### The purpose of the stay and the policies of the Bankruptcy Code are furthered by the Court's interpretation.

The purposes of the bankruptcy stay under § 362 "are to protect the debtor's assets, provide temporary relief from creditors, and further the equity of distribution among the creditors by forestalling a race to the courthouse." *Reliant Energy Servs., Inc. v. Enron Canada Corp.,* 349 F.3d 816, 825 (5th Cir.2003) (quoting *GATX Aircraft Corp. v. M/V Courtney Leigh,* 768 F.2d 711, 716 (5th Cir.1985)). This in turn protects creditors' postpetition expectations in a manner consistent with bankruptcy goal of equal treatment by halting prepetition proceedings that would otherwise result in a chaotic and uncontrolled scramble for debtor's assets in variety of uncoordinated proceedings in different courts. *See Hunt v. Bankers Trust Co.,* 799 F.2d 1060, 1068 (5th Cir.1986).

Consequently, if a non-federal forum's incorrect determination of whether the stay applies could bind a federal court to its determination of whether the stay applies, the bankruptcy court would lose its role as the

"gatekeeper," exposing the debtor to the risk of defending suits in numerous forums. This is exactly the "chaotic and uncontrolled scramble" the Code was designed to prevent. This could create situations in which non-federal forums may inadvertently subvert the rights and goals of the Bankruptcy Code by violating a Congressionally-imposed injunction.

Therefore, the Court finds that EEOC's Motion for Declaratory Ruling (docket no. 7) is denied and the arbitration letter ruling dated April 12, 2004 is declared void. Nevertheless, the Court recognizes (as set forth in this opinion) that EEOC's position is not without some limited support. Accordingly, the Court grants EEOC's motion for leave to appeal the order.

**All Citations**

314 B.R. 591

## Footnotes

1   On August 22, 2001, Nabors Drilling USA assigned a judgment against EEOC to Roy L. Barnes, in his capacity as "Trustee." On August 17, 2001 however, Roy L. Barnes, Trustee, had already assigned all of his rights in and to the Nabor's judgment to David Clark, Trustee. The validity of the Clark/Barnes/Nabor's transactions is not addressed in this opinion.

2   Baker Hughes became the sole shareholder as the result of a Louisiana state court lawsuit in which EEOC and its president Edwin Epstein entered into a consent judgment and settlement agreement in which he pledged all of the stock in EEOC to Baker Hughes as collateral for the settlement payments. Thereafter, he defaulted on the payments and Baker Hughes foreclosed on the stock.

3   *In re Edwin Epstein Operating Company, Inc.,* Case No. 02–33726.

4   This distribution is contested by other parties in interest that claim there was no trust *res* because the Trust made a distribution of all Trust property.

5   All references to "§ 362" or the "automatic stay" refer to 11 U.S.C. § 362 and its subsections.

6   This modification allowed the arbitration to continue with the parties returning to the Court for confirmation of the Panel's orders.

7   This case was transferred to this Court on March 23, 2004 because its relatedness to the Morningstar case. [docket no. 6]. The Morningstar case had been transferred to this Court after Bankruptcy Judge Greendyke recused.

8   On April 12, 2004, EEOC also filed a motion to confirm the arbitration order in the Morningstar case (as required by Judge Greendyke's order).

9   Morningstar also made a similar demand for arbitration upon David Clark.

10  *See Edwin A. Epstein, Jr. Operating Company, Inc. v. Morningstar Gas, Inc.,* Cause No. 193,331–D, In the District Court of Bell County, Texas, 169th Judicial District, EEOC original petition at ¶¶ 12, 18.

11  It should be noted that the order even encourages that parties and the panel to take up the title issue. [Case no. 03–42936 docket no. 30].

12  The letter ruling additionally leaves the door open for the parties to submit legal issues for the arbitration panel's determination at any time.

13  Because it does not affect the outcome of the decision, the Court makes no finding as to the nature and extent of the arbitration panel's authority. Rather, the Court presumes the arbitration panel has the full grant of the authority of the state court referring the matter to arbitration.

14  EEOC also cites numerous decisions stating the federal district courts have concurrent jurisdiction. The Court agrees with these cases because the district courts (from which the bankruptcy courts derive their jurisdiction) retain jurisdiction over the bankruptcy case. *See Picco v. Global Marine Drilling Co.,* 900 F.2d 846, 850 (5th Cir.1990).

15  EEOC elects to cite snippets of the opinion, without analyzing the facts of the case.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.     8

16    *See generally* Mette H. Kurth, Comment, *An Unstoppable Mandate and an Immovable Policy: The Arbitration Act and the Bankruptcy Code Collide,* 43 U.C.L.A. L.REV. 999 n. 102 (1996) (citing ABA Creditors' Rights Subcommittee Program, National Conference of Bankruptcy Judges, *The Effect of Bankruptcy on Arbitration- and Vice Versa* 1 (1990); H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6296–97 (stating that the automatic stay under 11 U.S.C. § 362 encompasses arbitration proceedings)).

17    11 U.S.C. § 362(c) states: Except as provided in subsections (d), (e), and (f) of this section—(1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate; and (2) the stay of any other act under subsection (a) of this section continues until the earliest of—(A) the time the case is closed; (B) the time the case is dismissed; or (C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied.

18    *D.C. Ct.App. v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

19    *See Appeal of Gajkowski (In re Highway Truck Drivers & Helpers Local Union # 107*), 888 F.2d 293, 299 n. 9 (3d Cir.1989) (noting, in the context of a challenge to the automatic stay, that the "*Rooker–Feldman* doctrine does not preclude a collateral attack of state court proceedings or judgments in the context of an appeal involving an exclusive federal question"); *compare Reitnauer v. Texas Exotic Feline Found., Inc. (In re Reitnauer*), 152 F.3d 341, 344 (5th Cir.1998) ("applying *Rooker–Feldman* to bar district court review, in bankruptcy case, of state court judgment on state constitutional grounds)." *Gruntz,* 202 F.3d at 1083 n. 8.

---

**End of Document**                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 20-14695-LML Document 41-1 Filed on 04/26/20 in TXSD Page 17 of 63

APPENDIX A-5

195 B.R. 1019
United States Bankruptcy Court,
S.D. Ohio,
Western Division.

In re The ELDER–BEERMAN
STORES CORP., et al., Debtors.
The ELDER–BEERMAN STORES CORP., Plaintiff,
v.
THOMASVILLE FURNITURE
INDUS. INC., Defendant.

Bankruptcy No. 95–33643.
|
Adv. No. 96–3047.
|
May 3, 1996.

**Synopsis**

Chapter 11 debtor-retailer sought to enjoin furniture manufacturer from terminating its sales distribution contract and sought damages for breach of contract. The Bankruptcy Court, William A. Clark, Chief Judge, held that: (1) manufacturer's actions in attempting to cancel its contract with debtor following filing of bankruptcy petition violated automatic stay; (2) manufacturer's attempted termination of contract was void ab initio; and (3) request for injunctive relief was moot.

Injunction denied.

**Attorneys and Law Firms**

**\*1019** Richard M. Cieri, Cleveland, Ohio, for debtor.

Lawrence E. Oscar, Hahn Loeser & Parks, Cleveland, Ohio.

**\*1020** William B. Sullivan, Womble Carlyle Sandridge & Rice, Winston–Salem, North Carolina.

Richard A. Chesley, Jones, Day, Reavis & Pogue, Columbus, Ohio.

Randy T. Slovin, Mason Slovin & Schilling Co., L.P.A., Cincinnati, Ohio.

DECISION AND ORDER FINDING VIOLATION OF
AUTOMATIC STAY AND DENYING INJUNCTION

WILLIAM A. CLARK, Chief Judge.

FINDINGS OF FACT

1. Plaintiff Elder–Beerman ("Elder–Beerman") is a corporation organized under the laws of the State of Ohio. Elder–Beerman is a complex enterprise engaged in the ownership, operation, and management of retail department stores, furniture stores, and related businesses throughout the United States.

2. Defendant Thomasville Furniture Industries, Inc. ("Thomasville") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Thomasville, North Carolina. Thomasville is engaged in the business of manufacturing furniture and related products.

3. Elder–Beerman has purchased and distributed Thomasville products for over 35 years. As early as 1985, the parties entered into a written contract for the sale and distribution of Thomasville furniture products. That contract contained a provision allowing either party to terminate without cause. Over the years, the relationship between Elder–Beerman and Thomasville expanded, and other written agreements were entered into. All of the agreements allow for termination without cause.

4. From the beginning of the relationship between the parties and through the mid–1970s, the Thomasville furniture line was an integral part of the Elder–Beerman furniture operation. Thomasville gave Elder–Beerman instant name recognition in the furniture business, and helped bolster the performance of those departments, as well as the franchise as a whole.

5. Thomasville is well-respected in the furniture industry. Mr. Max Gutmann, CEO of Elder–Beerman, stated that Thomasville is a "fine name" and is an essential line within Elder–Beerman's furniture market. Ron Bultema, Elder–Beerman's Divisional Merchandising Manager, stated that Thomasville is the "foundation" of his business. Thomasville's share of Elder–Beerman's

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

furniture business has been characterized as a "lion's share" (more than 40%).

6. Although Thomasville sales represent less than 1% of Elder–Beerman's total sales revenues, this figure is misleading. Thomasville acts as a promotional leader line for Elder–Beerman. That is, customers are attracted to shop at Elder–Beerman because of the Thomasville name. As such, having the Thomasville line in its stores contributes to sales for Elder–Beerman both inside and outside of the furniture line.

7. Because of Thomasville's wide range of products, it may take as many as six to nine vendors to replace Thomasville in the Elder–Beerman stores. Adding additional vendors will require significant changes in Elder–Beerman's operations. There are complications with multiple delivery sources and order deadlines, dealing with different representatives and invoices, advertising, and more vendors means less sales volume with each individual vendor, which in turn may mean less incentives offered to Elder–Beerman from each vendor. In addition, Elder–Beerman's salespeople must be retrained to sell the new vendors' products.

8. In the course of the parties' relationship, Elder–Beerman has also expended a great deal of time and money in order to meet with Thomasville's standards.

9. Between 1989 and 1994, Elder–Beerman renovated four of its stores in order to accommodate Thomasville Galleries. These Galleries were located at Elder–Beerman's Northtowne, Northwest, Southtown, and Fairborn locations.

10. In order to comply with Gallery Agreements, Elder–Beerman agreed to expend **\*1021** substantial amounts of its own funds to renovate portions of its stores in accordance with Thomasville's Gallery blueprints. The total expenditures on these galleries exceed $300,000. Elder–Beerman constructed, painted, wallpapered, lit, and furnished the Gallery areas to Thomasville's specifications.

11. In addition to the significant amount of time and money that Elder–Beerman spent to build its Thomasville Galleries, Elder–Beerman also eliminated its relationships with other furniture manufacturers to make room for additional Thomasville lines. Elder–Beerman made these sacrifices because Thomasville offered a well-established, recognized name, quality

products at the upper middle range of price points, and the opportunity to control distribution in the Dayton trading area.

12. Thomasville strongly supported its relationship with Elder–Beerman during 1994 and 1995. For example, on August 1, 1994, Michael Nesbit, Thomasville's representative to Elder–Beerman, wrote a memo to Bill Carrico, his supervisor, concerning the November grand opening of Elder–Beerman's fourth Thomasville Gallery at its Fairborn location. Because Thomasville was Elder–Beerman's "number one vendor and growing," Mr. Nesbit recommended that Thomasville offer Elder–Beerman support in the form of $22,500 of products discounts and cooperative advertising funds. As justification for this expenditure, Mr. Nesbit indicated his confidence that the Elder–Beerman relationship would continue to be profitable for Thomasville.

13. Other indicators show that Elder–Beerman's dealings in the Thomasville line prior to bankruptcy were productive. In March 1995, Thomasville approved Elder–Beerman for yet another Thomasville Gallery at its Salem Avenue store. And in September of 1995, Michael Nesbit, Elder Beerman's Thomasville representative, in an internal memorandum to his supervisor, Dave Scarangella, informed him Elder–Beerman was considering building up to five more Thomasville Galleries.

14. In addition, from 1993 through 1995, delivery and return problems from Elder–Beerman markedly decreased. During this period, Elder–Beerman's return ratio was less than Thomasville's national average.

15. The healthy relationship between Elder–Beerman and Thomasville continued into 1995. During that year, Elder–Beerman's sales of Thomasville furniture products "dramatically increased," according to Mr. Nesbit. Estimates show the sales figures increased from $1.6 million in 1994 to $2,226,000 in 1995. Moreover, projections for the 1996 fiscal year showed that Elder–Beerman would continue to grow, and could meet or exceed Thomasville's $3 million sales goal, goals which none of Thomasville's vendors had met in 1995.

16. On January 4, 1995, Mr. Nesbit recommended a "customized" discount program for Elder–Beerman that coordinated Thomasville's promotions with Elder–Beerman's advertising schedule. These flat-

rate discounts allowed Elder–Beerman to better take advantage of Thomasville's discounts when planning its own sales. According to Mr. Nesbit, these discounts were "much more responsive to growing business with Elder–Beerman."

17. On September 11, 1995, Mr. Nesbit wrote another memo to Scarangella recommending strong support for Elder–Beerman's stores. In this memo, Mr. Nesbit pointed out that Elder–Beerman had already doubled its volume with Thomasville and added that Thomasville made up 25% of Elder–Beerman's total furniture business, and approximately 50% of its case goods business. Because Mr. Nesbit approved of Ron Bultema, Elder–Beerman's new Divisional Merchandising Manager, and thought that it "behooved" Thomasville to help stabilize Elder–Beerman, he recommended a flat-rate discount for the first half of 1996 and possibly the last quarter of 1995.

18. On October 10, 1995, just seven days before Elder–Beerman filed its bankruptcy petition, Mr. Nesbit again recommended that Thomasville offer Elder–Beerman special promotions that could be coordinated **\*1022** with Elder–Beerman's advertising schedule. These plans were approved by Mr. Scarangella on October 12, 1995.

19. Prior to the Chapter 11 petition, Thomasville had grown to represent 25% of Elder–Beerman's wood products business with projected annual sales in excess of $2.5 million. It has been estimated that termination of the Thomasville product line may result in lost sales of $750,000 in wood products and $400,000 in upholstery business.

20. On October 17, 1995, Elder–Beerman and certain of its subsidiaries filed voluntary petitions for protection under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in this court.

21. Immediately upon the filing of Elder–Beerman's bankruptcy petition on October 17, 1995, the relationship between Elder–Beerman and Thomasville changed dramatically.

22. Thomasville notified Elder–Beerman that the customized promotional program designed specifically for Elder–Beerman by Thomasville had terminated with the bankruptcy petition. Thomasville never offered Elder–Beerman another discount or promotional

incentive until April 12, 1996, just one week prior to the hearing April 19, 1996.

23. On October 18, 1995, Thomasville demanded that Elder–Beerman return all previously shipped merchandise. On October 19, 1995, Thomasville stopped all shipments to Elder–Beerman. Thomasville did not resume shipments until Elder–Beerman furnished Thomasville with a $300,000 security, in early December.

24. On October 20, 1995, Charles Shaffer, Elder–Beerman's General Merchandising Manager, and Ron Bultema met with Thomasville representatives to discuss the bankruptcy filing. Thomasville had already, earlier in the day, taken steps to replace Elder–Beerman as they met with Larry Klaben of Morris Furniture, an Elder–Beerman competitor in Dayton.

25. At the October 20th meeting, Ron Berrier, Thomasville's Treasurer, expressed Thomasville's "extreme displeasure over the filing and emphatically indicated that (Thomasville) would not ship orders in the backlogue [sic]." In addition, Terry Funk, Thomasville's Credit Manager, asked how Elder–Beerman was able to file for bankruptcy given the fact that it had an $80 million net worth. Finally, Mr. Berrier, on behalf of Thomasville, expressly stated, "we [have] no intention of continuing to do business with [Elder–Beerman]."

26. Thomasville has offered Elder–Beerman little or no support since the bankruptcy petition. Mr. Nesbit, Thomasville's representative to Elder–Beerman, has stopped his once regular store visits. Thomasville invited the president of Morris Furniture to the Midwest Dealer's Meeting, sponsored by Thomasville, in Chicago, Illinois, yet failed to invite representatives from Elder–Beerman. In addition, Thomasville failed to offer Elder–Beerman any of its regular factory discounts until the week prior to a hearing on April 19, 1996.

27. On January 22, 1996, Thomasville sent notice to Elder–Beerman that Thomasville was severing the parties' long-standing relationship. In the notice Thomasville stated that it would "allow orders for a 60–day period to allow [Elder–Beerman] to balance inventory and process sold orders."

28. On March 14, 1996, before the expiration of the 60–day period, Elder–Beerman filed a Verified Complaint for Injunctive Relief. On the same day, Elder–

Case 4:20-cv-14695-LMPnt Dpc4 tem Filed 04/26/20 in TXSD Page 38 of 80
In re Elder-Beerman Stores Corp., 195 B.R. 1019 (1996)
35 Collier Bankr.Cas.2d 1446
Case 4:20-cv-14695-LMPnt Dpc4 Filed on 04/26/20 in TXSD Page 21 of 63

Beerman moved for a temporary restraining order and a preliminary injunction. This court issued its Temporary Restraining Order (the "Order") on that date.

29. On March 22, 1996, Elder–Beerman filed its First Amended Complaint which, in addition to seeking injunctive relief, requested damages for Thomasville's breach of contract, both express and implied.

30. Subsequent to a hearing on April 19, 1996, both parties have adjusted their pleadings to address issues of the automatic stay. The matter currently before the court is Elder–Beerman's Emergency Motion for Preliminary Injunction, and request for injunctive relief under Elder–Beerman's First Amended Complaint.

**\*1023** CONCLUSIONS OF LAW

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) & 1334. This proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (O).

Procedurally, this matter arose from Elder–Beerman's request for a preliminary injunction. It is clear, however, that the parties now recognize that the underlying legal principle is the automatic stay, and that so long as the stay remains in effect, other injunctive relief is inappropriate.

Had the parties not raised the issue of the automatic stay, the court would still be empowered to address stay violations *sua sponte. In re Laventhol & Horwath,* 139 B.R. 109, 116 n. 6 (S.D.N.Y.1992) ("[I]f necessary, the Bankruptcy Court could *sua sponte* modify the automatic stay...."); *Furness v. Lilienfield,* 35 B.R. 1006 (D.Md.1983) (modifying stay *sua sponte* ); *Putnam County Sav. Bank v. Bagen* (*In re Bagen* ), 185 B.R. 691, 701 (Bankr.S.D.N.Y.1995) (modifying the stay *sua sponte* ); *Swift v. Bellucci* (*In re Bellucci* ), 119 B.R. 763, 779 (Bankr.E.D.Cal.1990) ("[B]ankruptcy courts may lift the automatic stay *sua sponte* notwithstanding the language in section 362(d) that permits a 'party in interest' to seek relief from the automatic stay."); *James v. Draper* (*In re James* ), 112 B.R. 687, 700 (Bankr.E.D.Pa.), *aff'd in part, vacated in part on other grounds,* 120 B.R. 802 (E.D.Pa.1990), *rev'd on other grounds,* 940 F.2d 46 (3d Cir.1991) ("The court is obliged to raise the issue of the application of the automatic stay *sua sponte.*"); *In re Clark,* 69 B.R. 885, 890 n. 1 (Bankr.E.D.Pa.1987) ( "[W]e have a duty to raise obvious defenses to, as well as the issue of, the impact of the stay *sua sponte.*").

