**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA (Miami)**
**www.flsb.uscourts.gov**

| | | |
|---|---|---|
| In re: | ) | Case No. 20-14695-LMI |
| **Cinemex USA Real Estate Holdings, Inc.,**[1] | ) | Chapter 11 |
| | ) | |
| Debtor(s). | ) | (Jointly Administered) |

OBJECTION TO DEBTORS' REQUEST TO ABATE PERFORMANCE OF OBLIGATIONS
UNDER UNEXPIRED REAL PROPERTY LEASES

The Debtors' request to completely and indefinitely defer the lease payments and other obligations owed to leaseholder Cobb Lakeside, LLC ("**Lakeside**") is unsupported by the facts of this case and applicable law. In accordance, Lakeside hereby objects to the Debtors' *Emergency Motion for Entry of an Order (i) Extending the Time for Performance of Obligations Arising Under Unexpired Real Property Leases; (ii) Establishing Case Administration Temporary Procedures; and (iii) Granting Related Relief* (the "**Motion**" – Doc. 92) and the Debtors' recently filed *Brief in Support of Debtors' Motion Abating Performance of Obligations under Unexpired Real Property Leases* (the "**Brief**" – Doc. 299).

**Relevant Background**

1. Lakeside is a landlord as to a prepetition lease (the "**Theater Lease**") assumed by Debtor CB Theater Experience, LLC ("**CB Theater**" and with the other Chapter 11 debtors jointly administered in this case, collectively, the "**Debtors**") in December, 2017. True and correct copies of the Theater Lease and an Assignment and Assumption Agreement signed by CB Theater as to the Theater Lease are attached here as composite **Exhibit A**. The Theater Lease relates to real property ("**Property**") located at Lakeland Village Shopping Center in Lakeland, Florida where CB Theater

---

[1] The Debtors in these jointly administered cases and the last four digits of each Debtor's federal tax identification number are: Cinemex USA Real Estate Holdings, Inc. (2194), Cinemex Holdings USA, Inc. (5502), and CB Theater Experience LLC (0563). The address of the Debtors is 175 South West 7th Street, Suite 1108, Miami, Florida 33030.

operates a movie theater. The Property is subject to a ground lease (the "**Ground Lease**") with Castro-Oakridge Venture, Ltd.

2. Under the Theater Lease, CB Theater is required to make monthly rent payments to Lakeside in the current amount of $113,072.40. Lakeside has not received a monthly payment from CB Theater since March, 2020. CB Theater is also obligated to make payments under the Ground Lease—directly to the ground lessor—in the (current) amount of $27,890.00 per month, plus common area maintenance ("**CAM**") and applicable sales tax charges. As of this filing, the total current monthly amount due under the Ground Lease is $50,877.36. CB Theater has not satisfied the Ground Lease payments since March, 2020, requiring Lakeside to make those payments since April, 2020 in order to avoid default.

3. The Debtors' May 12, 2020 Motion asked the Court to grant the Debtors' temporary relief from the unexpired leases at issue in this case (the "**Unexpired Leases**"), including the Theater Lease. (Doc. 92, at ¶ 8(a)) (requesting an Order "[s]uspending the Debtors' obligations to landlords on account of obligations that accrue under unexpired real property leases … within 60 days of the Petition Dates, through and including June 24, 2020, pursuant to section 365(d)(3) … ."). The Motion also indicated that the "Debtors [were] engaged in ongoing negotiations for supplemental financing to cover **all** post-petition expenses[,]" and that "[t]he Debtors believe that this supplemental financing, combined with revenues from their theaters upon reopening, will be sufficient to pay **all** their post-petition obligations." (*Id.* at ¶ 10). Taking into account certain rejected leases, the Motion estimates that a total of $3.2 million per month will come due as to the Unexpired Leases. (*Id.* at ¶ 13).

4. Before the Motion was filed, Lakeside voluntarily agreed to the Debtors' request for a 60-day deferral as to its Theater Lease obligations. However, Lakeside did not agree to waive any amounts due under the Theater Lease retroactively or prospectively. Lakeside specifically filed its *Limited Motion for Adequate Protection* (Doc. 171) to make that point clear.

5. This Court entered an Order granting the Motion on an interim basis on May 27, 2020 (Doc. 157 – corrected version). The Order allowed the Debtors until June 30, 2020 to defer their responsibilities under the Unexpired Leases. (*Id*. at ¶ 3) ("[T]he performance obligations arising under the unexpired real property leases are hereby extended to June 30, 2020, pursuant to 11 U.S.C. § 365(d)(3)."). A decision as to the Debtors' request for additional deferrals was left to be decided at a later date.

