**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA (Miami)**
www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | Case No. 20-14695-LMI |
| Cinemex USA Real Estate Holdings, Inc.,[1] | ) | Chapter 11 |
| | ) | |
| Debtor(s). | ) | (Jointly Administered) |

**REPLY IN SUPPORT OF COBB LAKESIDE'S OBJECTION TO DEBTORS' REQUEST TO ABATE PERFORMANCE OF OBLIGATIONS UNDER UNEXPIRED REAL PROPERTY LEASES**

In response to the Debtors *Omnibus Reply to Oppositions to Debtors' Motion Abating Performance Obligations under Unexpired Real Property Leases* (the "**Reply**" – Doc. 342), Cobb Lakeside, LLC ("**Lakeside**") states the following:

**A. The Debtors' pleadings and arguments do not support application of the doctrine of impossibility to the Theater Lease.** [2]

1.  The Debtors do not contest that the Lakeside theater has been allowed to operate at 50% capacity since June 5, 2020. Accordingly, the Debtors' suggestion that it is totally impossible to comply with the terms of the Theater Lease going forward is belied by the facts. "The doctrine of impossibility excuses performance where it is totally impossible to do what was agreed." *Tonfi v. Prime Homes at Villa*, 07-22952-CIV-JORDAN, 2008 WL 11333242, at *4 (S.D. Fla., June 4, 2008). The Debtors cannot demonstrate the requisite impossibility.

2.  The Debtors instead erroneously argue that government restrictions in place *prior to* June 5, 2020 render their lease obligations impossible *in the future*. *See* (Doc. 342, Reply, at ¶¶ 27, 29) ("[Performance under the leases is impossible because state authorities ordered the closure of movie theaters, which made it impossible for the Debtors to operate and generate revenues.") *and*

---

[1] The Debtors in these jointly administered cases and the last four digits of each Debtor's federal tax identification number are: Cinemex USA Real Estate Holdings, Inc. (2194), Cinemex Holdings USA, Inc. (5502), and CB Theater Experience LLC (0563). The address of the Debtors is 175 South West 7th Street, Suite 1108, Miami, Florida 33030.

[2] Unless otherwise indicated, capitalized terms used here have the same meaning as those used in Lakeside's *Objection* (Doc. 321).

("Performance was impossible for [the period of time which the theaters were ordered closed.]."). The Lakeside movie theater could have been open since June 5, 2020, over a month ago. However, the Debtors have not taken any actions to get the theater up and running.[3] The Debtors even let their employees go and now appear to rely upon a rehire and retraining period in support of their request to defer lease obligations. (June 29, 2020, Hrg. Transcript, at p. 39) (arguing that the Debtors must "plan for rehiring of personnel, training the personal [sic] on necessary precautions to avoid the spread of the virus, but all of those things have to occur before those theaters can reopen … ."). Moreover, the other businesses which surround the Lakeside movie theater are currently operating and have been negatively impacted by the theater remaining closed.

3. Perhaps recognizing those issues, the Debtors indicated at the June 29, 2020 hearing that, "[w]ith respect to the B leases, were talking about specifically frustration of purpose … ." (June 29, 2020, Hrg. Transcript, at p. 39). In accordance, Lakeside, which is a landlord of a B Lease, asks this Court to disregard the Debtors' impossibility arguments.

**B. The purpose of the Theater Lease has not been frustrated, particularly on a going forward basis.**

4. "The doctrine of commercial frustration is limited to cases where performance is possible but an alleged frustration, which was not foreseeable, totally or nearly totally destroyed the purpose of the agreement." *Valencia Center, Inc. v. Publix Super Markets, Inc.*, 464 So. 2d 1267, 1269 (Fla. 3d DCA 1985). *See also CARD Investments, Inc. v. Burger King Corporation*, No. CV 12-05183-MMM, 2012 WL 1294718 (C.D. Cal., Oct. 1, 2012) (applying Florida law) ("This [frustration of purpose] doctrine excuses performance by a party where the purpose for which the contract was formed has been **entirely frustrated**.").

---

[3] The Debtors' own authority indicates that a promisor generally has a duty to make a bona fide effort to "dissolve the restraint that is preventing him from carrying out his promise." *Commonwealth Edison Co. v. Allied-General Nuclear Services*, 731 F. Supp. 850, 859 (N.D. Ill. 1990).