Bankruptcy courts then have the power, whether on the request of a party in interest or *sua sponte,* to consider both what acts constitute a violation of the stay and whether or not relief from stay is appropriate. The matter of relief from stay has already been considered in a separately issued decision, where the court declined to annul or terminate the stay. The court therefore concerns itself here solely with determining whether or not Thomasville's attempted termination on January 22, 1996, was in violation of the automatic stay, and subsequently what effect that determination has on Elder–Beerman's request for injunctive relief.

The stay protection in § 362 is "automatic and mandatory" with the filing of the petition. *Cathey v. Johns–Manville Sales Corp.,* 711 F.2d 60, 62 (6th Cir.1983). The debtor need not make any motion in the bankruptcy court to invoke its protection. *Ostano Commerzanstalt v. Telewide Sys., Inc.,* 790 F.2d 206, 207 (2d Cir.1986).

The automatic stay protects against "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3) (1994).

Property of the estate is defined in 11 U.S.C. § 541(a). Such property includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1994). The legislative history to § 541 indicates property of the estate is to be interpreted quite broadly. "It includes all kinds of property, including tangible or intangible property [and] causes of action...." H.R.Rep. No. 595, 95th Cong., 1st Sess. 367–68 (1977), *reprinted in* 1978 U.S.C.C.A.N. at 5963, 6323 (1978).

Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay. *Pester Refining Co. v. Insurance Co. of North Am.* (*In re Pester Refining* ), 58 B.R. 189, 192 (Bankr.S.D.Iowa 1985) ("Contractual rights constitute intangible property which is included within the definition of property of the estate"); *Wegner Farms Co. v. Merchants Bonding Co.* (*In re Wegner Farms Co.*), 49 B.R. 440, 443 (Bankr.N.D.Iowa 1985) (same); *Varisco v. Oroweat Food Co.* (*In re Varisco* ), 16 B.R. 634, 637 (Bankr.M.D.Fla.1981) (same); *accord In re Cardinal Industries, Inc.,* 116 B.R. 964, 971 (Bankr.S.D.Ohio 1990).

Courts have also consistently held that the automatic stay also applies to notices of termination. **\*1024** *Rogue*

*Valley Stations, Inc. v. Birk Oil Co.,* 568 F.Supp. 337, 348 (D.Or.1983) ("automatic stay prevents franchisor from sending notice of termination or nonrenewal without first securing appropriate relief from stay from the Bankruptcy Court"); *A. Dan Chisholm, Inc. v. B.P. Oil Inc.* (*In re A. Dan Chisholm, Inc.*), 57 B.R. 718, 719–20 (Bankr.M.D.Fla.1986) ("Any notice [of termination] sent in violation of the automatic stay is void and without effect").

As in the instant case, courts have not hesitated to retain the stay, even when one party would otherwise have the power to terminate "at will." This result is best demonstrated in the area of insurance policies. *Minoco Group of Cos., Ltd. v. First State Underwriters Agency of New England Reins. Corp.* (*In re Minoco Group of Cos., Ltd.*), 799 F.2d 517, 519 (9th Cir.1986) (staying the right to cancel insurance policy under § 362); *Pester Refining Co. v. Insurance Co. of North Am.* (*In re Pester Refining Co.*), 58 B.R. 189, 192 (Bankr.S.D.Ia.1985); *In re B. Siegel Co.,* 51 B.R. 159, 163–64 (Bankr.E.D.Mich.1985); *In re Garnas* (*Garnas v. American Family Mut. Ins. Co.*), 38 B.R. 221, 223–24 (Bankr.D.N.D.1984).

Thus while parties may otherwise be permitted to terminate an agreement under state contract law, in bankruptcy such a termination would be in violation of the stay, and the parties must seek permission of the court to act. *Computer Communications, Inc. v. Codex Corporation* (*In re Computer Communications, Inc.*), 824 F.2d 725, 729 (9th Cir.1987) (holding that even an unassumable executory contract would be protected from termination by the automatic stay); *In re M.J. & K. Co., Inc.,* 161 B.R. 586, 595 (Bankr.S.D.N.Y.1993) (granting relief from stay for law school to exercise at will termination clause against debtor); *Sanden v. Chautauqua Capital Corp.* (*In re Chautauqua Capital Corp.*), 135 B.R. 779 (Bankr.W.D.Pa.1992) (granting relief from stay for landlord to evict tenant at will); *Coates v. Peachtree Apartments* (*In re Coates* ), 108 B.R. 823, 826 (Bankr.M.D.Ga.1989) ("[E]ven a month-to-month tenancy at will is property of the estate which debtor's landlord cannot terminate until the landlord obtains relief from the automatic stay."); *Schewe v. Fairview Estates* (*In re Schewe* ), 94 B.R. 938 (Bankr.W.D.Mich.1989) (same).

Finally, much time and energy by the parties has been spent arguing whether or not this contract is executory, and if it is, whether § 365(e)(1) should apply. Because of the court's holding on the automatic stay, which applies whether or not

the contract is executory, *In re Pester Refining,* 58 B.R. at 191, this issue has become moot.

It is therefore clear, that Thomasville's actions in attempting to cancel its contract with Elder–Beerman were in violation of the automatic stay.

The treatment of violations of the stay has varied within the Circuits. The Bankruptcy Code does not state whether such acts are to be treated as void or voidable. Until recently each of the Circuits but one that had considered the void/voidable question had concluded that actions taken in violation of the automatic stay are void. *See In re Smith Corset Shops, Inc.,* 696 F.2d 971, 976 (1st Cir.1982); *In re 48th Street Steakhouse, Inc.,* 835 F.2d 427, 431 (2d Cir.1987), *cert. denied,* 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988); *Raymark Indus., Inc. v. Lai,* 973 F.2d 1125, 1132 (3d Cir.1992); *N.L.R.B. v. Edward Cooper Painting, Inc.,* 804 F.2d 934, 940 (6th Cir.1986); *Matthews v. Rosene,* 739 F.2d 249, 251 (7th Cir.1984); *In re Schwartz,* 954 F.2d 569, 574 (9th Cir.1992); *In re Calder,* 907 F.2d 953, 956 (10th Cir.1990); *Borg–Warner Acceptance Corp. v. Hall,* 685 F.2d 1306, 1308 (11th Cir.1982); *Bronson v. U.S.,* 46 F.3d 1573, 1579 (Fed.Cir.1995). *But see Picco v. Global Marine Drilling Co.,* 900 F.2d 846 (5th Cir.1990) ( "[A]ctions taken in violation of an automatic stay are not void.").

The Sixth Circuit, however, has recently reversed its position, holding that actions taken in violation of the automatic stay are not void, but voidable. *Easley v. Pettibone Michigan Corp.,* 990 F.2d 905, 909–11 (6th Cir.1993). Implicit in the Sixth Circuit's reasoning is that as void acts are incapable of cure, the power to cure past violations by annulling under § 362(d) precludes these violations from being void. *Easley,* 990 F.2d at 910. They must, therefore, be voidable. *Id.* In so doing, however, the Circuit made it clear that in general violations should still be **\*1025** treated as void, that "any exception to the stay must be applied sparingly." *Easley,* 990 F.2d at 911 (quoting *In re Smith,* 876 F.2d 524 (6th Cir.1989)).

While it is therefore clear that Thomasville's actions were in violation of the automatic stay and thus technically voidable, *Easley* also makes it clear that in general these acts will be treated as void.

It is the court's conclusion that Thomasville's attempted termination of the contract should be treated as void *ab initio,* and that the contract is presently intact. As this court has previously declined to terminate, annul, modify, or condition

the stay, the stay remains in effect. There is therefore no immediate danger of the sales distribution contract being terminated. Consequently, Plaintiff's request for injunctive relief against Thomasville and Morris Furniture Co., Inc. is moot, and should be, and hereby is DENIED.

The court sets a pretrial telephone conference on the Second Cause of Action in the complaint and on the issue of 11 U.S.C. § 362(h) damages for *Thursday, May 16, 1996, at 10:00 a.m.,* and a hearing for damages arising from the breach of sales and distribution contract and violation of the automatic stay for *Tuesday, July 2, 1996, at 9:30 a.m.*

**All Citations**

195 B.R. 1019, 35 Collier Bankr.Cas.2d 1446

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX A-6

327 B.R. 796
United States Bankruptcy Court,
S.D. Texas,
Houston Division.

In re Ricky Lynn GANDY, Debtor.
In re Elvia Diaz, Debtor.
Elvia Diaz, Plaintiff,
v.
State of Texas, Defendant.

Bankruptcy Nos. 05–30651–
H1–13, 05–32244–H2–13.
|
Adversary No. 05–3253.
|
July 18, 2005.

**Synopsis**
**Background:** Chapter 13 debtor brought adversary proceeding for determination that State of Texas had violated automatic stay, and state defended on theory that its actions came within "police and regulatory power" exception to automatic stay. In separate Chapter 13 case, Texas county and the Texas Commission on Environmental Quality moved for determination of nonapplicability of automatic stay to their actions.

**Holdings:** Issuing joint memorandum, the Bankruptcy Court, Marvin Isgur, J., held that:

county and commission, in pursuing cause of action for purely injunctive relief to prevent debtor's alleged continuing violations of Texas environmental law, came within "police and regulatory power" exception to automatic stay; and

state's conduct, in pursuing cause of action both for injunction and for entry of monetary judgment against Chapter 13 debtor based on her alleged violation of Texas consumer protection law, also came within "police and regulatory power" exception to stay.

So ordered.

**Attorneys and Law Firms**

**\*798** Reese W. Baker, Baker & Associates LLP, Houston, TX, for Debtor Ricky Lynn Gandy.

Richard W. Aurich, Jr., Baker & Associates LLP, Houston, TX, for Debtor Elvia Diaz.

Hal F. Morris, Asst. Atty. Gen. (argued), Ashley F. Bartram, Asst. Atty. Gen., Texas Atty. General's Office for Texas Commission on Environmental Quality (TCEQ) and State of Texas.

Clarissa K. Bauer, Asst. County Atty., Harris County Atty.'s Office, for Creditor Harris County.

*JOINT MEMORANDUM OPINION*

MARVIN ISGUR, Bankruptcy Judge.

On April 22, 2005, this Court issued an **\*799** order in *In re Gandy,* [1] finding that the automatic stay did not apply to a prepetition state court lawsuit brought by governmental units against Mr. Gandy. On April 29, 2005, this Court denied an Application for a Temporary Restraining Order in *Diaz v. State of Texas,* [2] finding that the automatic stay did not apply to a prepetition state court suit brought by the State of Texas against Ms. Diaz. The two decisions involve substantially similar questions of law. This Joint Memorandum Opinion provides the findings and conclusions on which the decisions were based.

**Gandy Background**

On March 24, 2004, Harris County filed a lawsuit in state court against Mr. Gandy for violations of various state environmental laws, including the Texas Solid Waste Disposal Act and the Texas Clean Air Act. In the state court suit, the County requested injunctive relief, fees and costs. On June 25, 2004, the Texas Commission on Environmental Quality intervened in the suit. The principal allegation in the lawsuit is that Mr. Gandy used his property to store debris from site clearing and construction projects. The bulk of the debris was comprised of wood products (such as tree stumps) and used building materials. The governmental units allege that Mr. Gandy's present use of the property violates Texas law. On August 4, 2004, the state court issued a temporary

restraining order concerning Mr. Gandy's alleged violations of state environmental laws.

On January 11, 2005, Mr. Gandy filed a petition for relief under chapter 13 of the Bankruptcy Code. Mr. Gandy then filed a suggestion of bankruptcy in the state court requesting "the observance of the Stay Order under § 362." Pursuant to Mr. Gandy's suggestion—and in spite of the governmental units' arguments that the suit was not subject to the automatic stay—the state court stayed all proceedings.

On March 17, 2005, Harris County and the Texas Commission on Environmental Quality filed their Amended Motion to Determine the Non–Applicability of Stay Pursuant to 11 U.S.C. § 362(b)(4). Mr. Gandy filed a response on April 14, 2005. The Court conducted a hearing on this matter on April 22, 2005. At the conclusion of the hearing, the Court issued an order determining that the stay did not apply to the state court suit.

### Diaz Background

On February 3, 2005, the State of Texas filed a lawsuit against Ms. Diaz in the 113th Judicial District Court of Harris County. The lawsuit alleges that Ms. Diaz committed consumer fraud under the Deceptive Trade Practices Act related to her work as a notary public. In general, the lawsuit alleges that Ms. Diaz misrepresented her services as a "notario" with the effect of misleading Houston's large Mexican immigrant population into believing that she could serve as an attorney. The State alleges that the term "notario" is a term used by licensed attorneys in Mexico and that Ms. Diaz is intending to mislead the public in violation of Texas law. [3]

On February 13, 2005, Ms. Diaz filed a petition for relief under chapter 13. Apparently, Ms. Diaz's state court counsel signed an agreed order stipulating to the non-applicability of automatic stay to the proceeding. Despite this agreed order, Ms. Diaz filed an application for a temporary restraining order to prevent the state **\*800** court from proceeding with the lawsuit and to seek damages for violations of the automatic stay. This Court denied the application and Ms. Diaz's request for damages based on the non-applicability of the automatic stay.

### Analysis

This Court is frequently called upon to determine whether the automatic stay applies to state court lawsuits involving a governmental unit's enforcement of police and regulatory powers. Sometimes—as occurred in Mr. Gandy's case—despite the plain application of the police and regulatory power exception, a debtor will file a suggestion of bankruptcy or affirmatively represent to the state court that the automatic stay precludes a state court from continuing with its adjudication. In other instances, as evidenced by Ms. Diaz's case, debtors seek injunctive relief from the bankruptcy court to stop the state court litigation based on the application of the automatic stay. Regardless of form, the debtors' actions sometimes lead state courts to stay the proceedings while awaiting an order from the bankruptcy court before continuing with their cases. Such actions delay state court proceedings and waste the resources of the parties and the courts. The Court appreciates the comity shown by state courts when they decline to proceed in the face of a pending bankruptcy case. Nevertheless, the Court finds that its duty of reciprocal comity requires the issuance of this opinion. Accordingly, this Court issues this Joint Memorandum Opinion clarifying that the state courts in the present cases had the authority to determine that the automatic stay did not apply to the governmental units' actions to enforce their police and regulatory power.

### Concurrent Jurisdiction

This Court has previously examined the issue of whether state courts possess jurisdiction and authority to determine whether the automatic stay applies. *In re Edwin A. Epstein, Jr. Operating Co., Inc.,* 314 B.R. 591, 598–99 (Bankr.S.D.Tex.2004). In determining that state courts are vested with jurisdiction, the Court's analysis began with the jurisdictional grant provided by Congress:

The U.S. Constitution gives Congress plenary power over bankruptcy thus allowing Congress to limit the jurisdiction that courts can exercise over the person and property of a debtor who duly invokes the bankruptcy law. U.S. CONST., art. I, § 8; *Kalb v. Feuerstein,* 308 U.S. 433, 439, 60 S.Ct. 343, 84 L.Ed. 370 (1940). The current bankruptcy jurisdictional statute, 28 U.S.C. § 1334, defines the role of the federal district courts in bankruptcy. Section 1334(a) provides, "[e]xcept as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). Section 1334(b) then provides: "[n]otwithstanding any Act

of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original *but not exclusive jurisdiction* of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

*Id.* (emphasis added). In *Edwin A. Epstein, Jr. Operating Co., Inc.,* an arbitration panel [4] erroneously ruled that the automatic stay did not apply to various claims against the debtor's interests in oil and gas properties. *Id.* The effect of this decision was to impermissibly **\*801** annul or terminate the automatic stay. *Id.* [5] Thus, while the Court found that state courts possess concurrent jurisdiction—pursuant to § 1334(b)—to determine whether the stay applies, state courts lack authority to terminate the stay when it in fact does apply. *Id.* The bankruptcy court alone has authority to modify the automatic stay. *Id.* For the reasons set forth in *Edwin A. Epstein, Jr. Operating Co., Inc.,* an erroneous determination of the inapplicability of the automatic stay would be voidable. Of course, the automatic stay does not arise when the police and regulatory exception applies. 11 U.S.C. § 362(b)(4). In a police and regulatory exception case—where the automatic stay has never arisen—the state court has concurrent jurisdiction to so determine.

### The Automatic Stay and the Police and Regulatory Power Exception

Section 362(a) [6] provides for an automatic stay of certain acts upon the filing of a bankruptcy petition under any chapter of the Bankruptcy Code. 11 U.S.C. § 362(a); *In re Pierce,* 272 B.R. 198, 209 (Bankr.S.D.Tex.2001); 2 COLLIER ON BANKRUPTCY ¶ 303.12 (15th ed.2004). "The purpose of the automatic stay is to give the debtor a 'breathing spell' from his creditors, and also, to protect creditors by preventing a race for the debtor's assets." *Browning v. Navarro,* 743 F.2d 1069, 1083 (5th Cir.1984) (citations omitted). The stay prohibits lien enforcement and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims. 11 U.S.C. § 362. It also stays a wide range of actions that would affect or interfere with property of the estate, property of the debtor, or property in the custody of the estate. *Id.*

Although the reach of the automatic stay is broad, it is not unlimited. Some actions that would otherwise fall within the scope of the stay are excepted from the stay. The exceptions are typically based on particular policy objectives.

One important exception to the automatic stay is the police and regulatory power exception. The police and regulatory power exception is based on the compelling **\*802** need for the government to continue to protect the public when a debtor files for bankruptcy and to "prevent a debtor from 'frustrating necessary governmental functions by seeking refuge in bankruptcy court.' " *SEC v. Brennan,* 230 F.3d 65, 71 (2nd Cir.2000) (citing *City of New York v. Exxon Corp.,* 932 F.2d 1020, 1024 (2nd Cir.1991)) (internal quotation marks omitted); *In re Commonwealth Cos., Inc.,* 913 F.2d 518, 527 (8th Cir. BAP 1990) (quoting *Commodity Futures Trading Comm'n. v. Co Petro Mktg. Group Inc.,* 700 F.2d 1279, 1283 (9th Cir.1983) ("a fundamental policy behind the police or regulatory power exception ... is 'to prevent the bankruptcy court from becoming a haven for wrongdoers.' ")) The exception accomplishes this goal by allowing the government to enforce various laws and regulations against a debtor. Specifically § 362(b)(4) states:

> The filing of a petition ... does not operate as a stay ... of the commencement or continuation of a criminal action or proceeding against the debtor ... of the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's or organization's *police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power ....*

11 U.S.C. § 364(b)(4) (emphasis added). Thus, "where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay." H.R.Rep. No. 95–595, at 343 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6299; S.Rep. No. 95–989, at 52, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5838. Therefore, while the majority of actions against a debtor must cease, a *bona*

*fide*[7] governmental unit action to enforce its police and regulatory power is unaffected by the automatic stay.