6. The May 27, 2020 Order also set for hearing *inter alia* adequate protection requests asserted by particular leaseholders. (Doc. 157). Immediately prior to the hearing, the Debtors filed their second emergency motion seeking to obtain post-petition unsecured financing (the "**Second DIP Motion**"). (Doc.221). The Budget filed with the Second DIP Motion specifically includes a line item for "Real Estate Expenses and Stub Rent" (the "**Administrative Rent**") in the amount of $6,900,154.00 and associates that amount with the week beginning June 29, 2020 and ending July 5, 2020. (*Id*. at *Exhibit B*). The Debtors doubled down on the Administrative Rent line item at the June 1, 2020 hearing:

> [T]here is not July rent, and that is because there will not be additional borrowing if there is not a business plan to reopen, and those leases will be rejected. It's no moment to the landlords if the – if the leases are rejected as of July 1, which would be the result if we don't come up with a business plan in partnership with the landlords, that's what's going to happen, **but in the meantime they're protected because we have a line item that says we'll pay your administrative rent.**

(June 1, 2020, Hrg. Transcript, at Page 88). Moreover, in finding that the landlords were adequately protected during the § 365(d)(3) deferred rent period, the Court specifically relied upon the Debtors' representations as to the Administrative Rent:

> I'm not unsympathetic to the arguments that have been made about CAM, and so I want to make clear why I am finding that for purposes of today that that is adequate, and it is because the debtors, in the – I'm sorry the landlords, in the absence of further agreement, have the assurance that at the end of the 60 days, the amounts that were owed to them will be paid. It might be the last payment that they get, but those amounts at least will be paid, and that has a tremendous bearing on the ruling that I'm making today.

> As I said, I recognize the concerns that have been raised by the landlords about having to finance a case, and that's why I said that a significant reason why I'm ruling the way I'm ruling is because the debtor has, assuming I approve the financing, filed a budget that if approved would take care of those 60 days if there is no agreement by the landlord to the contrary.

(*Id*. at Page 93).

7. However, any effort by the Debtors to make good on that promise is conspicuously absent from their subsequently filed Brief; instead, the Debtors are asking for additional relief from their future lease obligations for an indefinite period of time. *See generally* (Doc. 299, Brief) (arguing under various theories that the Debtors' obligations under the Unexpired Leases should be abated until the stay at home orders are lifted and the theaters are up and running) and *specifically* as to the Theater Lease, Brief *Exhibit B*, at #18 ("No obligation to pay rent from March 20, 2020 until the reopening of movie theaters."). *See also* (Doc. 92, Motion, at p. 1) ("The Debtors are, however, in the process of obtaining post-petition financing and anticipate being able to pay all administrative claims in these cases in full in connection with a plan of reorganization once the stay-at-home restrictions are lifted.").

## **Arguments and Authorities**

8. Lakeside opposes the Debtors' request for additional deferrals of lease obligations, including the payment of all amounts due under the Theater Lease. Lakeside also demands that the Debtors honor their agreement to remit sufficient funds to Lakeside to cover the deferred Administrative Rent which came due during the initial 60-day deferral period. Finally, Lakeside asks the Court to order the Debtors to either assume the Theater Lease and begin paying amounts as they come due or to reject the Theater Lease and allow Lakeside to retake possession of the premises. At a minimum, adequate protection is due to Lakeside in exchange for continued use of the property subject to the Theater Lease.

9. Impossibility and frustration of purpose[2] do not support the Debtors' request for an indefinite deferral of future lease obligations. "The doctrine of impossibility excuses performance where it is **totally impossible** to do what was agreed." *Tonfi v. Prime Homes at Villa*, 07-22952-CIV-JORDAN, 2008 WL 11333242, at *4 (S.D. Fla., June 4, 2008) (emphasis added). Similarly, "[t]he doctrine of 'frustration of purpose' excuses performance by a party where the value of performance regarding the subject of an agreement has been frustrated or destroyed." *Hopfenspirger v. West*, 949 So. 2d 1050, 1053 (Fla. 5th DCA 2006). However, "[b]ecause of the central importance placed upon the enforceability of contracts in our culture, the defense of impossibility (and its cousins, impracticability and frustration of purpose) must therefore be applied with great caution if the contingency was foreseeable at the inception of the agreement." *Ferguson v. Ferguson*, 54 So. 3d 553, 556 (Fla. 3d DCA 2011). Moreover, the Debtors bear the burden of proof as to the affirmative defenses they rely upon. *See Spring Lake NC, LLC v. Figueroa*, 104 So. 3d 1211, 1216 (Fla. 2d DCA 2012) ("As a result, Mr. Figueroa failed to carry his burden in establishing impossibility as an affirmative defense.").