5. The purpose of the Theater Lease is to provide Debtor CB Theater a location to show movies—a point which the Debtors appear to concede in their Reply. (Doc. 342, at ¶ 22) ("… the entire purpose of the leases—providing the Debtors locations to show movies … ."). The Debtors have been in possession of the leased property since late 2017 and its use and enjoyment has not been restricted by any action of Lakeside. In accordance, the purpose of the Theater Lease has been fulfilled. *See Valencia*, 464 So. 2d at 1269 ("Valencia's *intent* when it entered the lease was to make a profit, an intention frustrated by the tax rise; however, Valencia's property can still be used for rental, the *purpose* of the lease.") (emphasis in original); *CARD Investments, Inc.*, 2012 WL 1294718, at *3 ("[W]hile plaintiffs' intent in entering into the franchise agreements may have been to profit from operation of their restaurant, they can still sell food to the public under the Burger King name, which was the true purpose of the franchise agreements."). *See also Lee v. Bowlerama Enterprises, Inc.*, 368 So. 2d 913, 916 (Fla. 3d DCA 1979) ("The subject property could be used for a nightclub, albeit not for one as large as desired by appellant. … Also, because the conditions precedent under the agreements had been met, the trial court, under the facts of this case, was correct in refusing to order the return of appellant's deposit on the purchase agreement because neither the doctrine of impossibility or economic frustration were applicable as a defense."). Even if this Court accepts that the purpose of the lease was impacted by the stay-at-home orders, those restrictions[4] were modified as of June 5, 2020 to allow the Debtors' to screen movies.

6. Further, and contrary to the Debtors' arguments, the purpose of the Theater Lease is not to ensure that the Debtors can screen "first-run" movies. The terms of the Theater Lease and the *Lease Assignment and Assumption Agreement* that Debtor CB Theater signed do not include the term

---

[4] The Debtors' attempt to equate the State of Florida's *encouragement* of its citizens to avoid groups of more than 50 with a *restriction* prohibiting movie theater attendance is deeply flawed. (Doc. 342, at ¶ 29). If aspirational statements by governmental officials could excuse a party's need to comply with the terms of a commercial contract, such contracts would not be worth the paper they are written on.

"first-run" or any other language of similar import. *See* (Doc. 321-1). Under the Theater Lease, Lakeside agreed to provide Debtor CB Theater a facility to operate a movie theater business and that space has been provided. Moreover, CB Theater is free to show movies at the Lakeside facility so long as it does not exceed 50% capacity. In accordance, the purpose of the Theater Lease has not been "totally or nearly totally destroyed." *Valencia*, 464 So. 2d at 1269. For that reason, the Debtors' frustration of purpose argument fails.[5]

### C. The Debtors' performance under the Theater Lease should not be excused simply because compliance would be unprofitable.

7. The Theater Lease does not guarantee profitability—it simply requires Lakeside to provide CB Theater a place to show movies. As of June 5, 2020, the Debtors can do that at 50% capacity. Even so, the Debtors argue that

> [A]lthough we could show up, and we could show, you know, whatever film you want, Ben-Hur, or, you know, Charlie and the Chocolate Factory, it's not, it's not going to be the same, the same profitability, the same foot traffic, or the same customer that you would get with first run movies, and the point is that this debtor is – prides itself on being a luxury premier movie theater, that is its brand.

(June 29, 2020, Hrg. Transcript, at p. 40).

8. Florida law is abundantly clear that frustration of purpose requires much more than a showing of unprofitability. *See Elof Hansson Paper & Board, Inc. v. Caldera*, No. 11-20495-CV-WILLIAMS, 2012 WL 12865853, at *8 (S.D. Fla., April 26, 2012) ("Mere unprofitability is insufficient; 'it must be positively unjust to hold the parties bound.'"); *Valencia*, 464 So. 2d at 1269 ("Although impossibility of performance can include extreme impracticability of performance, courts are reluctant to excuse performance that is not impossible but merely inconvenient, profitless, and expensive to the lessor."); *Qdoba Rest. Corp. v. Taylors, LLC*, No. 08-CV-1179, 2010 WL 1240410,

---

[5] This conclusion holds even if the Court accepts the Debtors' argument that the doctrine of frustration of purpose is not precluded by the provisions of the Theater Lease. It is Lakeside's position that the terms of the Theater Lease control; however, where the underlying purpose of the lease has not been frustrated, then the doctrine cannot be applied.

at *6 (D. Colo., Mar. 23, 2010) (applying Florida law) ("Under … Florida law, the defense of frustration of purpose requires more than unprofitability of an enterprise; it requires frustration that is so severe as to not be within the risks assumed under the contract, i.e. complete frustration of the essential purpose of the contract."). Accordingly, the Debtors' "feelings of financial frustration do not necessarily equate to findings of frustration or impossibility under the law." *Valencia*, 464 So. 2d at 1270.