To determine whether an action falls under the police and regulatory power exception, a court must engage in a two-prong test. First, the court must determine whether the plaintiff in the state court action is a "governmental unit." *See* 11 U.S.C. § 362(b)(4) (excepting proceedings "by a governmental unit"). If the court answers this question in the affirmative, the court must next determine whether the governmental unit is seeking to enforce its police and regulatory power.

The first prong of the test is determined by reference to 11 U.S.C. § 101(27). Under § 101(27) a "governmental unit" is defined as:

> [the] United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

Thus, if the plaintiff in a state court action fits within the § 101(27) definition, it is considered a governmental unit.

The more difficult question is whether the governmental unit is enforcing its police and regulatory power. **\*803** Courts have developed two tests to define when an action qualifies as an exercise the government's police and regulatory power. The first is termed the "pecuniary interest" test. *Commonwealth Cos.,* 913 F.2d at 523. Under the pecuniary interest test, the court must determine whether the governmental unit is pursuing a matter of public interest rather than advancing the government's pecuniary interest. *See id.; In re Dunbar,* 235 B.R. 465, 471 (9th Cir. BAP 1999); *In re Charter First Mortgage, Inc.,* 42 B.R. 380, 382 (Bankr.D.Or.1984). This test requires courts to distinguish between a police and regulatory enforcement action and an attempt by a governmental unit to collect money damages that do not arise from an exercise of a governmental unit's police or regulatory power. For example, a governmental

unit's action on a debt arising from a normal commercial transaction to purchase goods or services,[8] or an action to collect taxes,[9] are generally stayed by the automatic stay. However, if the money damages are ancillary to the governmental unit's enforcement of its police and regulatory power, then the action itself is not stayed, though collection of the judgment is stayed. *Brennan,* 230 F.3d at 71–73. As explained by the Fifth Circuit:

> Quite separate from the entry of a money judgment, is a proceeding to enforce that money judgment. The paradigm for such a proceeding is when, having obtained a judgment for a sum certain, a plaintiff attempts to seize property of the defendant in order to satisfy that judgment. It is this seizure of a Defendant–Debtor's property, to satisfy the judgment obtained by a Plaintiff–Creditor, which is proscribed by subsection 362(b)(5).
> *Commonwealth Oil Ref. Co.,* 805 F.2d at 1186. The purpose of allowing a governmental unit to proceed to judgment for civil penalties in an enforcement lawsuit is to fix damages for purposes of the bankruptcy action. *SEC v. Bilzerian,* 131 F.Supp.2d 10, 14 (D.D.C.2001) (permitting an accounting but not actual disgorgement of funds). Thus, a state court may liquidate the claim and enter a judgment but the governmental unit is stayed from enforcing the money judgment against a debtor without an order of the bankruptcy court.

The second test is the "public policy" test. *See NLRB v. Edward Cooper Painting, Inc.,* 804 F.2d 934, 942 (6th Cir.1986). Under the public policy test, the court must determine whether the proceeding is designed to "effectuate public policy" rather than to "adjudicate private rights." *Dunbar,* 235 B.R. at 471 (citing *Universal Life Church,* 128 F.3d at 1299 (9th Cir.1997)); *In re Charter First Mortgage,* **\*804** *Inc.,* 42 B.R. at 383. Only the former actions are exempt under § 362(b)(4). *N.L.R.B.,* 804 F.2d at 934. A governmental unit may not adjudicate the private rights of its citizens under the guise of public protection to escape the general stay provision of § 362. *See In re Charter First Mortgage, Inc.,* 42 B.R. at 383–84. For guidance in this test, courts should refer to the legislative history of § 362(b)(4) to determine whether the subject proceeding is one of the enumerated types of proceedings to which § 362(b)(4) clearly applies. *See In re Eagle Bus Mfg., Inc.,* 158 B.R. 421, 427 (S.D.Tex.1993). The relevant legislative history of § 362(b)(4) states:

[Section 362(b)(4) ] excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.

*In re Commonwealth Oil Ref. Co.,* 805 F.2d 1175, 1182–83 (5th Cir.1986) (quoting H.R.Rep. No. 95–595, at 343 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6299; S.Rep. No. 95–989, at 52, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5838). Thus, where the government is enforcing these enumerated examples, the governmental unit is clearly enforcing public rights.

Further examples of governmental unit actions where courts have applied the police and regulatory power exception include: state bar disciplinary proceedings, labor law enforcement proceedings, enforcement of environmental regulations,[10] enforcement of consumer protection laws,[11] revocations of licenses,[12] and other similar **\*805** police or regulatory laws. *See* 3 COLLIER ON BANKRUPTCY ¶ 362.05(b)(5) (15th ed.2004).

### Application to *In re Gandy*

In applying the "police and regulatory exception" to Mr. Gandy's case, the plaintiffs—Harris County and the Texas Commission on Environmental Quality—are governmental units as defined by § 101(27). Further, the enforcement of state environmental laws falls within the gambit of the police and regulatory powers excepted by § 362(b)(4) under either the pecuniary interest or public policy tests. *See Safety—Kleen, Inc. (Pinewood) v. Wyche,* 274 F.3d 846, 859 (4th Cir.2001).

The action meets the pecuniary interest test because the governmental units were pursuing a matter of public safety and welfare through injunctive relief rather than seeking a monetary award. *See, e.g., Commonwealth Cos.,* 913 F.2d at 523. In the state court action, the governmental units allege that Mr. Gandy is violating the Texas Solid Waste Disposal Act and the Texas Clean Air Act. They are seeking injunctive relief to stop Mr. Gandy from using his property to store debris and other materials that allegedly violate state law. Thus, under the pecuniary interest test, Mr. Gandy's state court suit constitutes enforcement of the governmental units' police and regulatory power.

The action also satisfies the public policy test because the purpose of the proceeding is to further public policy instead of adjudicating private rights.[13] *Dunbar,* 235 B.R. at 471. Generally, proceedings to enforce environmental statutes invoke the police and regulatory exception to the automatic stay. *See* COLLIER ON BANKRUPTCY ¶ 362.05(b)(5) (15th ed.2004). This suit is brought to further the State's public policy of protecting the environment and does not implicate, much less adjudicate, the personal rights of any citizen. Accordingly, because the state court proceeding is enforcing environmental laws, which furthers public policy, it is excepted from the automatic stay based on the police and regulatory exception.

At the hearing on Mr. Gandy's case, there were substantial evidentiary disputes regarding (i) whether there was any immediate threat and (ii) whether Mr. Gandy was, in fact, in violation of the law. This Court will not address the merits of those disputes. If a governmental unit is attempting to enforce its police and regulatory powers, this Court (as does a state court with concurrent jurisdiction) only looks to the four corners of the complaint to determine if the purpose of the litigation by the governmental unit is to enforce its police and regulatory powers. If the purpose of the state court lawsuit is police and regulatory, the inquiry as to the application of the automatic stay is completed and the action is not stayed. *See Board of Governors of the Fed. Reserve Sys. v. MCorp Fin.,* 502 U.S. 32, 40, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991). This Court should not examine the merits of the litigation.[14]

**\*806** MCorp contends that in order for § 362(b)(4) to obtain, a court must first determine whether the proposed exercise of police or regulatory power is legitimate.... We disagree. MCorp's broad reading of the stay provisions would require bankruptcy courts to scrutinize the validity

In re Gandy, 327 B.R. 796 (2005)

Case 4:20-cv-14695-LML Doc 4 Filed 04/26/20 Page 47 of 80
Case 20-14695-LML Document 41-1 Filed on 04/26/20 in TXSD Page 30 of 63

of every administrative or enforcement action brought against a bankrupt entity. Such a reading is problematic.... *Id.*

Of course, when examining the four corners of the complaint, this Court and others with concurrent jurisdiction must be mindful of the need to avoid artifice. If the governmental unit is not engaged in the *bona fide* enforcement of its police and regulatory powers, it is violating the automatic stay and may not proceed to obtain a determination to the contrary.

### Application to *In re Diaz*

In the Diaz case, the State of Texas has brought a lawsuit against Ms. Diaz for alleged violations of the Deceptive Trade Practices Act. As discussed above, the State is a governmental unit. Further, the Deceptive Trade Practices Act is a consumer protection law. *See In re First Alliance Mortg. Co.,* 263 B.R. 99, 108 (9th Cir. BAP 2001) (actions brought by the State to implement the law are generally an exercise of its police and regulatory powers). Unlike the facts in Mr. Gandy's case, however, here the State is seeking damages in addition to injunctive relief. Despite this difference, the State's action passes the pecuniary interest test because the State is seeking injunctive relief. Ms. Diaz argues that the State is not seeking injunctive relief because she has given up her notary license and is no longer practicing as a notary. Thus, she reasons that the only possible purpose of the remaining litigation is to determine a monetary award against her. Ms.

Diaz's argument is unavailing. Simply because a defendant has ceased the alleged offensive conduct does not remove a governmental unit's ability to prosecute under its police and regulatory power. *In re First Alliance Mortg. Co.,* 263 B.R. 99, 113 (9th Cir. BAP 2001) (application of the police or regulatory exception to enforcement actions by the Federal Trade Commission to enjoin illegal lending, even though the debtor had already agreed to cease loan originations). Further, although the State is seeking monetary damages, enforcement of any money judgment is stayed. Accordingly, because the State is seeking injunctive relief, and because enforcement of any money judgment is stayed, the State's action passes the pecuniary interest test.

The public policy test is also met because the government's lawsuit is not an adjudication of private rights but an effectuate of public policy. Only proceedings which effectuate public policy are exempt under § 362(b)(4). *N.L.R.B.,* 804 F.2d at 934. The purpose of the Deceptive Trade Practices Act is to further the public policy of protecting Texas consumers from actions such as those alleged to have been committed by Ms. Diaz. *Head v. U.S. Inspect DFW, Inc.,* 159 S.W.3d 731, 743 (Tex.App.-Fort Worth 2005). Therefore, the lawsuit against Ms. Diaz is excepted from the automatic stay under § 362(b)(4).

### All Citations

327 B.R. 796

---

### Footnotes

1    Case no. 05–30651.

2    Case no. 05–32244; Adversary no. 05–3253.

3    Ms. Diaz alleges that she is not currently advertising any services as a "notario" and has given up her Notary Public license.

4    In the *Edwin Epstein Operating Co., Inc.,* opinion, the Court presumed that the arbitration panel was vested with the full jurisdiction of a Texas state court. *See In re Edwin A. Epstein, Jr. Operating Co., Inc.,* 314 B.R. at 598 n. 13.

5    In areas where state courts have concurrent jurisdiction, the jurisdiction may not be exercised when the automatic stay precludes the matter from proceeding in state court. *See In re Brady, Texas Mun. Gas Corp.,* 936 F.2d 212, 218 (5th Cir.1991), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 748 (1991). The Code allows only the bankruptcy court to annul or modify the automatic stay. 11 U.S.C. § 362(d); *see Farley v. Henson,* 2 F.3d 273 (8th Cir.1993); *Continental Cas., Co. v. Gullett,* 253 B.R. 796 (S.D.Tex.1999).

6    Section 362(a) states, "[e]xcept as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities of: (1) the commencement or

In re Gandy, 327 B.R. 796 (2005)

Case 4:20-cv-14695-LML Doc 4 Filed 04/26/20 Page 48 of 80
Case 20-14695-LMI Doc 14-1 Filed on 04/26/20 in TXSB Page 31 of 63

continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title; (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; (4) any act to create, perfect, or enforce any lien against property of the estate; (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title; (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title; (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and (8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor."

7 Of course, the government may not act with artifice. If the government proceeds under § 362(b)(4) when it is not exercising its police and regulatory powers, the governmental unit will have violated the automatic stay by seeking the determination (based in artifice) from the state court. *See In re Edwin A. Epstein, Jr. Operating Co., Inc.,* 314 B.R. 591.

8 *See In re Coporacion de Servicios Medicos Hospitalarios de Fajardo,* 805 F.2d 440, 445–46 (1st Cir.1986) (stating that "actions by a governmental agency to enforce [its] contractual rights," even if related in some way to a regulatory concern, are not police and regulatory; there was no showing that the government's actions were based on any generally applicable regulatory law, as opposed to rights solely derived from terms of contract); *United States v. Nicolet Inc.,* 857 F.2d 202, 209 (3rd Cir.1988) (stating that a government suit would not be excepted when the government is "suing in its role as a consuming participant in the national economy").

9 *See In re Thomassen,* 15 B.R. 907, 909 (9th Cir. BAP 1981) ("State and local governmental units cannot, by an exercise of their police or regulatory powers, subvert the relief afforded by the federal bankruptcy laws. When they seek to do so for a pecuniary purpose, they are automatically stayed, notwithstanding the exception found at 11 U.S.C. § 362(b)(4)"); *Matter of Ballentine Bros., Inc.* 86 B.R. 198 (Bankr.D.Neb.1988) (finding that county's real estate tax assessments and levies were pecuniary actions and not acts enforcing county's police or regulatory power).

10 *See Safety—Kleen (Pinewood), Inc. v. Wyche,* 274 F.3d 846 (4th Cir.2001) (holding that financial assurance regulations were a clear exercise of the state's regulatory power because their purpose was to deter environmental misconduct); *Penn Terra, Ltd. v. Dep't of Envtl. Res.,* 733 F.2d 267 (3rd Cir.1984) (stating that Commonwealth's injunction was exempt from automatic stay because it was an action or proceeding by a governmental unit to enforce police or regulatory power); *United States v. LTV Steel Co.,* 269 B.R. 576 (W.D.Pa. 2001) (stating that the automatic stay does not protect Chapter 11 debtors from suit to assess civil penalties under Clean Air Act); *In re Mateer,* 205 B.R. 915 (C.D.Ill. 1997) (holding that environmental enforcement action against Chapter 7 debtor is not stayed); *State v. Mirant New York, Inc.,* 300 B.R. 174 (S.D.N.Y. 2003) (noting that the automatic stay does not preclude the debtor from entering into environmental consent decree or the state from enforcing it).

11 *See In re First Alliance Mortgage Co.,* 263 B.R. 99 (9th Cir. BAP 2001) (holding that a consumer protection action brought by the Massachusetts Attorney General which sought not only the cessation of ongoing consumer fraud, but also a judgment against the debtor for civil penalties, attorneys' fees, and restitution for the debtor's customers, was excepted from the automatic stay by § 362(b)(4) and noting that while the exception permitted the state to proceed in its attempt to obtain a monetary judgment, it did not permit any effort to collect or enforce any judgment so obtained); *In re Draughon Training Inst., Inc.,* 119 B.R. 921 (Bankr.W.D.La. 1990) (stating that consumer protection statutes and court proceedings to determine violations of consumer protection statutes are both valid exercises of police and regulatory power for purposes of the automatic stay exception).

12  *See In re FCC,* 217 F.3d 125, 131–32 (2d Cir.2000) (noting that § 362(a) did not preclude agency's revocation of spectrum licenses); *In re Yellow Cab Co-op. Ass'n,* 132 F.3d 591, 599 (10th Cir.1997) (stating that § 362(a) did not preclude revocation of taxi company's operating certificate); *In re Universal Life Church, Inc.,* 128 F.3d 1294, 1296 (9th Cir.1997) (stating that § 3629(a) did not preclude IRS revocation of church's tax-exempt status). However, under section 525(a) of the Bankruptcy Code, 11 U.S.C. § 525(a), an agency may not revoke a debtor's license "solely" because the debtor is insolvent or has not paid a debt. *See NextWave Pers. Commc'ns, Inc. v. FCC,* 254 F.3d 130, 149–52 (D.C.Cir.2001), *cert. granted,* 535 U.S. 904, 122 S.Ct. 1202, 152 L.Ed.2d 141 (2002) (stating that section 523 may protect debtor even when section 362 does not).

13  This opinion does not address whether a governmental unit's enforcement of a "bad check complaint"—the remedy to which may be to require the debtor to compensate the check's holder—violates the stay.

14  To engage in a merits inquiry would mean that this Court's decision as to the application of the automatic stay would be affected by the merits inquiry. Because the merits of the governmental unit's allegations play no role in the determination of the automatic stay's application, the Court will not indulge in such an inquiry. Accordingly, in determining that the automatic stay does not apply, this Court is expressing no opinion of the merits of the government's claims or on the merits of Mr. Gandy's defenses.

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   8

APPENDIX A-7

60 USLW 2781, 23 U.S.P.Q.2d 1903

140 B.R. 969
United States District Court,
N.D. Illinois, Eastern Division.

In the Matter of MAHURKAR
DOUBLE LUMEN HEMODIALYSIS
CATHETER PATENT LITIGATION.

No. MDL 853.
|
May 28, 1992.

**Synopsis**

In multidistrict patent litigation brought against Chapter 11 debtor and nondebtor codefendant prepetition, plaintiff requested damages and injunction against debtor, debtor requested declaratory judgment, and plaintiff filed motion seeking order that debtor cease its interference with discovery. After bankruptcy filing, temporary restraining order was issued by the Delaware Bankruptcy Court. The District Court, Easterbrook, Circuit Judge, sitting by designation, held that: (1) district court had authority to interpret automatic stay; (2) enforcement of temporary restraining order issued by Delaware Bankruptcy Court was suspended; (3) automatic stay barred claims against debtor, and debtor's counterclaim for declaratory relief was also suspended; and (4) automatic stay did not bar discovery to extent it was calculated to lead to evidence admissible against nondebtor codefendant.

So ordered.

See also 781 F.Supp. 1295.

**Attorneys and Law Firms**

**\*970** Joseph N. Hosteny, Raymond P. Niro, John C. Janka, and Michael P. Mazza, Niro, Scavone, Haller & Niro, Chicago, Ill., for Sakharam D. Mahurkar.

Marvin A. Glazer, Cahill, Sutton & Thomas, Phoenix, Ariz., and Granger Cook, Jr. and Mark J. Murphy, Cook, Egan, McFarron & Manzo, Ltd., Chicago, Ill., for IMPRA, Inc.

H. Ross Workman, Brent P. Lorimer, and John C. Stringham, Workman, Nydegger & Jensen, Salt Lake City, Utah, for Kendall Med–West.