10. The underlying purpose of the Theater Lease is to provide CB Theater a facility to conduct its movie theater business. As of this filing, that purpose has not been rendered impossible nor has that purpose been frustrated. By their own admission, the Debtors are free to operate the movie theater located at the Lakeside property at 50% capacity. (Doc. 299, Brief, at ¶ 24) ("Executive Order No. 20-139 allowed for movie theaters to re-open at 50% capacity effective on June 5, 2020, except for those in Miami-Dade, Broward, and Palm Beach Counties, which remain closed."). The Lakeside property is in Polk County, Florida, and the Debtors could have re-opened weeks ago based upon the referenced Executive Order. In accordance, operating the movie theater, albeit at 50% capacity, has

---

[2] It appears that the Debtors only rely upon impossibility and frustration of purpose as to their request for additional lease obligation deferrals under the Theater Lease. *See* (Doc. 299, Brief *Exhibit B*, at #18).

not been rendered impossible or impracticable by any governmental decree. *See Home Design Center*, 563 So. 2d at 770 ("'Impossibility of performance' refers to those factual situations, too numerous to catalog, where the purposes, for which the contract was made, have, on one side, become impossible to perform.").

11. Moreover, just over a year and a half ago, the Debtors CEO, Jose Leonardo Marti, indicated to WLRN (Miami) that only 25% occupancy at its South Florida theaters would be enough to pay the bills. From the article: "With almost 100 screens in South Florida, Marti says they need each seat in each theater to be filled just once per day. Considering each movie screen shows maybe four movies per day – that would be an occupancy of 25 percent in order for CMX to pay its bills." The article and audio from the interview may be accessed at https://www.wlrn.org/post/sunshine-economy-cmx-cinemas-building-movie-theater-business-miami#stream/0 (last visited June 23, 2020). Lakeside's purpose in highlighting this information to the Court is to show that even operating at less than full capacity can still generate sufficient revenue for the Debtors to pay lessors, particularly after rejecting a handful of leases, *see* (Doc. 72).

12. The Debtors' argument that a dearth of new movie titles renders their performance impossible (or impracticable) is also flawed because it fails to consider the foreseeability of that market condition. Case law makes clear that the foreseeability of the alleged supervening cause is the gravamen of the doctrines relied upon by the Debtors. *See Home Design Center—Joint Venture v. County Appliances of Naples, Inc.*, 563 So. 2d 767, 769 (Fla. 2d DCA 1990) ("Although the doctrines of impossibility of performance and commercial frustration are 'undoubtedly in [the] process of evolution and have been applied with 'increasing liberality,' they should be employed with great caution if the relevant business risk was foreseeable at the inception of the agreement and could have been the subject of an express contractual agreement."). A limited supply of new movie titles is a foreseeable market risk. It is no different in character than reduced patrons due to the quality of the

movies offered by a movie theater or fewer moviegoers due to the widespread availability of video streaming services. Each of those circumstances are economic risks and "[e]conomic downturns and other market shifts do not truly constitute unanticipated circumstances in a market-based economy." *See Ferguson*, 54 So. 3d at 556. *See also Flathead–Michigan I, LLC v. Peninsula Development, LLC*, No. 09–14043, 2011 WL 940048 (E.D. Mich. March 16, 2011) ("[T]he continuation of existing market conditions and of the financial situation of the parties are not ordinarily such [basic] assumptions, so that mere market shifts or financial ability do not usually effect discharge … ."). "The state of the market is one of the things on which the parties are gambling when the contract … is made." *Flathead–Michigan I, LLC*, 2011 WL 940048, at *4 (citing and discussing *Seaboard Lumber Co. v. U.S.*, 41 Fed. Cl. 401 (Fed. Cl. 1998)).