### D. The terms of the Theater Lease preclude or undercut the Debtors' frustration of purpose arguments.

9. Article 59 of the Theater Lease explains that unavoidable delays due to Acts of God and governmental action do not excuse the payment of "monies required to be paid under" the lease. *See* (Doc. 321-1); (Doc. 321, at ¶ 13). Thus, the stay-at-home orders and the global pandemic do not excuse the Debtors' duty to make payments under the Theater Lease.

10. The Debtors rely exclusively upon one (unpublished) decision out of the Northern District of Iowa (*Rembrandt Enters., Inc. v. Dahmes Stainless, Inc.*, 2017 WL 3929308 (Bankr. N.D. Iowa, Sept. 7, 2017) to argue that Article 59 does not preclude the Debtors' frustration of purpose arguments. (Doc. 342, at ¶ 25). In doing so, the Debtors overstate[6] the holding in *Rembrandt* and completely disregard their own arguments and authority which indicates that "foreseeability is the touchstone of the impossibility and frustration of purpose doctrines." (*Id*. at ¶ 22 n.12).

11. The court in *Rembrandt* considered cross motions for summary judgment arising out of a contract dispute which arose in the wake of the Avian Flu. One party, Rembrandt Enterprises, Inc., was "a large scale producer of eggs and egg products." The other, Dahmes Stainless, Inc., manufactured industrial products. Rembrandt entered into an agreement with Dahmes to purchase an

---

[6] The Rembrandt court ruled that "Rembrandt [was] not barred from attempting to prove frustration of purpose at trial" and that "Dahmes' motion for summary judgment on [the] issue" was denied. *Rembrandt Enters., Inc. v. Dahmes Stainless, Inc.*, 2017 WL 3929308, at *14 (Bankr. N.D. Iowa, Sept. 7, 2017).

industrial egg dryer, and the agreement specifically required Dahmes to complete installation of the dryer by a date certain. Prior to the completion date under the agreement, the Avian Flu hit and significantly reduced Rembrandt's egg production capacity. In accordance, Rembrandt cancelled the deal with Dahmes prior to its completion and litigation followed.

12. In support of its summary judgment counterclaim, Dahmes argued that Rembrandt could not rely upon the common law doctrine of frustration of purpose because the agreement's force majeure clause provided Rembrandt its exclusive, negotiated remedy as to "the risk of certain events occurring to excuse performance." *Rembrandt*, 2017 WL 3929308, at *10. In response, Rembrandt argued that the force majeure provision should not supplant the common law frustration of purpose doctrine. Rembrandt specifically argued that the language of the force majeure provision did not consider Rembrandt's performance under the agreement; instead, the provision focused on instances which would impact Dahmes' ability to build and install the egg dryer. *Rembrandt*, 2017 WL 3929308, at *11. The district court agreed, stating "the express language of the [force majeure] clause demonstrates that it does not apply to the events at issue here" and "the clause applies to a failure or delay in the performance of Dahmes' obligations under the contract." *Rembrandt*, 2017 WL 3929308, at *12.

13. This case is not like *Rembrandt*. Here, the Theater Lease specifically explains at Article 59 that

> If either party to this Lease, as the result of any (i) strikes, lockouts or labor disputes, (ii) inability to obtain labor or materials or reasonable substitutes therefor, (iii) the inability to obtain materials or labor at reasonable prices due to the occurrence of a hurricane or other nature disaster or due to terrorism; (iv) acts of God, governmental action, condemnation, civil commotion, fire or other casualty, or (v) other conditions similar to those enumerated in this Section beyond the reasonable control of the party obligated to perform (other than failure to timely pay monies required to be paid under this Lease), fails punctually to perform any obligation on its part to be performed under this Lease, then such failure shall be excused and not be a breach of this Lease by the party in question, but only to the extent occasioned by such event.

(emphasis added). Unlike the force majeure clause in *Rembrandt*, Article 59 applies to certain events which might impact either party's performance under the Theater Lease and specifically indicates that the payment of rent would not be excused. In accordance, Article 59 considers the possibility that the lessee's performance may be delayed by various events—including those occasioned by Acts of God and governmental action—but that such events will not excuse timely payment of "monies required to be paid" under the Theater Lease. Similar facts were not before the court in *Rembrandt*.

14.     In addition, even if Article 59 does not preclude the Debtors' assertion of the frustration of purpose doctrine, it surely serves as evidence that the parties—at the time it was assumed—agreed that certain supervening events, including Acts of God and governmental action, would not excuse nonpayment of rent. Under Florida law, frustration of purpose is not "available if the difficulties that frustrate the purpose of the contract … reasonably could have been foreseen by the promisor when the parties entered into the contract." *Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 505 (S.D. Fla. 2000) (finding that the defendant's frustration and purpose and impossibility defenses failed based upon the foreseeability of the issue relied upon by defendant). Article 59 demonstrates that the parties to the Theater Lease[7] foresaw that unavoidable delays or force majeure events could subsequently occur, and the parties apportioned the risks associated with those events. Consequently, frustration of purpose should not be applied as to the Debtors' duty to pay rent under the Theater Lease.