**OPINION**

EASTERBROOK, Circuit Judge. [*]

After a settlement between Vas–Cath and Mahurkar, the initial adversaries in this patent case, only two accused infringers remain as parties: IMPRA and Kendall Med–West, a division of The Kendall Company. We are in the final stages of discovery, with depositions by the dozen. Trial is set for August 10.

On May 20 Kendall and its parent filed bankruptcy petitions in the bankruptcy court for the District of Delaware. Kendall had been planning the step for more than a year in consort with its major lenders. Kendall filed a bankruptcy petition "prepackaged" with a plan of reorganization to which these creditors had assented. The proposed plan restructures Kendall's debt obligations, which bear a rate of interest exceeding the going rate for money in the economy, while allowing all to avoid recognizing income (and paying tax) on the reduction of indebtedness.

Sakharam Mahurkar and Quinton Instruments Co., Kendall's adversaries in this patent litigation, hold contingent debt claims against Kendall. They were left out **\*971** of the negotiations for the bankruptcy proceeding, first learning of the plans when they read an article in the *Wall Street Journal.* This court, too, was taken aback. Kendall did not mention the preparations at any time while the schedule was being discussed and set—did not mention it even by a secret filing that would have preserved whatever confidences were important to the plan. Instead Kendall took everyone by surprise, filing its papers in Delaware, walking out of the ongoing deposition of Dr. Mahurkar, and faxing this court (and its adversaries) a notice.

Kendall is standing on its rights under the automatic stay, 11 U.S.C. § 362, even though it says it expects the plan of reorganization to be approved by the end of June. According to the plan of reorganization, claims such as Mahurkar's will pass through unaffected. Kendall's action nonetheless throws the schedule in this court out of whack, awarding itself the extension that I have repeatedly refused to grant and raising questions about whether Kendall will be able to catch up in time to join the trial in August.

Although the automatic stay halts only litigation against the debtor in bankruptcy, Kendall instructed a *former* employee not to attend his deposition. Apparently in anticipation of the filing in Delaware, Kendall's lawyer instructed one of its current employees not to answer certain financial questions during a deposition, although this court, consonant with Fed.R.Civ.P. 30(c) ("Evidence objected to *shall be taken* subject to the objections."), had told counsel not to instruct witnesses to refrain from answering on any ground other than an assertion of privilege. I had offered to resolve disputes of any other kind by telephone to avoid exactly the sort of interruption that has occurred. Kendall's instruction not to answer had no support in § 362, for Kendall had not yet filed its petition in bankruptcy.

Disturbed by these tactics, Dr. Mahurkar filed a motion on May 21 seeking an order that Kendall cease its interference with discovery pertinent to the ongoing litigation with IMPRA. Recognizing the force of § 362, Mahurkar conceded that his dispute in this forum with Kendall is in stasis, insofar as he seeks damages. But, citing numerous cases, Mahurkar asked me to rule that the automatic stay does not bar continued proceedings concerning Kendall's request for a declaratory judgment (on the ground that this is an action by rather than against the debtor) or his own counterclaim for an injunction, to the extent that Kendall's (asserted) infringement continues during the pendency of the bankruptcy proceeding. Naturally the first question is whether the forum in which an action is pending may decide for itself the effect of the automatic stay or instead whether the bankruptcy court has exclusive jurisdiction. Mahurkar cited a number of cases holding that the original forum may interpret § 362 and proceed to the extent that statute allows. Mahurkar asked me to do so.

On the afternoon of May 21 my staff called counsel for Kendall and instructed it to file a response by the close of business on May 26. Further conversations on May 22 conveyed to all counsel two additional decisions: Mahurkar's reply brief would be due on May 27, and I would hold oral argument at 10:00 A.M. on May 28.

Kendall filed its brief on May 26, disputing Mahurkar's interpretation of § 362. An orderly process was in train, leading to an orderly decision. Preferring a soliloquy to a dialog, Kendall began an adversary proceeding against Mahurkar and Quinton and at 2:30 P.M. on May 27 sought an *ex parte* order from the bankruptcy judge in Delaware. Mahurkar's counsel in Chicago had enough notice to engage a lawyer in Wilmington and fax him some papers, which

arrived at 1:00 P.M. on May 27. This lawyer appeared at the hearing but conceded that he lacked time to read the papers and knew next to nothing about the patent litigation. Quinton was unrepresented. Kendall asked the bankruptcy judge to enjoin Mahurkar from filing his reply brief or presenting his request for decision to this court. Kendall presented a draft order to bankruptcy judge Helen S. Balick, who dated and signed the draft, giving no written reasons. (Her brief oral statement also is sketchy.)

**\*972** What Kendall drafted for the bankruptcy judge contains formulaic and unreasoned recitations of irreparable harm (unfathomable, given that the expense of litigation is not irreparable injury, see *Petroleum Exploration, Inc. v. Public Service Commission,* 304 U.S. 209, 222, 58 S.Ct. 834, 841, 82 L.Ed. 1294 (1938); *FTC v. Standard Oil Co.,* 449 U.S. 232, 244, 101 S.Ct. 488, 495, 66 L.Ed.2d 416 (1980); *Renegotiation Board v. Bannercraft Clothing Co.,* 415 U.S. 1, 24, 94 S.Ct. 1028, 1040, 39 L.Ed.2d 123 (1974)) and contains these commands:

> Defendants [Quinton and Mahurkar] are hereby ordered and/or restrained from taking any action or doing any act, other than by proper motion or other application before this Court to commence or continue any action against The Kendall Company, *et al.* in either the United States District Court for the Northern District of Illinois, Eastern Division, the United States District Court for the Central District of Utah, or the United States Bankruptcy Court for the District of Delaware with respect to the matters set out in the Patent Infringement Action, including, but not limited to, filing any reply brief, motions or memorandum of law, or conducting or participating in any type of discovery, except as to forthwith notify the Clerks of the courts listed above of the entry of an Order of this Court restraining any application by Quinton Instruments Company and/ or Sakharam D. Mahurkar for any relief or discovery against The Kendall

Company whatsoever with respect to
the Patent Infringement Action....

In other words, the bankruptcy judge in Delaware not only
asserted exclusive jurisdiction to determine the meaning of
§ 362 but also instructed counsel to remain silent during the
hearing scheduled in this court. (Perhaps even showing up
would be a prohibited "act" to "continue" the proceeding.)
In forbidding Mahurkar and Quinton from "conducting or
participating in any type of discovery" in the entire "Patent
Infringement Action," this TRO also apparently halts the
litigation with IMPRA. It did not, however, issue in time to
prevent Mahurkar from filing his reply brief.

On learning of this preposterous order (I practically fell out of
my chair, and I have a sturdy chair), I entered the following
order of my own:

> Lest there be any misunderstanding about the telephonic
> instructions that have previously issued, I now issue my
> order in writing.
>
> Counsel for Kendall and Mahurkar are to be present in
> court tomorrow morning at 10:00 a.m. This is an order, not
> an invitation. Failure to appear will lead to sanctions.
>
> My instructions to appear and argue this case were issued
> last week. Any subsequent order from any other court is
> ineffectual. Kendall's ex parte application to the bankruptcy
> judge in Delaware appears to be an abuse of process.
> No bankruptcy court is authorized to instruct litigants in
> this court not to obey this court's orders. Any court has
> jurisdiction to determine its own jurisdiction, and this
> court unquestionably has the authority to determine what
> effect the bankruptcy stay has on the litigation. For the
> purpose of making that decision, the hearing will proceed
> as scheduled, and counsel for all parties are free to make
> whatever presentations they deem appropriate.

At the oral argument on May 28, Kendall's lawyers asserted
that the TRO forbade Mahurkar's lawyers from making any
oral argument in support of their motion. I ruled that any
attempt to enforce Judge Balick's prohibition against the
participation of Mahurkar's counsel in the ordinary course of
proceedings here would be treated as a violation of my order
of May 27, and thus contempt of court.

I shall have more to say about that rogue TRO. The first
issue I take up, however, is whether I have any authority

to interpret the automatic stay and decide for myself which
actions may proceed here. Part II of this opinion discusses the
TRO and explains why I am enjoining its enforcement. Part
III discusses the effect of the automatic stay on this patent
action. The final section sets out a formal injunction, binding
on Kendall and all those in privity with it, **973** which will
be entered in compliance with Fed.R.Civ.P. 65(d).

I

Section 362(a) provides that a petition in bankruptcy
"operates as a stay, applicable to all entities, of—(1) the
commencement or continuation, including the issuance or
employment of process, of a judicial ... action or proceeding
against the debtor that was or could have been commenced
before the commencement of the case under this title". This
statutory prohibition requires no judicial enforcement. But
it requires interpretation. What is the "continuation ... of a
judicial ... action or proceeding against the debtor"? Does
it include declaratory judgment actions filed *by* the debtor?
Discovery that may be relevant not only to actions against
the debtor but also to actions against other parties? Actions
against the debtor on account of violations of law (such as
infringement of patents) that continue after the filing of the
petition?

Someone must decide these questions. It might make sense
to commit their decision exclusively to bankruptcy judges,
who not only have greater familiarity with bankruptcy law but
also alone possess the power to coordinate the many actions
that may be pending against the debtor throughout the nation.
(Surely this is not the only suit against Kendall, a substantial
firm.) So, too, it might make sense to commit their decision
to the forums in which the cases are pending, which may
have the perspective needed to manage litigation that involves
other parties—as this multidistrict action does—or may be
in the best position to decide whether one of the numerous
exceptions in § 362(b) pertains.

However such matters might come out on first principles
(the statute itself is silent on the question), it is settled that
both the bankruptcy court and the court in which the other
litigation exists may construe the automatic stay. E.g., *Picco v.
Global Marine Drilling Co.,* 900 F.2d 846, 850 (5th Cir.1990);
*Brock v. Morysville Body Works, Inc.,* 829 F.2d 383, 387
(3d Cir.1987); *In re Baldwin–United Corporation Litigation,*
765 F.2d 343, 347 (2d Cir.1985). Cf. *Board of Governors
of the Federal Reserve v. MCorp Financial, Inc.,* 502 U.S.

Case 4:20-cv-14695-LMH Doc14 Filed 04/26/20 Page 54 of 80
Case 4:20-cv-14695-LMH Doc14 Filed 04/26/20 Page 37 of 63
Matter of Mahurkar Double Lumen Hemodialysis Catheter..., 140 B.R. 969 (1992)

32, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991); *NLRB v. P\*I\*E Nationwide, Inc.,* 923 F.2d 506, 512 (7th Cir.1991) (assuming that bankruptcy courts do not have exclusive authority to construe § 362, but without separate discussion). *Baldwin– United* even held that a district court may forbid the resolution of such issues by the bankruptcy court, although the second circuit thought the exercise of that power imprudent in the case at hand.

*Morysville,* rendered by the court of appeals with jurisdiction over bankruptcy judges in Delaware, is of particular interest. Mahurkar's bankruptcy lawyer did not have time to read the papers, but he did cite *Morysville* (doubtless having been put on the trail by Chicago counsel, who had cited it in papers filed here). Kendall's lawyer did not deign to reply, and Judge Balick did not mention that case.

To be sure, most of the cases holding that bankruptcy judges lack exclusive jurisdiction to interpret § 362 involve suits by public agencies, seeking relief excluded by § 362(b)(4). But the reason why the automatic stay may (or does) not apply is unrelated to the question: "Which court decides?" All the cases I have found hold that each court may decide for itself. So far as I am aware, there is no contrary authority. This court accordingly not only has jurisdiction to determine its jurisdiction, *Willy v. Coastal Corp.,* 503 U.S. 131, 112 S.Ct. 1076, 1080, 117 L.Ed.2d 280 (1992); *Harmon v. Brucker,* 355 U.S. 579, 582, 78 S.Ct. 433, 435, 2 L.Ed.2d 503 (1958); *Land v. Dollar,* 330 U.S. 731, 739, 67 S.Ct. 1009, 1013, 91 L.Ed. 1209 (1947), but actually possesses the authority to construe § 362 and decide what effect that statute has on the multidistrict patent litigation.

## II

Kendall sought and obtained a TRO based on the opposite premise. Kendall's adversary complaint asserts that the very filing of a motion in this court seeking an interpretation of § 362 violates that section, and that "[t]hese violations of the automatic stay by the Defendants are willful **\*974** and entitle Kendall to recover actual damages, including but not limited to, costs, attorneys' fees, interest and punitive damages." Kendall did not bring *Morysville* to the attention of the bankruptcy court. At oral argument before Judge Balick, Kendall's lawyers repeatedly treated litigation to determine the extent of the automatic stay as identical to a violation of § 362, which could be true only if the bankruptcy judge possesses exclusive jurisdiction.

Bankruptcy judges possess authority, by a combination of 11 U.S.C. § 105(a) and 28 U.S.C. § 157(b)(2), to issue injunctions in core proceedings. Enforcement of the automatic stay against fresh litigation or the continuation of old litigation on the merits is a core proceeding. *In re Johns– Manville Corp.,* 801 F.2d 60 (2d Cir.1986); cf. *In re Davis,* 730 F.2d 176 (5th Cir.1984) (declining to issue a writ of prohibition against such an injunction). But extension of the statute to forbid any other court from cogitating the meaning of § 362, and proceeding to the extent that statute allows, is not a core proceeding. This multidistrict patent litigation is not a core proceeding by any stretch of the imagination, and I think it beyond cavil that I have authority to decide, for example, whether Mahurkar is entitled to take discovery from former Kendall employees that may be relevant to the action against IMPRA. Yet Judge Balick issued an order forbidding Mahurkar to file a reply brief addressing that subject (among others) or argue his motion orally.

For one federal court to issue an injunction forbidding litigation in another is extraordinary, given principles of comity among coordinate tribunals. E.g., *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.,* 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952); cf. *Brillhart v. Excess Insurance Co.,* 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942). For a bankruptcy judge to issue an injunction with the effect of preempting resolution of a pending motion in a district court is unheard of. Well, perhaps not *un*-heard of. I found one case in which a bankruptcy court did so, and the district judge brushed the order aside in derision, treating the order as so patently unauthorized that no further explanation was warranted. *Lower Brule Construction Co. v. Sheesley's Plumbing & Heating Co.,* 84 B.R. 638, 644 (D.S.D.1988).

For reasons I elucidate below, Mahurkar asked for too much in this court. The automatic stay blocks most of the relief he wants. Yet arguing for a generous view of one's entitlements under the law is not the same as violating the law. There is all the difference in the world between a litigant who barges ahead as if the bankruptcy filing never took place and a litigant who conscientiously brings the filing to the attention of the court and asks for interpretation and instruction. Mahurkar honorably took the latter course. Kendall, by contrast, treated the two as identical and attempted to avoid decision by a tribunal where the issues had been fully briefed in favor of a decision elsewhere after a one-sided spiel. Kendall's course is an abuse of the judicial process and will not be tolerated.

Case 4:20-cv-14695-LML Doc 14 Filed 04/26/20 Page 55 of 80
**Matter of Mahurkar Double Lumen Hemodialysis Catheter..., 140 B.R. 969 (1992)** in DXSD Page 38 of 63

60 USLW 2781, 23 U.S.P.Q.2d 1903

Section 1651(a) of the judicial code permits district courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." An injunction forbidding interference with ongoing proceedings is appropriate (indeed, necessary) in aid of this tribunal's jurisdiction. The only potential bar lies in principles of issue and claim preclusion (res judicata and collateral estoppel) as a result of the bankruptcy judge's decision. But this is not a final decision, and unreviewable orders (a TRO is not reviewable by appeal) lack preclusive effect. I conclude that § 1651 gives me authority to enjoin the parties from enforcing the TRO, and that no other legal principle forbids such relief.

Because of the collateral bar doctrine, even legally erroneous injunctions must be obeyed until vacated or stayed. *Pasadena Board of Education v. Spangler*, 427 U.S. 424, 439–40, 96 S.Ct. 2697, 2706–07, 49 L.Ed.2d 599 (1976). It was to free Mahurkar's counsel from their (justified) fear that they had been forbidden to present oral argument in this court that I issued my order the afternoon of **\*975** May 27. When at oral argument bankruptcy counsel for Kendall insisted that *despite* my order Mahurkar's lawyers still could not speak, I replied that I would enjoin enforcement of the TRO, if that was what it took. To ensure that the collateral bar doctrine poses no risk to lawyers who have done no more than ask for a decision by a court, I shall make that order formal at the end of this opinion. I shall, moreover, direct Kendall to withdraw its ludicrous demand for punitive damages and other relief said to be in order to redress the sin of asking me to construe an act of Congress.

This unseemly war between two federal courts was occasioned by an unnecessary, incomplete, and deceptive filing by Kendall in the bankruptcy case. Lawyers who make *ex parte* applications have a special duty of candor in light of the one-sided nature of the presentation. Yet counsel sought to (and did) confuse rather than enlighten the bankruptcy judge.

Shame on the lawyers responsible. [†]

### III

Mahurkar asks me to hold that three subjects lie outside the automatic stay: Kendall's request for a declaratory judgment, its own request for an injunction against ongoing sales of catheters, and its demand that Kendall not interfere in discovery bearing on IMPRA. Mahurkar also contends

that I have the authority to make equitable exceptions to the automatic stay and should use that authority to keep discovery going while a prepackaged bankruptcy—which is not supposed to disrupt the debtor's business—winds up.

Section 362(a) admits of no "equitable" exceptions; it says that the stay applies "[e]xcept as provided in subsection (b) of this section", and subsection (b) contains no grant of equitable power to disregard subsection (a). There *is* an equitable power to release or modify the stay, § 362(d), (f), but only the bankruptcy court may exercise this power. Mahurkar should present his request for modification to the only tribunal that can entertain it. (Given the prepackaged nature of the reorganization, the parties should be able to agree that discovery can continue here, leading to a modification of the stay. But this is for Judge Balick, not me.)

Declaratory relief is the first issue. Kendall began this litigation, seeking a declaratory judgment that its catheters do not infringe Mahurkar's patents. Counterclaims for damages and an injunction came later. Section 362(a)(1) forbids continuation of an "action or proceeding *against* the debtor" (emphasis added), and Kendall's own suit is not an action "against" the debtor. "By" and "against" are opposites. *Northbrook National Insurance Co. v. Brewer*, 493 U.S. 6, 110 S.Ct. 297, 107 L.Ed.2d 223 (1980). See *Martin–Trigona v. Champion Federal Savings*, 892 F.2d 575, 577 (7th Cir.1989); James McCafferty, *The Effect of Bankruptcy on the Debtor's Pending Litigation,* 93 Comm.L.J. 214, 218–21 (1987) (citing other cases). Once again a case from the third circuit (whose jurisdiction includes Delaware) is instructive. After reciting the language of the statute, the court continued:

> All proceedings in a single case are not lumped together for purposes of automatic stay analysis.... Within a single case, some actions may be stayed, others not. Multiple claim and multiple party litigation must be disaggregated so that particular claims, counterclaims, crossclaims and third-party claims are treated independently when determining which of their respective proceedings are subject to the bankruptcy stay.