13.  Further, in the Motion, the Debtors recognize that "supervening impossibility" does not apply where the contract language indicates otherwise. (Doc. 92, at ¶ 30) ("The doctrine of supervening impossibility excuses performance by a party under a contract when such 'performance is made impracticable without his fault by the occurrence of an event the nonoccurrence of which was a basi[c] assumption on which the contract was made,' **unless the language of the contract indicates the contrary**."). The Theater Lease, at Article 59 indicates that the Parties not only contemplated unforeseen circumstances which might prevent a Party's performance, but also agreed that such events would not excuse timely payment of monies required to be paid under the Lease. *See* (**Exhibit A**, at ¶ 59.1). Article 59 states:

> If either party to this Lease, as the result of any (i) strikes, lockouts or labor disputes, (ii) inability to obtain labor or materials or reasonable substitutes therefor, (iii) the inability to obtain materials or labor at reasonable prices due to the occurrence of a hurricane or other nature disaster or due to terrorism; (iv) acts of God, governmental action, condemnation, civil commotion, fire or other casualty, or (v) other conditions similar to those enumerated in this Section beyond the reasonable control of the party obligated to perform (**other than failure to timely pay monies required to be paid under this Lease**), fails punctually to perform any obligation on its part to be performed under this Lease, then such failure shall be excused and not be a breach of this Lease by the party in question, but only to the extent occasioned by such event.

(emphasis added). *See also* (**Exhibit A**, at Article 8, ¶ 8.1) ("If the performance by Landlord or Tenant of any of its obligations under this Lease is delayed by reason of 'Force Majeure', the period for the commencement or completion thereof shall be extended for a period equal to such delay. For purposes of this Lease, 'Force Majeure' is defined as 'the act or neglect of the other party to this Lease, act of God, fire or other casualty, strike, labor dispute, boycott, governmental restrictions, riot, insurrection, terrorism, war, catastrophe, act of the public enemy or any other act over which the performing party has no control, **excluding financial inability of the performing party**.""). The terms of the Theater Lease, thus, preclude CB Theater's attempt to avoid its Theater Lease payments due to alleged impossibility or frustration of purpose. *See 1700 Rinehart, LLC v. Advance Am.*, 51 So. 3d 535, 537–38 (Fla. 5th DCA 2010) ("The 'lack of consideration' doctrine, which arises when the very purpose of an agreement has been totally frustrated by some outside force or circumstance … **has no proper application in a case such as this one, in which the particular potential obstacle was not only foreseen by the parties, but as to which they specifically bargained, with the risks of its occurrence divided by and between the parties to the agreement itself.**") (emphasis added).

14. In accordance, the Debtors should not be excused from their obligations under the Theater Lease and the normal rules as to executory contracts in Chapter 11 cases should apply. The Debtors should either be required to assume the Theater Lease and to timely comply with its terms, or the Debtors should be required to reject the lease—as they indicated they would do at the June 1, 2020 hearing: "That being said, there is no July rent, and that is because there will not be additional borrowing if there is not a business plan to reopen, and those leases will be rejected." (June 1, 2020, Hrg. Transcript, at Page 88).

15. Absent that, the Debtors should, at a minimum, be required to provide adequate protection to Lakeside pursuant to 11 U.S.C. §§ 363(e) and 361. Further, to the extent acceptable

adequate protection is paid to other similarly situated lessors, Lakeside should receive similar, legally sufficient treatment.

Dated: June 24, 2020

/s/ *Jason A. Weber*
Jason A. Weber
Tiffany & Bosco, P.A.
1000 Corporate Drive, Suite 150
Ft. Lauderdale, Florida 33334
Tel:   (954) 828-1118
Email: jaw@tblaw.com

-and-

/s/ *Stephen B. Porterfield*
Stephen B. Porterfield (admitted pro hac vice; Doc. 235)
Thomas B. Humphries (admitted pro hac vice; Doc. 230)

**Counsel for Cobb Lakeside, LLC**

**OF COUNSEL:**
**SIROTE & PERMUTT, P.C.**
2311 Highland Avenue South
P.O. Box 55727
Birmingham, AL 35255-5727
Tel.:   (205) 930-5278
Fax:   (205) 212-3862
sporterfield@sirote.com
thumphries@sirote.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that on June 24, 2020, I electronically filed the foregoing with the Clerk of Court via the CM/ECF filing system which will provide notice to all parties who have requested, or which are otherwise entitled to, electronic notices in this proceeding, specifically including the United States Trustee.

      /s/ *Jason A. Weber*
Jason A. Weber, Esq.
**TIFFANY & BOSCO, P.A.**
1000 Corporate Drive, Suite 150
Fort Lauderdale, Florida 33334
T: (954) 828-1118
F: (954) 828-1101
jweber@sirote.com

Florida Bar No. 0051681