E. **Lakeside's Theater Lease has unique attributes and the Debtors' bankruptcy goals should not subvert individualized determinations as to the Unexpired Leases.**

15.     Lakeside's Theater Lease is designated as a "B Lease", as to which only impossibility and frustration of purpose are raised. *See* (Doc. 299, at Exhibit B, at #18); (June 29, 2020 Hrg. Transcript, at pp. 38-39) ("These force majeure clauses under these two remaining leases don't apply

---

[7] Debtor CB Theater assumed the Theater Lease in its entirety. (Doc. 321-1, at Lease Assignment and Assumption Agreement, at Section 1) ("Assignee hereby accepts the foregoing assignment and assume and agrees to pay, perform, discharge and otherwise be and remain responsible for all covenants, obligations, and liabilities of Assignor as tenant under the Lease on and after the Effective Date.").

to the payment of rent. So they're not available to the debtors to use."). However, the Theater Lease is unique among the B-Leases because (1) the Lakeside theater property may operate at 50% capacity, (2) the Theater Lease does not require, or mention, "first run" movies, and (3) the Theater Lease does not excuse lease payment obligations for *inter alia* Acts of God and governmental action.

16.     As this Court noted at the June 29, 2020 hearing, the Unexpired Leases at issue in these cases are different—they have different terms, relate to different properties, and are governed by different state laws. Even so, the Debtors' actions in this case evince an intent to ignore many of those differences in order to achieve their bankruptcy goals. *See* (June 29, 2020, Hrg. Transcript, at p. 31) ("[M]y goal was to treat all lessors roughly equally, and to not, you know, reward the hold-out behavior … .") and (p. 45) ("… we're trying to create a situation in which all of the lessors are pulling in the same direction, and they're not being treated more favorably than the other, and that's been a theme we've used in our negotiations throughout, and that's something that I think that the Court should help us achieve.").[8] Lakeside submits that the unique attributes of the Theater Lease rebut the Debtors' impossibility and frustration of purpose arguments and that compliance with the terms of the lease should not take a back seat to the Debtors' global desires in this bankruptcy case.

**THEREFORE,** Lakeside asks the Court to deny the Debtors' request to completely and indefinitely defer their lease obligations under the Theater Lease.

Dated: July 7, 2020

---

[8] It is clear that the Debtors' intent is to hold Lakeside and other lessors hostage for an indefinite period of time to see if the financial climate might improve, making reorganization possible. That goal is particularly difficult for Lakeside to accept because Lakeside is actively incurring over $50,000 per month in out-of-pocket expenses related to the Ground Lease payments that Debtor CB Theater assumed. Beyond that, Lakeside has not been reimbursed for the deferred Administrative Rent which the Debtors promised to pay in their Second DIP Motion. *See* (Doc. 321, at ¶ 6). Lakeside recently contacted Debtors' counsel to inquire as to the Administrative Rent and Lakeside has not received a response. Lakeside has also not reached an agreement with the Debtors as to the Theater Lease, and the Debtors' statement in their Reply that "[t]he Parties are negotiating a term sheet" vastly overstates any progress that the Parties have made in that regard.

/s/ *Jason A. Weber*
Jason A. Weber
Tiffany & Bosco, P.A.
1000 Corporate Drive, Suite 150
Ft. Lauderdale, Florida 33334
Tel:   (954) 828-1118
Email: jaw@tblaw.com

-and-

/s/ *Stephen B. Porterfield*
Stephen B. Porterfield (admitted pro hac vice; Doc. 235)
Thomas B. Humphries (admitted pro hac vice; Doc. 230)

**Counsel for Cobb Lakeside, LLC**

**OF COUNSEL:**
**SIROTE & PERMUTT, P.C.**
2311 Highland Avenue South
P.O. Box 55727
Birmingham, AL 35255-5727
Tel.:   (205) 930-5278
Fax:   (205) 212-3862
sporterfield@sirote.com
thumphries@sirote.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2020, I electronically filed the foregoing with the Clerk of Court via the CM/ECF filing system which will provide notice to all parties who have requested, or which are otherwise entitled to, electronic notices in this proceeding, specifically including the United States Trustee.

/s/ *Jason A. Weber*
Jason A. Weber, Esq.
**TIFFANY & BOSCO, P.A.**
1000 Corporate Drive, Suite 150
Fort Lauderdale, Florida 33334
T: (954) 828-1118
F: (954) 828-1101
jweber@sirote.com
Florida Bar No. 0051681