> Thus, within one case, actions *against* a debtor will be suspended even though closely related claims asserted *by* the debtor may continue.

*Maritime Electric Co. v. United Jersey Bank,* 959 F.2d 1194, 1204-05 (3d Cir. 1992) (emphasis in original). Disaggregating this case produces three claims: by Kendall for declaratory

relief, against Kendall for damages, and against Kendall for an injunction.

True enough, Mahurkar's counterclaims have become the center of attention. But "whether an action is by or against a debtor is determined by the debtor's status at the time the action was begun, not by **\*976** who was ahead when the bankruptcy petition was filed." *In re Berry Estates, Inc.,* 812 F.2d 67, 71 (2d Cir.1987). Accord, *Maritime Electric,* 959 F.2d at 1205; *St. Croix Condominium Owners v. St. Croix Hotel Corp.,* 682 F.2d 446, 449 (3d Cir.1982). So far as the literal meaning of § 362(a)(1) is concerned, this court may proceed to decision on the declaratory judgment action as if no bankruptcy proceeding were pending. And the Supreme Court champions literalism in interpretation of the bankruptcy code. E.g., *Taylor v. Freeland & Kronz,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992); *Connecticut National Bank v. Germain,* 503 U.S. 249, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

That a court has the raw power to do something does not imply that it should, however. Section 362(a)(1) distinguishes actions against a debtor from actions by the debtor because actions by the debtor usually produce recovery for the estate (or leave its value unaffected). No-risk propositions with the debtor in control do not present any of the concerns that lead to collective proceedings, such as races among creditors to dismember assets or jump the priority queue. As a practical matter, however, Kendall's declaratory judgment action exposes the estate to exactly the same risk as Mahurkar's counterclaims: to lose the action is to suffer a judgment that Kendall infringed the patents. Concrete relief might await the lapse of the automatic stay, but the writing on the wall would be as ominous as a formal opinion deciding the entire case on the merits in Mahurkar's favor. Whether I ought to proceed on the declaratory judgment action depends, then, on whether Mahurkar is right in saying that injunctive actions lie outside of § 362(a)(1).

Mahurkar has two theories: first, that a suit seeking an injunction is not a "judicial ... action or proceeding" within the meaning of § 362(a)(1); second, that even if it is, a court may issue injunctive relief against wrongs that continue after the filing of the petition, because such post-petition conduct does not entail an action that "was *or could have been* commenced before the commencement of the case under this title" (emphasis added).

These two approaches collapse to the same thing, because an injunction should not issue unless wrongful conduct is ongoing or impending. Only post-bankruptcy acts (or threats) need concern us. A reading of § 362 leads me to reject Mahurkar's arguments whichever way they are phrased.

Distinctions between law and equity were abolished with the institution of the Rules of Civil Procedure in 1938. See Fed.R.Civ.P. 2. The Bankruptcy Code of 1978, following modern practice, speaks of an "action or proceeding" rather than an action at law or equity. Nothing in § 362(a)(1) suggests any difference between legal and equitable relief. Section 362(b) supports this conclusion, for a number of its subsections exclude from the stay certain equitable proceedings. These exceptions are unnecessary if § 362(a) does not apply in the first place to requests for injunctions. And the continuation during bankruptcy of conduct (such as the sale of catheters) begun beforehand is most certainly one in which an action "was or could have been commenced before the commencement of the case under this title". *This* action could have been, and was, commenced before Kendall filed its petition in bankruptcy.

For what it is worth, I think that this literal interpretation is not only good law but also good sense. Bankruptcy is a collective proceeding, one in which creditors divide claims while the court attempts to maximize the total value of the assets. *Covey v. Commercial National Bank of Peoria,* 960 F.2d 657, 661–62 (7th Cir.1992); *Levit v. Ingersoll Rand Financial Corp.,* 874 F.2d 1186 (7th Cir.1989); *In re Iowa R.R.,* 840 F.2d 535 (7th Cir.1988); *Boston & Maine Corp. v. Chicago Pacific Corp.,* 785 F.2d 562 (7th Cir.1986). One pressing task is to prevent creditors' actions that grab one aspect of the business and squeeze it for value that, while assisting a single creditor, may depress the collective value of the assets. Injunctions requiring debtors to abandon one part of their business or dramatically change their methods of doing business have a high holdup value for creditors and therefore may lead to this unfortunate consequence.

**\*977** None of this implies that debtors in bankruptcy may violate federal law with impunity, selling patented products or, say, going into the cocaine distribution business. Cf. Douglas G. Baird, *The Elements of Bankruptcy* 194–98 (1992). Damages for wrongs done during the bankruptcy proceeding are administrative claims, and thus paid in full most of the time. The bankruptcy judge may enjoin ongoing wrongs, or release the automatic stay to allow another court to consider claims that debtors are violating the law.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Public agencies may seek redress under § 362(b)(4). But the bankruptcy court is the clearinghouse for private actions, and it has yet to approve Mahurkar's request to pursue his demand for an injunction. I hold that litigation on Mahurkar's request for an injunction is barred by the automatic stay. From the discussion above it follows that I also will stay proceedings in Kendall's action for a declaratory judgment.

Having resolved the "which court?" issue in Part I on the basis of precedent, I owe the parties a few words about the precedents they have earnestly pressed on me. A number of district courts hold that the stay does not bar injunctions, but almost all of these decisions rely either on the 1898 Act (which distinguished "debts" and "damages" from other claims) or on cases interpreting the 1898 Act. E.g., *Bambu Sales, Inc. v. Sultana Crackers, Inc.,* 683 F.Supp. 899 (E.D.N.Y.1988); *Steak & Brew, Inc. v. Makris,* 177 U.S.P.Q. 412 (D.Conn.1973); *In re Shenberg,* 433 F.Supp. 677 (N.D.Ill.1977); *Brennan v. T & T Trucking, Inc.,* 396 F.Supp. 615 (N.D.Okla.1975). These cases are uninformative in litigation under a portion of the 1978 Code, § 362(a)(1), that changed dramatically. Although *Bambu* was decided under § 362(a), it relied only on older cases and is unpersuasive. Two other cases under the 1978 Act, *Doskocil Cos. v. C & F Packing Co.,* No. 89 C 600 (N.D.Ill. July 26, 1990) (Holderman, J.), and *In re Vylene Enterprises, Inc.,* 63 B.R. 900, 906–07 (Bankr.C.D.Cal.1986), also are incompletely reasoned, and I am unpersuaded.

No authority at the appellate level supports Mahurkar's argument. Cases such as *In re Gull Air, Inc.,* 890 F.2d 1255 (1st Cir.1989), do not support a general rule that the automatic stay does not apply to post-bankruptcy acts. The FAA canceled Gull Air's landing slots at an airport on account of non-use. Using the slots was a condition of the property interest, and the court held, consistent with many cases showing that bankruptcy takes property interests as it finds them, that this nonbankruptcy rule applies within the bankruptcy case. See *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *Chicago Board of Trade v. Olsen,* 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1923). Moreover, the non-use began (if a "non" something can be said to "begin") and the slots were reallocated after the filing of the bankruptcy petition, and thus could not have been the subject of pre-bankruptcy administrative action. Kendall has been making these catheters for years, and the litigation long antedates the bankruptcy. I hold, therefore, that the automatic stay applies to the request for an injunction.

We come, then, to discovery in the multidistrict patent case. Section 362(a)(1) applies only to actions against the debtor. At oral argument, counsel for Kendall conceded that the automatic stay does not affect discovery regarding IMPRA, and that Kendall is obliged to participate to the extent it would be as a non-party. Related litigation goes on without the debtor. *Landis v. North American Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 165–66, 81 L.Ed. 153 (1936); *Wedgeworth v. Fibreboard Corp.,* 706 F.2d 541 (5th Cir.1983).

That concession, which I believe correctly states the law (although there are no cases on point), means that Mahurkar is entitled to at least some of the relief he seeks. Kendall has no ground to interfere with or disrupt discovery that is calculated to lead to evidence admissible against IMPRA. That a given witness used to work for Kendall (or still works for Kendall) is irrelevant, if the discovery has utility other than to facilitate recovery against Kendall.

Working out the details will require a degree of cooperation among counsel that is sadly missing at the moment. Bickering has been at a high level throughout the **\*978** case, and Kendall's effort to forbid me from even considering Mahurkar's request (and to penalize its lawyers if they argued their motion) did not exactly endear Kendall's lawyers to Mahurkar's. I will be available by telephone to resolve any disputes as they arise, and will issue orders as the need arises clarifying the permitted scope of discovery.

One final issue. Kendall's pre-bankruptcy instructions to the witness Scahill not to answer certain financial questions violated my order that only privilege is a ground for issuing such instructions. Kendall attempts to justify this by insisting that Scahill's answers would have revealed terms of the proposed reorganization in violation of the securities laws. Kendall does not specify which of the many securities laws, and this defense of its instructions is risible. The securities laws forbid withholding certain material information, or trading while information is unavailable to the public, but never forbid *revealing* information! If disclosing details of a reorganization plan violates the securities laws, how did Kendall manage to negotiate terms with its (other) creditors?

I can see Kendall's concern that financial information not be disclosed prematurely, but (a) the deposition was being conducted under the terms of my protective order, and (b) Kendall was at liberty to apply to me by telephone for additional protection. Instead it engaged in self-help. That violation of my orders (and of the Rules of Civil

Case 4:20-cv-14695-LMI-Doc14 Filed 04/26/20 Page 58 of 80
Matter of Mahurkar Double Lumen Hemodialysis Catheter..., 140 B.R. 969 (1992) in DKS5 Page 41 of 63
60 USLW 2781, 23 U.S.P.Q.2d 1903

Procedure) cannot go unnoticed. I therefore direct Kendall to make Scahill available for re-deposition, at its own expense (including the legal fees borne by Mahurkar's lawyers). Kendall can, I suppose, contend that even this remedy for a pre-bankruptcy delict is barred by the automatic stay. But I remind Kendall, and its lawyers, that sanctions in discovery may run against counsel personally. Fed.R.Civ.P. 37(a)(4). Kendall's lawyers are not debtors in bankruptcy and so are outside the stay. I am indifferent to whether Kendall pays these costs or its lawyers pay; one way or the other, Mahurkar is entitled to be reimbursed, and without waiting for the conclusion of the bankruptcy proceeding.

IV

I now make the following orders, which will also be entered as a separate injunction complying with Rule 65(d).

1. The Kendall Company, its officers, agents, and all those acting in concert with them and having actual knowledge of this order, are permanently enjoined from enforcing or attempting to enforce the temporary restraining order issued by the United States Bankruptcy Court for the District of Delaware on May 27, 1992, in adversary proceeding No. A–92–57.

2. The Kendall Company shall withdraw adversary proceeding No. A–92–57.

3. The Kendall Company shall institute no further litigation in any court designed to prevent Sakharam D. Mahurkar or Quinton Instruments Company from filing motions in this court seeking an interpretation of 11 U.S.C. § 362 and any relief allowed by that statute and otherwise authorized by law.

4. The Kendall Company shall immediately transmit copies of this opinion and injunction to the United States Bankruptcy Court for the District of Delaware, to be lodged in bankruptcy

case No. 92–667 as well as adversary proceeding No. A–92–57.

5. The Kendall Company, its officers, agents, and all those acting in concert with them and having actual knowledge of this order, are permanently enjoined from interfering with or obstructing discovery in the ongoing litigation among IMPRA, Mahurkar, and Quinton.

As for this litigation: (a) Mahurkar's request for damages and an injunction against Kendall is stayed by virtue of § 362(a) until its automatic expiration (following confirmation of the plan of reorganization) or its modification by the bankruptcy court. (b) Kendall's request for a declaratory judgment is not automatically stayed, but I nonetheless halt all proceedings in that action so long as the automatic stay bars litigation of the counterclaim seeking damages and an injunction. (c) Discovery and all other proceedings shall continue in the litigation among IMPRA, Mahurkar, and Quinton as if Kendall were **\*979** an interested non-litigant. In particular, this means that Mahurkar may take depositions of Kendall's former (and current) employees, other than depositions under Fed.R.Civ.P. 30(b)(6), limited to the discovery of evidence bearing on the IMPRA litigation. Motions for summary judgment in the dispute among IMPRA, Mahurkar, and Quinton will be resolved in the ordinary course, just as if Kendall were no longer a party to the litigation. Kendall is free, however, to file any briefs it wants in these matters, just as if it were an *amicus curiae*. All discovery and other proceedings against Kendall and its experts are stayed until the lifting or modification of the automatic stay. Mahurkar shall give Kendall timely notification of any depositions that might collaterally affect its interests during the period of this stay, and shall promptly notify IMPRA of any depositions, already noticed, that Kendall believes may proceed under this order to obtain evidence concerning IMPRA.

**All Citations**

140 B.R. 969, 60 USLW 2781, 23 U.S.P.Q.2d 1903

## Footnotes

\*    Of the Seventh Circuit, sitting by designation.

Matter of **Manikal Double Lumen Hemodialysis Catheter...**, 140 B.R. 969 (1992)
Case 4:20 Case 20-14695-LML Doc 14 Filed 04/26/20 Page 59 of 80 in TXSD Page 42 of 63

60 USLW 2781, 23 U.S.P.Q.2d 1903

---

†     In the interest of protecting reputations, I note that Kendall's lawyers in the patent action do not represent it in the bankruptcy action. Kendall is represented in the bankruptcy case by Hale & Dorr of Boston and by Young, Conaway, Stargatt & Taylor of Wilmington.

---

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX A-8

In re Mosher, 578 B.R. 765 (2017)

Case 4:20-cv-14695-LML   Doc 4   Filed 04/26/20   Page 61 of 80
Case 4:20-cv-14695-LML   Document 41-1   Filed on 04/26/20 in TXSD   Page 44 of 63

578 B.R. 765
United States Bankruptcy Court,
S.D. Texas, Houston Division.

IN RE: Laurance Coleman MOSHER, Jr., Debtor.

Case No. 17–34430
|
Signed 11/09/2017
|
Entered 11/10/2017

**Synopsis**
**Background:** United States filed motion to lift automatic stay in debtor's Chapter 13 case, to allow United States to submit agreed judgment to district court in tax suit against debtor.

The Bankruptcy Court, Jeff Bohm, J., held that cause existed to lift the automatic stay.

Motion granted.

**Attorneys and Law Firms**

**\*766** Thomas Black, Attorney at Law, Houston, TX, for Debtor.

David G. Peake, Chapter 13 Trustee, Houston, TX, for Trustee.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE UNITED STATES OF AMERICA'S (INTERNAL REVENUE SERVICE) MOTION FOR RELIEF FROM THE STAY REGARDING DISTRICT COURT CASE**

Jeff Bohm, United States Bankruptcy Judge

### I. Introduction

Laurance Coleman Mosher, Jr., the debtor in this case (the "Debtor"), filed a voluntary Chapter 13 petition on July 24, 2017. [Doc. No. 1]. He did so in order to stop the United States of America (the "USA") from submitting to U.S. District Judge Keith Ellison an agreed judgment that the Debtor, through his attorney, had signed consenting to foreclosure on his homestead. The agreed judgment would bring to substantial conclusion a certain lawsuit pending in District Judge Ellison's court (the "Tax Suit"). The Tax Suit is styled "*United States of America v. Laurance Coleman Mosher, Jr., et al.*," Civil Action Number 4:16–cv–00369; the USA had initiated this suit in 2016 because the Debtor refused to pay past due taxes totaling $968,001.16.

In response to the Debtor's filing of his Chapter 13 petition, the USA, on September 21, 2017, filed a motion to lift stay (the "Motion") requesting this Court to lift the automatic stay to allow the Tax Suit to proceed—i.e., to allow the USA to submit the Agreed Judgment to District Judge Ellison. [Doc. No. 32]. On October 3, 2017, the Debtor filed a response opposing the Motion. [Doc. No. 34]. On October 10, 2017, this Court held a hearing on the Motion. Two witnesses —James Ashton (special compliance revenue officer with the IRS) and the Debtor—gave testimony, and this Court admitted several exhibits. After hearing closing arguments, the Court made certain oral findings of fact and conclusions of law on the record, requested briefing from the parties on two issues, and continued the hearing for October 24, 2017 to allow for the Court to give consideration with respect to the ultimate ruling on the Motion.

On October 23, 2017, the parties each filed their briefs regarding the two issues that this Court raised at the October 10 hearing. Because the Court was not able to **\*767** review these briefs by the next day—i.e., the continued hearing on the Motion—the Court continued the hearing once again. The Court now issues its ruling in writing rather than holding a hearing to issue its ruling from the bench. These written findings of fact and conclusions of law are made pursuant to Bankruptcy Rules 7052 and 9014.[1] To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; and to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. Finally, to the extent that any of this Court's oral findings of fact and conclusions of law—made at the October 10 hearing or at the November 9 hearing—conflict with the written findings and conclusions set forth herein, the latter shall govern; and to the extent that the written findings and conclusions do not encompass all of the oral findings and conclusions, the latter shall supplement the former. For the reasons set forth below, the Court finds that the Motion should be granted and that the stay should therefore be lifted to allow the USA to submit the agreed judgment to the District Court in the Tax Suit.

In re Mosher, 578 B.R. 765 (2017)

Case 4:20-cv-14695-LML Doc 4   Filed 04/26/20   Page 62 of 80
Case 20-14695-LML   Document 41-1   Filed on 04/26/20 in DXSD   Page 45 of 63

## II. Findings of Fact

1. The Debtor is a 77-year-old attorney at law licensed by the State of Texas. The Debtor practiced law at Fulbright & Jaworski from 1967 through 2004. He was a partner at this law firm when he retired in 2004. Presently, although his law license is still active, the Debtor is not practicing law to any appreciable extent. In the Debtor's own words, his "income for legal services performed is sporadic." [Doc. No. 14, p. 61 of 93].

2. The Debtor failed to timely file his tax returns for 1997, 1998, 2000, 2001, and 2002; he finally filed them in October of 2007 and March of 2008. [Oct. 10, 2017 Tr. 10:21–25]. He did not pay the taxes when he filed these returns. [*Id.* at 11:1–7]. The IRS advised him that he owed taxes, but the Debtor did not respond. [*Id.* at 11:8–15]. Therefore, the IRS pursued levy actions. [*Id.*]. In the course of doing so, the IRS discovered that the Debtor had deliberately withdrawn several hundred thousand dollars from his accounts by obtaining multiple cashier's checks. [*Id.* at 11:16–12:20, 62:9–66:9]. Indeed, the Debtor admitted that he took these actions to avoid paying the IRS. [*Id.* at 12:21–13:1]. As a result of the Debtor's obstructionist tactics, the IRS referred his case to the Department of Justice to file suit. [*Id.* at 14:3–9, 23:23–24:5].

3. The Debtor resides at the following address: 407 Greencove Street, Houston, Texas 77024–6734 (the "Property"). [Doc. No. 14, p. 18 of 93]. The Debtor claims the Property as his homestead. [*Id.*].

4. The Property has a present fair market value of approximately $2.3 million. [Oct. 10, 2017 Tr. 30:21–25].

5. According to the Debtor's Schedule D (entitled "Secured Creditors"), the total amount of liens on the Property is $1,068,207.78. [Doc. No. 14, p. 47 of 93].

6. Of this total amount of $1,068,207.78, the Debtor's Schedule D represents that the IRS holds a lien in the amount of $961,621.00.[2] [*Id.* at p. 45 of 93]. The **\*768** remaining liens, which aggregate $106,586.78, are all held by two taxing authorities: the Spring Branch Independent School District and the Harris County Tax Assessor–Collector.

7. Based upon the Debtor's schedules and his testimony at the October 10 hearing, the Court finds that the Property has equity in the approximate amount of $1.3 million.

8. The Debtor is presently married to Gaia Mosher ("Ms. Mosher"). The Debtor and Ms. Mosher are presently engaged in a very acrimonious divorce proceeding pending in the District Court of Harris County, Texas. The suit is styled *Gaia T. Mosher v. Laurance C. Mosher, Jr.*, Cause No. 2015–47158, in the 257th District Court of Harris County, Texas (the "Divorce Suit").

9. On February 11, 2016, the USA initiated the Tax Suit by filing a complaint against the Debtor, Ms. Mosher, the Harris County Tax Assessor–Collector, and the Spring Branch ISD Tax Assessor–Collector. The complaint asserts that the Debtor failed to pay income taxes for the tax years 1997, 1998, 2000, 2001, and 2002, and that he owes the USA the sum of $968,001.16. [USA's Ex. No. 1]. The USA requests District Judge Ellison to enter an order that: (a) declares that the Debtor owes the amount of $968,001.16 to the USA; (b) declares the USA to hold a valid lien in this amount on all property owned by the Debtor, including the Property; and (c) allows the USA to foreclose its lien on the Property. [*Id.*].

10. The Debtor retained counsel to defend him in the Tax Suit, and this attorney filed an answer on April 4, 2016. [USA's Ex. No. 5].

11. The other defendants also retained counsel, each of whom thereafter timely filed answers to the complaint for their respective clients. [*Id.*].

12. On March 16, 2017, the USA and the Debtor entered into a settlement agreement. Under the agreement, the Debtor was to make a payment within 120 days (or by July 14, 2017) in lieu of the USA foreclosing the tax lien on the Property. Additionally, under the agreement, if the Debtor did not make the payment, the parties agreed to the entry of an agreed judgment that the Debtor owed the subject income taxes and that the USA could foreclose its federal tax lien on the Property, sell the Property and apply the sale proceeds against his tax liability. [Doc. No. 32, p. 3 ¶ 9]; [Doc. No. 34, p. 2 ¶ 9 (Debtor's response admitting these allegations)].

13. Counsel for the USA and counsel for the Debtor signed a two-page agreed judgment that the parties agreed would be submitted to District Judge Ellison for

In re Mosher, 578 B.R. 765 (2017)

Case 4:20-cv-14695-LML  Doc 4  Filed 04/26/20  Page 63 of 80
Case 4:20-cv-14695-LML  Document 41-1  Filed on 04/26/20 in TXSD  Page 46 of 63

signature if the Debtor did not pay off the lien held by the USA by July 14, 2017 (the "Agreed Judgment"). [USA's Ex. No. 2]. The Agreed Judgment was not filed with the District Court; rather, counsel for the USA has held the judgment with the expectation that it would be submitted to District Judge Ellison if the Debtor failed to make payment within the 120–day period—i.e., by July 14, 2017.

14. On March 21, 2017, the USA, the Debtor, and all other parties filed a joint motion to stay deadlines in the Tax Suit. [USA's Ex. No. 3]. This motion gave District Judge Ellison notice that the USA and the Debtor had entered into a settlement agreement. **\*769** Specifically, this motion, in pertinent part, represented the following:

> On March 16, 2017, the United States and Laurance C. Mosher, Jr. entered into a settlement agreement. Under the agreement, Mr. Mosher will make a payment within 120 days in lieu of the United States foreclosing the tax lien on the property. Accordingly, based on this settlement there is no need to continue discovery and litigate the issues in this matter. However, if Mr. Mosher defaults under the settlement agreement, the United States will move forward to foreclose the tax liens against the property. And if this occurs, discovery and further litigation will be necessary to determine the interest of the parties in the property. Thus, the deadlines for discovery and motions should be stayed.

[USA's Ex. No. 3]. In reliance upon the representations made in the joint motion, District Judge Ellison granted the relief requested and signed an order staying the deadlines in the Tax Suit. [Civ. Act. No. 4:16–cv–00369, Doc. No. 40].

15. In order to pay off the USA's lien, the Debtor attempted to obtain a reverse mortgage on the Property. [Oct. 10, 2017 Tr. 41:13–23]. However, on June 23, 2017, he received notice from the proposed lender (HomeBridge Financial Services, Inc.) that his reverse mortgage application had been denied. [*Id.*]; [USA's Ex. No. 8]. The Debtor thereafter failed to pay off the tax lien by the deadline of July 14, 2017 imposed by the settlement agreement.

16. On July 19, 2017, counsel for the Debtor, counsel for the USA, and counsel for all of the other parties in the Tax Suit filed a joint status report that included the following language:

> The issues between the United States and Laurance C. Mosher have been resolved and the United States anticipates filing an Agreed Judgment Against Laurance C. Mosher shortly. Accordingly, the United States intends to move forward to foreclose the tax liens against the property. However, the interests, if any, of Defendant Gaia Mosher in the property remain to be determined by this Court. Accordingly, the parties request that the matter be reinstated and a scheduling order be entered to allow for a short discovery period and dispositive motion deadline.

[USA's Ex. No. 4].

17. In order to prevent counsel for the USA from submitting the Agreed Judgment to District Judge Ellison—thereby allowing the USA to foreclose its lien on the Property—the Debtor filed a Chapter 13 petition on July 24, 2017. [Oct. 10, 2017 Tr. 35:11–13]. At some point between July 19, 2017 and July 24, 2017, the Debtor decided that, contrary to the terms of the settlement agreement, he wanted to continue residing at the Property, and he therefore now opposes the USA foreclosing its tax lien thereon. [*See* Oct. 10, 2017 Tr. 50:1–2, 54:12–13].

18. The Debtor's schedules represent that the Debtor has the following debts:

a. $961,621.00 secured claim of the IRS

b. $29,901.26 secured claim of the Harris County Tax Assessor–Collector

c. $9,047.03 secured claim of the Harris County Tax Assessor–Collector

d. $54,563.40 secured claim of Spring Branch ISD Tax Office

e. $12,547.18 secured claim of Spring Branch ISD Tax Office

f. $527.91 secured claim of Spring Branch ISD Tax Office

**\*770** g. $2,500.00 priority, unsecured claim of J. Thomas Black, P.C.

h. $7,841.00 non-priority, unsecured claim of Capital One

In re Mosher, 578 B.R. 765 (2017)

Case 4:20-cv-04695-LML Doc 4 Filed 04/26/20 Page 64 of 80
Case 4:20-cv-04695 Document 41-1 Filed on 04/26/20 in TXSD Page 47 of 63

i. $8,187.83 non-priority, unsecured claim of Capital One

j. $23.00 non-priority, unsecured claim of Citicards Cbna

k. $12,741.00 non-priority, unsecured claim of JPMorgan Chase Bank

l. $8,919.00 non-priority, unsecured claim of JPMorgan Chase Bank

[Doc. No. 14, pp. 44–53 of 93].

19. In his Schedule I, the Debtor represents that he has monthly income of $11,531.22, which includes his monthly social security check, his monthly pension payment from Fulbright & Jaworski, income from legal services that he continues to render, and other miscellaneous income. [*Id.* at p. 60 of 93].

20. The Debtor's proposed plan as of the October 10 hearing on the Motion calls for the Debtor to make 36 monthly payments to the Chapter 13 trustee, with the first payment to be in the amount of $1,000.00, the next 34 payments to each be in the amount of $2,200.00, and the final payment to be in the amount of $45,000.00— for an aggregate amount of $120,800.00. [Doc. No. 41]. Additionally, pursuant to paragraph 17 of the plan, as well as the Debtor's testimony, the Debtor also proposes to obtain a reverse mortgage on the Property to satisfy in full all of the taxes owed on the Property. [*Id.* at p. 8 of 11]; [Oct. 10, 2017 Tr. 47:17–25, 54:2–7]. The funds to be received from the reverse mortgage will be paid in a balloon payment in month 36 and will be used to retire all of the Debtor's tax liens. [Oct. 10, 2017 Tr. 48:3–6, 54:8–11]. Thus, the Debtor's plan allows him to keep the Property and continue to reside there and bars the USA from foreclosing its lien on the Property.

### III. Credibility of Witnesses

Two witnesses testified at the October 10 hearing: James Ashton, a special compliance revenue officer with the IRS, and the Debtor. The Court finds that both of these individuals gave forthright answers to the questions posed to them; therefore, the Court finds their testimony to be credible and gives their testimony equal weight.

### IV. Conclusions of Law

**A. Jurisdiction, Venue, and Constitutional Authority to Enter a Final Judgment**

#### 1. Jurisdiction

This Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012–6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

This matter is a core proceeding because it is a request to lift the automatic stay, and such a request is expressly defined as a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(G). This dispute is also core under the general "catch-all" language because such a dispute is the type of proceeding that can only arise in the context of a bankruptcy case. *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 **\*771** if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."). Prosecution of a motion to lift the automatic stay pursuant to § 362(d) can only occur in a bankruptcy court. There is no state law equivalent of this action.

#### 2. Venue

Venue is proper pursuant to 28 U.S.C. § 1408(1).

#### 3. Constitutional Authority to Enter a Final Order

There is no question that an order lifting the automatic stay is a final order. *Matter of Chunn*, 106 F.3d 1239, 1241 (5th Cir. 1997) (holding that an order granting relief from the automatic stay is a final order). The Supreme Court's decision in *Stern v. Marshall* recognized certain limitations on bankruptcy courts' authority to enter final orders. 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). Therefore, this Court has a duty to question its constitutional authority to enter a final order for any matter brought before it. The Court concludes that the facts in the pending matter are distinguishable from those in *Stern*, and that this Court has the authority to enter a final order on the Motion.

In re Mosher, 578 B.R. 765 (2017)

Case 4:20-cv-14695-LML Doc 4 Filed 04/26/20 Page 65 of 80
Case 20-14695-LMI Document 41-1 Filed on 04/26/20 in TXSD Page 48 of 63

In *Stern*, the debtor filed a counterclaim based solely on state law, and the resolution of this counterclaim did not resolve the validity, or invalidity, of the claim held by the defendant. *Id.* Here, the matter before the Court is not a counterclaim by the Debtor or the estate brought pursuant to state law, but rather is a request from a creditor—the USA—to lift the automatic stay pursuant to § 362(d), which is an express provision of the Bankruptcy Code. Therefore, this Court has the constitutional authority to enter a final order in this dispute.

Finally, in the alternative, this Court has the constitutional authority to enter a final order on the Motion because the Debtor and the USA have consented, impliedly if not explicitly, to adjudication of this dispute by this Court. *Wellness Int'l Network, Ltd. v. Sharif*, —— U.S. ——, 135 S.Ct. 1932, 1947, 191 L.Ed.2d 911 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent...."). Indeed, the USA filed the Motion, the Debtor filed his response in opposition thereto, and the parties proceeded to adduce testimony and introduce exhibits at the hearing held on October 10, 2017. Moreover, they thereafter filed briefs in support of their respective positions. At no time did either party object—orally or in writing—to this Court's authority to enter a final order on the Motion. If these circumstances do not constitute consent, nothing does.

**B. Applicable Law**
There are two avenues available under § 362 for a creditor to obtain a lifting of the stay. First, under § 362(d)(2), a creditor can obtain a lifting of the stay if two elements are satisfied: (1) the property that is the subject of the motion has no equity; and (2) the property is not necessary to an effective reorganization of the debtor. In the matter at bar, the Property unquestionably has substantial equity—approximately $1.3 million. [Finding of Fact No. 7]. Therefore, the USA cannot obtain a lifting of the stay under § 362(d)(2).

**\*772**  That leaves the other avenue for the USA to pursue. Under § 362(d)(1), a creditor can obtain a lifting of the stay "for cause." The term "cause" is not defined in the Code. Whether cause exists is a fact-intensive inquiry that must be determined on a case-by-case basis. *In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. 106, 112 (Bankr. S.D. Tex. 2014); *In re Bovino*, 496 B.R. 492, 502 (Bankr. N.D. Ill. 2013). "Each

case must be viewed on the basis of its own particular facts, and there must be a balancing of the interest of the debtor with the interest of the secured creditor in its collateral." *In re Bovino*, 496 B.R. at 502. "The decision of whether to lift the stay is committed to the discretion of the bankruptcy judge." *In re Syndicom Corp.*, 268 B.R. 26, 43 (Bankr. S.D.N.Y. 2001). Finally, "[t]he burden of proof on a motion to lift the automatic stay is a shifting one: section 362(d)(1) requires an initial showing of cause by the movant; then, with the exception of the debtor's equity in the property (which is not at issue on a motion under section 362(d)(1), like this one), section 362(g) places the burden of proof on the debtor for all other issues." *Id.*

**C. Factors to Consider When Assessing Whether to Lift the Automatic Stay for Cause**
One court has stated that:

> Factors generally looked to in determining whether to modify the stay for cause include interference with the bankruptcy, good or bad faith of the debtor, injury to the debtor and other creditors if the stay is modified, injury to the movant if the stay is not modified, and the proportionality of the harms from modifying or continuing the stay." None of these factors alone is outcome determinative. The factors in the present case must be weighed within the context of all the relevant circumstances. Courts must weigh the costs and benefits of maintaining the stay.

*In re Bovino*, 496 B.R. at 502 (citations omitted).

Aside from these factors, one of the undersigned judge's former colleagues (now retired) set forth various factors to consider in specifically determining whether to lift the stay to allow litigation against the Debtor to proceed in another forum—which is exactly what the USA is requesting to do here, as it wants to proceed to file the Agreed Judgment in the Tax Suit. [*See* Finding of Fact No. 16]. In *In re Xenon*

*Anesthesia of Texas, PLLC*, Bankruptcy Judge Letitia Paul, citing several prior cases, set forth twelve factors to consider:

> 1) whether the relief will result in a partial or complete resolution of the issues; 2) lack of any connection with or interference with the bankruptcy case; 3) whether the other proceeding involves Debtor as a fiduciary; 4) whether a specialized tribunal has been established to hear the particular cause of action; 5) whether the debtor's insurer has assumed full responsibility; 6) whether the action primarily involves third parties; 7) whether litigation in the other forum would prejudice the interests of other creditors; 8) whether the judgment claim arising from the other action is subject to equitable subordination; 9) whether movant's success would result in a judicial lien avoidable by the debtor; 10) interests of judicial economy and the expeditious and economical resolution of litigation; 11) whether the proceedings have progressed to the point that parties are ready for trial; and 12) impact of the stay on the parties and the balance of harm.

510 B.R. 106, 112 (Bankr. S.D. Tex. 2014) (citations omitted).

**\*773** In total, *Bovino* and *Xenon* articulate a universe of seventeen factors to consider in evaluating whether cause exists to lift the stay. This Court believes that some, but not all, of these factors are relevant in the dispute at bar. This Court will therefore address those factors that it believes are relevant in determining whether to lift the automatic stay for cause to allow the USA to proceed forward in the Tax Suit.

### 1. Good or Bad Faith of the Debtor

The Debtor's conduct has been less than stellar. First, he is an attorney at law, [Finding of Fact No. 1], who has a duty to follow the law. Yet, he thumbed his nose at the law by failing to timely file numerous tax returns and paying taxes.

*Matter of Crayton*, 169 B.R. 243, 245 (Bankr. S.D. Ga. 1994) ("The Internal Revenue Code imposes a duty to file federal income tax returns.") (citing 26 U.S.C. §§ 6001, 6011); *In re Vines*, 200 B.R. 940, 944 (M.D. Fla. 1996) (stating that the debtor's argument that filing a tax return is purely voluntary as "entirely meritless and is clearly contrary to established law" and that "[i]n addition to the legal requirement, the filing of taxes is also a necessary element for full disclosure in the bankruptcy court which is a court of equity."). Second, he was a partner at one of the largest law firms in the country, [Finding of Fact No. 1], so he was doubtless generating substantial income; yet, he chose not to pay taxes for several years while practicing law at this firm, [Finding of Fact No. 2]. Third, when the IRS tried to communicate with him in an effort to negotiate payment of the past due taxes, he gave the IRS the silent treatment. [*Id.*]. Further, when the IRS initiated levy actions to collect the taxes, the Debtor quickly withdrew hundreds of thousands of dollars by obtaining cashier's checks. [*Id.*]. Fifth, once the USA sued him in the Tax Suit, he entered into a settlement agreement promising to pay the past due taxes by July 14, 2017, or, if he failed to do so, to allow the USA to submit the Agreed Judgment to the District Court so that the USA could foreclose its lien on the Property. [Finding of Fact No. 12]. But then, when he failed to pay off the taxes by the deadline, the Debtor reneged on the settlement agreement by filing this Chapter 13 petition and informing this Court that he wants to keep the Property. [Finding of Fact No. 17].

Overall, the Court finds the Debtor's conduct to be shameful and, accordingly, finds him to be in bad faith. But, there is more. By filing his Chapter 13 petition and taking the position that the USA should not be able to foreclose its lien on the Property, the Debtor is undermining the integrity of the judicial process. This Court, now invoking the doctrine of judicial estoppel, will not allow the Debtor to continue to pursue this strategy.

Judicial estoppel should apply when the following elements are present: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011). Here, in the Tax Suit, the Debtor asserted a specific position in the joint motion to stay deadlines: namely, that he had settled with the USA, one of the terms of which is that he would pay off the tax lien by July 14, 2017, or else allow the USA to foreclose its lien on the Property. [Finding of Fact No. 14].

The Debtor made this representation to District Judge Ellison in order to convince him to abate the deadlines imposed by the District Court in the Tax Suit. [*Id.*]. District Judge Ellison, in reliance upon the representation by the Debtor that he had settled with the USA, approved the motion and signed the order. [*Id.*]. Stated differently, District **\*774** Judge Ellison accepted the Debtor's position that he had settled with the USA.

However, when the Debtor failed to pay off the tax lien by the July 14, 2017 deadline, rather than abide by the terms of the settlement agreement, he filed his Chapter 13 petition and proceeded to file a plan proposing to allow him to keep the Property and also opposed the Motion by vigorously arguing that the stay should not be lifted. Thus, the Debtor is now asserting a legal position (i.e., that no cause exists to allow the USA to submit the Agreed Judgment so that it can foreclose on the Property) that is plainly inconsistent with his prior position in the Tax Suit (i.e., that the USA should be allowed to submit the Agreed Judgment if he fails to pay the tax lien by July 14, 2017).

Moreover, the Debtor's filing of his Chapter 13 petition, the filing of his proposed plan allowing him to keep the Property and to continue to reside thereon, and his vigorous opposition to the Motion are not inadvertent acts. He has intentionally undertaken this strategy in a last ditch effort to thwart the USA. This Court will not allow the Debtor to do so. Pursuant to the doctrine of judicial estoppel, this Court finds that the Debtor is estopped from now arguing that the USA should not be allowed to submit the Agreed Judgment to District Judge Ellison. Stated differently, the Debtor's actions have undermined the integrity of the judicial process, which means that the Debtor has acted in bad faith.

For all of the reasons set forth above, this factor strongly favors lifting the automatic stay.

### 2. Injury to the Debtor and Other Creditors if the Stay is Lifted

Lifting the stay to allow the USA to submit the Agreed Judgment to the District Court will presumably lead to a foreclosure sale on the Property. Such an action will not harm the taxing authorities because their liens will be paid prior to the tax lien held by the IRS. Moreover, the Debtor's unsecured creditors, who hold aggregate debts of $40,211.83, [*see* Finding of Fact No. 18], can be paid from the Debtor's substantial monthly income of $11,531.22, [*see* Finding of Fact No. 19]. Indeed, that is what the Debtor's plan essentially proposes. [*See* Finding of Fact No. 20]. Accordingly, these creditors are not harmed if the stay is lifted. The Debtor's wife, Ms. Mosher, will not be harmed, either. She and the Debtor are in divorce proceedings, and she is not residing at the Property, as she moved out after the divorce petition was filed.

So, if there is anyone harmed by lifting of the stay, it will only be the Debtor. However, it is not as if he will be out on the streets without a roof over his head. The Property—which has substantial equity, [Finding of Fact No. 7], will indeed be sold, but in a deliberate, well-advertised sale pursuant to IRS procedures, so it is highly likely that after all tax liens are paid from the sale proceeds, there will be substantial funds remaining that will be remitted to the Debtor. Accordingly, he will be able to purchase a new homestead, although perhaps not as palatial as the Property. Given the Debtor's bad faith conduct, as already described above, the Court finds that any such harm is *de minimis*.

In sum, this factor favors a lifting of the stay.

### 3. Injury to the Movant if the Stay is Not Lifted

The Debtor argues that if the stay is not lifted, the Movant will not be injured because the Property has substantial equity. Hence, so the argument goes, if the Property ever has to be sold, there will be sufficient proceeds to completely retire the USA's lien.

**\*775** If the Debtor had not entered into the settlement agreement and signed the Agreed Judgment, [*see* Finding of Fact Nos. 12 & 13], his argument would have much merit. However, by signing these documents and also filing the joint motion to stay deadlines, [Finding of Fact Nos. 12, 13, & 14], the Debtor was able to convince the USA to stand down in the Tax Suit for several months to allow him time to obtain a reverse mortgage on the Property in order to retire the tax lien. [Finding of Fact No. 14]. However, he failed to procure a reverse mortgage and instead of abiding by the terms of the settlement agreement and allowing the USA to foreclose on the Property, the Debtor has reneged on the terms and is now using his Chapter 13 case to buy more time to obtain a reverse mortgage. [Finding of Fact Nos. 15 & 17]. The injury to the USA if this Court does not lift the stay, therefore, is that it will not receive the benefit of the bargain it made when it entered into the settlement agreement. This injury is significant for two reasons. First, as already discussed above, the Debtor's actions undermine the integrity of the judicial system. Second, the taxes owed by the Debtor have remained unpaid for approximately twenty years while the Debtor has

In re Mosher, 578 B.R. 765 (2017)

Case 4:20-cv-14695-LML  Doc 4   Filed 04/26/20   Page 68 of 80
Case 20-14695-LML   Document 41-1   Filed on 04/26/20 in TXSD   Page 51 of 63

continued to live the "life of Riley" in what is accurately described as a mansion in the Piney Point neighborhood of Houston, Texas.

For all of these reasons, the Court finds that if it does not lift the stay to allow the USA to submit the Agreed Judgment to District Judge Ellison, then the USA will be substantially injured.

#### 4. Whether the Relief will Result in a Partial or Complete Resolution of the Issues

Lifting the stay to allow the Tax Suit to proceed will definitely result in a partial resolution of the issues in the Tax Suit. Specifically, if the stay is lifted, the USA would be free to submit the Agreed Judgment to District Judge Ellison. His entering the Agreed Judgment would resolve a major issue of the Tax Suit: namely, whether the USA should be allowed to foreclose on the Property. The remaining issue left for resolution would be whether Ms. Mosher has an interest in the Property.

Under these circumstances, this factor weighs in favor of lifting the automatic stay.

#### 5. Whether the Judgment Claim Arising from the Other Action is Subject to Equitable Subordination

The Agreed Judgment to be submitted to District Judge Ellison is not subject in any way to equitable subordination. There is absolutely nothing in the record to indicate that the USA has taken any actions that merit equitable subordination of its tax lien.

Under these circumstances, this factor weighs in favor of lifting the automatic stay.

#### 6. Whether the Movant's Success Would Result in a Judicial Lien Avoidable by the Debtor

The movant here—the USA—holds a valid tax lien on the Property. There is no judicial lien that could be avoidable by the Debtor in this Chapter 13 case.

Under these circumstances, this factor weighs in favor of lifting the automatic stay.

### V. Conclusion

In assessing whether cause exists to lift the stay, this Court finds that the factors discussed above strongly weigh in favor of **\*776** immediately lifting the automatic stay for cause. Lifting the stay will allow the USA to submit the Agreed Judgment to the District Court, and to take all other actions necessary to protect its lien in the Tax Suit—and, additionally, to bring to closure the major issue in the Tax Suit: namely, allowing the USA to foreclose its tax lien on the Property. Admittedly, the Debtor, who is a 77-year-old man, will lose his homestead, but he has only himself to blame. He has been gaming the system for much too long by first not filing tax returns, and then not paying past due taxes, and then deliberately moving substantial sums of money to avoid the IRS' efforts to collect the taxes, and then negotiating a settlement in the Tax Suit, but then reneging on the terms of this settlement by filing the petition initiating this Chapter 13 case. The Debtor is highly sophisticated individual who has shirked too many of his responsibilities. It is time to draw the line in the dust and bring an end to his gamesmanship. The Court does so by lifting the automatic stay immediately so that the USA can proceed to submit the Agreed Judgment to the District Court in the Tax Suit.

An order consistent with these Findings of Fact and Conclusions of Law is entered simultaneously on the docket herewith.

**All Citations**

578 B.R. 765

### Footnotes

1       Any reference to a "Rule" is a reference to the Federal Rules of Bankruptcy Procedure. Further, any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.

In re Mosher, 578 B.R. 765 (2017)
Case 4:20-cv-14695-LML   Doc 4   Filed 04/26/20   Page 69 of 80
Case 20-14695-LML   Document 41-1   Filed on 04/26/20 in TXSD   Page 52 of 63

2    The IRS has filed a proof of claim setting forth that its secured claim is $969,353.95. [USA's Ex. No. 7]. Therefore, the parties do not materially disagree on the amount of the USA's lien.

**End of Document**                                             © 2020 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX A-9

2005 WL 357174
Only the Westlaw citation is currently available.
United States District Court,
E.D. Louisiana.

Annette LEDET, wife of,
Patrick Ledet, and Lisa Land
v.
K-MART CORPORATION

No. Civ.A. 01-2485.
|
Feb. 11, 2005.

**Attorneys and Law Firms**

Michael Hudson Ellis, Chehardy, Sherman, Ellis, Breslin,
Murray & Recile LLP, Metairie, LA, for Plaintiffs.

Jack Etherton Truitt, Ingrid Cruz, The Truitt Law Firm,
Madisonville, LA, for Defendant.

*ORDER AND REASONS*

BERRIGAN, J.

 **\*1** Before the Court is Defendant K-Mart Corporation's
("K-Mart") Motion for Dismissal with prejudice under
Fed.R.Civ.P. 12(b)(6). After considering the motion and
memorandum in support, the memorandum in opposition
thereto, and the applicable law, the Court hereby DENIES the
Motion to Dismiss.

I. Background
This case originated as a personal injury suit under the Court's
diversity jurisdiction pursuant to 28 U.S.C. § 1332 after the
plaintiffs, Annette Ledet and Lisa Land, alleged they were
struck by falling boxes in the defendant's store in Boutte,
Louisiana. (Rec. Doc. 1 at 2). However, before the case was
settled or proceeded to trial, K-Mart filed for Chapter 11
bankruptcy protection in the Northern District of Illinois.
(Rec.Doc. 16). The next day, on February 2, 2002, this Court
administratively closed the case. (Rec.Doc. 17). While the
Court retained original jurisdiction, the parties were given
leave to return the matter to the trial docket upon the filing
of a motion. (*Id.*)

Meanwhile in the bankruptcy proceeding, the Bankruptcy
Court on April 1, 2004 issued an Order Disallowing and
Expunging or Otherwise Reducing or Reclassifying Certain
Claims Set Forth in the Twenty-First Omnibus Objection
(Certain Personal Injury and Other Claims) [hereinafter
"Reclassification Order"], under its jurisdiction over the core
proceeding pursuant to 28 U.S.C. §§ 157(b)(2) and 1334. [1]
Under this Reclassification Order, the value of the plaintiff's
personal injury claim was set at $5,000, with no apparent
challenge to this sum by the plaintiffs. [2] (Rec. Doc. 18 at 2-3,
Ex. 1). On July 30, 2004, a few days before the instant Motion
to Dismiss was filed, the defendant's former counsel, Jack
Truitt, allegedly contacted the plaintiffs by mail indicating
that the value of the claim to be settled was $15,000, and that
a settlement draft with said sum was "in the process of being
mailed." [3] (Rec.Doc. 23, Ex. A).

II. Law and Analysis
Defendant argues that the Reclassification Order resolved
the claim that gave rise to the tort action before this Court,
thus permitting dismissal under Fed.R.Civ.P. 12(b)(6). (Rec.
Doc. 18 at 3). While the plaintiffs appear to concede the
validity of the Reclassification Order, they allege that no
such settlement draft reached their counsel. Plaintiffs further
allege that neither the defendant's former counsel (Truitt) nor
its new counsel, Neil Abramson of Phelps Dunbar, LLC,
have forwarded an amount for settlement as required under
the Reclassification Order. (Rec.Doc. 23). Nonetheless, the
defendant requests that the Court dismiss the underlying
claims.

The Court cannot grant the defendant's request because to do
so would violate the automatic stay on proceedings, which the
defendant itself noticed on January 31, 2002. The filing of a
petition for Chapter 11 bankruptcy

> operates as a stay, applicable to all
> entities, of the commencement or
> *continuation,* including the issuance or
> employment of process, of a judicial,
> administrative, or other action or
> proceeding against the debtor that
> was or could have been commenced
> before the commencement of the case
> under this title, or to recover a claim
> against the debtor that arose before the

commencement of the case under this title.

**\*2** 11 U.S.C. § 362(a)(1) (emphasis added). The Fifth Circuit has broadly construed "continuation" in subsection (a)(1) to encompass any change or occurrence in the action. *See Pope v. Manville Forest Products Corp.,* 778 F.2d 238 (5th Cir.1985). In *Manville,* the appeals court unequivocally found that the automatic stay under § 362(a)(1) affected motions for dismissal:

> [O]rdinarily the stay must be construed to apply to dismissal as well. First, if either of the parties takes any step to obtain dismissal, such as motion to dismiss or motion for summary judgment, there is clearly a continuation of the judicial proceeding. Second, in the more technical sense, just the entry of an order of dismissal, even if entered sua sponte, constitutes a judicial act toward the disposition of the case and hence may be construed as a 'continuation' of a judicial proceeding. Third, dismissal of a case places the party dismissed in the position of being required 'to continue the judicial proceeding,' thus effectively blocking his right to appeal. Thus, absent the bankruptcy court's lift of the stay, or perhaps a stipulation of dismissal, a case such as the one before us must, as a general rule, simply languish on the

court's docket until final disposition of the bankruptcy proceeding.

*Manville Forest Products Corp.,* 778 F.2d at 239. In the instant case, the Court administratively closed the plaintiffs' case to avoid the inadvertent languishing referenced in the *Manville* decision.

The Court denies the defendant's motion on four grounds. First, contrary to the Court's Order, K-Mart failed to petition the Court to re-open the case such that it could file its 12(b)(6) motion. (*See* Rec. Doc. 17). Second, to the knowledge of the undersigned, the Bankruptcy Court in the Northern District of Illinois has not lifted the stay. Third, as mentioned above, an adjudication of the defendant's motion would constitute a continuation of judicial action in violation of § 362(a)(1). Finally, as the disposition of the Reclassification Order is satellite to the core proceeding [4] and falls within the purview of the Bankruptcy Court, the Bankruptcy judge is obviously best positioned to remove whatever barriers to the resolution of the plaintiffs' claims. The defendant is thus directed to file any dispositive motions in the Bankruptcy Court. The plaintiffs are likewise instructed to address themselves to the Bankruptcy Court should they feel that the defendant is dilatory in satisfying the command of the Reclassification Order with respect to their pending tort claim.

Accordingly,

IT IS ORDERED that Defendant's Motion to Dismiss be DENIED, and that the above-caption case remain ADMINISTRATIVELY CLOSED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 357174

## Footnotes

1    K-Mart had filed its Twenty-First Omnibus Objection to facilitate the resolution of a large number of tort claims asserted against it in the Chapter 11 bankruptcy proceeding.

2    It is undisputed that prior to the reclassification, the plaintiffs had leave from the Bankruptcy Court to proceed with their claim when they were unable to settle with K-Mart under the Bankruptcy Court's Order Approving Procedures for Liquidating and Settling Personal Injury Claims Through Direct Negotiation and/or Alternative Dispute Resolution issued on July 18, 2002.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 357174

3    The Court notes in passing the discrepancy of $10,000 between the value assigned to the claim under the Reclassification order and the apparent settlement offer in Mr. Truitt's correspondence.

4    Under § 157(b)(2)(B), a core proceedings includes "allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11."

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 20-14695-LML Doc 4 Filed 04/26/20 Page 74 of 80

# APPENDIX A-:

2013 WL 5604339
Only the Westlaw citation is currently available.
United States District court, D.
Maryland, Northern Division.

LEDO PIZZA SYSTEM, INC., et al., Plaintiffs,

v.

Inderjit SINGH, et al., Defendants.

Civil No. WDQ–13–2365.
|
Oct. 10, 2013.

MEMORANDUM OPINION

WILLIAM D. QUARLES, JR., District Judge.

**\*1** Ledo Pizza System, Inc. and Ledo Pizza Carryouts, Ltd. (collectively "Ledo") sued Defendants Tri–Bro, Inc. ("Tri–Bro") and Inderjit Singh for violations of the Lanham Act, and other claims. ECF No. 1. Pending is Ledo's motion for a temporary restraining order **and** preliminary injunction. ECF No. 2–1. No hearing is necessary on the motion for a temporary restraining order ("TRO"). *See* Local Rule 105.6 (D.Md.2012). For the following reasons, Ledo's motion for a TRO will be granted in part and denied in part.

I. Background [1]
On June 8, 2007, Ledo and the defendants signed a franchise agreement, which authorized the defendants to operate a Ledo pizza restaurant in Lorton, Virginia. ECF No. 2–1 at 2. Beginning in 2010, the defendants defaulted on several of their obligations under the agreement. *Id.* at 3. According to Ledo, the defendants now owe Ledo tens of thousands of dollars in overdue franchise and other fees. ECF No. 4 at 9 ¶ 47. On May 14, 2012, Ledo terminated the franchise agreement. ECF No. 2–1 at 3.

On May 31, 2012, Ledo and the defendants entered into a forbearance agreement. ECF No. 2–1 at 4. Under this agreement, Ledo refrained from exercising its post-termination rights under the franchise agreement, to give the defendants an opportunity to sell the franchise or dispose of its assets. ECF No. 2–1 at 4–5. Although this agreement expired in November 1, 2012, ECF No. 2–8 at 2, Ledo agreed in June 2013 to extend the forbearance period to July 31,

2013. ECF No. 2–1 at 5. [2] Ledo contends that the defendants continued to operate the franchise following the termination of the franchise agreement and after the forbearance periods. *Id.*

On August 14, 2013–two weeks after the extended forbearance period-Ledo moved for a TRO and a preliminary injunction. ECF No. 2–1. The motion seeks to enjoin the defendants from the continued use of Ledo's trademark and trade dress, allegedly in violation of the Lanham Act and Ledo's common law trademark rights. *Id.* at 6.

Ledo also seeks the defendants' compliance with the post-termination obligations in the franchise agreement, *id.* at 8, [3] and the agreement's covenant-not-to-compete, *id.* at 12–13. [4]

The amended complaint seeks a permanent injunction, see *e.g.,* ECF No. 4 at 17, and specific performance, ECF No. 4 at 12–15. Ledo also requests damages for breach of contract [5] and costs and attorneys' fees against defendant Singh only, because Tri–Bro had declared bankruptcy. [6] *See id.* at 216, 12.

Both Defendants were served on August 19, 2013. ECF No. 7; ECF No. 8. The parties held a telephone conference on August 22, 2013, during which counsel for Tri–Bro confirmed that the company had filed for Chapter 11 Bankruptcy protection. Counsel for both defendants were instructed to file their responses to Ledo's motion by mid-day August 26, 2013. Only Tri–Bro's counsel responded and, by letter, declined to file a response to the motion because Ledo no longer sought damages against it. ECF No. 10. On August 30, 2013, the parties jointly stipulated to entry of a consent order that would have given the defendants 0 days to wind down the business, after which the Court would order dismissal of the action or grant injunctive relief depending on whether the defendants complied with the agreement. See ECF No. 11 at 6–9. On September 4, 2013, the Court informed the parties that, due to concerns that the defendants would not have sufficient time to wind down the business, it would not enter the consent order. ECF No. 12. Instead, the Court would treat the consent order as a tentative settlement and request to stay the litigation. *Id.* On October 7, 2013, Ledo renewed its request for injunctive relief, because the defendants did not comply with the terms of the consent order. [7] ECF No. 13 at 5.

II. Analysis

### A. Bankruptcy Filing

**\*2** Although Tri–Bro has filed for bankruptcy, Ledo seeks injunctive relief against it. ECF No. 4 at 2. Under 11 U.S.C. § 362, a bankruptcy petition "operates as a stay ... of ... the commencement or continuation ... of a judicial ... action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy proceeding.]" § 362(a) (1). The plain text of the statute suggests that the automatic stay provision applies to suits for equitable relief. *See id.* In *Advanced Computer Servs. of Michigan, Inc. v. MAI Sys. Corp.,* 161 B.R. 771, 772, 774 (E.D.Va.1993),[8] the plaintiffs sought declaratory and injunctive relief after the defendant filed for bankruptcy. The court held that the § 362 "automatic stay bars claims for declaratory and injunctive relief, as well as claims for monetary relief and that the stay also bars claims based on conduct that commenced pre-petition and continues into the post-petition period." *Id.* at 772.[9]

Ledo's amended complaint states that Tri–Bro filed for bankruptcy on May 20, 2013. ECF No. 4–1 at 2. Ledo contends that the basis for Ledo's motion for injunctive relief is conduct before, and after, Tri-Bro's bankruptcy filing. *See, e.g.,* ECF 4–1 at 5, 8. Because Ledo seeks injunctive relief against Tri–Bro for behavior that arose before and after the petition was filed, the Court will reject Ledo's request for injunctive relief against Tri–Bro. [10]

### B. Preliminary Injunction Standard [11]

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.,* 245 F.3d 335, 339 (4th Cir.2001) (internal quotation marks omitted). Because a preliminary injunction "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way," "[t]he danger of a mistake in this setting is substantial." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.,* 17 F.3d 691, 693 (4th Cir.1994) (internal quotation marks omitted).

To obtain a preliminary injunction, the movant must demonstrate that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors him; and (4) an injunction is in the public interest. [12] The movant must show more than a "grave or serious question for litigation;" instead,

he bears the "heavy burden" of making a "clear showing that [he] is likely to succeed at trial on the merits." *Real Truth,* 575 F.3d at 347, 351. All four elements must be satisfied. *Id.* at 346.

### C. Lanham Act Trademark Infringement

#### 1. Likelihood of Success on the Merits

To prevail on its Lanham Act claims, Ledo must show that it "has a valid, protect[a]ble trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 930 (4th Cir.1995) (citing 15 USC § 1141(1)). In a directly analogous case involving a terminated pizza franchise agreement, the court held that a franchisee's continued use of a franchisor's trademarks following the termination of the agreement was likely to cause confusion among consumers. *See Prosperity Systems, Inc. v. Ali,* CIV. CCB–10–2024, 2010 WL 5174939, at \*2 (D.Md. Dec.15, 2010) (citing *Merry Maids Ltd. P'ship v. Kamara,* 33 F.Supp.2d 443, 445 (D.Md.1998)). In this context it is probable that consumers will be misled or confused "as to the source of the goods in question." *See Ohio Learning Ctrs., LLC v. Sylvan Learning, Inc.,* CIV.A. RDB–10–1932, 2012 WL 1067668, at \*10 (D.Md. Mar.27, 2012). [13]

**\*3** Ledo likely owns the trademark "Ledo Pizza." [14] Here, the defendant is using Ledo's actual trademark, not a "colorable imitation." ECF No. 4 at 8. The defendant's customers are likely to erroneously believe they are patronizing an authorized Ledo restaurant. Ledo has established its likelihood of success on the merits.

#### 2. Irreparable Harm

Ledo argues that it has suffered irreparable harm from the defendant's infringement of its trademark rights. ECF No. 2–1 at 6–7. A finding of irreparable harm usually follows a finding of unlawful use of a trademark and a likelihood of confusion. [15]

Ledo asserts that the defendant's continued use of its trademark and trade dress, and his continued operation of a now-unauthorized Ledo pizza restaurant "undermine[s] the good will, reputation and loyal patronage" of Ledo. ECF No. 2–1 at 7. The defendant's customers erroneously believe that the defendant's restaurant is an authorized Ledo franchise, and expect that the restaurant will provide the quality of

services and products received at authorized franchises. See *id.* at 7, 11–12. Ledo can no longer control the quality of products and services at the defendant's restaurant because of the termination of the franchise agreement. *Id.* at 11. Ledo also claims that the defendant's restaurant is diverting customers from authorized Ledo franchises, decreasing Ledo's profits. *Id.* This loss of control of the defendant's restaurant, the threat to Ledo's reputation and goodwill, and the ongoing loss of profits qualify as irreparable harm. *See, e.g., Merry Maids,* 33 F.Supp.2d at 445.

3. Balance of Equities

Ledo argues that the balance of equities favors it, because "[t]he potential harm to the Defendants in granting [this motion] ... is relatively minimal" compared to the harm Ledo will suffer by defendant's continued infringement. ECF No. 2–1 at 7. Although several analogous cases conclude that the balance of equities generally favors the franchisor, some of these cases also recognized that the former franchisees suffer great harm from the closure of their businesses. *See NaturaLawn,* 484 F.Supp.2d at 403; *Prosperity,* 2010 WL 5174939, at \*5. However, when the defendant's "hardships have been created by their own willful acts," the balance favors the plaintiffs. [16]

Here, it is likely that the defendant will suffer serious economic harm from the closure of his restaurant, especially since the defendant is apparently attempting to find a buyer for the business or its assets. Nonetheless, the defendant's hardship appears self-inflicted. Ledo has produced numerous invoices sent to the defendant showing overdue balances which demonstrate that the defendant was on notice of likely termination of the franchise. ECF No. 2–5. The defendant also received several letters from Ledo requesting that he cease operating as a Ledo pizza restaurant following the termination. *See, e.g.,* ECF No. 1–5 at 2. Accordingly, the balance of equities tips in Ledo's favor, despite the economic hardship the defendant will likely suffer.

4. Public Interest

**\*4** Ledo argues that the public "has a strong interest in the protection of trademarks," justifying the injunction. ECF No. 2–1 at 8. Several cases in this district emphasize the public interest in enforcement of trademark rights, particularly noting that the public has a strong interest in avoiding consumer confusion " 'about the identity of the enterprise from which goods and services are purchased.' " *See Prosperity,* 2010 WL 5174939, at \*6 (quoting *Toolchex,*

*Inc. v. Trainor,* 634 F.Supp.2d 586, 594 (E.D.Va.2008)); *Merry Maids,* 33 F.Supp.2d at 446. Because Ledo seeks to protect its trademark rights, and so avoid consumer confusion, the public interest favors granting Ledo's requested relief. *See Merry Maids,* 33 F.Supp.2d at 446.

**5. Ledo's Other Trademark Claims**

Ledo also asserts common law trademark infringement claims. *See* ECF No. 2–1 at 6–8. Because Ledo appears to satisfy the requirements for an injunction on its Lanham Act claims, granting this injunction, which prohibits further infringement of Ledo's trademark by the defendant, will also protect Ledo's common law trademark rights.

D. Contract Claims [17]

1. Likelihood of Success on the Merits

Ledo is likely to establish that: (1) Ledo and the defendant entered into a contract, the franchise agreement; [18] (2) the franchise agreement was terminated; [19] and (3) the agreement requires defendant's compliance with several post-termination obligations, including the covenant-not-to-compete. [20] As Ledo has failed to establish the requisite imminent irreparable harm for entitlement to immediate injunctive relief, the covenant-not-to-compete and other post-termination obligations will not be enforced now.

**2. Covenant-not-to-compete**

Ledo asserts that defendant's continued operation of the franchise has caused irreparable harm. ECF No. 2–1 at 14–15. Ledo contends that the defendant's continued operation threatens Ledo's "good will and reputation," especially since any departure by the defendant from Ledo's standard quality of goods and services will be attributed to Ledo generally. See *id.* at 15. Ledo also contends that it will likely need two years to find a new franchisee for the area. *Id.* at 16. Finally, Ledo argues that "the ability of a franchisee to terminate a franchise agreement and continue to offer products and services similar to the franchisor is likely to send a clear signal to other franchisees that they can terminate their franchise agreements and continue to [offer] such products and services in essentially the same manner." *Id.* at 15.

Assuming the covenant-not-to-compete is enforceable under Maryland law, Ledo has not established sufficiently imminent irreparable harm that would entitle it to immediate

enforcement of the covenant at this stage in the suit. Because the Court will grant Ledo's request for immediate injunctive relief on Ledo's trademark infringement claims, the defendant will be immediately barred from operating as a Ledo pizza restaurant.

**\*5** Ledo has not shown that the defendant's potential violation of the covenant-not-to-compete will irreparably harm Ledo's goodwill and reputation, or prevent Ledo from soliciting new franchisees, given that the defendant is prohibited from associating any future restaurant with the Ledo pizza brand. The injunctive relief the Court will grant will prohibit the defendant from offering "products and services in essentially the same manner" as it had before. Thus, Ledo has failed to show that immediate enforcement of the covenant-not-to-compete is necessary. *See MicroStrategy,* 245 F.3d at 339.[21]

### 3. Defendant's Post–Termination Obligations

#### a. Standard

Ledo seeks the defendant's compliance with several contractual obligations that arose out of the termination of the franchise agreement, many of which require the defendant's affirmative action.[22] "Ordinarily, preliminary injunctions are issued to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *Perry v. Judd,* 471 F. App'x 219, 223 (4th Cir.2012) (internal quotation marks omitted). "[M]andatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." *Id.* (internal quotation marks omitted).

#### b. Irreparable Harm and Balance of Equities

Ledo recycles several arguments for defendant's immediate compliance with the post-termination obligations. Ledo again notes that defendant's continued operation of the business threatens its goodwill and profits and prevents it from controlling its reputation. ECF No. 2–1 at 11. Ledo does not, however, specify any threat of irreparable harm from defendant's failure to immediately change the store's phone number, change the location's decor, or return Ledo's operating manuals, when the defendant ceases operations as a Ledo Pizza store. Moreover, many of Ledo's requests, particularly modifying the physical interior and exterior of the restaurant, will likely result in some expense to the defendant. The hardship to the defendant of awarding mandatory relief now may outweigh the hardship to Ledo when the defendant's business stops operating. Thus, given that the injunctive relief that will be ordered remedies the primary source of the injury to Ledo-the defendant's continued operation of the restaurant-Ledo likely has not met its heightened burden to justify the award of a mandatory injunction now.

### III. Conclusion

In conclusion, the Court will grant Ledo's request for a TRO enjoining the defendant from further infringement of the Ledo trademark. The Court will deny Ledo's requests for relief on its breach of contract claims.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5604339

---

### Footnotes

1    The facts are taken from the complaint, (ECF No. 1), amended complaint, (ECF No. 4), their supporting documents, the motion, (ECF No. 2–1), and the August 26, 2013 letter of counsel for Tri–Bro, (ECF No. 10).

2    Neither the motion nor the complaint explains the reason for the long gap between the expiration of the first forbearance agreement and the agreement extending the forbearance period.

3    The agreement states that the obligations arise "[u]pon termination or expiration of the franchise for any reason whatsoever ." ECF No. 2–1 at 8. These obligations, which require affirmative acts, include, inter *alia,* returning all copies of Ledo's operating manuals, assigning the restaurant's phone numbers to Ledo, and modifying the interior of the restaurant to no longer reflect the color schemes or physical appearance of Ledo restaurants. *Id.* at 9. According to Ledo, the defendants have yet to comply with any of these post-termination obligations. See ECF No. 4 at 13.

2013 WL 5604339

4    The covenant is effective upon Ledo's termination of the franchise agreement, whether or not that termination occurs in accordance with the agreement. *See* ECF No. 2–1 at 13. The covenant prohibits the defendants from engaging in "any dine in or carry-out food products business" within ten miles of any Ledo pizza restaurant for a period of two years. *Id.* Ledo asserts that, by continuing to operate following termination of the franchise agreement, the defendants have breached this covenant. *See id.* at 14.

5    The complaint asserts that the defendants owe several thousand dollars in unpaid advertising and royalty fees and outstanding invoices under the franchise agreement. ECF No. 4 at 9 ¶ 47. The complaint also asserts that the defendants owe $100,000 in liquidated damages for breach of the covenant-not-to-compete. *Id.* at 11 ¶ 59.

6    The complaint asserts that the franchise agreement requires the defendants to pay Ledo's costs and attorney's fees, "incurred in any action brought to enforce the Franchise Agreement." ECF No. at 11 ¶ 60. The complaint seeks attorneys' fees for all the claims. See, *e.g.,* ECF No. 4 at 16–17 ¶ 91.

7    Ledo also requested "that a Default Judgment be entered against the Defendants," because they have not yet answered the Amended Complaint. ECF No. 13 at 5. However, no default has been entered as to the defendants. Thus, entry of a default judgment at this time is not warranted. *See F.D.I.C. v. Danzig,* 10 F.3d 806, at \*2 n. 5 (4th Cir.1993).

8    The *Advanced Computer* court noted that the question of the effect of the automatic stay on the availability of injunctive and declaratory relief is "seldom-litigated." *Id.* at 773.

9    *See also In re Enron Corp.,* 314 B.R. 524, 533 (Bankr.S.D.N.Y.2004) (stating, in the discussion of the applicability of § 362 to equitable relief, that "[t]he scope of the automatic stay is broad"); *Neighbors Law Firm, P.C. v. Highland Capital Mgmt., L.P.,* 5:09–CV–352–F, 2010 WL 5477260, at \*1 (E.D.N.C. Dec.28, 2010) (noting that the court held plaintiff's motion for preliminary injunction in abeyance "pending the resolution" of defendants' bankruptcy action).

10   Accordingly, this opinion's references to the defendant, mean Defendant Singh individually. One court has held that § 362 does not stay actions for injunctive relief, because an injunction does not interfere with the policies behind the Bankruptcy Act but instead "correct [s] a continuing offense against the public interest." *See Brennan v. T & T Trucking, Inc.,* 396 F.Supp. 615, 617–18 (N.D.Okla.1975). Given the plain language of the statute, however, the Court finds *Brennan* unpersuasive.

11   *See General Parts Dist., LLC v. St. Clair,* Civ. No. 11–3556–JFM 2011, WL 6296746, at \*2 (D.Md. Dec. 14, 2011) (stating that the standards for a TRO and a preliminary injunction are the same).

12   *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Real Truth About Obama, Inc. v. Fed. Election Comm'n,* 575 F.3d 342, 346 (4th Cir.2009), *vacated on other grounds,* 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764, *reinstated in relevant part on remand,* 607 F.3d 355 (4th Cir.2010) (per curiam).

13   *See also Anheuser–Busch, Inc. v. L. & L. Wings, Inc.,* 962 F.2d 316, 318 (4th Cir.1992) ("[A]n unauthorized use of a mark infringes the trademark holder's rights if it is likely to confuse an 'ordinary consumer' as to the source or sponsorship of the goods.").

14   Ledo alleges that it is "the owner of the federally registered trademark/servicemark Ledo Pizza® (USPTO Reg. Nos. 2712869 and 1760125)." ECF No. 2–1 at 2.

15   *See Prosperity Systems,* 2010 WL 5174939, at \*5; *Merry Maids,* 3 F.Supp.2d at 445. In the franchise context, multiple cases note that the franchisor loses control of its business reputation when a terminated franchisee continues to operate its former franchise, and thus suffers irreparable harm. *See Merry Maids,* 33 F.Supp.2d at 445 (*citing Long John Silver's, Inc. v. Washington Franchise, Inc.,* 1980 U.S. Dist. LEXIS 16635, at \*12, 1980 WL 30249 (E .D.Va. June 24, 1980)). Irreparable harm may also arise in the franchise context "where there is an inherent injury to the goodwill and reputation of the plaintiff" resulting from the "[v]iolation of a trademark." *See NaturaLawn of Am., Inc. v. W. Grp., LLC,* 484 F.Supp.2d 392, 401 (D.Md.2007) (finding that former franchisees' continued use of the franchisor's trademark, trade secrets, and customer lists qualified as inherent injury).

16   *See NaturaLawn,* 484 F.Supp.2d at 403; *Meineke Car Care Centers, Inc. v. Bica,* 3:11–CV–369–FDW–DCK, 2011 WL 4829420, at *4 (W.D.N.C. Oct.12, 2011) (*citing S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 379 (3d Cir.1992) ("[Franchisee] is certainly harmed by the threat of loss of his franchise, but his self-inflicted harm is far outweighed by the immeasurable damage done Jiffy Lube by the infringement of its trademark.")).

17   Although the Court will not decide the merits of Ledo's breach of franchise claims now, Maryland law likely governs the enforceability and construction of the franchise agreement. The franchise agreement provides that, "this Agreement ... is governed by the laws of the State of Maryland." ECF No. 1–2 at 32143. A federal court exercising diversity jurisdiction must apply the choice-of-law principles of the state in which the federal court is located. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Maryland law, this Court should presume that the parties' choice of law is enforceable. *See Meena Enters., Inc. v. Mail Boxes Etc.,* No. DKC 12–1360, 2012 WL 4863695, at *6 n. 8 (D.Md. Oct.11, 2012) (internal quotation marks omitted).

18   *See* ECF No. 1–2.

19   On May 11, 2012, Ledo sent a Notice of Termination letter to the defendants. ECF No. 1–5. This letter followed a Notice of Default letter which detailed the defendants' outstanding financial obligations to Ledo under the franchise agreement. ECF No. 1–4. The complaint claims that the defendants failed to pay these amounts owed. ECF No. 4 at 9147. Ledo has also verified the complaint. ECF No. 1–1.

20   *See* ECF No. 2–1 at 8.

21   One court has held that the balance of equities favors the defendant franchisee when enforcement of the non-compete provision according to its terms will cause substantial harm to the defendant. Prosperity *Systems,* 2010 WL 5174939, at *5 (finding that substantial economic harm to franchisee resulting from prohibition against operating a pizza restaurant in his own name outweighed harm to franchisor, when defendant likely had established "his own good will with customers" after operating for many years).

22   Ledo requests that the Court enjoin the defendant to:

   i. [Cease] operations as a food or related products carryout business for a period of two years at the Business premises;

   ii. [Return] all copies of the Ledo Pizza Operating Manual;

   iii. [Cancel] all assumed names or equivalent registrations relating to the use of any mark used pursuant to the Agreement'

   iv. [Notify] the telephone company and all listing agencies, including classified and other directory listings, of the termination of the Defendants' right to use any Ledo Pizza trademark or trade dress;

   v. [Authorize] the telephone company and all listing agencies to transfer all telephone numbers and directory listings to Ledo Pizza system;

   vi. [Remove] all signs and other interior and exterior decor associated with Ledo Pizza System's trademark or trade dress; and

   vii. [Cease] the use of trade secrets developed by the Plaintiffs[.]

   ECF No. 4 at 14.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.