UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

CINEMEX USA REAL ESTATE
HOLDINGS, INC., CINEMEX
HOLDINGS USA, INC., and CB THEATER
EXPERIENCE LLC,[1]

Chapter 11

Case No. 20-14695-LMI

    Debtors.                                                     (Jointly Administered)
_____/

**AMENDED OBJECTION TO AMENDED CLAIM NOS. 28 AND 85 OF
OMAR KHAN, AMENDED CLAIM NOS. 29 AND 87 OF S.C.G.C. INC., AMENDED
CLAIM NOS. 30 AND 89 OF S.C.G.M. INC., AMENDED CLAIM NOS. 31 AND 91 OF
SCG-B INC., CLAIM NOS. 39 AND 94 OF SCG-VP INC., CLAIM NOS. 50 AND 109 OF
DISTRICT THEATERS INC., CLAIM NOS. 49 AND 110 OF SCG-WR LLC, CLAIM
NOS. 51 AND 108 OF SCG-CS INC., CLAIM NOS. 45 AND 102 OF SCGK INC., CLAIM
NOS. 46 AND 103 OF SCG-SW INC., CLAIM NOS. 47 AND 104 OF SCG-WL INC., AND
CLAIM NOS. 48 AND 105 OF SCG-N INC.[2]**

---

[1]   The Debtors in these cases and the last four digits of each Debtor's federal tax identification number are as follows:  (1) Cinemex USA Real Estate Holdings, Inc. (2194); (2) Cinemex Holdings USA, Inc. (5502); and (3) CB Theater Experience, LLC (0563).  The address for the Debtors is 175 South West 7th Street, Suite 1108, Miami, Florida 33130.

[2]   Debtors seek a waiver to the requirement in Local Rule 3007-1(c) that "up to five objections to claim may be included in one pleading."  As set forth in detail in the Objection, Debtors submit that the claims that are the subject of this Objection are nearly identical to each other, and are in essence the same claim.

**IMPORTANT NOTICE TO CREDITOR:**
**THIS IS AN OBJECTION TO YOUR CLAIM**

This objection seeks either to disallow or reduce the amount or change the priority status of the claim filed by you or on your behalf. Please read this objection carefully to identify which claim is objected to and what disposition of your claim is recommended.

If you disagree with the objection or the recommended treatment, you must file a written response WITHIN 30 DAYS from the date of service of this objection, explaining why your claim should be allowed as presently filed, and you must serve a copy to the undersigned attorney OR YOUR CLAIM MAY BE DISPOSED OF IN ACCORDANCE WITH THE RECOMMENDATION IN THIS OBJECTION.

If your entire claim is objected to and this is a chapter 11 case, you will not have the right to vote to accept or reject any proposed plan of reorganization until the objection is resolved, unless you request an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing your claim for voting purposes. The written response must contain the case name, case number, and must be filed with the Clerk of the United States Bankruptcy Court, 301 North Miami Avenue, Room 150, Miami, Florida 33128.

Cinemex USA Real Estate Holdings, Inc. ("Cinemex USA"), Cinemex Holdings USA, Inc. ("Cinemex Holdings"), and CB Theater Experience LLC ("CB Theater," and collectively, the Debtors" or "Cinemex"), all of which are Debtors in the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases"), through undersigned counsel and pursuant to Section 502(b) of title 11, United States Code (the "Bankruptcy Code"), rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 3007-1 of the Local Bankruptcy Rules for the Southern District of Florida (the "Local Bankruptcy Rules"), hereby object to the following claims filed in these cases, for the reasons set forth in the table below and discussed in further detail in the Amended[3] Objection:

| Claim No. | Name of Claimant | Amount of Claim | Basis for Objection | Recommended Disposition |
|---|---|---|---|---|
| 28-2 | Omar Khan | $82,970,000.00 | Debtors not liable | Disallow |
| 85-2 | Omar Khan | $82,970,000.00 | Duplicative; CB Theater not liable | Disallow |
| 29-2 | S.C.G.C. Inc. | $26,079,214.65 | Duplicative | Disallow |
| 87-2 | S.C.G.C. Inc. | $26,079,214.65 | Duplicative; CB Theater not liable | Disallow |
| 30-2 | S.C.G.M. Inc. | $26,079,214.65 | Duplicative | Disallow |
| 89-2 | S.C.G.M. Inc. | $26,079,214.65 | Duplicative; CB Theater not liable | Disallow |
| 31-2 | SCG-B Inc. | $26,079,214.65 | Duplicative | Disallow |
| 91-2 | SCG-B Inc. | $26,079,214.65 | Duplicative; CB Theater not liable | Disallow |
| 39 | SCG-VP, Inc. | $26,079,214.65 | Duplicative | Disallow |
| 94 | SCG-VP, Inc. | $26,079,214.65 | Duplicative; CB Theater not liable | Disallow |
| 50 | District Theaters, Inc. | $26,079,214.65 | Duplicative | Disallow |
| 109 | District Theaters, Inc. | $26,079,214.65 | Duplicative; CB Theater not liable | Disallow |
| 49 | SCG-WR LLC | $26,079,214.65 | Duplicative | Disallow |
| 110 | SCG-WR LLC | $26,079,214.65 | Duplicative; CB Theater not liable | Disallow |
| 51 | SCG-CS Inc. | $26,079,214.65 | Duplicative | Disallow |

---

[3]    The Objection was amended to remove the objection to Proofs of Claim Nos. 33 and 34 in Case No. 20-14696, which were withdrawn, and to add an objection to Proofs of Claim Nos. 85-2, 87-2, 89-2, 91-2, 94, 109, 110, 108, 102, 103, 104, and 105 to the extent they assert claims against Debtor CB Theater.

| 108 | SCG-CS Inc. | $26,079,214.65 | Duplicative; CB Theater not liable | Disallow |
| 45 | SCGK Inc. | $26,079,214.65 | Duplicative | Disallow |
| 102 | SCGK Inc. | $26,079,214.65 | Duplicative; CB Theater not liable | Disallow |
| 46 | SCG-SW Inc. | $26,079,214.65 | Duplicative | Disallow |
| 103 | SCG-SW Inc. | $26,079,214.65 | Duplicative; CB Theater not liable | Disallow |
| 47 | SCG-WL Inc. | $26,079,214.65 | Duplicative | Disallow |
| 104 | SCG-WL Inc. | $26,079,214.65 | Duplicative; CB Theater not liable | Disallow |
| 48 | SCG-N Inc. | $26,079,214.65 | Duplicative | Disallow |
| 105 | SCG-N Inc. | $26,079,214.65 | Duplicative; CB Theater not liable | Disallow |

## I.    RELIEF REQUESTED

1.    The Debtors request entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Bankruptcy Code Section 502(b), rule 3007 of the Bankruptcy Rules, and rule 3007-1 of the Local Bankruptcy Rules, (a) disallowing and expunging Amended Claim No. 85 of Khan, Amended Claim No. 87 of SCGC, Amended Claim No. 89 of SCGM, Amended Claim No. 91 of SCG-B, Claim No. 94 of SCG-VP, Claim No. 109 of District Theaters, Claim No. 110 of SCG-WR, Claim No. 108 of SCG-CS, Claim No. 102 of SCGK, Claim No. 103 of SCG-SW, Claim No. 104 of SCG-WL, and Claim No. 105 of SCG-N for which Debtor CB Theater is not liable; (b) furthermore, disallowing and expunging Amended Claim No. 85 of Khan, Amended Claim Nos. 29 and 87 of SCGC, Amended Claim Nos. 30 and 89 of SCGM, Amended Claim Nos. 31 and 91 of SCG-B, Claim Nos. 39 and 94 of SCG-VP, Claim Nos. 50 and 109 of District Theaters, Claim Nos. 49 and 110 of SCG-WR, Claim Nos. 51 and 108 of SCG-CS, Claim Nos. 45 and 102 of SCGK, Claim Nos. 46 and 103 of SCG-SW, Claim Nos. 47 and 104 of SCG-WL, and Claim Nos. 48 and 105 of SCG-N as duplicative; and (c) disallowing and expunging Amended Claim No. 28 Khan for which Debtors Cinemex USA and Cinemex Holdings are not liable for the amount claimed.

## II.    JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. Sections 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. Section 157(b)(2).

3.      Venue is proper pursuant to 28 U.S.C. Sections 1408 and 1409.

4.      The bases for the relief requested in this Amended Objection are Sections 105(a) and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Bankruptcy Rule 3007-1.

## III.    FACTUAL HISTORY

### A.    The Bankruptcy

5.      On April 25, 2020, Cinemex USA and Cinemex Holdings filed for bankruptcy under chapter 11 of title 11 of the Bankruptcy Code in this Court.  On April 26, 2020 (together with April 25, 2020, the "Petition Dates"), CB Theater also filed for bankruptcy under chapter 11 in this Court.

6.      The deadline to file proofs of claim was set as July 6, 2020.

7.      The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession.  No examiner or trustee has been appointed in the Chapter 11 Cases.

8.      Cinemex is in the movie theater business and is based in Miami, Florida.  At the time of the bankruptcy filing, Cinemex operated 41 movie theaters in dozens of cities in 12 states, including Florida.  The theaters operate under the brand name "CMX Cinemas."

### B.    The Transaction and Resulting Litigation

9.      On March 10, 2020, Debtors Cinemex USA and Cinemex Holdings entered into two equity purchase agreements (the "Agreement") with Khan, as well as with SCGC, SCGM,

SCG-B, SCG-VP, District Theaters, SCG-WR, SCG-CS, SCGK, SCG-SW, SCG-WL, and SCG-N, companies wholly owned by Khan (collectively, the "Companies") to purchase Star Cinema Grill (the "Transaction").  *See* Agreement, attached hereto as **Exhibit B**.  CB Theater was not a party, signatory, or guarantor to the Agreement.

10.    Because of the looming coronavirus outbreak and Khan's and the Companies' inability as a result to meet the required closing conditions and to comply with the necessary representations and warranties, the parties never closed on the Transaction.  *See* Mot. Dismiss, *Khan v. Cinemex USA*, No. 4:20-cv-01178 (S.D. Tex. Apr. 23, 2020), ECF No. 37, attached hereto as **Exhibit C**.

11.    Specifically, one of the conditions to closing required that Khan and the Companies provide reasonable access to the properties underlying the Transaction and the employees of Star Cinema Grill.  However, on account of governmental orders that went into effect in order to curtail the coronavirus pandemic, access to the properties and employees was made impossible.  *See id.* 9-12.

12.    In addition, one of the representations and warranties of Khan and the Companies in the Agreement was that the employees were authorized to operate the Star Cinema Grill.  However, because of governmental shut-down orders relating to the coronavirus pandemic, the employees have been unable to operate the business.  *See id.* 12-15.

13.    On March 24, 2020, Cinemex informed Khan that it is not obligated to close the Transaction because "Cinemex's operations and finance teams lack pre-Closing access to Star Cinema theaters and the Corporate Employees managing those theaters.  Attempting to close under these circumstances would imperil Cinemex personnel.  Moreover, key personnel are

located in Mexico City and cannot get to Houston regardless because the US/Mexico border is closed." *See* Proof of Claim No. 85-2, Exhibit A2 (Complaint) ¶ 45.

14.      On April 1, 2020, Khan and the Companies filed a complaint against Debtors Cinemex USA and Cinemex Holdings in the United States District Court for the Southern District of Texas, Case No. 4:20-cv-01178, seeking specific performance for Cinemex USA and Cinemex Holdings to close on the Transaction (the "Complaint"). *See* Proof of Claim No. 85-2, Exhibit A2 (Complaint).  Khan and the Companies did not name CB Theater as a defendant in the Complaint.

15.      On April 23, 2020, Cinemex USA and Cinemex Holdings filed a Motion to Dismiss.  *See* **Exhibit C** (Mot. Dismiss, *Khan v. Cinemex USA*).

16.      The litigation has been stayed by the Debtors' bankruptcy cases.

C.    **The Claims**

17.      On July 6, 2020, Khan filed Proof of Claim No. 28 in Case No. 20-14696.  That same day, Khan filed Amended Proof of Claim No. 28 in Case No. 20-14696, alleging an unsecured claim against Debtor Cinemex Holdings in the amount of $82,970,000.00.

18.       On July 6, 2020, Khan also filed Proof of Claim No. 85 in Case No. 20-14695.  That same day, Khan filed Amended Proof of Claim No. 85 in Case No. 20-14695, alleging an unsecured claim against Debtor Cinemex USA in the amount of $82,970,000.00.  Khan listed CB Theater as "Debtor 2" on Amended Proof of Claim No. 85.

19.      On July 6, 2020, SCGC filed Proof of Claim No. 29 in Case No. 20-14696.  That same day, SCGC filed Amended Proof of Claim No. 29 in Case No. 20-14696, alleging an unsecured claim against Debtor Cinemex Holdings in the amount of $26,079,214.65.

20.     On July 6, 2020, SCGC also filed Proof of Claim No. 87 in Case No. 20-14695. That same day, SCGC filed Amended Proof of Claim No. 87 in Case No. 20-14695, alleging an unsecured claim against Debtor Cinemex USA in the amount of $26,079,214.65.    SCGC listed CB Theater as "Debtor 2" on Amended Proof of Claim No. 87.

21.     On July 6, 2020, SCGM filed Proof of Claim No. 30 in Case No. 20-14696.  That same day, SCGM filed Amended Proof of Claim No. 30 in Case No. 20-14696, alleging an unsecured claim against Debtor Cinemex Holdings in the amount of $26,079,214.65.

22.     On July 6, 2020, SCGM also filed Proof of Claim No. 89 in Case No. 20-14695. That same day, SCGC filed Amended Proof of Claim No. 89 in Case No. 20-14695, alleging an unsecured claim against Debtor Cinemex USA in the amount of $26,079,214.65.  SCGM listed CB Theater as "Debtor 2" on Amended Proof of Claim No. 89.

23.     On July 6, 2020, SCG-B filed Proof of Claim No. 31 in Case No. 20-14696.  That same day, SCG-B filed Amended Proof of Claim No. 31 in Case No. 20-14696, alleging an unsecured claim against Debtor Cinemex Holdings in the amount of $26,079,214.65.

24.     On July 6, 2020, SCG-B also filed Proof of Claim No. 91 in Case No. 20-14695. That same day, SCG-B filed Amended Proof of Claim No. 91 in Case No. 20-14695, alleging an unsecured claim against Debtor Cinemex USA in the amount of $26,079,214.65.  SCG-B listed CB Theater as "Debtor 2" on Amended Proof of Claim No. 91.

25.     On July 6, 2020, SCG-VP filed Proof of Claim No. 39 in Case No. 20-14696, alleging an unsecured claim against Debtor Cinemex Holdings in the amount of $26,079,214.65.

26.     On July 6, 2020, SCG-VP also filed Proof of Claim No. 94 in Case No. 20-14695, alleging an unsecured claim against Debtor Cinemex USA in the amount of $26,079,214.65. SCG-VP listed CB Theater as "Debtor 2" on Proof of Claim No. 94.

27.    On July 6, 2020, District Theaters filed Proof of Claim No. 50 in Case No. 20-14696, alleging an unsecured claim against Debtor Cinemex Holdings in the amount of $26,079,214.65.

28.    On July 6, 2020, District Theaters also filed Proof of Claim No. 109 in Case No. 20-14695, alleging an unsecured claim against Debtor Cinemex USA in the amount of $26,079,214.65.  District Theaters listed CB Theater as "Debtor 2" on Proof of Claim No. 109.

29.    On July 6, 2020, SCG-WR filed Proof of Claim No. 49 in Case No. 20-14696, alleging an unsecured claim against Debtor Cinemex Holdings in the amount of $26,079,214.65.

30.    On July 6, 2020, SCG-WR also filed Proof of Claim No. 110 in Case No. 20-14695, alleging an unsecured claim against Debtor Cinemex USA in the amount of $26,079,214.65.  SCG-WR listed CB Theater as "Debtor 2" on Proof of Claim No. 110.

31.    On July 6, 2020, SCG-CS filed Proof of Claim No. 51 in Case No. 20-14696, alleging an unsecured claim against Debtor Cinemex Holdings in the amount of $26,079,214.65.

32.    On July 6, 2020, SCG-CS also filed Proof of Claim No. 108 in Case No. 20-14695, alleging an unsecured claim against Debtor Cinemex USA in the amount of $26,079,214.65.  SCG-CS listed CB Theater as "Debtor 2" on Proof of Claim No. 108.

33.    On July 6, 2020, SCGK filed Proof of Claim No. 45 in Case No. 20-14696, alleging an unsecured claim against Debtor Cinemex Holdings in the amount of $26,079,214.65.

34.    On July 6, 2020, SCGK also filed Proof of Claim No. 102 in Case No. 20-14695, alleging an unsecured claim against Debtor Cinemex USA in the amount of $26,079,214.65. SCGK listed CB Theater as "Debtor 2" on Proof of Claim No. 102.

35.    On July 6, 2020, SCG-SW filed Proof of Claim No. 46 in Case No. 20-14696, alleging an unsecured claim against Debtor Cinemex Holdings in the amount of $26,079,214.65.

36.     On July 6, 2020, SCG-SW also filed Proof of Claim No. 103 in Case No. 20-14695, alleging an unsecured claim against Debtor Cinemex USA in the amount of $26,079,214.65.  SCG-SW listed CB Theater as "Debtor 2" on Proof of Claim No. 103.

37.     On July 6, 2020, SCG-WL filed Proof of Claim No. 47 in Case No. 20-14696, alleging an unsecured claim against Debtor Cinemex Holdings in the amount of $26,079,214.65.

38.     On July 6, 2020, SCG-WL also filed Proof of Claim No. 104 in Case No. 20-14695, alleging an unsecured claim against Debtor Cinemex USA in the amount of $26,079,214.65.  SCG-WL listed CB Theater as "Debtor 2" on Proof of Claim No. 104.

39.     On July 6, 2020, SCG-N filed Proof of Claim No. 48 in Case No. 20-14696, alleging an unsecured claim against Debtor Cinemex Holdings in the amount of $26,079,214.65.

40.     On July 6, 2020, SCG-N also filed Proof of Claim No. 105 in Case No. 20-14695, alleging an unsecured claim against Debtor Cinemex USA in the amount of $26,079,214.65. SCG-N listed CB Theater as "Debtor 2" on Proof of Claim No. 105.

41.     Khan's Claims and the Companies' Claims are collectively referred to herein as the "Claims."

## IV.    <u>OBJECTION</u>

42.     By this Amended Objection, the Debtors seek to (a) disallow and expunge Amended Claim No. 85 of Khan, Amended Claim No. 87 of SCGC, Amended Claim No. 89 of SCGM, Amended Claim No. 91 of SCG-B, Claim No. 94 of SCG-VP, Claim No. 109 of District Theaters, Claim No. 110 of SCG-WR, Claim No. 108 of SCG-CS, Claim No. 102 of SCGK, Claim No. 103 of SCG-SW, Claim No. 104 of SCG-WL, and Claim No. 105 of SCG-N for which Debtor CB Theater is not liable; (b) furthermore, disallow and expunge Amended Claim No. 85 of Khan, Amended Claim Nos. 29 and 87 of SCGC, Amended Claim Nos. 30 and 89 of

SCGM, Amended Claim Nos. 31 and 91 of SCG-B, Claim Nos. 39 and 94 of SCG-VP, Claim

Nos. 50 and 109 of District Theaters, Claim Nos. 49 and 110 of SCG-WR, Claim Nos. 51 and

108 of SCG-CS, Claim Nos. 45 and 102 of SCGK, Claim Nos. 46 and 103 of SCG-SW, Claim

Nos. 47 and 104 of SCG-WL, and Claim Nos. 48 and 105 of SCG-N as duplicative; and (c)

disallow and expunge Amended Claim No. 28 Khan for which Debtors Cinemex USA and

Cinemex Holdings are not liable for the amount claimed.

43.    Simply put, none of the claims are supported by competent evidence of damages

and fail to meet the claimants' burden of initial proof.  Given the outsized, overlapping and

overstated claims, resolution is necessary at this juncture to facilitate the Debtors' restructuring.

44.    Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest, proof

of which is filed under Section 501 of this title, is deemed allowed, unless a party in interest …

objects."  11 U.S.C. § 502(a).  As set forth in Bankruptcy Rule 3001(f), a properly executed and

filed proof of claim constitutes *prima facie* evidence of the validity and amount of the claim

under Section 502(a) of the Bankruptcy Code.  However, a claimant's proof of claim is entitled

to the presumption of *prima facie* validity only until the debtor effectively rebuts the

presumption of validity.  *In re Santiago*, 404 B.R. 564, 570 (Bankr. S.D. Fla. 2009).  The burden

of proof then shifts to the creditor.  *Id.*

A.    **CB Theater Is Not Liable for Khan and the Companies' Claims**

45.    Amended Claim No. 85 of Khan, Amended Claim No. 87 of SCGC, Amended

Claim No. 89 of SCGM, Amended Claim No. 91 of SCG-B, Claim No. 94 of SCG-VP, Claim

No. 109 of District Theaters, Claim No. 110 of SCG-WR, Claim No. 108 of SCG-CS, Claim No.

102 of SCGK, Claim No. 103 of SCG-SW, Claim No. 104 of SCG-WL, and Claim No. 105 of

SCG-N list CB Theater as "Debtor 2" on their respective Proofs of Claim.

46.     CB Theater is not liable to Khan or the Companies for the amounts they assert in their Proofs of Claim.  CB Theater was not a party or a signatory to the Agreement.

47.     Section 12.12 of the Agreement states:

All claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement or the other Transaction Documents, or the negotiation, execution or performance of this Agreement or the other Transaction Documents (including any representation or warranty made in or in connection with this Agreement or the other Transaction Documents or as an inducement to enter into this Agreement or the other Transaction Documents), may be made only against the entities that are expressly identified as parties hereto and thereto.  No Person who is not a named party to this Agreement or the other Transaction Documents, including any past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or Representative of any named party to this Agreement or the other Transaction Documents ("**Non-Party Affiliates**"), shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any obligations or liabilities arising under, in connection with or related to this Agreement or such other Transaction Document (as the case may be) or for any claim based on, in respect of, or by reason of this Agreement or such other Transaction Document (as the case may be) or the negotiation or execution hereof or thereof; and each party hereto waives and releases all such liabilities, claims and obligations against any such Non-Party Affiliates.  Non-Party Affiliates are expressly intended as third party beneficiaries of this provision of this Agreement.

Ex. B at § 12.12.

48.     The Agreement unequivocally exempts CB Theater from any liability for the amounts allegedly owed to Khan and the Companies in connection with the Transaction.  As

such, it was wrongly named as an additional debtor on the Proofs of Claim, and the Court should disallow these Claims.[4]

## B.    Companies' Claims and Amended Claim No. 85 Are Duplicative of Claim No. 28

49.    First, Amended Claim No. 85 of Khan should be disallowed as it is entirely duplicative of Amended Claim No. 28 of Khan.  Both Claims seek damages for alleged breach for the same amount in connection with the Transaction.  The only difference between the Claims is that Amended Claim No. 28 seeks damages against Cinemex Holdings while Amended Claim No. 85 seeks damages against Cinemex USA and CB Theater.  However, one claim does not allege different conduct by one of the Debtors as opposed to others in connection therewith, and they are for the same underlying alleged breach.

50.    Moreover, the Companies' Claims—i.e., Amended Claim Nos. 29 and 87 of SCGC, Amended Claim Nos. 30 and 89 of SCGM, Amended Claim Nos. 31 and 91 of SCG-B, Claim Nos. 39 and 94 of SCG-VP, Claim Nos. 50 and 109 of District Theaters, Claim Nos. 49 and 110 of SCG-WR, Claim Nos. 51 and 108 of SCG-CS, Claim Nos. 45 and 102 of SCGK, Claim Nos. 46 and 103 of SCG-SW, Claim Nos. 47 and 104 of SCG-WL, and Claim Nos. 48 and 105 of SCG-N—should also be disallowed as they are duplicative of each other.  They are also all duplicative of Amended Claim No. 28 of Khan, because they are for the same alleged underlying breach, and they do not allege differing injuries.  Furthermore, all of the Companies

---

[4]    Section 9.2 provides that the entirety of Article 12 of the Agreement survives termination:  "In the event of the termination of this Agreement pursuant to Section 9.1, written notice thereof shall be given to the other Parties, specifying the provisions hereof pursuant to which such termination is made and the basis therefor, and this entire Agreement shall forthwith become void (and there shall be no liability or obligation on the part of any of the Parties or their respective officers, directors or equity holders); provided that, no such termination shall relieve any Party hereto of any liability or damages resulting from any willful breach of this Agreement prior to such termination, in which case, the aggrieved Party shall be entitled to all remedies available at law or in equity; and provided further that the provisions of this Section 9.2, Section 10.2, Section 10.4, Section 10.5 and ARTICLE 12 shall survive any termination of this Agreement and remain valid and binding obligations of the Parties."

are owned by Khan.  There is no separate harm that the Companies allegedly suffered in connection with the Transaction, nor do they so allege.

51.     The failure to disallow the aforementioned claims as duplicative would result in a windfall against the Debtors' estates, to the detriment of other similarly situated creditors. Moreover, elimination of the duplicative claims will enable the Debtors to maintain a more accurate claims register.  As a result of these claims, the claims register is currently inflated in an amount in excess of $656 million.  As such, the Court should disallow Amended Claim No. 85 of Khan and the Companies' Claims as duplicative.

**C.**     **The Claims Should Be Disallowed as Debtors Did Not Breach the Agreement**

52.     The Claims should be disallowed in their entirety because Cinemex USA and Cinemex Holdings are not liable for damages to Khan or the Companies in connection with the Transaction.  First, contrary to the statements in the Complaint, Khan and the Companies did not fulfill the conditions required to close the Transaction, precluding Cinemex USA and Cinemex Holdings from being able to close and permitting termination of the Agreement.  They also did not comply with the required representations and warranties under the Agreement.

53.     Section 9.1(D) of the Agreement permits Cinemex USA to terminate the Transaction if "any of the covenants or agreements of [Khan] or the Companies set forth in this Agreement shall have been breached such that the condition to Closing set forth in Section 8.1[B] would not be satisfied…"  *See* **Exhibit B** (Agreement), Section 9.1(D).  Section 8.1(B), in turn, states that one of the "Closing Conditions" is that the "Companies and [Khan] will have performed and complied in all material respects… with all of the covenants and agreements required to be performed by the Companies and [Khan], as the case may be, hereunder or under any of the Transaction Documents at or prior to the Closing."  *Id.* § 8.1(B).

54.     Among those covenants are in Sections 7.2 and 7.9 of the Agreement, which, as Khan admits in the Complaint, require Khan and the Companies to provide Cinemex with "reasonable access to and the right to inspect all of the properties, assets, premises, books and records, contracts, agreements and other documents and data related to the Company Group," *see id.* § 7.2, and with "reasonable access to each Corporate Employee." *See* Proof of Claim No. 85-2, Exhibit A2 (Complaint) ¶ 52.

55.     As such, Khan and the Companies were required to provide reasonable access to the properties underlying the Transaction, as well as to the employees, as a condition to closing. However, because of governmental orders that went into effect to curtail the spread of the coronavirus, access to the properties and employees was made impossible. *See* **Exhibit C** (Mot. Dismiss, *Khan v. Cinemex USA*) 9-12.

56.     In addition, Section 5.16(B) of the Agreement states that "the Company Group is in possession of, and at all times has possession of, and immediately following the Closing will hold, all material franchises, grants, authorizations, licenses, permits, registrations, qualifications, easements, variances, exemptions, consents, certificates, approvals and orders necessary to own, lease and operate its properties, to carry on its Business" and that "no member of the Company Group has received any written notice to the contrary." *See* **Exhibit B** (Agreement), § 5.16(B).

57.     However, due to the governmental shut-down orders, the Companies' employees did *not* have the authorization to operate the business. *See* **Exhibit C** (Mot. Dismiss, *Khan v. Cinemex USA*) 12-15. As such, Khan and the Companies breached that representation and warranty in the Agreement.

58.    Cinemex validly exercised its rights under the Agreement to terminate the Agreement for Khan's and the Companies' failure to satisfy closing conditions.  Pursuant to the Agreement, the effect of termination is that the "entire Agreement shall forthwith become void (and there shall be no liability or obligation on the part of any of the Parties or their respective officers, directors or equity holders)."  **Exhibit B** (Agreement), § 9.2.  For this reason, the Claims should be disallowed and expunged in their entirety.

59.    The Claims should be disallowed and expunged for the additional reasons that Cinemex USA and Cinemex Holdings did not breach the Agreement due to the principles of frustration of purpose and impossibility.  The principal purpose of the Agreement was for Cinemex to become the owner of operating movie theaters.   However, because of the governmental shut-down orders that would have prevented Cinemex from being able to operate the move theaters had it closed on the Transaction, the purpose of the Transaction was frustrated. *See, e.g., Unihealth v. U.S. Healthcare, Inc.*, 14 F. Supp. 2d 623, 635 (D.N.J. 1998) (excusing performance where government ended hospital billing system and parties should have assumed billing rates under the system would fluctuate but not that the system itself would end); *Texas Co. v. Hogarth Shipping Corp.*, 256 U.S. 619, 629-30 (1921) (excusing ship owner's performance where its ships were requisitioned for use in the British navy); *Sch. Dist. No. 16 of Sherman Cty. V. Howard*, 98 N.W. 666, 666-67 (Neb. 1904) (school district was released from paying teachers' wages where school was shut down due to smallpox outbreak).  While the parties, while negotiating the Transaction, foresaw the possibility of a coronavirus pandemic, they did not foresee the extreme and unprecedented events that the pandemic ultimately led to, including a governmental-imposed shut-down of entertainment venues for the foreseeable future. Indeed, the Agreement itself demonstrates the parties' lack of foreseeability as to such measures,

as the parties had contemplated in the Agreement access to properties and employees, as discussed *supra*.

60.     Moreover, Cinemex had no obligation to close on the Transaction because performance of the Agreement was rendered impossible due to travel restrictions and stay-at-home requirements imposed by the governmental shut-down orders.    *See, e.g., Mueller v. Marvel*, No. 03-07-110, 2004 WL 7325622, at *3 (Del. Com. Pl. Dec. 8, 2004) (finding impossibility where chicken house which was subject of lease collapsed because of age, thereby rendering use of building by defendant for storage and retrieval of products impossible).  Here, it was impossible for Khan and the Companies to satisfy their pre-closing obligation to provide Cinemex with reasonable access to the property and employees, as discussed *supra*.  It was also impossible for key personnel from Cinemex to travel to Houston to inspect the premises.  As such, the Debtors did not breach the Agreement, and Khan's and the Companies' claims alleging same should therefore be disallowed and expunged in their entirety.

## V.     <u>RESERVATION OF RIGHTS</u>

61.     This Amended Objection is limited to the grounds stated herein.  Accordingly, it is without prejudice to the rights of the Debtors or any other party in interest to object to any claim on any grounds whatsoever, and the Debtors expressly reserve all further substantive or procedural objections they may have.  The Debtors expressly reserve the right to further amend, modify, or supplement this Amended Objection and to file additional substantive or non-substantive objections to the Claims.  Should one or more grounds of objection set forth in this Amended Objection be overruled, the Debtors reserve the right to object to the Claims on any other applicable ground.  The Debtors also expressly reserve the right to raise further objections, including objections under Section 502(d) of the Bankruptcy Code.

62.     Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of any party's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Amended Objection or any order granting the relief requested by this Amended Objection; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to Section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.

## VI.     NOTICE

63.     The Debtors will provide notice of this Amended Objection to: (a) the Office of the United States Trustee for the Southern District of Florida; (b) Khan, the Companies, and their counsel; and (b) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## VII.    CONCLUSION

WHEREFORE, the Debtors respectfully request entry of an Order substantially in the form attached hereto as **Exhibit A**, (a) granting the instant Motion; (b) disallowing and expunging Amended Claim No. 85 of Khan, Amended Claim No. 87 of SCGC, Amended Claim No. 89 of SCGM, Amended Claim No. 91 of SCG-B, Claim No. 94 of SCG-VP, Claim No. 109 of District Theaters, Claim No. 110 of SCG-WR, Claim No. 108 of SCG-CS, Claim No. 102 of SCGK, Claim No. 103 of SCG-SW, Claim No. 104 of SCG-WL, and Claim No. 105 of SCG-N for which Debtor CB Theater is not liable; (c) furthermore, disallowing and expunging Amended Claim No. 85 of Khan, Amended Claim Nos. 29 and 87 of SCGC, Amended Claim Nos. 30 and

89 of SCGM, Amended Claim Nos. 31 and 91 of SCG-B, Claim Nos. 39 and 94 of SCG-VP, Claim Nos. 50 and 109 of District Theaters, Claim Nos. 49 and 110 of SCG-WR, Claim Nos. 51 and 108 of SCG-CS, Claim Nos. 45 and 102 of SCGK, Claim Nos. 46 and 103 of SCG-SW, Claim Nos. 47 and 104 of SCG-WL, and Claim Nos. 48 and 105 of SCG-N as duplicative; (d) disallowing and expunging Amended Claim No. 28 Khan for which Debtors Cinemex USA and Cinemex Holdings are not liable for the amount claimed; and (e) granting any and further relief as the Court deems just and proper.

Respectfully submitted this 22nd day of October, 2020.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Patricia B. Tomasco (admitted *pro hac vice*)
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100
Email: pattytomasco@quinnemanuel.com

By: /s/ *Patricia B. Tomasco*
    Patricia B. Tomasco (admitted *pro hac vice*)

-and-

Juan P. Morillo (FBN 135933)
1300 I Street, NW, Suite 900
Washington, D.C.  20005
Telephone: 202-538-8000
Facsimile: 202-538-8100
Email: juanmorillo@quinnemanuel.com

-and-

BAST AMRON LLP

Jeffrey P. Bast (FBN 996343)
Brett M. Amron (FBN 148342)
One Southeast Third Avenue, Suite 1400
Sun Trust International Center
Miami, Florida 33131
Telephone: 305-379-7904
Facsimile: 305-379-7905
Email: jbast@bastamron.com
Email: bamron@bastamron.com

COUNSEL FOR CINEMEX USA REAL ESTATE HOLDINGS, INC.,  CINEMEX HOLDINGS USA, INC., and CB THEATER EXPERIENCE LLC

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

CINEMEX USA REAL ESTATE                      Chapter 11
HOLDINGS, INC., CINEMEX
HOLDINGS USA, INC., and CB                   Case No. 20-14695-LMI
THEATER EXPERIENCE LLC,[1]

     Debtors.                               (Jointly Administered)

_____/

**ORDER GRANTING DEBTORS' AMENDED OBJECTION TO AMENDED CLAIM
NOS. 28 AND 85 OF OMAR KHAN, AMENDED CLAIM NOS. 29 AND 87 OF S.C.G.C.
INC., AMENDED CLAIM NOS. 30 AND 89 OF S.C.G.M. INC., AMENDED CLAIM
NOS. 31 AND 91 OF SCG-B INC., CLAIM NOS. 39 AND 94 OF SCG-VP INC., CLAIM
NOS. 50 AND 109 OF DISTRICT THEATERS INC., CLAIM NOS. 49 AND 110 OF SCG-
WR LLC, CLAIM NOS. 51 AND 108 OF SCG-CS INC., CLAIM NOS. 45 AND 102 OF
SCGK INC., CLAIM NOS. 46 AND 103 OF SCG-SW INC., CLAIM NOS. 47 AND 104 OF
SCG-WL INC., AND CLAIM NOS. 48 AND 105 OF SCG-N INC.**

---

[1]    The Debtors in these cases and the last four digits of each Debtor's federal tax identification number are as follows:  (1) Cinemex USA Real Estate Holdings, Inc. (2194); (2) Cinemex Holdings USA, Inc. (5502); and (3) CB Theater Experience, LLC (0563).  The address for the Debtors is 175 South West 7th Street, Suite 1108, Miami, Florida 33130.

Upon the amended objection (the "Amended Objection") of the Debtors to Amended Claim Nos. 28 and 85 of Omar Khan ("Khan"), Amended Claim Nos. 29 and 87 of S.C.G.C. Inc. ("SCGC"), Amended Claim Nos. 30 and 89 of S.C.G.M. Inc. ("SCGM"), Amended Claim Nos. 31 and 91 of SCG-B Inc. ("SCG-B"), Claim Nos. 39 and 94 of SCG-VP Inc. ("SCG-VP"), Claim Nos. 50 and 109 of District Theaters Inc. ("District Theaters"), Claim Nos. 49 and 110 of SCG-WR LLC ("SCG-WR"), Claim Nos. 51 and 108 of SCG-CS Inc. ("SCG-CS"), Claim Nos. 45 and 102 of SCGK Inc. ("SCGK"), Claim Nos. 46 and 103 of SCG-SW Inc. ("SCG-SW"), Claim Nos. 47 and 104 of SCG-WL Inc. ("SCG-WL"), and Claim Nos. 48 and 105 of SCG-N Inc. ("SCG-N"), and request for entry of an order (a) disallowing and expunging Amended Claim No. 85 of Khan, Amended Claim No. 87 of SCGC, Amended Claim No. 89 of SCGM, Amended Claim No. 91 of SCG-B, Claim No. 94 of SCG-VP, Claim No. 109 of District Theaters, Claim No. 110 of SCG-WR, Claim No. 108 of SCG-CS, Claim No. 102 of SCGK, Claim No. 103 of SCG-SW, Claim No. 104 of SCG-WL, and Claim No. 105 of SCG-N for which Debtor CB Theater is not liable; (b) furthermore, disallowing and expunging Amended Claim No. 85 of Khan, Amended Claim Nos. 29 and 87 of SCGC, Amended Claim Nos. 30 and 89 of SCGM, Amended Claim Nos. 31 and 91 of SCG-B, Claim Nos. 39 and 94 of SCG-VP, Claim Nos. 50 and 109 of District Theaters, Claim Nos. 49 and 110 of SCG-WR, Claim Nos. 51 and 108 of SCG-CS, Claim Nos. 45 and 102 of SCGK, Claim Nos. 46 and 103 of SCG-SW, Claim Nos. 47 and 104 of SCG-WL, and Claim Nos. 48 and 105 of SCG-N as duplicative; and (c) disallowing and expunging Amended Claim No. 28 Khan for which Debtors Cinemex USA and Cinemex Holdings are not liable for the amount claimed, as more fully set forth in the Amended Objection; and the Court having found that the Debtors provided appropriate notice of the Amended Objection and the opportunity for a hearing on the Amended Objection under the circumstances; and the Court having reviewed the

Amended Objection and having heard statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Amended Objection and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation,

IT IS HEREBY ORDERED THAT:

1.      The Amended Objection is sustained as set forth herein.

2.      Any response to the Amended Objection not otherwise withdrawn, resolved, or adjourned is hereby overruled on the merits.

3.      Amended Claim No. 85 of Khan, Amended Claim No. 87 of SCGC, Amended Claim No. 89 of SCGM, Amended Claim No. 91 of SCG-B, Claim No. 94 of SCG-VP, Claim No. 109 of District Theaters, Claim No. 110 of SCG-WR, Claim No. 108 of SCG-CS, Claim No. 102 of SCGK, Claim No. 103 of SCG-SW, Claim No. 104 of SCG-WL, and Claim No. 105 of SCG-N are disallowed and expunged in their entirety because CB Theater is not liable for the amount of the Claims for the reasons set forth in the Amended Objection.

4.      Amended Claim No. 85 of Khan, Amended Claim Nos. 29 and 87 of SCGC, Amended Claim Nos. 30 and 89 of SCGM, Amended Claim Nos. 31 and 91 of SCG-B, Claim Nos. 39 and 94 of SCG-VP, Claim Nos. 50 and 109 of District Theaters, Claim Nos. 49 and 110 of SCG-WR, Claim Nos. 51 and 108 of SCG-CS, Claim Nos. 45 and 102 of SCGK, Claim Nos. 46 and 103 of SCG-SW, Claim Nos. 47 and 104 of SCG-WL, and Claim Nos. 48 and 105 of SCG-N are disallowed and expunged as duplicative of Amended Claim No. 28 of Khan.

5.      Amended Claim No. 28 of Khan is disallowed and expunged in its entirety because Cinemex USA and Cinemex Holdings are not liable for the amount of the Claim for the reasons set forth in the Amended Objection.

6.      The Clerk of the Court is authorized and directed to update the claims register maintained in these chapter 11 cases to reflect the relief granted in this Order.

7.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Amended Objection.

8.      The terms and conditions of this Order will be immediately effective and enforceable upon its entry.

9.      This Court shall retain exclusive jurisdiction to resolve any dispute arising from or related to this Order.

# # #

Submitted By:
Patricia B. Tomasco
Quinn Emanuel Urquhart & Sullivan, LLP
711 Louisiana, Suite 500
Houston, Texas 77002
Telephone: 713-221-7100
Email: pattytomasco@quinnemanuel.com

-and-

Jeffrey P. Bast
Bast Amron LLP
One Southwest Third Avenue
Suite 1400
Miami, Florida 33131
Telephone: 305-379-7904
Email: jbast@bastamron.com

Copies to:

*Attorney Patty Tomasco, who shall serve a copy of this order on all interested parties and file a certificate of service reflecting same.*

# EXHIBIT B

The Parties have executed this Equity Purchase Agreement as of the date first written above.

<u>**COMPANIES**</u>

S.C.G.C. INC.

By: _____
    Name: Omar Khan
    Title: President

S.C.G.M. INC.

By: _____
    Name: Omar Khan
    Title: President

SCG-B INC.

By: _____
    Name: Omar Khan
    Title: President

SCG-VP INC.

By: _____
    Name: Omar Khan
    Title: President

DISTRICT THEATERS INC.

By: _____
    Name: Omar Khan
    Title: President

[Signature Page to Equity Purchase Agreement]

**EQUITY PURCHASE AGREEMENT**

**by and among**

**S.C.G.C. INC.,**

**S.C.G.M. INC.,**

**SCG-B INC.,**

**SCG-VP INC.,**

**DISTRICT THEATERS INC.,**

**SCG-WR LLC,**

**SCG-CS INC.,**

**SCGK INC.,**

**SCG-SW INC.,**

**SCG-WL INC.,**

**OMAR KHAN,**

**CINEMEX USA REAL ESTATE HOLDINGS, INC.**

**and**

**CINEMEX HOLDINGS USA, INC.**

**dated as of March 10, 2020**

33439967.16

# TABLE OF CONTENTS

ARTICLE 1. DEFINITIONS ......................................................................................................1
    1.1.    Defined Terms .........................................................................................1

ARTICLE 2. ACQUISITION OF EQUITY INTERESTS.....................................................14
    2.1.    Acquisition of Equity Interests by Buyer.............................................14
    2.2.    Closing Estimates, and Closing Payments............................................14
    2.3.    Post-Closing Adjustment to Preliminary Purchase Price......................15
    2.4.    Withholding ...........................................................................................18
    2.5.    Escrow ...................................................................................................18

ARTICLE 3. CLOSING ..........................................................................................................19
    3.1.    Closing Date...........................................................................................19
    3.2.    Closing Transaction ...............................................................................19

ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF THE EQUITYHOLDER.........19
    4.1.    Authorization of Closing Transactions .................................................19
    4.2.    Absence of Conflicts .............................................................................19
    4.3.    Brokers' Fees .........................................................................................20
    4.4.    Securities; Title ......................................................................................20

ARTICLE 5. REPRESENTATIONS AND WARRANTIES OF THE COMPANIES.................20
    5.1.    Organization and Power.........................................................................20
    5.2.    Authorization of Closing Transactions .................................................20
    5.3.    Capitalization; Subsidiaries ...................................................................21
    5.4.    Absence of Conflicts .............................................................................22
    5.5.    Financial Statements..............................................................................22
    5.6.    Title to Tangible Assets .........................................................................23
    5.7.    Certain Developments ............................................................................23
    5.8.    Real Property .........................................................................................24
    5.9.    Tax Matters ............................................................................................26
    5.10.    Material Contracts..................................................................................27
    5.11.    Proprietary Rights; Privacy....................................................................29
    5.12.    Company Group's Broker.......................................................................29
    5.13.    Labor Matters ........................................................................................30
    5.14.    Employee Benefit Plans .........................................................................31
    5.15.    Affiliate Transactions.............................................................................32
    5.16.    Compliance with Laws; Permits ...........................................................32
    5.17.    Environmental Matters...........................................................................33
    5.18.    Insurance ...............................................................................................34
    5.19.    Litigation ...............................................................................................34
    5.20.    Inventory ...............................................................................................34
    5.21.    Material Suppliers .................................................................................35

i

5.22. Anti-Bribery; Anti-Corruption; Anti-Money Laundering; Anti-Terrorism;
Sanctions ........................................................................................................35
5.23. Film Studio Contracts ....................................................................................35
5.24. NO OTHER REPRESENTATIONS ...............................................................36

ARTICLE 6. REPRESENTATIONS AND WARRANTIES OF BUYER ..........................36
6.1. Organization and Power ..................................................................................36
6.2. Authorization of Closing Transactions ...........................................................36
6.3. Absence of Conflicts .......................................................................................37
6.4. Litigation .........................................................................................................37
6.5. Independent Auditor ........................................................................................37
6.6. Investment Intent; Restricted Securities .........................................................37
6.7. Due Diligence Review .....................................................................................38
6.8. Availability of Funds; Solvency ......................................................................39
6.9. Closings and Mass Layoffs .............................................................................40
6.10. Brokers' Fees ..................................................................................................40
6.11. Exceptions to GAAP .......................................................................................40

ARTICLE 7. COVENANTS ...............................................................................................40
7.1. Operation and Maintenance of the Business...................................................40
7.2. Access ..............................................................................................................41
7.3. Exclusive Dealing ...........................................................................................42
7.4. Further Assurances ..........................................................................................42
7.5. Updating Disclosure Schedules .......................................................................42
7.6. Regulatory Filings ...........................................................................................43
7.7. 280G Matters ...................................................................................................43
7.8. Non-Compete ...................................................................................................44
7.9. Access to Corporate Employees; Transition Services Agreement ..................44
7.10. Domain Names .................................................................................................45
7.11. Right of First Offer ..........................................................................................45

ARTICLE 8. CONDITIONS TO OBLIGATIONS ..............................................................45
8.1. Buyer's Closing Conditions ............................................................................45
8.2. Equityholder's Closing Conditions .................................................................47
8.3. Frustration of Closing Conditions ..................................................................48

ARTICLE 9. TERMINATION .............................................................................................48
9.1. Termination ......................................................................................................48
9.2. Effect of Termination ......................................................................................49

ARTICLE 10. OTHER COVENANTS ................................................................................49
10.1. Notice of Breach ..............................................................................................49
10.2. Press Releases and Announcements ................................................................49
10.3. Further Transfers .............................................................................................50
10.4. Confidentiality. ................................................................................................50
10.5. WARN Act Notice ...........................................................................................51
10.6. Director and Officer Indemnification ..............................................................51

33439967.16

| | | |
|---|---|---|
| 10.7. | Documents and Information .......................................................................51 | |
| 10.8. | Release of Personal Guarantees ................................................................51 | |
| 10.9. | Gift Certificates ........................................................................................52 | |
| 10.10. | Third Party Agreements .............................................................................52 | |
| 10.11. | Woodlands Construction .............................................................................52 | |
| 10.12. | Screen Advertising Payments ...................................................................53 | |
| 10.13. | Sony Master Lease Payments ...................................................................54 | |

ARTICLE 11. INDEMNIFICATION AND TAX MATTERS ...........................................54

| | | |
|---|---|---|
| 11.1. | Survival .....................................................................................................54 | |
| 11.2. | Indemnification .........................................................................................55 | |
| 11.3. | Indemnification Procedures .......................................................................58 | |
| 11.4. | Treatment of Indemnification Payments ...................................................59 | |
| 11.5. | Reserved ....................................................................................................60 | |
| 11.6. | Tax Matters ...............................................................................................60 | |

ARTICLE 12. MISCELLANEOUS ...................................................................................63

| | | |
|---|---|---|
| 12.1. | Amendment and Waiver ............................................................................63 | |
| 12.2. | Notices ......................................................................................................64 | |
| 12.3. | Construction; Interpretation ......................................................................65 | |
| 12.4. | Severability ...............................................................................................65 | |
| 12.5. | Entire Agreement; Assignment .................................................................66 | |
| 12.6. | Counterparts; Electronic Signatures .........................................................66 | |
| 12.7. | Governing Law; Jurisdiction .....................................................................66 | |
| 12.8. | Expenses ...................................................................................................67 | |
| 12.9. | Parties in Interest ......................................................................................67 | |
| 12.10. | Schedules and Exhibits .............................................................................67 | |
| 12.11. | Remedies ...................................................................................................67 | |
| 12.12. | Non-Recourse ...........................................................................................68 | |
| 12.13. | Waiver of Conflicts and Privileged Information .......................................69 | |
| 12.14. | Parent Guarantee. ......................................................................................70 | |

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Accounting Principles |
| Exhibit B | - | Current Assets |
| Exhibit C | - | Current Liabilities |
| Exhibit D | - | Escrow Agreement |
| Exhibit E-1 | - | Example Statement of Net Working Capital |
| Exhibit E-2 | - | Example Statement of Indebtedness |

## SCHEDULES

| | | |
|---|---|---|
| Schedule P-1 | - | Permitted Indebtedness |
| Schedule P-2 | - | Permitted Liens |
| Schedule W-1 | - | Woodlands Construction Reimbursement |
| Schedule 2.2(B)(1) | - | Estimated Closing Company Group Indebtedness |
| Schedule 4.2 | - | Absence of Conflicts |
| Schedule 4.4 | - | Securities; Title |
| Schedule 5.3(A) | - | Capitalization |
| Schedule 5.3(B) | - | Subsidiaries |
| Schedule 5.4 | - | Absence of Conflicts |
| Schedule 5.5(A) | - | Financial Statements |
| Schedule 5.5(C) | - | Undisclosed Liabilities |
| Schedule 5.6 | - | Title to Tangible Assets |
| Schedule 5.7 | - | Certain Developments |
| Schedule 5.8(B) | - | Leased Real Property |
| Schedule 5.8(C) | - | Schedule of Lease Information |
| Schedule 5.9 | - | Tax Matters |
| Schedule 5.10(A) | - | Material Contracts |
| Schedule 5.10(B) | - | Material Contract; Exceptions |
| Schedule 5.11(A) | - | Proprietary Rights; Privacy |
| Schedule 5.11(B) | - | Ownership; Infringement |
| Schedule 5.13(A) | - | Labor Matters |
| Schedule 5.13(B) | - | Labor; Legal Compliance |
| Schedule 5.13(C) | - | Immigration Matters |
| Schedule 5.13(D) | - | Employees |
| Schedule 5.14(A) | - | Employee Benefit Plans |
| Schedule 5.14(D) | - | Benefit Plans: Reports |
| Schedule 5.14(H) | - | Benefit Plans; Payments |
| Schedule 5.15 | - | Affiliate Transactions |
| Schedule 5.16(A) | - | Compliance with Laws |
| Schedule 5.16(B) | - | Permits |
| Schedule 5.17 | - | Environmental Matters |
| Schedule 5.18 | - | Insurance |
| Schedule 5.19 | - | Litigation |
| Schedule 5.20 | - | Inventory |
| Schedule 5.21(A) | - | Material Suppliers |
| Schedule 5.21(B) | - | Change in Material Suppliers |

Schedule 7.1(A)        -        Operation and Maintenance of the Business
Schedule 7.8           -        Non-Compete
Schedule 7.10          -        Domain Names
Schedule 8.1(D)(4)     -        Third Party Consents and Approvals (Condition Precedent)
Schedule 10.8(A)       -        Release of Personal Guarantees
Schedule 10.8(B)       -        Third Party Consents and Approvals (Covenant)
Schedule 11.6(I)       -        Purchase Price Allocation

# EQUITY PURCHASE AGREEMENT

The following parties (the "**Parties**") enter into this EQUITY PURCHASE AGREEMENT (this "**Agreement**") as of March 10, 2020: (i) S.C.G.C. Inc., a Texas corporation ("**SCGC**"); (ii) S.C.G.M. Inc., a Texas corporation ("**SCGM**"); (iii) SCG-B Inc., a Texas corporation ("**SCG-B**"); (iv) SCG-VP Inc., a Texas corporation ("**SCG-VP**"); (v) District Theaters Inc., a Texas corporation ("**District Theaters**"); (vi) SCG-WR LLC., a Texas limited liability company ("**SCG-WR**"); (vii) SCG-CS Inc., a Texas corporation ("**SCG-CS**"); (viii) SCGK Inc., a Texas corporation ("**SCGK**"); (ix) SCG-SW Inc., a Texas corporation ("**SCG-SW**"); (x) SCGWL Inc., a Texas corporation ("**SCGWL**" and with SCGC, SCGM, SCG-B, SCG-VP, District Theaters, SCG-WR, SCG-CS, SCGK and SCG-SW, collectively, the "**Companies**" and each a "**Company**"); (xi) Omar Khan, an individual resident of the State of Texas (the "**Equityholder**"); (xii) Cinemex USA Real Estate Holdings, Inc., a Delaware corporation ("**Buyer**"); and (xiii) Cinemex Holdings USA, Inc., a Delaware corporation ("**Parent**").

**WHEREAS**, the Equityholder owns all of the issued and outstanding equity interests of each Company (the "**Equity Interests**"); and

**WHEREAS**, the Equityholder desires to transfer to Buyer, and Buyer desires to acquire from the Equityholder, all of the Equity Interests as set forth in, and subject to the provisions of, this Agreement and the other applicable Transaction Documents;

**NOW THEREFORE**, in consideration of the premises and the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1.
## DEFINITIONS

1.1.    <u>Defined Terms</u>. In this Agreement, the following terms will have the following meanings:

"**Accounting Principles**" means GAAP, and, if any deviations or exceptions therefrom, those accounting policies, principles and practices set forth on <u>Exhibit A</u>.

"**Actual Value**" is defined in <u>Section 2.3(C)(3)</u>.

"**Adjustment Statement**" is defined in <u>Section 2.3(C)(1)</u>.

"**Affiliate**" means, with respect to any specified Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such specified Person.

"**Affiliated Group**" means an affiliated group as defined in Section 1504 of the Code (or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax law) of which any member of the Company Group is or has been a member.

"**Agreement**" is defined in the preamble to this Agreement.

"**AML Laws**" means all Legal Requirements from time to time concerning or relating to anti-money laundering and related guidelines, financial recordkeeping or reporting requirements, issued, administered or enforced by any Governmental Entity.

"**Anti-Corruption Laws**" means all U.S. and non-U.S. Legal Requirements relating to the prevention of fraud, money laundering, corruption and bribery, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977, as amended, and any rules and regulations promulgated thereunder, and the U.K. Bribery Act and any other applicable anti-corruption related rules or regulations.

"**Anti-Terrorism Laws**" means all Legal Requirements relating to terrorism or money laundering, including, without limitation, Executive Order No. 13224, the PATRIOT Act, the Bank Secrecy Act, the Money Laundering Control Act of 1986 (i.e., 18 USC. §§ 1956 and 1957), the Legal Requirements administered by the U.S. Department of Treasury Office of Foreign Assets Control, or any successor thereto, and all Legal Requirements comprising or implementing these Legal Requirements.

"**Attorney-Client Communications**" means any communication occurring on or prior to the Closing between Law Firm, on the one hand, and any member of the Company Group, any Equityholder or any of their respective Affiliates or representatives, on the other hand, that in any way relates to the transactions contemplated by this Agreement (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the transactions contemplated hereby or thereby), including any representation, warranty or covenant of any party under this Agreement or any related agreement.

"**Basket**" is defined in Section 11.2(C)(1).

"**Benefit Plan**" means any "employee benefit plan" (as such term is defined in ERISA Section 3(3)) and any other employee benefit or compensation plan, program, policy, agreement or arrangement, including any equity-based, employment, retirement, profit sharing, bonus, incentive, severance, separation, change in control, retention, deferred compensation, fringe benefit, vacation, paid time off, medical, dental, life or disability plan, program, policy, agreement or arrangement, in each case, whether or not subject to ERISA, and whether written or oral, formal or informal, that a member of the Company Group sponsors, maintains, contributes to or has any obligation to contribute to for the benefit of any present or former employees, consultants, directors or service providers of any member of the Company Group, or with respect to which a member of the Company Group has any material liability (whether actual, contingent, with respect to any of its assets or otherwise).

"**Business**" means the business of leasing, owning, managing or operating motion picture theaters.

"**Business Day**" means any day, other than a Saturday or Sunday, on which commercial banks in Houston, Texas are authorized or required to be open for the general transaction of business.

"**Buyer**" is defined in the preamble to this Agreement.

"**Buyer Exclusions**" is defined in Section 11.2(C)(2).

"**Buyer Fundamental Representations**" is defined in Section 11.1(B).

"**Buyer Indemnitee**" is defined in Section 11.2(A).

"**Cap**" is defined in Section 11.2(C)(2).

"**Charter Documents**" means, as applicable, the certificates or articles of incorporation, certificates or articles of organization, limited liability company agreement or operating agreement, bylaws or similar governing documents of a Person.

"**Claim Notice**" is defined in Section 11.3(A).

"**Closing**" is defined in Section 3.1.

"**Closing Company Group Cash**" means, as of 11:59 p.m. Houston time on the date that is immediately prior to the Closing Date, the sum, immediately prior to Closing, of the fair market value of all cash and cash equivalents of the Company Group (including, without limitation, marketable securities (with maturities of 90 days or less), short-term investments, cash on hand, security deposits  or prepaid rental amounts with respect to any of the Leased Real Property, checks issued to the Company Group (if cleared), and bank deposits (if cleared), in each case calculated in accordance with the Accounting Principles; provided, however, checks issued by the Company Group but uncleared shall be deducted from Cash unless such amounts are otherwise reflected in the calculation of Closing Company Group Indebtedness, Closing Net Working Capital or Transaction Expenses used to calculate the Final Purchase Price. Notwithstanding the foregoing, the sum of (i) all cash received by the Company Group in connection with the sale of Gift Certificates following the date hereof through 11:59 p.m. Houston time on the date that is immediately prior to April 1, 2020; minus (ii) ████████, shall be excluded from the calculation of the Closing Company Group Cash for purposes hereunder.

"**Closing Company Group Indebtedness**" means, as of 11:59 p.m. Houston time on the date that is immediately prior to the Closing Date, the aggregate amount of Indebtedness of the Company Group, calculated in accordance with the Accounting Principles.

"**Closing Date**" is defined in Section 3.1.

"**Closing Net Working Capital**" means, as of 11:59 p.m. Houston time on the date that is immediately prior to the Closing Date, the Net Working Capital of the Company Group, calculated in accordance with the Accounting Principles.

"**COBRA**" means the requirements of Part 6 of Subtitle B of Title I of ERISA and Code Section 4980B and of any similar state Legal Requirement.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Company**" and "**Companies**" is defined in the preamble to this Agreement.

"**Company / Equityholder Fundamental Representations**" is defined in <u>Section 11.1(A)</u>.

"**Company Group**" means the collective reference to each Company and its respective Subsidiaries.

"**Company Group Employee**" means an employee of any member of the Company Group as of the date hereof.

"**Company Group Permits**" is defined in <u>Section 5.16(B)</u>.

"**Competing Proposal**" means, other than the transactions contemplated by this Agreement, any inquiry, proposal or offer, relating to, whether in one or a series of related transactions, (a) the acquisition (directly or indirectly) by any Person of all or substantially all, or more than a majority of, the consolidated assets of the Company Group, taken as a whole; (b) the acquisition in any manner (including directly or indirectly and whether by way of merger, sale of Equity Securities, consolidation, recapitalization or other similar business combination) by any Person of Equity Securities representing 50% or more of the Company Group's issued and outstanding Equity Securities; or (c) any public announcement of a proposal, plan or intention to do any of the foregoing or any Contract to engage in any of the foregoing.

"**Company Tax Representation**" is defined in <u>Section 11.1(A)</u>.

"**Confidential Information**" is defined in <u>Section 10.4(A)</u>.

"**Consent**" means any consent, order, approval, waiver, authorization, agreement or license with respect to any Governmental Entity or any other Person.

"**Contract**" means any binding written contract, agreement, instrument, license or lease (in each case, including any extension, renewal, amendment or other modification thereof).

"**Corporate Employee**" means each employee of SCG-AH, Inc. as of the date hereof.

"**Current Assets**" means, as of any date or time of determination, without duplication, those current assets of the Company Group that are included in the line item categories of assets specifically identified on <u>Exhibit B</u> determined on a consolidated basis and calculated in accordance with the Accounting Principles with the use of the same principles, practices, methodologies, procedures and manner for establishing levels of reserves and materiality as such levels were used in preparing the Example Statement of Net Working Capital. The parties hereto acknowledge and agree that this <u>Exhibit B</u> (i) represents the "Current Assets" of the Company Group and SCG-N Inc.; and (ii) shall apply to both this Agreement and the Naperville Purchase Agreement.

"**Current Liabilities**" means, as of any date or time of determination, without duplication, those current liabilities of the Company Group that are included in the line item categories of liabilities specifically identified on <u>Exhibit C</u>, determined on a consolidated basis and calculated in accordance with the Accounting Principles with the use of the same principles,

practices, methodologies, procedures and manner for establishing levels of reserves and materiality as such levels were used in preparing the Example Statement of Net Working Capital; provided that notwithstanding the foregoing, Current Liabilities will not include any changes to liabilities as a result of the transactions associated with this Agreement (including any purchase accounting adjustment), the Closing Company Group Indebtedness, any income Tax liabilities or Transaction Expenses.  Furthermore, no fact, event or occurrence on or after the Closing shall be taken into account when calculating the Current Liabilities.  The parties hereto acknowledge and agree that this Exhibit C (i) represents the "Current Liabilities" of the Company Group and SCG-N Inc.; and (ii) shall apply to both this Agreement and the Naperville Purchase Agreement.

"**Employee Pension Benefit Plan**" means any "employee pension benefit plan" as such term is defined in ERISA Section 3(2) subject to Title IV of ERISA, Code Sections 412 or 4971 or Section 302 of ERISA (but excluding any "multiemployer plan" within the meaning of Section (3)(37) of ERISA).

"**Enterprise Value**" means $██████████████████████████████ ██████████████.

"**Environmental Law**" means all Legal Requirements relating to pollutants, contaminants, wastes, chemicals, or protection of the environment, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., the Hazardous Substances Transportation Act, 49 U.S.C. Section 5101 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq., the Clean Water Act, 33 U.S.C. Section 1251 et seq., the Clean Air Act, 42 U.S.C. Section 7401 et seq., the Emergency Planning Community Right-to-Know Act, 42 U.S.C. Section 11001 et seq., the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq., and the Oil Pollution Act of 1990, 33 U.S.C. Section 2701 et seq., all as now amended, and all regulations promulgated pursuant thereto, each as now in effect.

"**Equity Interests**" is defined in the recitals to this Agreement.

"**Equity Security**" means (a) any capital stock, membership interests or other equity security, (b) any security directly or indirectly convertible into or exchangeable for any capital stock, membership interests or other equity security or security containing any profit participation features, (c) any warrants, options or other rights, directly or indirectly, to subscribe for or to purchase any capital stock, membership interests, other equity security or security containing any profit participation features or directly or indirectly to subscribe for or to purchase any security directly or indirectly convertible into or exchangeable for any capital stock, membership interests or other equity security or security containing profit participation features, or (d) any stock appreciation rights, phantom stock or equity rights or other similar rights.

"**Equityholder**" is defined in the preamble to this Agreement.

"**Equityholder Returns**" is defined in Section 11.6(C).

"**Equityholder Tax Claim**" is defined in Section 11.6(F).

33439967.16

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means, with respect to any Person, any trade or business, whether or not incorporated, that together with such Person would be deemed a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code or to be a member of the same "controlled group" with such Person within the meaning of Section 4001(a)(14) of ERISA.

"**Escrow Account**" means the account established by the Escrow Agent to hold the Escrow Amount pursuant to the terms of the Escrow Agreement.

"**Escrow Agent**" means Wells Fargo Bank, N.A.

"**Escrow Agreement**" means the escrow agreement dated as of the Closing Date by and among the Equityholder, Buyer and the Escrow Agent substantially in the form attached to this Agreement as Exhibit D.

"**Escrow Amount**" means an amount equal to the sum of $██████.

"**Estimated Closing Company Group Cash**" is defined in Section 2.2(A)(1).

"**Estimated Closing Company Group Indebtedness**" is defined in Section 2.2(A)(2).

"**Estimated Closing Net Working Capital**" is defined in Section 2.2(A)(3).

"**Estimated Transaction Expenses**" is defined in Section 2.2(A)(4).

"**Example Statement of Net Working Capital**" means the statement of Net Working Capital as of 11:59 p.m. Houston time on December 31, 2019 and attached as Exhibit E-1 hereto. The parties hereto acknowledge and agree that this Exhibit E-1 (i) represents the calculation of "Net Working Capital" of the of the Company Group and SCG-N Inc.; and (ii) shall apply to both this Agreement and the Naperville Purchase Agreement.

"**Final Adjustment Amount**" means the amount, which may be a positive or negative number, equal to the Final Purchase Price minus the Preliminary Purchase Price.

"**Final Purchase Price**" is defined in Section 2.3(D).

"**Financial Statements**" is defined in Section 5.5(A).

"**Flow of Funds**" means a written flow of funds statement prepared by the Equityholder and delivered to Buyer, with a draft of the Funds Flow (including all requisite wiring instructions and reasonable estimates of the final payoff amounts) to be delivered at least five (5) Business Days prior to the Closing (or such other time as mutually agreed upon by Buyer and Equityholder), and subject to finalization by the parties prior to Closing.

6

"**GAAP**" means generally accepted accounting principles as in effect as of the date of this Agreement in the United States.

"**General Survival Period Expiration Date**" is defined in Section 11.1(A).

"**Gift Certificates**" means any gift certificates, gift cards, guest passes, complimentary passes, re-admission passes, private event certificates, food or beverage credits and any other cards, passes and certificates which entitle a ticketholder to admission, food, beverage or other goods without any further consideration or at a discount, in respect of the Company Group or the Business, that are issued by the Company and required to be honored by the Company in the Ordinary Course.

"**Governmental Entity**" means any government, agency, governmental department, commission, court, arbitration panel or instrumentality of the United States of America or any state, municipality or other political subdivision in or of any of the foregoing and any court, agency, instrumentality, regulatory commission or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Hazardous Substances**" means any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, radioactive materials or any other substances exposure, in each case, to which is regulated, limited or prohibited under any Environmental Law.

"**High Value**" is defined in Section 2.3(C)(2).

"**Holdback Amount**" means $██████.

"**Indebtedness**" means, with respect to any Person as of any time, without duplication, the outstanding principal amount of, accrued but unpaid interest on, and other payment obligations (including any prepayment premiums or termination costs payable as a result of the consummation of the transactions contemplated hereunder) arising under, any obligations of such Person consisting of (i) indebtedness for borrowed money or indebtedness issued in substitution or exchange for borrowed money, (ii) accounts payable with maturities of 90 days or more, (iii) liabilities for the deferred purchase price of property or services, including with respect to any conditional sale, title retention, consignment or similar arrangements (other than accounts payable and accrued expenses), (iv) indebtedness evidenced by any note, bond, debenture or other debt security, (v) indebtedness related to any letter of credit, any banker's acceptance, or any payment, performance, customs, insurance or surety bond or other type of surety agreement, in each case solely to the extent drawn, (vi) capital leases (which, for the avoidance of doubt, shall exclude all Leases of Leased Real Property), (vii) any unsettled payables related to the Business between or among the Company Group, on the one hand, and the Equityholder (and Affiliates of the Equityholder (other than the Company Group)), on the other hand, (viii) deferred compensation and (ix) accrued but unpaid severance obligations (including the employer portion of any employment Taxes thereon, if any). Notwithstanding the foregoing, with respect to the Company Group, "Indebtedness" shall not include any obligations consisting of (A) liabilities under operating leases, (B) indebtedness related to any letter of credit, any banker's acceptance, or any

7

payment, performance, customs, insurance or surety bond or other type of surety agreement, in each case to the extent not drawn (including any that are outstanding under any credit facilities of the Company Group), (C) debt financing incurred by Buyer and/or any member of the Company Group in connection with the consummation of the transactions contemplated by this Agreement, (D) amounts included as Transaction Expenses or any amounts otherwise included in the calculation of Closing Net Working Capital, or (E) any Permitted Indebtedness.  The parties agree that an example statement of Indebtedness of the Company Group as of 11:59 p.m. Houston time on December 31, 2019 is set forth on Exhibit E-2 attached hereto. The parties hereto acknowledge and agree that this Exhibit E-2 (i) represents the "Indebtedness" of the Company Group and SCG-N Inc.; and (ii) shall apply to both this Agreement and the Naperville Purchase Agreement.

"**Indemnified Party**" is defined in Section 11.3(A).

"**Indemnified Tax**" means (i) any Tax of the Company Group for any Pre-Closing Tax Period, (ii) any Tax of any member of an Affiliated Group (other than any such group that includes the Buyer and/or its Affiliates) of which the Company Group is or was a member on or prior to the Closing Date (including pursuant to Treasury Regulation § 1.1502-6 or any analogous or similar state, local, or foreign law or regulation), (iii) any Taxes of any person imposed on the Company Group for any period as a transferee or successor in respect of a transaction occurring on or before the Closing Date, by law, contract, or otherwise (for Taxes imposed by contract, only Taxes for a Pre-Closing Tax Period), (iv) any payments required to be made after the Closing Date under any Tax sharing, Tax indemnity, Tax allocation or similar contracts (other than any customary commercial contract entered into in the ordinary course of business the principal subject of which is not Taxes) to which the Company Group was obligated, or was a party, on or prior to the Closing Date; provided that, Indemnified Taxes shall not include any Taxes (A) that result from the manner in which the Buyer finances its obligations under this Agreement, (B) that are attributable to any transactions outside the ordinary course of business occurring on the Closing Date but after the Closing and not contemplated by this Agreement, (C) to the extent such Taxes are included in Current Liabilities, Indebtedness, and/or Transaction Expenses, as finally determined under this Agreement, or (D) that are attributable to a breach of Section 11.6(D).

"**Indemnifying Party**" is defined in Section 11.3(A).

"**Independent Auditor**" means KPMG LLP.

"**Law Firm**" is defined in Section 12.13(A).

"**Leased Real Property**" or "**Real Property**" means the parcels of real property leased by any member of the Company Group and listed on Schedule 5.8(B).

"**Leases**" means all leases, subleases, licenses, and other Contracts pursuant to which any member of the Company Group has the right to occupy any Leased Real Property.

"**Legal Requirement**" means, with respect to any Person, all federal, state and local laws, statutes, codes and ordinances of any Governmental Entity applicable to such Person or to the Business.

"<u>**Lien**</u>" means any mortgage, pledge, security interest, encumbrance, lien, claim, agreement, right of first refusal, option, limitation on transfer or use or assignment, licensing restricting ownership, easement, charge or other similar encumbrance or restriction, excluding the Permitted Liens.  For the avoidance of doubt, the term "Lien" shall not be deemed to include any license of Proprietary Rights or any lease.

"<u>**Loss**</u>" means any loss, liability, cost, damage, causes of action, royalty, deficiency, penalty, Tax, judgment, fine, fees, penalties, cost or expense, but shall exclude punitive or exemplary damages (except to the extent such damages are awarded to a third party), and shall also exclude special, consequential, indirect, speculative, remote damages, lost profits, diminution in value and damages based on any multiple of "EBITDA," earnings, profit or similar financial metric (except to the extent such damages are awarded to a third party).

"<u>**Low Value**</u>" is defined in <u>Section 2.3(C)(1)</u>.

"<u>**Material Adverse Effect**</u>" means any change, development, event, occurrence, fact, circumstance or condition, that, individually or taken as a whole, has or is reasonably likely to have (a) a material adverse effect upon the financial condition, business or results of operations of the Company Group, including by substantially reducing the value of the Company Group or (b) a material adverse effect on the ability of the Equityholder or any member of the Company Group to consummate the transactions contemplated hereby; provided, however, that none of the following (or results thereof) shall be taken into account, either alone or in combination, in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur: (i) conditions generally affecting the United States economy, the regulatory environment or credit, securities, currency, financial, banking or capital markets (including any disruption thereof and any decline in the price of any security or any market index or any changes in interest rates or exchange rates) in the United States or elsewhere in the world, (ii) any national, international or supranational political, geopolitical or social conditions, including the engagement in or escalation of hostilities or war, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack, or any epidemics, pandemics, outbreaks, earthquakes, hurricanes, tornadoes or any other natural disasters (whether or not caused by any Person or any force majeure event) or any other national or international calamity or crisis, (iii) changes in GAAP accounting standards or in the interpretation or enforcement thereof, (iv) changes in any Legal Requirement or any action required to be taken under any Legal Requirement or existing contract by which any member of the Company Group (or any of their respective assets or properties) is bound, (v) any change that is generally applicable to the industries or markets in which any member of the Company Group operates or in which products or services of any member of the Company Group are produced, distributed or sold, (vi) the execution, announcement or existence of this Agreement or the consummation of the transactions contemplated by this Agreement, (vii) any failure in and of itself by any member of the Company Group to meet any internal or published projections, forecasts, estimates or predictions of revenue, earnings, cash flow or cash position and any seasonal changes in the results of operations of any member of the Company Group for any period ending on or after the date of this Agreement, (viii) the taking of any action contemplated, permitted or required by this Agreement and/or the Transaction Documents, or any failure to take any action by any member of the Company Group that is prohibited by this Agreement (whether with or without consent of Buyer), including the completion of the transactions contemplated hereby and thereby (including the obtaining of

9

approval or consent from any Governmental Entity or other third party in connection with the consummation of transactions contemplated hereby and thereby), or (ix) any action taken with Buyer's consent; except in the case of clauses (i), (ii), (iii) or (v) above, to the extent that such conditions, events, changes, crisis and disasters, as applicable, have a material and disproportionate impact on the Company Group, taken as a whole, as compared to other industry participants.

"**Material Contracts**" is defined in <u>Section 5.10(A)</u>.

"**Multiemployer Welfare Plan**" means any employee benefit plan of the type described in Section 3(37) of ERISA and that provides health and welfare benefits that any member of the Company Group maintains, contributes to, is obligated to contribute to, or with respect to which any member of the Company Group has any liability or potential liability.

"**Naperville Purchase Agreement**" means that certain Equity Purchase Agreement, dated as of the date hereof, between SCG-N Inc., a Texas corporation, Buyer and Equityholder.

"**Net Working Capital**" means, as of any applicable date or time, the aggregate value of the Current Assets <u>minus</u> Current Liabilities.

"**Non-Party Affiliates**" is defined in <u>Section 12.12</u>.

"**Ordinary Course**" means, with respect to any Person, in the ordinary course of that Person's business consistent with past practice.

"**Parties**" is defined in the preamble to this Agreement.

"**Permitted Indebtedness**" means such Indebtedness described on Schedule P-1.

"**Permitted Liens**" means (i) mechanic's, materialmen's, carriers', repairers' and other Liens arising or incurred in the Ordinary Course for amounts that are not yet delinquent, are being contested in good faith or for which adequate reserves have been established, (ii) Liens for Taxes, assessments or other governmental charges that are not yet due and payable as of the Closing Date, or are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided on the Financial Statements in accordance with the Accounting Principles, (iii) encumbrances, restrictions on real property and other matters of title (including easements, covenants, conditions, rights of way and similar matters affecting title to the real property and other title defects) that do not materially interfere with the value, or the Company Group's present uses or occupancy, of such real property, (iv) Liens of the Company Group that will be released at Closing that are securing the obligations of the Company Group under its existing credit facilities being repaid at Closing, (v) Liens which would not have had or would not reasonably be expected to have a Material Adverse Effect, (vi) Liens granted to any lender at the Closing in connection with any financing by Buyer of the transactions contemplated hereby, (vii) zoning, building codes and other land use laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property and which are not violated by the current use or occupancy of such real property or the operation of the businesses of the Company Group or any violation of which would not have had or would not reasonably be expected to have a Material Adverse Effect,

(viii) any right, interest, Lien or title of a lessor or sublessor under any Lease of Leased Real property, and (ix) Liens described on Schedule P-2.

"**Person**" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any Governmental Entity or any similar entity.

"**Position Statement**" is defined in Section 2.3(B).

"**Post-Closing Tax Period**" means any taxable period or portion thereof which is not a Pre-Closing Tax Period.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and the portion of the taxable period through the end of the Closing Date for a taxable period that begins on or before the Closing Date and ends after the Closing Date.

"**Preliminary Purchase Price**" is defined in Section 2.2(A).

"**Proceeding**" means any action, arbitration, suit, summons, citations or subpoena of any kind or nature whatsoever, civil, criminal, regulatory or otherwise, at law or in equity, in each case, involving or before a Governmental Entity or arbitrator.

"**Proprietary Rights**" means, to the extent protectable by law, all patents, patent applications, trademarks and service marks (including all goodwill associated therewith and all registrations and applications therefor), trade names, social media identifiers and other source indicators, copyrights (and all registrations and applications therefor), domain names, trade secrets, know-how and other proprietary information.

"**Purchase Price**" means, without duplication, an amount equal to (i) the Enterprise Value, plus (ii) the Closing Company Group Cash, minus (iii) the Closing Company Group Indebtedness, plus (iv) the amount, if any, by which the Closing Net Working Capital is greater than the Target Net Working Capital, minus (v) the amount, if any, by which the Closing Net Working Capital is less than the Target Net Working Capital, minus (vi) the amount of unpaid Transaction Expenses, plus (vii) the Woodlands Construction Reimbursement, minus (viii) the Sony Holdback Amount.

"**Representatives**" is defined in Section 7.2.

"**Review Period**" is defined in Section 2.3(A)(2).

"**Schedules**" is defined in Section 7.5.

"**Screen Advertising Payments**" means any receipts, proceeds, checks, securities or other property of any kind comprising, arising out of or derived from the sale of any theatre screen advertisements by the Company Group prior to the Closing.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

11

"**Seller Indemnitee**" is defined in Section 11.2(B).

"**Solvent**" is defined in Section 6.8.

"**Sony Holdback Amount**" means $██████; provided, that, such amount is not otherwise reflected in the calculation of Closing Company Group Indebtedness or Closing Net Working Capital.

"**Sony Lease Agreements**" means each such Master Lease Agreement set forth as items 1-6 on Schedule P-1 of the Schedules.

"**Statement of Objections**" is defined in Section 2.3(A)(2).

"**Straddle Period**" is defined in Section 11.6(J).

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to whether, at the time, stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, limited liability company, association or other business entity, a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof.

"**Target Net Working Capital**" means $██████.

"**Tax**" (and, with correlative meaning, "Taxes," "Taxable" and "Taxing") means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profits, environmental (including under Section 59A of the Code), customs, duty, real property, real property gains, personal property, capital stock, equity, social security, unemployment, disability, payroll, license, employment, withholding, or other tax of any kind whatsoever, including any interest, penalties or additions to tax in respect of the foregoing.

"**Tax Claim**" is defined in Section 11.6(F).

"**Tax Return**" means any return, declaration, claim for refund, information return, or report filed or required to be filed with any Taxing Authority in connection with the determination, assessment or collection of Taxes (including any schedule or attachment thereto, and including any amendment thereof).

"**Taxing Authority**" means any Governmental Entity having or purporting to exercise jurisdiction with respect to any Tax.

"**Transaction Documents**" means this Agreement, the Escrow Agreement and each other agreement, document, certificate or instrument delivered pursuant to, or in connection with, this Agreement.

"**Transaction Expenses**" means, without duplication, (i) the aggregate amount of all out-of-pocket costs and expenses incurred by any member of the Company Group or by or on behalf of the Equityholder (to the extent such amounts are a liability of any member of the Company Group) prior to and as a direct result of the consummation of the transfer of the Equity Interests to Buyer, including fees and disbursements of lawyers, accountants, investment bankers and other advisors and service providers and (ii) any transaction, incentive or stay bonus or termination or change of control payment payable to any Person by any member of the Company Group as a result of the Closing and the employer portion of any employment Taxes with respect thereto, provided that such arrangement was agreed to by the Company Group (rather than the Buyer) prior to Closing. Notwithstanding anything to the contrary contained herein, in no event shall "Transaction Expenses" include any amounts with respect to (a) Transfer Taxes, (b) Current Liabilities, or (c) any amounts included in Closing Company Group Indebtedness.

"**Transaction Tax Deductions**" means, without duplication, to the extent deductible for U.S. federal income Tax purposes by any member of the Company Group, the sum of (i) Transaction Expenses, (ii) the fees, expenses and interest incurred by any member of the Company Group with respect to the payment of the Indebtedness (including, for the avoidance of doubt, amounts treated as interest for U.S. federal income Tax purposes, any breakage fees or accelerated deferred financing fees, whether paid before, at or after the Closing), and (iii) all fees, costs and expenses incurred by any member of the Company Group in connection with or incident to this Agreement and the consummation of the transactions contemplated hereby, including any such legal, accounting, transaction, closing and investment banking fees, costs and expenses, in each case, in connection with the transactions contemplated hereby, and in each case, solely to the extent such costs or expenses are economically borne by the Equityholder.

"**Transfer Taxes**" is defined in Section 11.6(B)

"**Treasury Regulations**" means the regulations promulgated or proposed by the United States Treasury Department under the Code.

"**Update**" is defined in Section 7.5.

"**Upper Cap**" is defined in Section 11.2(C).

"**WARN Act**" means the Worker Adjustment Retraining and Notification Act of 1988, as amended, or any similar foreign, state or local law, regulation or ordnance.

"**Woodlands Construction Reimbursement**" means, as of 11:59 p.m. Houston time on the date that is immediately prior to the Closing Date, the aggregate amount of the reasonable and documented costs (each of which are in-line with market rates) described on Schedule W-1, solely to the extent previously paid by the Equityholder or the Company Group and which have not been reimbursed by the Woodlands Landlord, with respect to the construction of the theatre at the Woodlands Location in accordance with the Woodlands Lease.

"**Woodlands Lease**" means the Lease Agreement, dated as of June 20, 2019, between BRIXMOR HOLDINGS 12 SPE, LLC, as landlord (the "**Woodlands Landlord**"), and SCG-WL INC., as Tenant.

"**Woodlands Location**" means the Leased Real Property location in Woodlands, Texas under the Woodlands Lease.

# ARTICLE 2.
## ACQUISITION OF EQUITY INTERESTS

2.1.    Acquisition of Equity Interests by Buyer.

(A)    At the Closing, Buyer shall acquire from the Equityholder, and the Equityholder shall assign, transfer and deliver to Buyer, all of the Equity Interests held by the Equityholder (free and clear of any Liens).

(B)    In consideration for the transfer of the Equity Interests, Buyer shall pay the Purchase Price as set forth in this Agreement.

2.2.    Closing Estimates, and Closing Payments.

(A)    **Estimated Adjustments**.  Three (3) Business Days prior to the Closing Date (or such other time as mutually agreed upon by Buyer and Equityholder), the Equityholder will prepare and submit to Buyer a written statement prepared in good faith and in accordance with the Accounting Principles setting forth in reasonable detail Equityholder's calculation of the Purchase Price which shall include calculations of the following (the sum resulting from such calculation, the "**Preliminary Purchase Price**"):

(1)    the estimated Closing Company Group Cash (the "**Estimated Closing Company Group Cash**");

(2)    the estimated Closing Company Group Indebtedness (the "**Estimated Closing Company Group Indebtedness**");

(3)    the estimated Closing Net Working Capital determined as of December 31, 2019 (the "**Estimated Closing Net Working Capital**");

(4)    the estimated unpaid Transaction Expenses (the "**Estimated Transaction Expenses**");

(5)    the estimated Woodlands Construction Reimbursement (the "**Woodlands Construction Reimbursement**"); and

(6)    the Sony Holdback Amount.

(B)    Payment of Preliminary Purchase Price.  On the Closing Date, Buyer shall pay, or cause to be paid, the amounts described below, as follows:

33439967.16

(1)     Buyer, on behalf of the Company Group, shall pay, or cause to be paid, the Estimated Closing Company Group Indebtedness as set forth on Schedule 2.2(B)(1) to such payees and in such amounts as set forth in Flow of Funds and payoff letters provided three (3) Business Days prior to the Closing (or such other time as mutually agreed upon by Buyer and Equityholder) by the Equityholder to Buyer, by wire transfer of immediately available funds to such accounts designated in the Flow of Funds.

(2)     Buyer, on behalf of the Company Group, shall pay, or cause to be paid, the Estimated Transaction Expenses to such payees and in such amounts as set forth in the Flow of Funds, by wire transfer of immediately available funds to such accounts designated in the Flow of Funds.

(3)     Buyer shall pay the Escrow Amount by wire transfer of immediately available funds to the Escrow Account in accordance with the wire instructions designated in writing by the Escrow Agent.

(4)     Buyer shall pay to the Equityholder, by wire transfer of immediately available funds to an account designated in the Flow of Funds, an amount equal to the sum of (A) the Preliminary Purchase Price, minus (B) the Escrow Amount.

(5)     At Closing, Buyer shall retain the Holdback Amount.  Following the determination of the Final Purchase Price in accordance with Section 2.3, Buyer shall distribute and release from the Holdback Amount any Final Adjustment Amount payable to Equityholder (in accordance with the terms of Section 2.3) and retain any remainder of the Holdback Amount.

2.3.    Post-Closing Adjustment to Preliminary Purchase Price.

(A)     Within sixty (60) days after the Closing Date, Buyer shall prepare and deliver to the Equityholder, the following:

(1)     A written statement (the "**Adjustment Statement**") setting forth in reasonable detail its good faith calculation of the Purchase Price which shall include calculations of (i) the Closing Company Group Cash, (ii) the Closing Company Group Indebtedness, (iii) the Closing Net Working Capital, (iv) the Transaction Expenses, (v) the Woodlands Construction Reimbursement, and (vi) the Final Adjustment Amount.  Following the date on which the Adjustment Statement is delivered, Buyer shall not be entitled to propose any adjustment to any of the items or amounts contained in the Adjustment Statement.  The Adjustment Statement shall be prepared in accordance with the Accounting Principles.  The Adjustment Statement will include, as supplemental information, a detailed list of the elements that comprise the items required by Section 2.3(A) and a brief explanation thereof.

(2)     The Equityholder shall have sixty (60) days from his receipt of the Adjustment Statement to review the Adjustment Statement (the "**Review Period**").  Following the Equityholder's receipt of the Adjustment Statement, the Equityholder and other Representatives of the Equityholder will have reasonable

access to the working papers relating to the Adjustment Statement and such other books and records and reasonable access to the personnel of Buyer and the Company Group. On or prior to the last day of the Review Period, the Equityholder may object to the Adjustment Statement by giving Buyer written notice of the Equityholder's objection (a "**Statement of Objections**"). Any Statement of Objections shall (x) specify the nature and amount of any objection so asserted (and an alternative amount for each such disputed item to the extent known by the Equityholder) and (y) include a calculation by the Equityholder of the Final Adjustment Amount and each of the items set forth in the Adjustment Statement (to the extent possible based on information in the possession of the Equityholder as of the date such Statement of Objections is delivered); provided, however, in the event Buyer, the Company Group or any of their Representatives do not provide Equityholder or his Representatives with any of the books, records or other information that Equityholder may reasonably request in accordance with this Section 2.3(A)(2), such Statement of Objections shall not require any such specifications or calculations.

(3)     If a Statement of Objections is received by Buyer, then the applicable Adjustment Statement (as revised in accordance with clause (i) or (ii) below) will become final and binding upon the Parties on the earlier of (i) the date Buyer and the Equityholder resolve in writing any differences they have with respect to any matter specified in the Statement of Objections or (ii) the date any matters in dispute are finally resolved in writing by the Independent Auditor in accordance with Section 2.3(B). During the thirty (30) days immediately following the delivery of a Statement of Objections, Buyer and the Equityholder will consult in good faith to resolve in writing any differences that they may have with respect to any matter specified in the Statement of Objections.

(B)     At the end of the thirty (30)-day consultation period described in Section 2.3(A)(3), if Buyer and the Equityholder have not agreed upon the Final Adjustment Amount, the Equityholder and Buyer shall submit any and all matters that remain in dispute to the Independent Auditor. The Independent Auditor's services and authority to make a determination shall be limited in scope to the disputed issues identified in the Statement of Objections and shall be (i) based solely on presentations by Buyer and the Equityholder (each, a "**Position Statement**") submitted to the Independent Auditor with a copy simultaneously delivered to the other Party, and not independent review and (ii) made in strict accordance with the terms of this Agreement (including, but not limited to, the Accounting Principles). The Independent Auditor shall (x) act as an expert and not as an arbitrator, (y) apply the provisions of this Section 2.3 to the disputed issues only, and (z) have no authority or power to alter, modify, amend, add to or subtract from any term or provision of this Agreement. None of Buyer, the Equityholder or any of their respective Representatives or Affiliates shall have any ex parte communications or meetings with the Independent Auditor regarding the subject matter hereof without the other Party's prior written consent. The Independent Auditor will work to resolve such dispute promptly and, in any event, within thirty (30) days from the date the dispute is submitted to the Independent Auditor. Any item not specifically referred to the Independent Auditor for evaluation in a Position Statement shall be deemed final and binding on the Parties. The Independent Auditor will determine the Final Adjustment Amount by selecting with respect to each item in dispute an amount between or equal

to Buyer's position as set forth in its Position Statement or the Equityholder's position as set forth in his Position Statement. Buyer and the Equityholder agree to execute, if requested by the Independent Auditor, a reasonable engagement letter in customary form consistent with the terms and conditions applicable to the Independent Auditor and dispute resolution process described in this <u>Section 2.3(B)</u> and reasonably cooperate with the Independent Auditor so as to enable it to make a determination as quickly and as accurately as practicable.

(C)     Buyer, on the one hand, and the Equityholder, on the other hand, shall pay their own costs and expenses incurred in connection with the dispute resolution procedure set forth in this <u>Section 2.3</u>; provided, that in the event Buyer and the Equityholder submit any unresolved disputes to an Independent Auditor for resolution as provided in <u>Section 2.3(B)</u>, Buyer, on the one hand, and the Equityholder, on the other hand, will share responsibility for the fees and expenses of the Independent Auditor as follows:

(1)     if the Independent Auditor resolves all of the remaining disputes in favor of Buyer (the applicable Final Adjustment Amount so determined is referred to herein as the "**<u>Low Value</u>**"), the Equityholder will be responsible for all of the fees and expenses of the Independent Auditor;

(2)     if the Independent Auditor resolves all of the remaining disputes in favor of the Equityholder (the applicable Final Adjustment Amount so determined is referred to herein as the "**<u>High Value</u>**"), Buyer will be responsible for all of the fees and expenses of the Independent Auditor; and

(3)     if the Independent Auditor resolves some of the remaining disputes in favor of Buyer and some disputes in favor of the Equityholder (the applicable amounts so determined are referred to herein as the "**<u>Actual Value</u>**"), the Equityholder will be responsible for that fraction of the fees and expenses of the Independent Auditor equal to (x) the difference between the High Value and the Actual Value over (y) the difference between the High Value and the Low Value, and Buyer will be responsible for the remainder of the fees and expenses of the Independent Auditor.

(D)     The determination of the final Purchase Price as determined by agreement of the Parties or by the Independent Auditor (the "**<u>Final Purchase Price</u>**") and the Final Adjustment Amount, in each case, pursuant to the terms of this <u>Section 2.3</u>, will be final, non-appealable and binding on the Parties and the procedures set forth in this <u>Section 2.3</u> for resolving disputes with respect to the Adjustment Statement will be the sole and exclusive method for resolving such disputes; provided, that Buyer and the Equityholder shall not be prohibited from instituting a Proceeding to enforce any final determination of the Final Purchase Price and Final Adjustment Amount as determined in accordance with this <u>Section 2.3</u>.

(E)     (i) If the Preliminary Purchase Price is greater than the Final Purchase Price, the Final Adjustment Amount (expressed as a positive number) shall be paid to Buyer by the Equityholder within five (5) Business Days of the final determination of the Final Adjustment Amount pursuant to this <u>Section 2.3</u>; provided, that, Buyer shall first seek recovery for such Final Adjustment Amount from the remaining funds then held in the Escrow Account (and in the event

such amount is in excess of the amount of funds then remaining in the Escrow Account, Buyer may seek recovery directly from the Equityholder for such excess amount); and (ii) if the Preliminary Purchase Price is less than the Final Purchase Price, Buyer shall pay, or cause to be paid, the Final Adjustment Amount to the Equityholder within five (5) Business Days of the final determination of the Final Adjustment Amount pursuant to this <u>Section 2.3</u>.

(F)    Buyer agrees that following the Closing it will not take any actions with respect to the accounting books, records, policies and procedures of any member of the Company Group that would obstruct or prevent the preparation of the Adjustment Statement as provided in this <u>Section 2.3</u>.  Buyer will cooperate in the preparation of the Adjustment Statement, including providing customary certifications to the Equityholder or, if requested, to the Equityholder's auditors or the Independent Auditor.

2.4.    <u>Withholding</u>.

Buyer shall be entitled to deduct and withhold from any payments made pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the making of any such payment under any applicable Tax law; provided that, Buyer shall provide the respective payee with reasonable notice prior to withholding any amount pursuant to this Section 2.4 and shall work in good faith with the respective payee to minimize any such withheld amounts (provided such actions do not adversely impact the Buyer); provided further that, no such notice or actions shall be required with respect to U.S. federal withholding Taxes required under Section 1445 to the extent the Equityholder does not deliver to the Buyer the certificate required under <u>Section 8.1(D)(7)</u>.  To the extent that amounts are so withheld, and paid to the proper Taxing Authority pursuant to any applicable Tax law, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such holder in respect of which such deduction and withholding was made.

2.5.    <u>Escrow</u>.

(A)    The Escrow Amount shall be held by the Escrow Agent pursuant to the terms of the Escrow Agreement; provided that if there is a conflict between the Escrow Agreement and this Agreement, the terms of this Agreement shall govern.

(B)    Consistent with the provisions of the Escrow Agreement, (i) one-third (1/3) of the Escrow Amount remaining on deposit in the Escrow Account shall be disbursed to the Equityholder on the 6-month anniversary of the Closing Date; (ii) one-half (1/2) of the Escrow Amount remaining on deposit in the Escrow Account shall be disbursed to the Equityholder on the 12-month anniversary of the Closing Date and (iii) any remaining funds on deposit in the Escrow Account shall be disbursed to the Equityholder on the date that is the 18-month anniversary of the Closing Date; in each case of clauses (i) through (iii), less any amounts required to remain in the Escrow Account in connection with a pending or unresolved claim for indemnification that was delivered to the Escrow Agent on or prior to the applicable date (until such pending or unresolved claim for indemnification is resolved in accordance with the terms of this Agreement and the Escrow Agreement).

# ARTICLE 3.
## CLOSING

3.1.  <u>Closing Date</u>.

The closing of the transfer of the Equity Interests to Buyer (the "**Closing**") shall take place at 10:00 a.m., Central time, on a date to be specified by the Parties, which shall be no later than the second Business Day after satisfaction (or waiver) of the conditions set forth in <u>ARTICLE 8</u> (not including conditions which are to be satisfied by actions taken at the Closing), in Houston, Texas, unless another time, date or place is agreed to in writing by the Parties.  The date upon which the Closing actually occurs is referred to herein as the "**Closing Date**."

3.2.  <u>Closing Transaction</u>.

At the Closing, the Equityholder and Buyer will consummate the following transactions: (i) the Equityholder will deliver (or cause to be delivered) to Buyer the various certificates, instruments, and documents referred to in <u>Section 8.1</u> below, and (ii) Buyer will deliver the payments described in <u>Section 2.2(B)</u> above, and deliver and the various certificates, instruments, and documents referred to in <u>Section 8.2</u> below.

# ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE EQUITYHOLDER

As a material inducement to Buyer to enter into this Agreement, Equityholder makes the representations and warranties set forth in this <u>ARTICLE 4</u> as of the date of this Agreement.

4.1.  <u>Authorization of Closing Transactions</u>.

The Equityholder has the legal capacity (including any required consents of his spouse) to execute and deliver this Agreement and to perform Equityholder's obligations hereunder.  The execution, delivery and performance of this Agreement have been duly authorized by all corporate or equivalent action on behalf of the Equityholder. This Agreement constitutes a valid and legally binding obligation of the Equityholder enforceable in accordance with its terms and conditions, except as enforceability hereof may be limited by bankruptcy, insolvency or other laws affecting creditor's rights generally and limitations on availability of equitable remedies.  No other proceeding or action on the part of the Equityholder is necessary to approve and authorize the Equityholder's execution and delivery of this Agreement or the performance of the Equityholder's obligations hereunder.

4.2.  <u>Absence of Conflicts</u>.

Except as set forth on <u>Schedule 4.2</u>, none of the execution, delivery or performance by Equityholder of this Agreement:

(A)  does or will (i) result in any breach of any of the provisions of, (ii) constitute a default under, (iii) result in a violation of, (iv) give any third party the right to terminate or to accelerate any obligation under or (v) result in the creation of any Lien upon any assets of the Equityholder or any Material Contract or any permits to which the Equityholder is party or by

19

which the Business is bound or any Legal Requirement by which the Equityholder or any of the Equityholder's assets is bound, or

(B)    without limiting clause (A) above, requires any Consent of or filing with any Governmental Entity or any Person under any Material Contract, or any Company Group Permits to which the Company is a party or by which the Business is bound, or any Legal Requirement of any Governmental Entity or any other Person which has not been obtained or made by the Equityholder.

4.3.    Brokers' Fees.

Except for PJ Solomon, L.P. (whose fees shall be deemed a Transaction Expense for purposes hereunder), the Equityholder has not incurred any liability or obligation to pay any fees or commissions to any broker, finder or agent or employed any investment banker, broker or finder, in connection with the transactions contemplated by this Agreement.

4.4.    Securities; Title.

The Equityholder holds of record and owns beneficially the Equity Interests set forth on Schedule 5.3, free and clear of any restrictions on transfer (other than any restrictions under the Securities Act and state securities laws) or Liens (other than Liens that will be discharged at the Closing). The delivery of the Equity Interests as set forth in this Agreement shall transfer lawful, valid, marketable and indefeasible title thereto to the Buyer, free of any Liens. Except as set forth on Schedule 4.4, the Equityholder is not a party to any option, warrant, purchase right, or other contract or commitment that could require the Equityholder to sell, transfer, or otherwise dispose of any of the Equity Interests (other than this Agreement).

## ARTICLE 5.
## REPRESENTATIONS AND WARRANTIES OF THE COMPANIES

As a material inducement to Buyer to enter into this Agreement, the Companies and Equityholder, on a joint and several basis, make the representations and warranties set forth in this ARTICLE 5 as of the date of this Agreement.

5.1.    Organization and Power.

Each member of the Company Group is validly existing and in good standing (or comparable status) under the laws of its jurisdiction of organization and is qualified to do business in every jurisdiction in which the nature of its business or its ownership of property requires it to be qualified, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.  Each member of the Company Group has the requisite corporate or limited liability company (as applicable) power and authority necessary to carry on its business as presently conducted.

5.2.    Authorization of Closing Transactions.

Each Company has the requisite corporate or limited liability company power and authority (as applicable) to execute and deliver this Agreement and all other Transaction Documents to

which it is a party and to perform its obligations hereunder and thereunder. Each Company has duly authorized its execution, delivery and performance of this Agreement and all other Transaction Documents to which it is a party. No other proceeding or action on the part of any member of the Company Group is necessary to approve and authorize each Company's execution and delivery of this Agreement or any other Transaction Document to which it is a party or the performance of its obligations hereunder or thereunder. This Agreement constitutes, and each of the other Transaction Documents to which a Company is a party will when executed constitute, a valid and binding obligation of such Company, enforceable in accordance with its terms, except as enforceability hereof may be limited by bankruptcy, insolvency or other laws affecting creditor's rights generally and limitations on the availability of equitable remedies.

5.3.    Capitalization; Subsidiaries.

(A)    The authorized Equity Securities of each Company are as described on Schedule 5.3(A). The Equity Securities have been validly authorized and issued, are fully paid and non-assessable. There are issued and outstanding Equity Securities of each Company held of record as indicated on Schedule 5.3(A). Except as set forth on Schedule 5.3(A), there are no outstanding Equity Securities of any Company, preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, repurchase rights, redemption rights, registration rights, agreements or Contracts, commitments, understandings, arrangements or obligations, by which a Company is or may become bound to issue, sell, purchase or exchange any Equity Securities of such Company or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire any securities or Equity Securities, and no securities or obligations evidencing such rights are authorized, issued or outstanding. Except as set forth on Schedule 5.3(A), there are no voting trusts, proxies, or other Contracts or understandings with a Company with respect to the voting of any Equity Securities of such Company.

(B)    Except as set forth on Schedule 5.3(B), no Company has any Subsidiaries, controls, directly or indirectly, or has any direct or indirect equity participation in any corporation, partnership, trust, or other business association or entity. The authorized Equity Securities of each member of the Company Group (other than the Companies) are as described on Schedule 5.3(B). There are issued and outstanding Equity Securities of the Company Group (other than the Companies) held of record as indicated on Schedule 5.3(B). Except as set forth on Schedule 5.3(B), there are no outstanding Equity Securities of any member of the Company Group (other than the Companies), or Contracts, commitments, understandings or arrangements, by which any member of the Company Group (other than the Companies) is or may become bound to issue any Equity Securities of any member of the Company Group (other than the Companies). Except as set forth on Schedule 5.3(B), there are no voting trusts, proxies, or other Contracts or understandings with respect to the voting of any Equity Securities of any member of the Company Group (other than the Companies) to which may member of the Company Group is a party. Except as set forth on Schedule 5.3(B), no member of the Company Group (other than the Companies) has any Subsidiaries, controls, directly or indirectly, or has any direct or indirect equity participation in any corporation, partnership, trust, or other business association or entity.

5.4. <u>Absence of Conflicts</u>.

Except as set forth on <u>Schedule 5.4</u>, none of the execution, delivery or performance by a Company of this Agreement or any other Transaction Document to which it is a party:

(A)     does or will (i) result in any breach of any of the provisions of, (ii) constitute a default under, (iii) result in a violation of, (iv) give any third party the right to terminate or to accelerate any obligation under or (v) result in the creation of any Lien upon any assets of the Company Group, in each case under the provisions of the Charter Documents of any member of the Company Group or any Material Contract, or any Company Group Permits to which any Company is a party or by which the Business is bound, or any Legal Requirement by which any member of the Company Group or any of its respective assets are bound, or

(B)     without limiting clause (A) above, requires any Consent of or filing with any Governmental Entity or any other Person under any Material Contract, or any Company Group Permits to which the Company is a party or by which the Business is bound, or any Legal Requirement which has not been obtained or made by the Companies.

5.5. <u>Financial Statements</u>.

(A)     Attached as <u>Schedule 5.5(A)</u> are the following (collectively, the "**Financial Statements**"):

(1)     the unaudited balance sheets of the Companies, as of December 31, 2018, and the related statements of income and members' equity for the fiscal year then ended; and

(2)     the unaudited consolidated balance sheet of the Companies dated as of, and the related statements of income and members' equity for the fiscal year ended December 31, 2019.

(B)     The Financial Statements (in each case including the notes thereto, if any) have been prepared in accordance with the Companies' normal accounting practices, in accordance with the Accounting Principles, on a consistent basis throughout the period involved, subject, in the case of the Financial Statements described in <u>Section 5.5(A)</u>, to (i) a lack of footnote disclosures and other presentation items and (ii) changes resulting from year-end adjustments. The Financial Statements, taken as a whole, present fairly in all respects the financial condition and results of operations of the Companies and Business as of such dates and for the applicable periods then ended, in all material respects.

(C)     Except as set forth on <u>Schedule 5.5(C)</u>, there are no undisclosed liabilities or obligations of a material nature relating to any Company of the nature required to be disclosed in accordance with the Accounting Principles since the date of the most recent Financial Statements other than (i) those incurred in the Ordinary Course consistent with past practices (none of which liabilities is a liability for breach of Contract, breach of warranty, tort, infringement or a violation of a Legal Requirement), (ii) Transaction Expenses or Closing Company Group Indebtedness that will be paid off in full at Closing and which actually reduce the Purchase Price, (iii) obligations of the Companies expressly contemplated under this Agreement or any of the

Transaction Documents or (iv) such obligations and liabilities expressly disclosed on the Schedules.

5.6.    <u>Title to Tangible Assets</u>.

The Company Group has good and valid title or valid leases to all the material tangible assets necessary for the conduct of its business as presently conducted, free and clear of all Liens (other than Permitted Liens).  Except as set forth on <u>Schedule 5.6</u>, to the knowledge of the Companies, the material tangible assets of the Company Group are in good operating condition and repair, reasonable wear and tear excepted.  This representation does not apply to the Leased Real Property, Proprietary Rights or intangibles, which are covered elsewhere.

5.7.    <u>Certain Developments</u>.

Except as set forth on <u>Schedule 5.7</u>, as contemplated by this Agreement or as otherwise set forth in the Schedules, during the period beginning on January 1, 2019 through the date of this Agreement, each member of the Company Group has conducted its business in all material respects in the Ordinary Course, and there has not been, with respect to the Business or the Company Group, any of the following:

(A)    any change, development, event, occurrence, fact, circumstance or condition that, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect;

(B)    split, combination or reclassification of any of the Equity Interests or Equity Securities of the Company Group

(C)    amendment of the articles of organization, bylaws, operating agreement or other organizational documents of any member of the Company Group;

(D)    material change in any method of accounting or accounting practice for the Business, except as required by GAAP or as disclosed in the notes to the Financial Statements;

(E)    transfer, assignment, sale, license, abandonment, expiration, lapse or other disposition of any material assets, rights or properties shown or reflected on the Financial Statements, except for the sale of inventory in the Ordinary Course and the disposal or replace of any such asset in the Ordinary Course;

(F)    material damage, destruction or loss, or any material interruption of use, with respect to any material assets of the Company Group;

(G)    incurrence, assumption, guarantee or cancellation of any Indebtedness or other obligations for borrowed money, in an outstanding principal amount in excess of $██████, individually or in the aggregate;

(H)    capital expenditures in an aggregate amount in excess of $██████, individually or in the aggregate;

(I)     acquisition by merger or consolidation with, or by purchase of a substantial portion of the assets or securities of, or by any other manner, any business or any Person or any division thereof;

(J)     commencement, waiver, cancellation, settlement, or offer to settle, any litigation, investigation, arbitration, proceeding or other claim involving any member of the Company Group, in excess of ████, individually or in the aggregate; or

(K)     termination of, or receipt of written notice of termination of, any Material Contract, which could reasonably be expected to result in a Material Adverse Effect.

5.8.    Real Property.

(A)     No member of the Company Group owns any parcels of real property.

(B)     Schedule 5.8(B) sets forth the address of each parcel of Leased Real Property, and a true and complete list of all Leases for each such Leased Real Property. The applicable member of the Company Group named therein has a good and valid leasehold interest in and to the applicable Leased Real Property free and clear of all Liens, other than Permitted Liens. The Companies have delivered to Buyer a true, complete and correct copy of each such Lease (including all amendments, extensions, renewals and guaranties) and the Companies have delivered to Buyer a true, complete and correct copy of any other agreements affecting the Leases in its possession. Except as set forth in Schedule 5.8(B), with respect to each of the Leases (and the Leased Real Property, as applicable):

(1)     such Lease is legal, valid and binding on the applicable member of the Company Group named therein, and in full force and effect, except as enforceability may be limited by bankruptcy, insolvency or other laws affecting creditor's rights generally and limitations on the availability of equitable remedies;

(2)     to the Companies' knowledge, the Company Group's possession and quiet enjoyment of the rights and benefits granted to the Company Group under such Lease have not been disturbed in any material respect, and there are no pending disputes between the Company, on the one hand, or other Person, on the other hand, with respect to any Lease;

(3)     no member of the Company Group, nor to the Companies' knowledge, any other party to any Lease is in material breach or default under such Lease and the Company Group has not received any notice of any breach or default under any Lease;

(4)     to the Companies' knowledge, no security deposit or portion thereof deposited with respect to such Lease has been applied in respect of a breach or default under such Lease that has not been redeposited in full;

(5)     the Companies are in material compliance with all applicable rental payments and other payments due or contemplated under each Lease, including the timely submission of all statements required under any Lease;

24

(6)     the Companies have not made any advance rental or lease payments;

(7)     no member of the Company Group has subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof;

(8)     no member of the Company Group has received any written notice, and to the knowledge of the Company Group, is not aware of any existing, pending or threatened condemnation proceedings or zoning, building code or other moratorium proceedings, in each case, with respect to any Leased Real Property which would reasonably be expected to adversely affect the ability to operate the Leased Real Property as currently operated;

(9)     neither the whole nor any material portion of any Leased Real Property has been damaged or destroyed by fire or other casualty, nor suffers from any material latent defect which would reasonably be expected to materially and adversely affect the ability to operate the Leased Real Property as currently operated;

(10)    except for the Woodlands Location, all work required to be performed under any Lease by the applicable member of the Company Group named therein as of the date hereof has been performed and paid for, all work to be performed under any Lease by the landlord thereto has been completed to the Companies' satisfaction, and any construction allowances required to be paid by the landlord under such Lease have been paid in full;

(11)    no profit sharing, recapture or other obligation, restriction or cancellation of any option under, or termination of any Lease will arise as a result of the transactions contemplated by this Agreement;

(12)    no member of the Company Group has received any notification within the last three years of any material violation of any applicable health, fire, safety, zoning and building laws or ordinances related to any Leased Real Property and all improvements and fixtures on any Leased Real Property conform to all applicable health, fire, safety, environmental, zoning and building laws and ordinances, in all material respects;

(13)    except for the Woodlands Location, to the extent required by applicable laws, the Company Group holds current and valid certificates of occupancy for each building located on each Leased Real Property and there have been no renovations to any such buildings or any other change in circumstances that would reasonably be expected to require the issuance of a new certificate of occupancy for any such buildings, except where the failure to obtain such certificate would not have a Material Adverse Effect; and

(14)     with respect to the Woodlands Location, the Possession Date (as such term is defined in the Woodlands Lease) has occurred, no portion of the construction allowance under the Woodlands Lease has been paid to the applicable

25

member of the Company Group, and all the construction currently being performed on behalf of the applicable member of the Company Group at the Woodlands Location is in full compliance with the Woodlands Lease.

(C)      Schedule 5.8(C) sets forth, for each Lease of any Leased Real Property, the commencement date and expiration date, the square footage of the premises, the current annual rent (including current additional rent, operating expenses, taxes and insurance, utilities and any percentage rent paid), any security deposit, whether the Leased Real Property has been separately assessed, and any renewal and right of first offer options.

5.9.    Tax Matters.

Except as set forth on Schedule 5.9:

(A)      All material Tax Returns required to be filed by the Company Group have been timely filed. All such Tax Returns are true, correct and complete in all material respects. All Taxes due and payable with respect to such Tax Returns (whether or not shown on any Tax Return) have been timely paid in full.

(B)      No federal, state, local or foreign Tax audits or other administrative or judicial proceedings are presently pending with respect to any Tax Returns of any member of the Company Group, and no member of the Company Group has received written notice of any such audit or other proceeding. No written claim has been made by a taxing authority in a jurisdiction where any member of the Company Group does not file Tax Returns such that the member of the Company Group is or may be subject to taxation by, or required to file any Tax Return in, that jurisdiction, in each case, that has not been resolved in full.

(C)      Each member of the Company Group has withheld and paid all material Taxes required to have been withheld and paid by it in connection with amounts paid or owing to any employee, former employee, partner, independent contractor, creditor, stockholder, member, Affiliate, customer, supplier or other third party or other Person.

(D)      No member of the Company Group (1) is or has been a member of an Affiliated Group (other than a group of which such entity is or was the parent), (2) has current liability for Taxes of any other Person (except for another member of the Company Group) under Treasury Regulation §1.1502-6, or as a successor or transferee, by Contract or otherwise (excluding any customary or commercial contract entered into in the ordinary course of business and not primarily related to Taxes).

(E)      No member of the Company Group (1) has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, in each case, which is still in effect and no written power of attorney with respect to any such Taxes has been filed or entered into with any taxing authority, which is still in effect, (2) is a party to or bound by any Tax allocation, Tax indemnification or Tax sharing agreement or similar contract or arrangement (other than any agreement entered into in the ordinary course of business the primary focus of which is not Taxes), or (3) is or has been a party to any "reportable transaction," as defined in Section 6706A(c)(1) of the Code.

(F)     There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of the Company Group.

(G)     No member of the Company Group will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date, as a result of any (i) change in method of accounting occurring prior to the Closing Date, (ii) use of an incorrect method of accounting for a taxable period ending on or prior to the Closing Date, (iii) installment sale or open transaction disposition made on or prior to the Closing Date, (iv) prepaid amount received on or prior to the Closing Date, (v) Tax ruling or "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state or local income or foreign Tax law) executed on or prior to the Closing Date, or (vi) any intercompany transactions or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state or local income or foreign Tax law).

(H)     Each member of the Company Group has (i) collected all material sales, use, value added, goods and services, and similar Taxes required to be collected and (ii) timely remitted all such Taxes collected to the appropriate taxing authority in accordance with applicable laws.

(I)     In the last two (2) years, no member of the Company Group has distributed stock of another Person or had its stock distributed by another Person in a transaction that was purported or intended to be governed in whole or in part by Sections 355 or 361 of the Code.

(J)     Notwithstanding anything to the contrary contained in this Agreement, nothing in this Agreement (including this Section 5.9) shall be construed as providing a representation or warranty with respect to the existence, amount, expiration date or limitations on (or availability of) in a Post-Closing Tax Period of any tax attribute of any member of the Company Group that was generated or created in a Pre-Closing Tax Period.

5.10.   Material Contracts.

(A)     Schedule 5.10(A) lists the following Contracts to which any member of the Company Group is a party (in each instance, excluding purchase orders, this Agreement, the Charter Documents and the Leases) (collectively, the "**Material Contracts**"):

(1)     Each Contract for the employment of any officer, individual employee or other person on a full-time, part-time, consulting or other basis providing annual base salary in excess of $████ (other than any "at will" contract that may be terminated by any member of the Company Group upon 30 days or less advance notice);

(2)     each Contract under which any member of the Company Group has made advances or loans to any other Person (other than any such Contract involving advances made to an employee of any member of the Company Group in the Ordinary Course);

(3)     each Contract containing a covenant not to compete granted by any member of the Company Group in favor of a third party that materially impairs the business as currently conducted of the Company Group taken as a whole;

(4)     each Contract relating to Indebtedness except for Indebtedness for an amount less than $▮▮▮▮;

(5)     lease or agreement under which any member of the Company Group is lessee of or holds or operates any tangible property (other than real property), owned by any other Person, except for any lease or agreement under which the aggregate annual rental payments do not exceed $▮▮▮▮;

(6)     lease or agreement under which any member of the Company Group is lessor of or permits any third party to hold or operate any tangible property (other than real property), owned or controlled by a Company, except for any lease or agreement under which the aggregate annual rental payments do not exceed $▮▮▮▮;

(7)     each Contract pursuant to which any member of the Company Group is granted a license or other right to use any Proprietary Rights that are material to the operation of the business of a Company, or grants any other Person a right to use any Proprietary Rights that are material to the operation of the business of a Company (excluding non-exclusive licenses for shrink-wrap, click-wrap or off-the-shelf software, or other commercially available software);

(8)     material partnership agreements and material joint venture agreements relating to the Company Group;

(9)     any Contract with a vendor of the Company Group pursuant to which such vendor was paid by the Company Group in excess of $▮▮▮▮ during the twelve-month period ending December 31, 2019 (other than any Contract that may be terminated by any member of the Company Group upon 30 days' or less advance notice and purchase orders entered into in the Ordinary Course);

(10)    any "take or pay" Contract;

(11)    any Contract that requires any member of the Company Group to use any supplier or third party for all or substantially all of such member of the Company Group's requirements or needs or requires such member of the Company Group to provide other parties "most favored nation" pricing;

(12)    each Contract for the design, construction, completion, furnishing and equipping of the Woodlands Location; and

(13)    each collective bargaining agreement.

(B)     Except as set forth on <u>Schedule 5.10(B)</u>, each Material Contract is a valid, legal and binding agreement of the applicable member of the Company Group, and is in full force

and effect and (assuming that such Material Contract was duly and validly authorized, executed and delivered by the other Persons party thereto) enforceable against the applicable member of the Company Group and, to the Companies' knowledge, each other party thereto, in accordance with its terms, except (i) to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Legal Requirements affecting the enforcement of creditors' rights generally and (ii) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any proceeding thereof may be brought.

5.11.   <u>Proprietary Rights; Privacy</u>.

(A)   <u>Schedule 5.11(A)</u> sets forth a complete and correct list of (i) all registered trademarks of the Company Group (that have not expired or otherwise been abandoned or canceled) and all pending applications for registration of trademarks of the Company Group, (ii) all registered copyrights of the Company Group, including all pending applications for registration of copyrights of the Company Group and (iii) all other material licenses, sublicenses, agreements, permissions, consents, covenants, or similar agreements or arrangements, whether written or oral, granted by a member of the Company Group to any other party or naming a member of the Company Group as licensee or licensor for material Proprietary Rights (excluding non-exclusive licenses for shrink-wrap, click-wrap or off-the-shelf software, or other commercially available software).  The Proprietary Rights identified on <u>Schedule 5.11(A)</u> constitute all of the Proprietary Rights that are material to and used in or required to conduct the business of the Company Group as presently conducted.

(B)   Except as set forth on <u>Schedule 5.11(B)</u>, (i) the members of the Company Group own and possess all right, title and interest in and to, or have a valid  right to use the Proprietary Rights described or required to be described on <u>Schedule 5.11(A)</u>, free and clear of all Liens (other than Permitted Liens); (ii) the Proprietary Rights described or required to be described on <u>Schedule 5.11(A)</u> as currently used by the Company Group, and the conduct of the business of the Company Group, does not infringe upon, misappropriate, or otherwise violate any Proprietary Rights of any third party; (iii) no third party is infringing upon, misappropriating or otherwise violating the Proprietary Rights of the Company Group.

(C)   The Company Group is in compliance in all material respects with all applicable laws and with its own policies and procedures with respect to the integrity, operation, redundancy, disaster recovery and security of all material software, websites, applications, networks, systems and other information technology infrastructure used in the Business (and all data, including personal data, stored therein or processed thereby), and, there have been no material (actual or attempted) breaches, outages, corruptions, interruptions or violations of (or deletions of or damages to) same, other than those that were resolved without material cost, material liability or the duty to notify any Person.

5.12.   <u>Company Group's Broker</u>.

Except for PJ Solomon, L.P. (whose fees shall be deemed a Transaction Expense for purposes hereunder), no member of the Company Group has incurred any liability or obligation to

pay any fees or commissions to any broker, finder or agent or employed any investment banker, broker or finder, in connection with the transactions contemplated by this Agreement.

5.13.   <u>Labor Matters</u>.

(A)     Except as set forth on <u>Schedule 5.13(A)</u>, (i) no member of the Company Group is party to any collective bargaining agreement or similar agreement with any labor organization setting forth the terms and conditions of employment for Company Group employees, (ii) there is no strike, walk out, work stoppage, lockout or other material labor dispute pending or, to the Companies' knowledge, threatened in writing against any member of the Company Group, (iii) to the Companies' knowledge, as of the date of this Agreement, no union organization campaign is in progress with respect to any employees of any member of the Company Group; and (iv) there are no unfair labor practice charges or complaints, material labor arbitrations or material labor grievances pending, or, to the Companies' knowledge, threatened, against any member of the Company Group.

(B)     Each Company is in compliance in all material respects with all applicable Legal Requirements pertaining to employment and employment practices to the extent they relate to employees of such Company. Except as set forth in <u>Schedule 5.13(B)</u>, there are no Proceedings against any member of the Company Group pending, or to the Companies' knowledge, threatened to be brought or filed, by or with any Governmental Entity or arbitral tribunal in connection with the employment or termination of employment of any current or former employee of the Company Group, including, without limitation, any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay or any other employment related matter arising under applicable Legal Requirements. No member of the Company Group has implemented any location closing or employee layoffs during the one-year period prior to the date hereof which would trigger the notification Legal Requirements of the WARN Act without complying with such Legal Requirements. Each member of the Company Group maintains adequate insurance as required by applicable Legal Requirements with respect to workers' compensation claims and unemployment benefits claims.

(C)     Except as set forth on <u>Schedule 5.13(C)</u>: (i) each member of the Company Group has properly utilized Form I-9 to verify the identity and work authorization status of each of its employees in compliance with the Immigration and Nationality Act, as amended, the Immigration Reform and Control Act of 1986, as amended, and related promulgating regulations; (ii) no employee of any member of the Company Group presented any temporary work authorization document at the time of hire that is presently or at any future date will be subject to I-9 re-verification; (iii) no employee of any member of the Company  Group is employed under an H-1B, L-1A or L-1B visa, or any other employer-petitioned non-immigrant U.S. work authorization; and (iv) no member of the Company Group is petitioning for employment-based lawful permanent residence status on behalf of any employee of such member of the Company Group and no member of the Company Group has filed any Application for Alien Employment Certification (ETA Form 750), Application for Permanent Employment Certification (ETA Form 9089), or any Form I-140 (Immigrant Petition for Alien Workers) that remains pending. <u>Schedule 5.13(C)</u> contains a list and description of any correspondence received by any member of the Company Group from any Person or Governmental Entity in the last three years questioning the validity of the social security number of any employee of such member of the Company Group.

33439967.16

(D)     Set forth on Schedule 5.13(D) is a correct and complete list of each Company Group Employee and each Corporate Employee as of the date hereof and, to the extent applicable, his or her respective (i) title, (ii) location, (iii) current base salary or hourly wage rate, (iv) date of hire or engagement, (v) employment classification (full-time or part-time and exempt or non-exempt), (vi) average hours worked per week in the preceding twelve (12) month period for each part-time employee, (vii) 2020 bonus target (to the extent a bonus target is established and/or communicated to a Company Group Employee or Corporate Employee in the ordinary course of business), (viii) commission or fee arrangement and commissions, and (ix) annual vacation, sick leave and other paid time off allowance.

5.14.    Employee Benefit Plans.

(A)     Schedule 5.14(A) contains a correct and complete list of each Benefit Plan. The Company Group has made available to Buyer complete and correct copies of the following documents with respect to each Benefit Plan, to the extent applicable: (i) all plan documents, and written descriptions of all material non-written agreements relating to any such plan or arrangement; (ii) the most recent Form 5500, including all schedules thereto, annual report, financial statements and any related actuarial reports; (iii) the most recent summary plan description and summaries of material modifications thereto; (iv) all material notices or other communications received from the IRS, Department of Labor, or any other Governmental Entity on or after January 1, 2018; and (v) employee manuals or handbooks containing personnel or employee relations policies.

(B)     Each Benefit Plan has been operated in accordance with the terms of such Benefit Plan and complies in form and in operation with the applicable requirements of ERISA, the Code and other applicable Legal Requirements, in each case, in all material respects.

(C)     No member of the Company Group or any of their ERISA Affiliates currently contributes to, or within the past six years has contributed to, or has any liability in respect of a Multiemployer Welfare Plan or an Employee Pension Benefit Plan or a "multiemployer plan" as defined in Section 3(37) of ERISA.

(D)     Except as set forth on Schedule 5.14(D), all required reports and descriptions (including Form 5500 annual reports, summary annual reports, and summary plan descriptions) with respect to each Benefit Plan have been properly and timely filed or distributed to participants and other applicable individuals in accordance with the applicable requirements of ERISA and the Code, in each case, in all material respects.

(E)     No Benefit Plan provides health or life insurance or other welfare-type benefits for current or future retired or terminated employees (or any spouse or other dependent thereof) other than in accordance with COBRA.

(F)     All contributions (including all employer contributions and employee salary reduction contributions) and premiums that are due have been made within the time periods prescribed by ERISA and the Code to each Benefit Plan or with respect to each Benefit Plan, as applicable, in each case, in all material respects.

(G)     Each Benefit Plan that is intended to meet the requirements of a "qualified plan" under Code Section 401(a) has received a current favorable determination letter from the Internal Revenue Service or is the subject of a current favorable opinion or advisory letter issued by the Internal Revenue Service with respect to such Benefit Plan.

(H)     Except as set forth on Schedule 5.14(H), (i) neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement (either alone or in connection with any other event) will not give rise to any liability under any Benefit Plan, including liability for severance pay or accelerate the time of payment or vesting or increase the amount of compensation or benefits due to any employee, officer, director, stockholder or other service provider of any member of the Company Group (whether current, former or retired) or their beneficiaries, (ii) no amount received (whether in cash or property or the vesting of property), as a result of the consummation of the transactions contemplated by this Agreement either alone or in connection with any other event, by any employee, officer, director, stockholder or other service provider of any member of the Company Group under any Benefit Plan or otherwise would not be deductible by reason of Code Section 280G or would be subject to an excise tax under Code Section 4999, and (iii) no Benefit Plan promises or provides for any tax gross ups or tax indemnification including under Sections 280G, 4999 or 409A of the Code.

5.15.     Affiliate Transactions.

Other than as set forth on Schedule 5.15, (i) no Affiliate (other than members of the Company Group) (A) is a party to any Contract or transaction with any member of the Company Group (other than in such Affiliate's capacity as an employee of such member of the Company Group), or (B) has any interest in or owns any asset, tangible or intangible, of the Company Group that is used in the Business, and (ii) no material relationship exists or during the last three (3) years has existed, between the Equityholder or any of its Affiliates with respect to the Business, on the one hand, and any equity holder, officer, director or Affiliate of the Equityholder, or any Person controlled by or controlling of, any of them, or their respective family members, on the other hand, involving payment for goods or services (other than an employment agreement or arrangement with a member of the Company Group disclosed in Schedule 5.15)or the providing or guaranteeing of any Indebtedness.

5.16.     Compliance with Laws; Permits.

(A)     Except as set forth on Schedule 5.16(A), each member of the Company Group during the past three (3) years has complied in all material respects with, and currently is in compliance with, all material applicable Legal Requirements to which such member of the Company Group is subject.

(B)     To the Companies knowledge, the Company Group is in possession of, and at all times has possession of, and immediately following the Closing will hold, all material franchises, grants, authorizations, licenses, permits, registrations, qualifications, easements, variances, exemptions, consents, certificates, approvals and orders necessary to own, lease and operate its properties, to carry on its Business (collectively, the "**Company Group Permits**"). All fees and charges with respect to such Company Group Permits that are due and payable as of the date hereof have been paid in full. Except as set forth on Schedule 5.16(B), (i) the Company Group

is, and during the past three (3) years has been, in material compliance with such Company Group Permits, all of which are in full force and effect, (ii) to the Companies' knowledge, no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Company Group Permit, and (iii) to the Company's knowledge, no member of the Company Group has received any written notice to the contrary.

5.17. <u>Environmental Matters</u>.

Except as set forth on <u>Schedule 5.17</u> or disclosed in any environmental reports, documents or assessment provided or made available to Buyer:

(A) Each member of the Company Group is, and has been for the past three (3) years, in compliance in all material respects with all applicable Environmental Laws relating to its business as presently conducted.

(B) Within the past three (3) years, no member of the Company Group has (i) received written notice under the citizen suit provisions of any Environmental Law; (ii) received any written notice of violation, demand letter, or complaint or claim under any Environmental Law; or (iii) been subject to or, to the Companies' knowledge, threatened with, any judicial or administrative proceeding alleging violation by any member of the Company Group of any applicable Environmental Laws.

(C) There is no Hazardous Substance at the Leased Real Property except in compliance in all material respects with applicable Environmental Laws, and no member of the Company Group has released Hazardous Substances on any Leased Real Property in material violation of, and no member of the Company Group has received any written notice that any Leased Real Property has been contaminated with Hazardous Substances which could reasonably be expected to give rise to a material liability under, applicable Environmental Laws.

(D) No member of the Company Group has (i) treated, stored, or disposed of, (ii) arranged for the treatment, storage or disposal of, (iii) transported or arranged for the transportation of, (iv) handled, (v) exposed any Person to, any Hazardous Substances in a manner that would reasonably be expected to give rise to material liability under applicable Environmental Laws.

(E) (i) The Company Group has obtained all permits, licenses and other approvals required under applicable Environmental Laws that are necessary for the Company Group's activities and operations at the Leased Real Property; (ii) all such permits licenses and other approvals are valid and in full force and effect; (iii) no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any permit, licenses other approvals required under applicable Environmental Laws; (iv) no written notice has been received by the Company Group alleging the failure to hold any such permit, license or other approval; (v) all applications for renewal of such permits, licenses and other approvals have been timely filed; and (vi) all of such permits, licenses and other approvals will be available for use on the same terms by the Company Group immediately after the Closing.

33

(F)     No member of the Company Group has assumed or undertaken any liability (including any investigatory, corrective or remedial obligation) of any other Person relating to any applicable Environmental Laws.

(G)     Neither this Agreement nor the consummation of the transaction that is the subject of this Agreement will result in any obligations for site investigation or cleanup, or notification to or consent of Governmental Entity or third parties, pursuant to any applicable Environmental Laws.

(H)     The Company Group has provided or otherwise made available to Buyer any and all material environmental reports, studies, audits, sampling data and site assessments with respect to the business of the Company Group as presently conducted, the Leased Real Property or any formerly owned or leased real property which are in the possession or control of any member of the Company Group and have been obtained within the last five (5) years.

5.18.   Insurance.

Schedule 5.18 contains a list of all policies of fire, liability, workers' compensation, property, casualty and other forms of insurance owned or held by any member of the Company Group as of the date of this Agreement.  To the Companies' knowledge, all such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date will have been paid, and no notice of cancellation or termination has been received by any member of the Company Group with respect to any such policy. The insurance policies maintained by the Company covering operations at each Leased Real Property are on such terms and in such coverage amounts as are required by Leases. All premiums due and payable by the members of the Company Group or their respective Affiliates under any insurance policies prior to the date hereof have been duly paid. There are no claims related to the Business or the Companies Group pending under any such insurance policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of right

5.19.   Litigation.

Except as set forth on Schedule 5.19, there is no Proceeding pending or, to the Companies' knowledge, threatened in writing, against any member of the Company Group before any Governmental Entity (i) for an amount in dispute in excess, individually or in the aggregate, of ████, or (ii) which has had or would reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 5.19, no member of the Company Group is subject to any outstanding order, writ, injunction or decree that has had or would reasonably be expected to have a Material Adverse Effect.

5.20.   Inventory.

Except as set forth in Schedule 5.20, the inventory of the Company Group, net of applicable reserves, (i) was acquired or produced in the Ordinary Course, (ii) is good and merchantable and is of a quality and quantity presently useable and salable in the Ordinary Course, and (iii) has maintained by the Company Group in the Ordinary Course.  All such inventory is owned by the Company Group free and clear of all Liens (other than Permitted Liens), and no such inventory is held on a consignment basis.

34

5.21. <u>Material Suppliers</u>.

(A)    <u>Schedule 5.21(A)</u> sets forth a correct and complete list for the twelve month period ended December 31, 2019, each of the top ten (10) suppliers to the Company Group (on a consolidated basis) in terms of total cost of goods supplied to the Company Group for that period.

(B)    Except as set forth on <u>Schedule 5.21(B)</u>, no supplier listed in <u>Schedule 5.21(A)</u> has stopped or materially decreased or has threatened in writing to stop or materially decrease the rate of supplying materials or products to the Company Group.

5.22. <u>Anti-Bribery;  Anti-Corruption;  Anti-Money  Laundering;  Anti-Terrorism; Sanctions</u>.

Since December 31, 2013, neither any member of the Company Group, nor, to the Companies' knowledge, any of their respective representatives (acting for or on behalf of the Company Group) nor any other Person acting for or on behalf of any member of the Company Group has, directly or, knowingly indirectly, in furtherance of or in connection with the business of any member of the Company Group (i) offered, promised or given any financial or other advantage or inducement to any Person with the intention of influencing (A) any representative of any foreign, federal, state or local Governmental Entity in the performance of his or her public functions or (B) any other Person (whether or not such Person is the recipient of the advantage or inducement) to perform his, her or its function improperly, or where the acceptance of such advantage or inducement would itself be unlawful, (ii) requested, agreed to receive or accepted any financial or other advantage or inducement where such request, agreement to receive or acceptance would be unlawful, (iii) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity, (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other payment to any foreign or domestic government official or employee or (v) otherwise taken any action that would constitute a violation of any Anti-Corruption Laws, AML Laws or Anti-Terrorism Laws. Since December 31, 2013, no member of the Company Group is or has been the subject of any Proceeding regarding any actual or alleged violation of any Anti-Corruption Laws, AML Laws or Anti-Terrorism Laws. No such Proceeding has been threatened in writing (or, to the Companies' knowledge, other than in writing), and no Equityholder nor any member of the Company Group has (x) received any notice or allegation from any Person alleging any actual or potential violation of any Anti-Corruption Laws, AML Laws or Anti-Terrorism Laws or (y) made a voluntary disclosure to any Governmental Entity or similar agency with respect to any alleged act or omission arising under or relating to any noncompliance with any Anti-Corruption Laws, AML Laws or Anti-Terrorism Laws.  Each member of the Company Group represents that it has not engaged in nor intends to engage in any dealings or transactions with, or for the benefit of, any sanctioned person or with or in any sanctioned country.

5.23. <u>Film Studio Contracts</u>. To the knowledge of the Company Group, no member of the Company Group is in default in the performance of any obligation under any Contract relating to any film rental, motion picture or master studio licensing agreement or any similar Contract, and each Company Group has reported all fees (including, without limitation, internet fees and premium seat surcharges) to such film or motion picture studios as required to be reported under such respective Contract. Since January 1, 2019, no third party has made any claim or threat to

collect amounts due or pending under any film rental, motion picture or master studio licensing agreement.

5.24.    NO OTHER REPRESENTATIONS.

EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE 4 OR THIS ARTICLE 5, NO MEMBER OF THE COMPANY GROUP, AND NONE OF THE EQUITYHOLDER OR ANY OF HIS AFFILIATES, MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.    NOTWITHSTANDING ANYTHING TO THE CONTRARY, (A) NO MEMBER OF THE COMPANY GROUP, AND NONE OF THE EQUITYHOLDER OR ANY OF HIS AFFILIATES, WILL BE DEEMED TO MAKE TO BUYER OR ITS AFFILIATES ANY REPRESENTATION OR WARRANTY OTHER THAN AS EXPRESSLY MADE BY SUCH PERSON IN THIS AGREEMENT, AND (B) NO MEMBER OF THE COMPANY GROUP, AND NONE OF THE EQUITYHOLDER OR ANY OF HIS AFFILIATES, MAKES ANY REPRESENTATION OR WARRANTY TO BUYER OR ITS AFFILIATES WITH RESPECT TO (I) ANY PROJECTIONS, ESTIMATES OR BUDGETS HERETOFORE DELIVERED TO OR MADE AVAILABLE TO BUYER OR ITS AFFILIATES, COUNSEL, ACCOUNTANTS OR ADVISORS OF FUTURE REVENUES, EXPENSES OR EXPENDITURES OR FUTURE RESULTS OF OPERATIONS OF ANY MEMBER OF THE COMPANY GROUP AND/OR THE BUSINESS, OR (II) EXCEPT AS EXPRESSLY COVERED BY A REPRESENTATION AND WARRANTY CONTAINED IN ARTICLE 4 OR THIS ARTICLE 5, ANY OTHER INFORMATION OR DOCUMENTS (FINANCIAL OR OTHERWISE) MADE AVAILABLE TO BUYER OR ITS AFFILIATES, COUNSEL, ACCOUNTANTS OR ADVISORS WITH RESPECT TO ANY MEMBER OF THE COMPANY GROUP, ANY EQUITYHOLDER OR ANY OF THEIR RESPECTIVE AFFILIATES.

## ARTICLE 6.
## REPRESENTATIONS AND WARRANTIES OF BUYER

As a material inducement to the Companies and the Equityholder to enter into this Agreement, Buyer hereby makes the representations and warranties set forth in this ARTICLE 6 as of the date of this Agreement.

6.1.    Organization and Power.

Buyer is a corporation that is duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer is qualified to do business in every jurisdiction in which the execution, delivery and performance of its obligations under this Agreement requires it to be so qualified.  Buyer has the requisite company power and authority to execute, deliver and perform its obligations under this Agreement and the other Transaction Documents.

6.2.    Authorization of Closing Transactions.

The execution, delivery and performance of this Agreement and the Transaction Documents to which Buyer is a party have been duly authorized by all necessary company action on behalf of Buyer.  No other proceedings or actions on the part of Buyer are necessary to approve

and authorize Buyer's execution and delivery of this Agreement or any other Transaction Document to which Buyer is a party or the performance of Buyer's obligations hereunder or thereunder. This Agreement constitutes, and each of the other Transaction Documents to which Buyer is a party will when executed constitute, a valid and binding obligation of Buyer, enforceable in accordance with their terms, except as enforceability hereof may be limited by bankruptcy, insolvency or other Legal Requirements affecting creditor's rights generally and limitations on the availability of equitable remedies.

6.3.    Absence of Conflicts.

None of the execution, delivery or performance by Buyer of this Agreement or any other Transaction Document to which Buyer is a party:

(A)    does or will (i) result in any breach of any of the provisions of, (ii) constitute a default under, (iii) result in a violation of, (iv) give any third party the right to terminate or to accelerate any obligation under or (v) result in the creation of any Lien upon any assets of such Person, in each case under the provisions of the Charter Documents of such Person or any indenture, mortgage or other contract or agreement or any Legal Requirement by which such Person or any of its assets is bound, or

(B)    without limiting clause (A) above, requires any Consent of any Governmental Entity or any other Person under any contract or agreement or Legal Requirement.

6.4.    Litigation.

There are no Proceedings, orders or investigations pending or, to the best of Buyer's knowledge, threatened against or affecting Buyer, at law or in equity, or before or by any Governmental Entity which would adversely affect Buyer's performance under this Agreement, the other Transaction Documents to which Buyer is a party, or the consummation of the transactions contemplated hereby or thereby.

6.5.    Independent Auditor.

Neither Buyer nor any of Buyer's Affiliates have been a client of the Independent Auditor nor has Buyer (or any of Buyer's Affiliates) had any material relationship with the Independent Auditor during the last year.

6.6.    Investment Intent; Restricted Securities.

Buyer is acquiring the Equity Interests solely for Buyer's own account, for investment purposes only, and not with a view to, or with any present intention of, reselling or otherwise distributing such Equity Securities or dividing its participation herein with others. Buyer understands and acknowledges that (A) none of the Equity Interests have been registered or qualified under the Securities Act, or under any securities laws of any state of the United States or other jurisdiction, in reliance upon specific exemptions thereunder for transactions not involving any public offering; (B) all of such Equity Securities constitute "restricted securities" as defined in Rule 144 under the Securities Act; (C) none of such Equity Securities are traded or tradable on any securities exchange or over the counter; and (D) none of such Equity Securities may be sold,

transferred or otherwise disposed of unless a registration statement under the Securities Act with respect to such Equity Securities and qualification in accordance with any applicable state securities laws becomes effective or unless such registration and qualification is inapplicable, or an exemption therefrom is available. Buyer will not transfer or otherwise dispose of any such Equity Securities acquired hereunder or any interest therein in any manner that may cause any Equityholder to be in violation of the Securities Act or any applicable state securities laws. Buyer is an "accredited investor" as defined in Rule 501(a) of the Securities Act.

6.7. <u>Due Diligence Review</u>.

(A) Buyer is an informed and sophisticated Person, and has engaged expert advisors experienced in the evaluation and acquisition of companies such as the members of the Company Group as contemplated hereunder. Buyer and its respective representatives have undertaken such investigation and have been provided with and has evaluated such documents and information as each of them have deemed necessary to enable them to make an informed decision with respect to the execution, delivery and performance of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereunder. Buyer and its representatives have received materials relating to the business of the Company Group and have been afforded the opportunity to obtain any additional information, in each case, that they deem necessary to make an informed decision with respect to the merits of the acquisition of the Equity Interests. Buyer and its representatives have reviewed all of the documents, records, reports and other materials made available by (or on behalf of) the Company Group in the online data room created for the transaction or identified in the Schedules and is familiar with the content thereof. In making a determination to proceed with the transactions contemplated herein, Buyer has relied solely on the results of its and its representatives' own investigation and the representations and warranties expressly set forth in <u>ARTICLE 4</u> or <u>ARTICLE 5</u> as qualified by the Schedules.

(B) In connection with the investigation by Buyer of the Company Group, Buyer and its representatives may have received and, after the date hereof but prior to the Closing, may receive from the Company Group or any of their representatives certain projections, budgets, forward looking statements and other forecasts. Buyer acknowledges that there are uncertainties inherent in attempting to make such projections, budgets, forward looking statements and other forecasts, that Buyer and its representatives are familiar with such uncertainties, that Buyer and its representatives are taking full responsibility for making their own evaluation of the adequacy and accuracy of all projections, budgets, forward looking statements and other forecasts so furnished to them (including the reasonableness of the assumptions underlying such projections, budgets, forward looking statements and other forecasts), and that, except to the extent such information is included in the representations and warranties expressly set forth in <u>ARTICLE 4</u> or <u>ARTICLE 5</u> as qualified by the Schedules, Buyer has not relied upon, is not relying upon and will not rely upon any such projections, budgets, forward looking statements or other forecasts or any other materials, documents or information (including those provided in certain "data rooms," confidential information memoranda or similar materials, or management presentations in connection with the transactions contemplated hereunder) made available to Buyer or its representatives and Affiliates by the Company Group or any of their representatives, and Buyer shall have no claim against any Person with respect thereto.

(C)     Buyer (on behalf of itself and its Affiliates) acknowledges that, other than as expressly set forth in ARTICLE 4 or ARTICLE 5, no member of the Company Group or any of their respective directors, officers, employees, Affiliates, stockholders, equity holders (including the Equityholder), agents or representatives or any other Person makes or has made any representation or warranty, contractual or legal, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or any of its respective agents, representatives, lenders or Affiliates or any other Person acting on their behalf prior to the execution of this Agreement.

(D)     EXCEPT FOR THE SPECIFIC REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE 4 OR ARTICLE 5, BUYER (ON BEHALF OF ITSELF AND ITS AFFILIATES) SPECIFICALLY DISCLAIMS THAT IT IS RELYING UPON OR HAS RELIED UPON ANY OTHER REPRESENTATIONS OR WARRANTIES THAT MAY HAVE BEEN MADE BY ANY MEMBER OF THE COMPANY GROUP, THE EQUITYHOLDER OR THEIR RESPECTIVE AFFILIATES OR ANY OTHER PERSON, AND ACKNOWLEDGES AND AGREES THAT THE EQUITYHOLDER AND HIS AFFILIATES, AND EACH MEMBER OF THE COMPANY GROUP HAVE SPECIFICALLY DISCLAIMED AND DO HEREBY SPECIFICALLY DISCLAIM ANY SUCH OTHER REPRESENTATION OR WARRANTY MADE BY ANY MEMBER OF THE COMPANY GROUP, THE EQUITYHOLDER OR THEIR RESPECTIVE AFFILIATES OR ANY OTHER PERSON.  THE BUYER (ON BEHALF OF ITSELF AND ITS AFFILIATES) FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE SPECIFIC REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE 4 OR ARTICLE 5, NONE OF THE COMPANY GROUP MEMBERS, THE EQUITYHOLDER OR THEIR RESPECTIVE AFFILIATES, OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, MANAGERS, PRINCIPALS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS, CONSULTANTS, LENDERS, FINANCING SOURCES, ADVISORS, ACCOUNTANTS OR OTHER REPRESENTATIVES (I) HAVE MADE OR MAKE ANY REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, AS TO THE ACCURACY OR COMPLETENESS OF THE DILIGENCE MATERIALS PROVIDED OR (II) SHALL HAVE ANY LIABILITY WHATSOEVER TO BUYER, ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES RELATING TO OR RESULTING FROM THE USE OF SUCH DILIGENCE MATERIALS OR ANY ERRORS THEREIN OR OMISSIONS THEREFROM.

6.8.     Availability of Funds; Solvency.

Buyer is not entering into this Agreement or the Transaction Documents to which it is, or is specified to be, a party, with the intent to hinder, delay or defraud either present or future creditors.  As of the Closing and immediately after giving effect to the transactions contemplated hereunder, including the making of the payments contemplated under this Agreement, including any related fees and expenses, Buyer and its Subsidiaries (which at such time will include the Company Group), taken as a whole, will be Solvent. For purposes of this Section 6.8, "**Solvent**" means that, with respect to any Person and as of any date of determination, (A) the amount of the "present fair saleable value" of the assets of such Person, will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise," as of such date, as such quoted terms are generally determined in accordance with applicable federal laws governing determinations of the insolvency of debtors, (B) the present fair saleable value of the assets of such Person will, as

of such date, be greater than the amount that will be required to pay the liability of such Person on its Indebtedness as its Indebtedness becomes absolute and matured, (C) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (D) such Person will be able to pay its Indebtedness as it matures.

6.9.  **Closings and Mass Layoffs**.

Buyer agrees not to conduct any closings, reductions in force, or terminations of employees of any member of the Company Group in the 90-day period following the Closing that would trigger the notification requirements of the WARN Act.

6.10.  **Brokers' Fees**.

Buyer has not incurred any liability or obligation to pay any fees or commissions to any broker, finder or agent or employed any investment banker, broker or finder, in connection with the transactions contemplated by this Agreement.

6.11.  **Exceptions to GAAP**. To the best of its knowledge, neither Buyer nor any of its representatives or advisors is aware of (or has any reason to believe there exist) any deviations or exceptions to GAAP utilized by the Companies or the Business, other than those deviations or exceptions set forth in Exhibit A hereto.

## ARTICLE 7.
## COVENANTS

7.1.  **Operation and Maintenance of the Business**.

(A)  From the date hereof until the Closing or termination of this Agreement by its terms, except (i) as otherwise expressly provided in this Agreement or (ii) as described on Schedule 7.1(A), the Companies shall use commercially reasonable efforts to (and shall cause each member of the Company Group to use commercially reasonable efforts to): (a) conduct the Business in the Ordinary Course; (b) maintain and preserve intact the organization, operations and franchise of the Business as in effect on the date hereof; (c) maintain in effect all Company Group Permits and valid policies of insurance as in effect on the date hereof; (d) keep available the services of their respective directors, officers and employees (excluding terminations in accordance with the terms of Section 7.1(B)(g)(III) or resignations in the Ordinary Course); (e) preserve the rights, franchises, goodwill and relationships with its employees, customers, lenders, suppliers, regulators and others having relationships with the Company Group; and (f) refrain from taking any action that could reasonably be expected to cause a default under any Material Contract or any Lease.

(B)  Without limiting Section 7.1(A), from and after the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, except as (i) consented to in writing by Buyer, (ii) required by Legal Requirement, (iii) expressly permitted by this Agreement, or (iv) listed on Schedule 7.1(A), the Companies shall not, and shall cause each member of the Company Group not to: (a) settle any litigation that would result in or create liability to any Company Group after the Closing; (b) take, or commit to take, any action from the close of business on the day immediately preceding the Closing Date to the time when the Closing occurs

that would not be accounted or adjusted for in connection with the Purchase Price adjustment contemplated by Section 2.3; (c) issue, sell or deliver any Equity Securities of any member of the Company Group or issue or sell any securities convertible into, or options with respect to, or warrants to purchase or rights to subscribe for (including upon conversion, exchange or exercise), any Equity Securities of any member of the Company Group to any third party, including pursuant to any Benefit Plan that is an equity or equity-based incentive plan; (d) make any material change in any method of accounting or accounting practice or policy other than those required by GAAP; (e) make, change or revoke any material Tax election, change any accounting period with respect to Taxes, file any amended material Tax Return, enter into any closing agreement, settle or compromise any proceeding with respect to any material Tax claim or assessment relating to the Company Group, surrender any right to claim a refund of a material amount of Taxes; (f) acquire by merging or consolidating with, or by purchasing substantially all of the assets of, or by any other manner, any third party Person or division thereof; (g) except as required by a Benefit Plan: (I) increase the compensation (including bonuses or commission) payable or to become payable after the date hereof to any employee, officer, director or consultant of any member of the Company Group; (II) adopt, enter into, amend or modify any Benefit Plan or policy, plan, arrangement or agreement that would be a Benefit Plan if it were in existence on the date hereof (except as required by any Legal Requirement); or (III) hire or terminate (other than for cause or by reason of permanent disability) any employee, officer, director or consultant of the Company Group whose total annual compensation is in excess of $█████ per year; (IV) loan or advance any money or other property to any employee, officer, director or consultant of the Company Group or any Corporate Employee, excluding expense advances in the ordinary course of business consistent with past practice; or (V) grant any severance, termination pay or retention or change in control entitlements to any employee, officer, director or consultant of the Company Group or any Corporate Employee; (h) engage in any mass layoff that would trigger notification requirements pursuant to the WARN Act; (i) except as required by Legal Requirement, voluntarily recognize a labor union or similar organization or enter into a collective bargaining agreement or similar agreement; (j) sell, lease, license, allow the expiration or lapse of, or otherwise dispose of its properties, rights or assets, other than in the Ordinary Course; (k) amend any privacy policies or the operation or security of any material IT assets used in the Business of the Company and its Subsidiaries, except in each case, in the Ordinary Course; or (l) agree or otherwise commit, whether in writing or otherwise, to do, or take any action or omit to take any action that would result in, any of the foregoing or which would result in any of the changes or events listed in Section 5.4 to be reasonably likely to occur.

     7.2.   Access.

From the date hereof until the Closing and subject to the terms of any applicable confidentiality agreements, the Companies shall (and shall cause each member of the Company Group to): (A) afford Buyer and its counsel, accountants and other authorized agents and representatives (collectively, "**Representatives**") reasonable access to and the right to inspect all of the properties, assets, premises, books and records, contracts, agreements and other documents and data related to the Company Group; and (B) make available to Buyer and its Representatives with such financial, operating and other data and information related to the Company Group as Buyer or any of its Representatives may reasonably request; provided that any such investigation shall be conducted during normal business hours upon reasonable advance notice to the Company Group, under the supervision of the Company Group's personnel and in such a manner as (i) not

to interfere with the normal operations of the Company Group, and (ii) to prevent the unauthorized disclosure of the transactions contemplated hereby or any confidential or legally privileged information; and provided further that the Company Group shall not be required to permit, and Buyer and its representatives shall not be permitted to, perform any environmental sampling at any Leased Real Property, including sampling of soil, groundwater, surface water, building materials, or air or wastewater emissions without the prior written consent of the Equityholder (in which case a separate access and indemnity agreement, in a form reasonably acceptable to the Equityholder will be required). Notwithstanding the foregoing, during such period until the earlier of the Closing Date or the termination of this Agreement in accordance with its terms, except as contemplated by Section 7.9 of this Agreement, Buyer hereby agrees that it is not authorized to and shall not (and shall not permit any of its employees, agents, representatives or Affiliates to) contact any employee, customer, supplier, distributor or other material business relation of any member of the Company Group regarding any member of the Company Group's business or the transactions contemplated by this Agreement without the prior consent of the Equityholder. All of such information obtained by Buyer or any of its Affiliates and any of their respective directors, officers, managers, employees, agents or representatives shall be treated as confidential information.

7.3. <u>Exclusive Dealing</u>.

During the period from the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Equityholder and the Companies, and each of their respective officers, directors or representatives: (i) will immediately cease any solicitations, discussions, negotiations or communications with any Person (other than Buyer and its Affiliates) that may be ongoing with respect to any Competing Proposal; and (ii) will not (x) initiate, solicit, knowingly encourage or facilitate (including by way of furnishing non-public information) the submission of a Competing Proposal, (y) execute or enter into, or legally commit to execute or enter into, any agreement with respect to a Competing Proposal, or (z) enter into or participate in any negotiations or discussions with any potential third party acquirer or its representatives regarding a Competing Proposal (other than Buyer and its Affiliates).

7.4. <u>Further Assurances</u>. Each Party will use reasonable best efforts to cause the conditions to Buyer, the Companies' and the Equityholder's respective obligations to consummate the Closing to be satisfied (including, without limitation, the preparation, execution and delivery of all agreements, instruments, and filings (including pursuant to Section 7.6) contemplated hereunder to be executed, delivered, and/or filed by such party in connection with or prior to the Closing).

7.5. <u>Updating Disclosure Schedules</u>.

Concurrently with the execution and delivery of this Agreement, the Equityholder and the Companies have delivered to Buyer the schedules to this Agreement (the "**Schedules**"). From and after the date of this Agreement until no later than two (2) Business Days before the Closing Date, the Companies and the Equityholder may prepare and deliver to Buyer supplements and/or amendments to the Schedules (that may contain additional Schedules that are not in existence as of the date hereof relating to any of the provisions contained in this Agreement, in each case, such supplement, amendment or new Schedule being referred to as an "**Update**"), and each such Update shall be deemed to be an amendment to this Agreement for all purposes hereof; provided that, any

such Update shall be given effect solely for the purposes of determining whether there has been a breach of a representation or warranty for purposes of determining the fulfilment of the condition set forth in <u>Section 8.1(A)</u> but shall have no effect for purposes of determining whether there has been a breach of representation and warranty for purposes of the indemnification provisions under <u>Article 11</u>.  Notwithstanding the foregoing, the Equityholder agrees to update <u>Schedule 5.13(D)</u> as fully as possible as soon as possible following the date hereof; provided, that, for the avoidance of doubt, the failure to deliver all information required by the terms of <u>Section 5.13(D)</u> as of the date hereof shall not be deemed a breach for the purposes hereunder.

7.6.   <u>Regulatory Filings</u>.

(A)   In the event any claim, action, suit, investigation or other proceeding by any Governmental Entity or other Person is commenced that questions the validity or legality of the transactions contemplated hereby or seeks damages in connection therewith, the Parties hereto agree to cooperate and use commercially reasonable efforts to defend against such claim, action, suit, investigation or other proceeding and, if an injunction or other order is issued in any such action, suit or other proceeding, to use commercially reasonable efforts to have such injunction or other order lifted, and to cooperate reasonably regarding any other impediment to the consummation of the transactions contemplated hereby.

(B)   Each Party hereto shall promptly notify the other Parties hereto of any communication it or its Affiliates receives from any Governmental Entity relating to the matters that are the subject of this Agreement and permit the other Parties hereto to review in advance any proposed communication by it to any Governmental Entity.  No Party hereto shall agree to participate in any meeting with any Governmental Entity in respect of any filings, investigation or other inquiry relating to this Agreement or the transactions contemplated hereunder, unless it consults with the other Parties hereto in advance and, to the extent permitted by such Governmental Entity, gives the other Parties hereto the opportunity to attend and participate at such meeting. Each Party hereto will provide the other Parties hereto with copies of all correspondence, filings or communications between it or any of its representatives, on the one hand, and any Governmental Entity or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement.

7.7.   <u>280G Matters</u>. To the extent applicable, if required to avoid the imposition of Taxes under Section 4999 of the Code or loss of a deduction under Section 280G of the Code with respect to any payment or benefit in connection with this Agreement or the transactions contemplated by this Agreement, the Equityholder and the applicable member(s) of the Company Group shall: (i) use best efforts to obtain a waiver from each "disqualified individual" (within the meaning of Section 280G(c) of the Code) entitled to receive a payment that is reasonably expected to be a "parachute payment" (within the meaning of Section 280G(b)(2) of the Code) in connection with the transactions contemplated by this Agreement of his or her right to receive such payment or benefit; and (ii) take all actions necessary to, reasonably in advance of the Closing Date, deliver to its equityholders a disclosure statement which is reasonably intended to satisfy its disclosure obligations under Section 280G(b)(5)(B) of the Code and the regulations thereunder, and which solicits and recommends that its equityholders vote in favor of the parachute payments disclosed therein through a vote reasonably intended to meet the requirements of Section 280G(b)(5)(B) of the Code and the regulations thereunder.  To the extent applicable, the Company shall provide

43

Buyer and its representatives with a copy of such waivers, disclosure statement and underlying calculations of potential "parachute payments" within at least five Business Days prior to delivery to the Company's equityholders and shall consider in good faith (and shall not unreasonably omit) any reasonable comments timely made by Buyer or its representatives regarding the content of such disclosure statement.

7.8. <u>Non-Compete</u>. From the date hereof until the two (2) year anniversary of the Closing Date (the "**Restricted Period**"), the Equityholder agrees that he shall not, without the prior written consent of Buyer, directly or indirectly, whether on Equityholder's own behalf or in conjunction with any Person, including, but not limited to SCCG Inc. (or any successor entity thereof), (i) own, invest or engage in, assist others in owning, investing or engaging in, or have an interest in, or encourage or facilitate another Person to engage or have an interest in, any Competing Business within the Restricted Territory (as defined below); or (ii) interfere with, or attempt to interfere with, business relationships (whether formed before, on or after the date of this Agreement) between the members of the Company Group and any of their clients, customers, suppliers, partners, employees, members or investors within the Restricted Territory. For purposes of this <u>Section 7.8</u>, (x) "**Competing Business**" means any business that provides products or services which are competitive with the products or services provided by the Business or the Company Group and any other line of business that the Business or the Company Group is engaged in or has plans to be engaged in; and (y) "**Restricted Territory**" means each and every area located within a ten (10) mile radius of (1) each Leased Real Property location set forth on <u>Schedule 5.8</u>; and (2) each location in which Buyer (or one of its Affiliates) is currently operating or anticipates operating a motion picture theater, in each case, to the extent set forth on <u>Schedule 7.8</u>.

7.9. <u>Access to Corporate Employees; Transition Services Agreement</u>.

(A) From and after the date hereof until Closing Date, the Equityholder shall provide Buyer and its Affiliates with reasonable access to each Corporate Employee (including but not limited to by providing contact information for each such Corporate Employee) and to the personnel record of each Corporate Employee, and Buyer and its Affiliates may conduct interviews and discussions with such Corporate Employees regarding employment with Buyer and its Affiliates, and Buyer and its Affiliates in their sole discretion may extend offers of employment to such Corporate Employees.

(B) To enable the Buyer to manage an orderly transition in its operation of the Company Group, following the Closing, Buyer and Equityholder agree that each shall use their reasonable best efforts to enter into a transition services agreement (the "**TSA**") in such form reasonably acceptable to each of Buyer and Equityholder, pursuant to which (i) certain Corporate Employees shall provide transition services that may reasonably be required by the Buyer, at-cost to Buyer (which shall mean an hourly rate set forth in the TSA based on the applicable Corporate Employee's salary, incentive compensation, benefits and, in each case, the Equityholder's portion of any employment Taxes thereon), including but not limited to financial services, accounting support, marketing, human resources and training to support the operations of the Company Group, for a period not to exceed three (3) months from the Closing Date; and (ii) the Subject Employees are made available to Equityholder (or any of its Affiliates) in accordance with the terms of <u>Section 10.11(B)</u>.

7.10.   <u>Domain Names</u>. Equityholder shall, within thirty (30) days of the date hereof, file all assignments necessary to reflect the Company as the record and beneficial owner of the domain names set forth on <u>Schedule 7.10</u> hereof.

7.11.   <u>Right of First Offer</u>.

(A)     Equityholder hereby grants to Buyer, for a period of three (3) years from the date hereof, a right of first offer (the "**ROFO**") to lease, manage or operate any motion picture theaters to be constructed by Equityholder (or an agent thereof) in any shopping center or similar center to be developed by Equityholder (or an agent thereof) (the "**Opportunity**"), under the terms and conditions set out below.  For the avoidance of doubt, the Opportunity shall not apply in the event Equityholder (or any of its Affiliates) is the intended lessee, manager or operator of any such motion picture theatre.

(B)     Prior to offering a third-party the Opportunity, Equityholder shall in good faith send to Buyer a written notice (the "**ROFO Notice**") identifying the Opportunity and Buyer shall have an irrevocable option to enter into, or cause its Affiliate to enter into, the Opportunity. The option of the Buyer will be exercisable by written notice to Equityholder within (30) days from the receipt of such ROFO Notice (the "**ROFO Period**"). If Buyer does not exercise such option before the expiration of the ROFO Period, Buyer shall be deemed to have elected not to exercise its option to enter into the Opportunity and Equityholder shall be free to offer the Opportunity to any third-party on such terms and conditions determined by Equityholder in his sole discretion.

(C)     If Buyer exercises its right to enter into the Opportunity, Equityholder and Buyer shall, as soon as possible, and no later than sixty (60) days (or such other period agreed in writing by Buyer and Equityholder) enter into an agreement in respect of the Opportunity. Upon exercise by the Buyer of its right to enter into the Opportunity, Buyer and Equityholder shall be legally obligated to execute the agreement contemplated hereby and shall use their reasonable best efforts to secure any approvals required, to comply as soon as reasonably practicable with all Legal Requirements, and to take all such other actions and to execute such additional documents as are necessary or appropriate in connection therewith.

**ARTICLE 8.**
**CONDITIONS TO OBLIGATIONS**

8.1.   <u>Buyer's Closing Conditions</u>.

The obligation of Buyer to consummate the purchase of the Equity Interests is subject to the satisfaction (or waiver by Buyer) of the following conditions as of the time of the Closing:

(A)     (i) Each of the Company / Equityholder Fundamental Representations shall be true and correct in all respects as of the Closing as though made on the Closing, and (ii) each of the other representations and warranties set forth in <u>ARTICLE 4</u> and <u>ARTICLE 5</u> will be true and correct (in each case disregarding any limitations as to materiality or "Material Adverse Effect" therein) as of the time of the Closing as though then made (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined only as of such date), except, in the case of this clause (ii), where the failure of such

45

representations and warranties to be true and correct would not, in the aggregate, have a Material Adverse Effect;

(B)     The Companies and the Equityholder will have performed and complied (or shall have cured any non-performance or non-compliance) with all of the covenants and agreements required to be performed by the Companies and the Equityholder, as the case may be, hereunder or under any of the Transaction Documents at or prior to the Closing;

(C)     There will be no action or Proceeding before any Governmental Entity pending wherein an unfavorable judgment, decree, injunction or order would prevent the consummation of the sale of the Equity Interests or result in the sale of the Equity Interests being declared unlawful or rescinded, and no such judgment, decree, injunction or order will be in effect;

(D)     On or prior to the Closing Date, the Equityholder will have delivered (or cause to be delivered) to Buyer all of the following (dated as of the Closing Date, except as otherwise indicated):

(1)     (a) Original stock certificates representing the Equity Interests, duly endorsed in blank or accompanied by stock powers or other instruments of transfer, duly executed in blank and (b) evidence of the conveyance to the Buyer of all of the issued and outstanding shares in the Company Group reflecting the Buyer as the owner thereof.

(2)     Each Company's resolutions of the board and equityholders authorizing the execution, delivery and performance of this Agreement and the Transaction Documents to which it is a party; and

(3)     Payoff letters from the holders of the Closing Company Group Indebtedness to the payees contemplated in the Flow of Funds.

(4)     Executed third party consents and approvals as set forth on Schedule 8.1(D)(4).

(5)     The Escrow Agreement, duly executed by the Equityholder and the Escrow Agent.

(6)     The Naperville Purchase Agreement, duly executed by the Equityholder and SCG-N Inc., a Texas corporation.

(7)     A certification by the Equityholder (in such form as may be reasonably requested by counsel to Buyer) conforming to the requirements of Treas. Reg. § 1.1445-2(b)(2).

(E)     Since (and including) the date of this Agreement, there shall not have occurred a Material Adverse Effect.

8.2. <u>Equityholder's Closing Conditions</u>.

The obligation of the Equityholder to consummate the sale of the Equity Interests is subject to the satisfaction (or waiver by the Equityholder) of the following conditions as of the Closing Date:

(A) (i) Each of the Buyer Fundamental Representations shall be true and correct in all respects as of the Closing as though made on the Closing, and (ii) each of the other representations and warranties set forth in <u>ARTICLE 6</u> will be true and correct (in each case disregarding any limitations as to materiality or "Material Adverse Effect" therein) as of the time of the Closing as though then made (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined only as of such date), except, in the case of this clause (ii), where the failure of such representations and warranties to be true and correct would not, in the aggregate, have a Material Adverse Effect;

(B) Buyer will have performed and complied (or shall have cured any non-performance or non-compliance) with all of the covenants and agreements required to be performed by Buyer hereunder or under any of the Transaction Documents at or prior to the Closing;

(C) No action or proceeding before any Governmental Entity will be pending against Buyer wherein an unfavorable judgment, decree, injunction or order would prevent the consummation of the transfer of the Equity Interests or result in the transactions contemplated under this Agreement being declared unlawful or rescinded, no such judgment, injunction, decree or order will be in effect;

(D) On or prior to the Closing Date, Buyer will have delivered to the Equityholder all of the following (dated as of the Closing Date, except as otherwise indicated):

(1) Resolutions of Buyer's board of directors authorizing the execution, delivery and performance of this Agreement and each Transaction Document to which Buyer is a party, and certifying as to the incumbency of the officer(s) of Buyer executing this Agreement and the Transaction Documents on behalf of Buyer.

(2) The Escrow Agreement, duly executed by the Buyer and the Escrow Agent.

(3) The Naperville Purchase Agreement, duly executed by the Buyer.

(E) Buyer shall have delivered to the appropriate parties all cash amounts that are required to be delivered on or before the Closing, including, without limitation, all amounts described in <u>Section 2.2(B)</u>.

8.3.     <u>Frustration of Closing Conditions</u>. No Party may rely on the failure of any condition set forth in this <u>ARTICLE 8</u> to be satisfied if such failure was caused by such Party's failure to use commercially reasonable efforts to cause the Closing to occur, as required by <u>Section 7.4(A)</u>.

**ARTICLE 9.**
**<u>TERMINATION</u>**

9.1.     <u>Termination</u>.

This Agreement may be terminated at any time prior to the Closing as follows:

(A)     at any time, by mutual written agreement of the Equityholder and Buyer;

(B)     by the Equityholder, if any of the representations or warranties of Buyer set forth in <u>ARTICLE 6</u> shall not be true and correct such that the condition to Closing set forth in <u>Section 8.2(A)</u> would not be satisfied or if any of the covenants or agreements of Buyer set forth in this Agreement shall have been breached such that the condition to closing set forth in <u>Section 8.2(B)</u> would not be satisfied and, in each case, such breach (or breaches) is not cured within 30 days after written notice thereof is delivered to Buyer (provided, that the failure of Buyer to deliver the consideration required pursuant to <u>Section 2.2</u> at the Closing as required hereunder will not be subject to cure); provided that Buyer does not also then have the right to terminate this Agreement pursuant to <u>Section 9.1(D)</u>;

(C)     by the Equityholder, if (i) all the conditions set forth in ARTICLE 8 have been satisfied, or, with respect to the Equityholder's conditions, waived (in each case, other than those conditions that by their terms are to be satisfied by actions taken at the Closing, provided that such conditions are then capable of being satisfied), (ii) Buyer shall have failed to consummate the Closing that should have occurred pursuant to <u>Section 3.1</u> and (iii) the Equityholder has notified Buyer in writing that all of the conditions set forth in ARTICLE 8 have been satisfied or, with respect to the Equityholder's conditions, waived (or would be satisfied or waived if the Closing were to occur on the date of such notice) and it stands and will stand ready, willing and able to consummate the Closing at such time;

(D)     by Buyer, if any of the representations or warranties set forth in <u>ARTICLE 4</u> or <u>ARTICLE 5</u> shall not be true and correct such that the condition to Closing set forth in <u>Section 8.1(A)</u> would not be satisfied or if any of the covenants or agreements of the Equityholder or the Companies set forth in this Agreement shall have been breached such that the condition to Closing set forth in <u>Section 8.1(B)</u> would not be satisfied and, in each case, such breach (or breaches) is not cured within 30 days after written notice thereof is delivered to the Equityholder and the Companies; provided that the Equityholder does not also then have the right to terminate this Agreement pursuant to <u>Section 9.1(B)</u>;

(E)     by Buyer, if (i) all the conditions set forth in ARTICLE 8 have been satisfied, or, with respect to the Buyer's conditions, waived (in each case, other than those conditions that by their terms are to be satisfied by actions taken at the Closing, provided that such conditions are then capable of being satisfied), (ii) Equityholder shall have failed to consummate the Closing that should have occurred pursuant to <u>Section 3.1</u> and (iii) Buyer has notified Equityholder in writing that all of the conditions set forth in ARTICLE 8 have been satisfied or,

48

with respect to Buyer's conditions, waived (or would be satisfied or waived if the Closing were to occur on the date of such notice) and it stands and will stand ready, willing and able to consummate the Closing at such time; and

(F)     by Buyer or the Equityholder, if on or after 5:00 p.m. Eastern Time on April 30, 2020; provided that the right to terminate this Agreement pursuant to this Section 9.1(F) shall not be available to any Party if the failure of such Party to perform or comply with any of its obligations under this Agreement has been the principal cause of or resulted in the failure of the Closing to have occurred on or before such date.

9.2.    Effect of Termination.

In the event of the termination of this Agreement pursuant to Section 9.1, written notice thereof shall be given to the other Parties, specifying the provisions hereof pursuant to which such termination is made and the basis therefor, and this entire Agreement shall forthwith become void (and there shall be no liability or obligation on the part of any of the Parties or their respective officers, directors or equity holders); provided that, no such termination shall relieve any Party hereto of any liability or damages resulting from any willful breach of this Agreement prior to such termination, in which case, the aggrieved Party shall be entitled to all remedies available at law or in equity; and provided further that the provisions of this Section 9.2, Section 10.2, Section 10.4, Section 10.5 and ARTICLE 12 shall survive any termination of this Agreement and remain valid and binding obligations of the Parties.

## ARTICLE 10.
## OTHER COVENANTS

10.1.    Notice of Breach. Promptly after it obtains knowledge thereof, but in all events prior to the Closing, Buyer will inform the Companies and the Equityholder of any fact or circumstance that, if it existed on the Closing Date, would constitute a breach of any representation or warranty of Buyer set forth in this Agreement or any breach of any of its covenants or agreements set forth in this Agreement. Promptly after the Companies obtain knowledge thereof, but in all events prior to the Closing, the Companies will inform Buyer of any fact or circumstance that, if it existed on the Closing Date, would constitute a breach of any representation or warranty of the Companies set forth in this Agreement or any breach of any covenant or agreement of the Companies set forth in this Agreement.

10.2.    Press Releases and Announcements.

None of the Parties nor any of their respective representatives shall issue any press releases or make any public announcements with respect to this Agreement or the transactions contemplated hereby without the prior written consent of Buyer and the Equityholder, as the case may be. Notwithstanding the foregoing, any such press release or public announcement may be made if required by any Legal Requirement or a securities exchange rule; provided that the Party required to make such press release or public announcement shall, to the extent possible, confer with the other parties concerning the timing and content of such press release or public announcement before the same is made; provided, that nothing herein shall prevent any Party from referencing the transactions contemplated hereby (including financial returns and other matters

related thereto) in confidential materials provided to investors of such Party; provided, however, in no event shall the Preliminary Purchase Price, Purchase Price or Final Purchase Price be disclosed without the prior written consent of Equityholder.

10.3.    Further Transfers.

Each Party will execute and deliver such further instruments of transfer and take such additional actions as any other party may reasonably request to effect, consummate, confirm or evidence the transfer of the Equity Interests and the other transactions described in this Agreement and in the other Transaction Documents.

10.4.    Confidentiality.

(A)    Confidentiality by Buyer.  (x) Prior to the Closing and (y) solely to the extent this Agreement is terminated in accordance with Article 9, for a period of two (2) years following any such termination, in each case, Buyer will treat and hold as confidential all non-public information concerning the business and affairs of any member of the Company Group and its Business ("**Confidential Information**") and refrain from using any such Confidential Information, in each case except as necessary to consummate the transfer of the Equity Interests or otherwise in connection with this Agreement, and, after any termination of this Agreement pursuant to Section 9.1, deliver promptly to the Companies or destroy, at the request and option of the Companies, all tangible embodiments (and all copies) of any such Confidential Information that are in Buyer's possession or under Buyer's control; provided, that Buyer will not have any such obligations with respect to (i) information which is or becomes generally available to the public other than as a result of disclosure by Buyer or its Affiliates, or (ii) information that becomes available to Buyer or any of Buyer's representatives from a source that is not known by Buyer to be bound by a confidentiality agreement to any member of the Company Group.  If Buyer is requested or required prior to the Closing (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any such Confidential Information, Buyer will notify the Companies promptly of the request or requirement so that the Companies may seek an appropriate protective order or waive compliance with the provisions of this Section 10.4(A).  If, in the absence of a protective order or the receipt of a waiver hereunder, Buyer is compelled to disclose any such Confidential Information in connection with any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process, then Buyer may disclose such Confidential Information in connection therewith; provided, that Buyer will use its commercially reasonable efforts to assist the Companies in obtaining, at the request and expense of the Companies, an order or other assurance that confidential treatment will be accorded to such portion of such Confidential Information as the Companies may designate

(B)    Remedy for Buyer's Breach.  Buyer acknowledges and agrees that in the event of a breach by Buyer of any of the provisions of this Section 10.4, monetary damages may be inadequate, and the Companies may have no adequate remedy at law.  Accordingly, in the event of any such breach, the Companies, the Equityholder or their respective successors or assigns, as the case may be, may, in addition to any other rights and remedies existing in its favor, enforce its rights and Buyer's obligations hereunder by an action or actions for specific performance, injunctive or other relief, without any requirement of posting a bond or proving actual damages.

10.5.  <u>WARN Act Notice</u>.

Buyer shall, to the extent applicable, be solely responsible for providing any notice required under the WARN Act in respect of the termination after the Closing of the employment of any employee of any member of the Company Group, and shall indemnify and hold the Equityholder harmless from any liability arising from any failure of Buyer to comply fully with the foregoing covenant with respect to any such terminations following the Closing.

10.6.  <u>Director and Officer Indemnification</u>.

(A)  On or before the Closing Date, the Company Group, at the Equityholder's sole cost and expense, shall have the option to, maintain and fully pay for irrevocable "tail" insurance policies naming the Company Group and all managers, directors, officers, employees, equityholders and agents of each member of the Company Group ("**D&O Indemnitees**") as direct beneficiaries with a claims period of at least six (6) years from the Closing Date, upon such terms and conditions which shall be on customary market terms for a business comparable to the Company Group, with respect to matters existing or occurring at or prior to the Closing Date (the "<u>D&O Policy</u>"). In the event the D&O Policy is purchased, the Buyer (or any of its Affiliates) shall not, and shall cause the Company Group not to, cancel or change such insurance policies in any respect so long as such D&O policy is continued to be covered at the sole cost and expense of the Equityholder.

(B)  The managers, directors, officers, employees, equityholders and agents of each member of the Company Group entitled to the indemnification, liability limitation, exculpation and insurance set forth in this <u>Section 10.6</u> are intended to be third party beneficiaries of this <u>Section 10.6</u>.  This <u>Section 10.6</u> shall survive the consummation of the transactions contemplated by the Closing.  If the Equityholder does purchase and obtain such D&O Policy pursuant to the terms of this <u>Section 10.6</u>, the Company Group agrees to utilize the D&O Policy in order provide coverage to the D&O Indemnitees for any claims covered by the D&O Policy, in accordance with and subject to its terms.

10.7.  <u>Documents and Information</u>.

After the Closing Date, Buyer shall (and shall cause each member of the Company Group to), until the seventh anniversary of the Closing Date, retain all books, records and other documents pertaining to the business of any member of the Company Group in existence on the Closing Date and make the same reasonably available for inspection and copying by the Equityholder during normal business hours of the Company Group, as applicable, upon reasonable written request and upon reasonable notice.  No such books, records or documents shall be destroyed after the seventh anniversary of the Closing Date by Buyer or any member of the Company Group without first advising the Equityholder in writing and giving the Equityholder a reasonable opportunity to obtain possession thereof.

10.8.  <u>Release of Personal Guarantees</u>.

Buyer shall arrange for the release of any personal guarantees by Equityholder or any Affiliates or family members of Equityholder set forth in <u>Schedule 10.8</u>, made in relation to the Company Group. Buyer shall indemnify and hold harmless (in accordance with the provisions of

51

ARTICLE 11 of this Agreement) Equityholder and any Affiliates and family members of Equityholder, against and in respect to any claims relating to or arising from Buyer's failure to arrange for releases all personal guarantees in accordance with this Section 10.8.

10.9.   Gift Certificates.

Buyer hereby acknowledges and agrees that it shall assume all responsibilities, obligations and liabilities with respect to any and all Gift Certificates issued by the Company Group as of the Closing and that such liabilities will not be included for purposes of (or used as a basis for) any purchase price adjustments or indemnification claims.  Notwithstanding the foregoing, in the event the unredeemed gift certificate liability for gift certificates sold by the Companies and/or their respective Affiliates (which, for the avoidance of doubt, shall exclude any liability or obligation with respect to guest passes, complimentary passes, re-admission passes, private event certificates, food or beverage credits and any other cards, passes and certificates which entitle a ticketholder to admission, food, beverage or other goods without any further consideration or at a discount) through the Closing Date exceeds ███████ (the "**Gift Certificate Threshold**"), Equityholder shall reimburse Buyer for any such liability in excess of the Gift Certificate Threshold. For the avoidance of doubt, any such amount for which Buyer is reimbursed pursuant to the terms of the Naperville Purchase Agreement shall not require any additional reimbursement pursuant to the terms of this Agreement (or vice versa).

10.10.   Third Party Agreements.

(A)   Equityholder shall use reasonable best efforts to obtain, prior to the Closing Date, an estoppel certification for each Leased Real Property location set forth on Schedule 5.8, which certification shall cite the commencement date and expiration date, the square footage of the premises, the current annual rent (including current additional rent, operating expenses, taxes and insurance, utilities and any percentage rent paid), any security deposit, any renewal and right of first offer options, and whether there are monetary or non-monetary defaults under the Lease, and any other matter reasonably requested by Buyer (in each case, to the extent acceptable to the applicable landlord), duly executed by the Equityholder and each landlord that is party to such Lease.

(B)   Equityholder shall use reasonable best efforts to obtain, prior to the Closing Date, such third party consents and approvals as set forth on Schedule 10.10(B).

10.11.   Woodlands Construction.

(A)   Following the Closing, the Parties agree that Buyer and SCCG Inc. (i.e. Equityholder's construction company) will use their reasonable best efforts to enter into an agreement with Buyer to complete Infrastructure Construction of the theatre at the Woodlands Location upon such terms as mutually agreed upon and consistent with the terms of this paragraph and the Woodlands Lease (the "**Secondary Agreement**").  For the purposes of this Agreement "Infrastructure Construction" shall mean the structural build-out of the Woodlands Location, including demolition, backfill, building framing, foundation, roof, exterior and interior walls, insulation, windows, doors, HVAC, electrical, plumbing, mechanical, concrete flooring, finishes, painting, interior and exterior signage and any related design and architectural fees; and shall

52

include any and all fixtures, equipment, furniture, trim, landscaping, and other furnishings and finishes. In addition, Infrastructure Construction shall also include raising the ceiling and structure to the standard-quality theater height of at least 32" feet (the "**Ceiling Construction**"). The labor, materials, design, and specifications of the Infrastructure Construction at the Woodlands Location will be similar to the labor, materials, design and specifications utilized at the Companies' existing theatres located in Richmond, TX and Spring, TX, including such specifications set forth on Schedule 10.11(A) (which specifications will be subject to appropriate zoning approval). The price for the Infrastructure Construction will not exceed ███████ (which includes $████ from which the construction company shall be permitted to make draws from the Woodlands Landlord in accordance with the terms of the Woodlands Lease, and the Woodlands Construction Reimbursement paid at Closing). In addition, Equityholder shall also be responsible for any cost-overruns in connection with completing the foregoing Infrastructure Construction (subject to appropriate zoning approval for the Ceiling Construction), except to the extent that such overage is due to any requests of Buyer out of scope or outside of the foregoing specifications, in which case, Buyer will be responsible for such additional costs, unless otherwise agreed to by the parties. The parties agree that if the zoning authorities do not provide zoning approval for solely the eleven screens contemplated in Schedule 10.11(A) and the Woodlands Location is built with a greater number of screens, Equityholder shall continue to be responsible for the cost (including any cost-overruns, subject to the preceding exception in relation to out-of-scope requests) in connection with Ceiling Construction of such eleven screens, and Buyer shall only be responsible for the costs of any screens in excess of such eleven screens.

(B) Buyer (and its Affiliates, which, following the Closing shall include the Company Group) acknowledges and agrees that it shall make available to Equityholder (and any of his Affiliates) any Corporate Employee who receives and accepts an offer of employment and becomes an employee of Buyer or its Affiliate pursuant to Section 7.9 (collectively, the "**Subject Employees**") for such period of time as reasonably necessary to complete Equityholder's obligations with respect to the Infrastructure Construction at the Woodlands Location, in accordance with the terms of the TSA. For so long as a Subject Employee remains employed by Buyer (or one of its Affiliates), the services provided by such Subject Employee to Equityholder (or one of its Affiliates) shall be billed to Equityholder at-cost (which shall mean an hourly rate set forth in the TSA based on the applicable Subject Employee's salary, incentive compensation, benefits and, in each case, the employer's portion of any employment Taxes thereon). In the event the employment of a Subject Employee is terminated by Buyer (or one of its Affiliates) following the Closing and Equityholder has not previously breached its obligations under Section 7.8, Equityholder (and its Affiliates) shall be entitled to solicit, engage and hire such terminated Subject Employee in relation to the Infrastructure Construction at the Woodlands Location (which, for the avoidance of doubt, shall be deemed an exclusion from the restrictions set forth in Section 7.8 hereunder).

10.12. Screen Advertising Payments.

If at any time following the Closing, the Buyer or any its Affiliates (which shall include the Company Group) receives, or comes into possession of, any Screen Advertising Payments for a period of six (6) months following the Closing, Buyer shall (or shall cause its Affiliates to), within three (3) Business Days, deliver such Screen Advertising Payments to Equityholder, with such endorsements, transfers or assignments as may be necessary or useful to ensure that Purchaser

receives the full benefit thereof; provided that, any payment or reimbursement for a Screen Advertising Payment that may be owed to an advertiser shall be borne solely by the Equityholder.

10.13. <u>Sony Master Lease Payments</u>.

(A)    Upon the expiration of the term set forth in each of the Sony Lease Agreements, in the event Buyer (or one of its Affiliates) exercises the equipment purchase option set forth in Section 2.5.1 of such Sony Lease Agreement (i.e. purchase upon the expiration of the term of such Master Lease Agreement and not in respect of an early termination), Equityholder shall reimburse the Buyer for such amounts paid by Buyer with respect to the purchase of the subject equipment in excess of $███████ (in the aggregate); however, in the event the price paid by Buyer (or its Affiliates) for such equipment is less than $██████ (in the aggregate), Buyer shall pay such difference to Equityholder.

(B)    Notwithstanding the foregoing, in the event Sony Electronics Inc. withholds its consent as it relates to the transactions contemplated hereunder in connection with any of the Sony Lease Agreements and subsequently terminates such agreement prior to the expiration of the term set forth therein, in the event Buyer (or one of its Affiliates) exercises the related equipment purchase option, Equityholder shall reimburse the Buyer for such amounts paid by Buyer with respect to the purchase of such subject equipment in excess of $██████ (in the aggregate).

## ARTICLE 11.
## INDEMNIFICATION AND TAX MATTERS

11.1. <u>Survival</u>.

(A)    The representations and warranties of the Equityholder and the Companies contained herein will survive until the eighteen (18) month anniversary of the Closing Date (the "**General Survival Period Expiration Date**"), and will terminate on such date except to the extent that any written claims for indemnification in respect of a breach of any such representation or warranty is made on or before the General Survival Period Expiration Date, in which case such representation or warranty will survive until the resolution of such claim; provided, however, that (i) the representations and warranties contained in <u>Sections</u> <u>4.1</u> (Authorization of Closing Transactions), <u>4.3</u> (Brokers' Fees), <u>4.4</u> (Securities; Title), <u>5.1</u> (Organization and Power), <u>5.2</u> (Authorization of Closing Transactions), <u>5.3</u> (Capitalization (Company)) and <u>5.12</u> (Company Group's Broker) (collectively, the "**Company / Equityholder Fundamental Representations**") will survive indefinitely and (ii) the representations and warranties contained in Section 5.9 (Tax Matters) (the "**Company Tax Representation**") and Section 5.17 (Environmental Matters) (the "**Company Environmental Representation**") shall survive until the date that is 60 days after expiration of the applicable statute of limitations (after giving effect to any extension thereof).

(B)    The representations and warranties of Buyer contained herein will survive until the General Survival Period Expiration Date and will terminate on such date except to the extent that any written claims for indemnification in respect of a breach of any such representation or warranty is made on or before the General Survival Period Expiration Date, in which case such representation or warranty will survive until the resolution of such claim; provided however, that the representations and warranties contained in <u>Sections</u> <u>6.1</u> (Organization and Power), <u>6.2</u>

54

(Authorization of Closing Transactions), 6.7 (Due Diligence Review) and 6.10 (Brokers' Fees) (collectively, the "**Buyer Fundamental Representations**") will survive indefinitely.

(C)     The covenants and agreements of the Equityholder, the Companies and Buyer contained herein will survive until one hundred twenty (120) days after the date performance is due and any claims for indemnification in respect of a breach of such covenants must be made on or before such date.

(D)     The survival periods set forth in Sections 11.1(A) through (C) are in lieu of, and the parties expressly waive, any other applicable statute of limitation, whether arising in law or equity.

11.2.   <u>Indemnification</u>.

(A)     <u>By the Equityholder</u>.   Subject to the limitations set forth in this <u>ARTICLE 11</u>, from and after the Closing, the Equityholder will indemnify and hold harmless Buyer and each of its Affiliates (including, following the Closing, the Companies), officers, directors, members, shareholders, partners, members, managers, representatives and agents and each of the successors and assigns of the foregoing (each, a "**Buyer Indemnitee**") from and against any and all Losses that any Buyer Indemnitee may suffer, sustain or become subject to, as a result of, in connection with, or relating to:

(1)     any inaccuracy or breach of any Equityholder representation set forth in <u>ARTICLE 4</u> or any representation of the Companies set forth in <u>ARTICLE 5</u>;

(2)     any failure by the Equityholder to perform any covenant or obligation of the Equityholder hereunder;

(3)     any failure by a Company to perform any covenant or obligation of such Company set forth herein that, pursuant to its terms, is to be performed before the Closing; and

(4)     the Indemnified Taxes.

(B)     <u>By Buyer</u>.   Subject to the limitations set forth in this <u>ARTICLE 11</u>, from and after the Closing, Buyer will indemnify and hold harmless the Equityholder and each of his Affiliates, officers, directors, members, shareholders, partners, members, managers, representatives and agents and each of the successors, heirs and assigns of the foregoing (each a "**Seller Indemnitee**") from and against any and all Losses that any Seller Indemnitee may suffer, sustain or become subject to, as a result of, in connection with, or relating to:

(1)     any inaccuracy or breach of any representation or warranty of Buyer set forth in this Agreement;

(2)     any failure by Buyer to perform any covenant or obligation of Buyer set forth in this Agreement; or

33439967.16

(3)    any failure by a Company to perform any covenant or obligation of such Company set forth in this Agreement that, pursuant to its terms, is to be performed after the Closing.

(C)    <u>Limits on Indemnification</u>.

(1)    The Equityholder will have no liability for any Loss under <u>Section 11.2(A)(1)</u> (other than a Loss arising in respect of a breach of a (x) Company / Equityholder Fundamental Representation or (y) Company Tax Representation), in each case, until the aggregate amount of such Losses exceeds an amount equal to ▆▆▆▆ (the "**Basket**"), in which case the Equityholder shall be liable for all Losses and not solely the amount in excess of the Basket; provided that the Equityholder will not have any liability for any Loss under <u>Section 11.2(A)(1)</u> (other than a Loss arising in respect of a breach of a (x) Company / Equityholder Fundamental Representation or (y) Company Tax Representation), in each case, to the extent that the aggregate amount of Losses resulting from such single claim or aggregated related claims arising out of the same facts, events or circumstances exceeds $▆▆▆.  Notwithstanding the foregoing, any Losses pursuant to Section 11.2(A)(1) of the Naperville Purchase Agreement (other than a Loss arising in respect of a breach of a "Company / Equityholder Fundamental Representation" or a "Company Tax Representation" (each as defined therein)), shall be applied towards the Basket for purposes hereunder (assuming the closing of the Naperville Purchase Agreement).

(2)    Notwithstanding anything in this Agreement to the contrary, (i) the aggregate amount of all Losses for which the Equityholder shall be liable pursuant to this <u>ARTICLE 11</u> (other than a Loss arising in respect of (x) Section 11.2(A)(4) or a breach of a (y) Company / Equityholder Fundamental Representation or (z) Company Tax Representation (collectively, the "**Buyer Exclusions**")) shall not exceed the balance of the Escrow Amount (the "**Cap**"); provided that, any Claim for indemnification pursuant to this <u>ARTICLE 11</u> (other than the Buyer Exclusions) shall be paid from the Escrow Amount; and (ii) the aggregate amount of all Losses for which the Equityholder shall be liable pursuant to this <u>ARTICLE 11</u> or otherwise with respect to the Buyer Exclusions shall not exceed the Final Purchase Price actually received by Equityholder (the "**Upper Cap**") (it being understood that, for the purposes of this <u>ARTICLE 11</u>, "**Final Purchase Price**" shall include both the Transaction Expenses and the Closing Company Group Indebtedness paid by Buyer in accordance with the terms hereof).  Furthermore, upon the closing of the Naperville Purchase Agreement (if applicable), the parties acknowledge and agree that (i) the Cap (for purposes hereunder) shall be increased by an amount equal to the "Escrow Amount" (as defined in the Naperville Purchase Agreement); and (ii) the Upper Cap (for purposes hereunder) shall be increased by an amount equal to the "Final Purchase Price" (as defined in the Naperville Purchase Agreement).

(3)    With respect to any claim seeking recovery of any Loss with respect to a Buyer Exclusion, the Buyer Indemnitees shall recover such Loss directly from

the Equityholder in accordance with the limitations set forth in this Agreement, including those in this <u>Section 11.2</u> (including the Upper Cap).

(4)     No Buyer Indemnitee shall be entitled to recover any Losses under this <u>ARTICLE 11</u> to the extent (i) the applicable Buyer Indemnitee has made recovery from a Person other than another Party to this Agreement (to the extent of such recovery), (ii) the applicable Buyer Indemnitee could have mitigated or prevented such Loss (including seeking indemnification or other redress pursuant to the terms of any Contract to which any member of the Company Group is a party and by which such member has the right to seek indemnification from any third party), (iii) such Loss relates to any breach or inaccuracy of any representation or warranty disclosed on the Schedules to this Agreement, or (iv) such Loss is attributable to any inaccuracy or breach of any representation or warranty in <u>Section 5.9</u> (other than the representations and warranties set forth in <u>Section 5.9(D)</u>, <u>(E)</u> and <u>(G)</u>) to the extent such Loss or Taxes are with respect to a Post-Closing Tax Period.

(5)     The Buyer Indemnitees' right to indemnification pursuant to <u>ARTICLE 11</u> on account of any Losses will be reduced by the amount of any reserve reflected on the Company Group's books and records as of the Closing Date established for the general category of items or matters similar in nature to the specific items or matters giving rise to such Loss.

(6)     No Indemnified Party shall be entitled to recover Losses in respect of any claim or otherwise obtain reimbursement or restitution more than once with respect to any claim hereunder.  Without limiting the foregoing, notwithstanding anything to the contrary in this Agreement, the Buyer Indemnitees shall not be entitled to indemnification with respect to any Losses as a result of, or based upon or arising from, any claim or liability to the extent such claim or liability is taken into account in determining the amount of any adjustment to the Final Purchase Price.

(7)     If any Indemnifying Party makes any indemnification payment pursuant to this <u>ARTICLE 11</u> or otherwise by reason of the transactions contemplated hereby under any theory of recovery, such Indemnifying Party shall be subrogated, to the extent of such payment and to the extent permitted by law, to any rights and remedies of the Indemnified Party to recoup amounts paid from third parties with respect to the matters giving rise to indemnification hereunder.

(8)     The amount of any and all Losses under this <u>ARTICLE 11</u> shall be determined net of any amounts recovered or recoverable by the Indemnified Party under the insurance policies, indemnities or other reimbursement arrangements of the Company Group with respect to such Losses and the Buyer Indemnitees shall, to the extent applicable, use reasonable efforts to pursue recovery pursuant to the insurance policies of the Company Group.

(9)     Any claims for indemnification under <u>ARTICLE 11</u> shall be made on an after Tax basis.  Accordingly, in determining the amount of any indemnification payment for a Loss suffered or incurred by a Buyer Indemnitee hereunder, the amount of such Loss shall be decreased to take into account any deduction, credit or other Tax benefit actually realized by the Buyer Indemnitee in connection with the Losses that form the basis of the Buyer Indemnitee's claim for indemnification, in each case, in the year the Loss is incurred or the indemnity payment is made, in any prior year, or in the immediately following year.  The Indemnified Party shall be deemed to realize, with respect to any taxable year described in the immediately preceding sentence, a Tax benefit in connection with a Loss if, and to the extent that, the Indemnified Party's cumulative liability for Taxes through the end of such taxable year, calculated by excluding any Tax items attributable to the Loss from such taxable year, exceeds the Indemnified Party's cumulative liability for Taxes through the end of such taxable year, calculated by taking into account any Tax items attributable to the Loss for such taxable year. For the avoidance of doubt, notwithstanding anything to the contrary contained herein, this <u>Section 11.2(C)(9)</u> shall not be construed to require the Buyer or any of its Affiliates to make available its Tax Returns (or any other information relating to its Taxes that it deems confidential) to the Equityholders or any other person.

11.3.    <u>Indemnification Procedures</u>.

(A)     <u>Notice of Claim</u>.  Any Party making a claim for indemnification under <u>Section 11.2</u> (the "**Indemnified Party**") will notify the Party from whom indemnification is claimed (the "**Indemnifying Party**") of the claim in writing (a "**Claim Notice**") promptly after receiving written notice of any Proceeding against it (if by a third party) or discovering the Loss giving rise to such claim for indemnification.  The Claim Notice will describe the claim, the amount thereof (to the extent then known and quantifiable), and the basis therefor, in each case to the extent known to the Indemnified Party.  The failure to so notify the Indemnifying Party will not relieve the Indemnifying Party of its obligations under <u>Section 11.2</u>, except to the extent that such failure actually prejudices the Indemnifying Party.  Thereafter, the Indemnified Party shall deliver to the Indemnifying Party within five (5) Business Days after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to such claim.

(B)     <u>Assumption of Defense</u>.  With respect to any third party claim (other than a claim in respect of Taxes, which is governed by Section 11.6(F)) that gives rise or is alleged to give rise to a claim for indemnity under <u>Section 11.2</u>, the Indemnifying Party, at its option and own expense, will be entitled (subject to the limitations set forth herein) to assume responsibility for and control the defense of such claim by (i) giving written notice to the Indemnified Party of its election hereunder and (ii) appointing competent and reputable counsel reasonably acceptable to the Indemnified Party to act as lead counsel of such defense, each within thirty (30) days after delivery of the Claim Notice by the Indemnified Party.  The Indemnifying Party shall thereafter consult with the Indemnified Party upon the Indemnified Party's reasonable request for such consultation, from time to time, with respect to such claim or Proceeding.

(C)     Limits of Assumption of Defense.  An Indemnifying Party's rights under Section 11.3(B) will be subject to the following additional limitations:

(1)     with respect to any claim the defense of which the Indemnifying Party has assumed, the Indemnified Party will be entitled to participate in the defense of such claim and to employ counsel of its choice for such purpose, and the fees and expenses of such separate counsel will be borne by the Indemnified Party;

(2)     if the Indemnifying Party assumes control of the defense of any such claim, then the Indemnified Party shall cooperate in the defense of such claim (such cooperation will include, at the request of the Indemnifying Party, using commercially reasonable efforts to retain and provide to the Indemnifying Party all records and information reasonably relevant to such claim and to make employees available (during normal business hours and without interrupting the operation of the Indemnified Party's business) to provide information and explanation on the materials provided);

(3)     if the Indemnifying Party assumes control of the defense of any such claim, then the Indemnifying Party will obtain the prior written consent of the Indemnified Party before entering into any settlement of such claim, if (i) such settlement does not expressly and unconditionally release the Indemnified Party from all liabilities and obligations with respect to such claim, without prejudice, or (ii) such settlement imposes any injunctive or equitable relief on the Indemnified Party or imposes any restrictions on the operation of the business of any member of the Company Group or their Affiliates; and

(4)     if the Indemnifying Party assumes control of the defense of any such claim, then the Indemnifying Party and its counsel will proceed diligently and in good faith with respect thereto.  If the Indemnifying Party has the right to, but does not, assume control of the defense of any claim in accordance with this Section 11.3, then the Indemnifying Party may engage competent and reputable counsel to nonetheless participate (at the Indemnifying Party's own expense) in the defense of such claim and the Indemnified Party will use commercially reasonable efforts to consult with the Indemnifying Party, upon the reasonable request of the Indemnifying Party, in respect of such defense.

(D)     Control by Indemnified Party.  If the Indemnifying Party does not assume the defense of any such Proceeding, investigation or other claim, the Indemnified Party may defend against such matter as it deems appropriate; provided that the Indemnified Party may not settle any such matter without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld) if the Indemnified Party is seeking or will seek indemnification hereunder with respect to such matter.

11.4.     Treatment of Indemnification Payments.

Each Party will treat all payments made pursuant to Section 11.2 as adjustments of the Final Purchase Price for all purposes, unless otherwise required by applicable law.

11.5.   <u>Reserved</u>.

11.6.   <u>Tax Matters</u>.

(A)     The Parties shall provide each other such cooperation and information as any of them reasonably may request in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to refund of Taxes or in conducting any audit or other proceeding in respect of Taxes. Such cooperation shall include the retention and, upon any other Party's request, the provision of records and information which are reasonably relevant to any such audit or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  From and after the Closing Date, Buyer shall, and agrees to cause each member of the Company Group to (i) retain all books and records of the Companies relating to any period beginning on or before the Closing until the expiration of the applicable statute of limitations, and to abide by all record retention agreements entered into with any Taxing Authority, and (ii) give the Equityholder reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the Equityholder so requests, shall allow the Equityholder to take possession of such books and records.

(B)     All federal, state, local, foreign transfer, documentary stamp, registration, sales, use or similar Taxes, fees or expenses ("**Transfer Taxes**") applicable to, imposed upon or arising out of the purchase and sale of the Equity Interests or any other transaction contemplated by this Agreement shall be paid by Buyer.  The party required by Law to do so shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and, if required by applicable Law, the other parties shall, and shall cause their respective Affiliates to, join in the execution of any such Tax Returns and other documentation, and pay over their share of any such Transfer Taxes to the filing party.

(C)     The Equityholder shall prepare and file or cause to be prepared and filed, all Tax Returns of the Company Group for all taxable periods ending on or prior to the Closing Date (in each case, to the extent not already filed prior thereto) ("Equityholder Returns").  All Equityholder Returns shall be prepared in a manner that is consistent with the past custom and practice of the Company Group, except as otherwise required by applicable Law; provided that, such Equityholder Returns shall include the safe harbor election to any success-based fees pursuant to Revenue Procedure 2011-29, 2011-18 IRB 746 for the taxable period that includes the Closing Date.  At least thirty (30) days prior to the date on which each such income Equityholder Return is due and at least fifteen (15) days prior to the date on which any other Equityholder Return for is due, the Equityholder shall submit such Equityholder Return (and all relevant work papers and other items required to understand such Equityholder Return or other items as reasonably requested by the Buyer) to Buyer for Buyer's review and comment, and the Equityholder shall not file such Equityholder Return without Buyer's consent, which shall not be unreasonably withheld, conditioned, or delayed. Buyer shall prepare and file all Tax Returns of the Company Group for Straddle Periods ("**Buyer Returns**"); provided, however, that not later than thirty (30) days prior to the due date for filing of a Buyer Return (or as soon as reasonably practicable if the due date for filing such Buyer Return is within thirty (30) days of Closing), Buyer shall provide Equityholder with a copy of such Buyer Return (and all relevant work papers and other items required to understand such Equityholder Return or other items as reasonably requested by the Equityholder),

shall make such changes to the portions of the Buyer Return that relate to the Taxes for which the Equityholder is responsible as Equityholder may reasonably request, and shall not file such Tax Return without Equityholder's consent, which shall not be unreasonably withheld, conditioned, or delayed. Equityholder shall pay to Buyer the Equityholder's share of any Taxes due with respect to Buyer Returns and Equityholder Returns no later than seven (7) days prior to the due date for filing such Buyer Returns or Equity Holder Returns; provided that for this purpose, the Equityholder's share of such Taxes shall be limited to those that the Equityholder is responsible for under Section 11.2. If the Buyer and Equityholder cannot, through good-faith negotiation, resolve any disagreement over any Equityholder Return or Buyer Return, then their disagreement shall be resolved by the Independent Auditor in accordance with Section 2.3, mutatis mutandis. The resolution of any such dispute shall not delay the filing of any such Tax Return beyond its due date as prepared by the party who is responsible for preparing such Tax Return under this Section 11.6(C) and, following resolution of such disagreement, such Tax Return shall be amended if and as necessary to conform to the resolution of such disagreement.

(D)     Except as otherwise required by applicable law (as determined pursuant to the next sentence), without the prior written consent of the Equityholder (which consent shall not be unreasonably withheld, conditioned, or delayed), the Buyer nor any member of the Company Group shall (A) amend any Tax Return relating to a Pre-Closing Tax Period, (B) agree to waive or extend the statute of limitations relating to any Taxes of any member of the Company Group for any Pre-Closing Tax Period, (C) make or change any election with respect to, or that has any retroactive effect on, any Pre-Closing Tax Period of any member of the Company Group or (D) voluntarily approach (including initiating a voluntary disclosure process) any Taxing Authority with respect to any Pre-Closing Tax Period of any member of the Company Group or Taxes of any member of the Company Group for any Pre-Closing Tax Period, in each case, only to the extent such actions listed in (A) – (D) above would reasonably be expected to materially change any Tax rights or obligations, including increase any indemnification obligation of the Equityholder pursuant to Section 11.2(A)(4). For the purposes of determining whether any of the actions described in the preceding sentence are required by applicable law, the parties shall negotiate in good faith prior to taking any such action; provided that if the parties are unable to agree on whether an action is required by law, the dispute shall be submitted for resolution to the Independent Auditor, whose determination shall be final and binding, and the costs and expenses of the Independent Auditor shall be borne by the non-prevailing party. The Buyer shall not make any election under Section 338 of the Code (or any similar provision under state, local or non-U.S. Law) with respect to the transactions contemplated under this Agreement. Except as otherwise required by applicable law, the Buyer shall not (nor should it cause any member of the Company Group) to enter into any transactions outside the ordinary course of business and not contemplated by this Agreement occurring on the Closing Date but after the Closing. The Buyer shall not take any action with respect to any Company Group that would cause the transactions contemplated by this Agreement to constitute part of a transaction that is the same as, or substantially similar to, the "Intermediary Transaction Tax Shelter" described in Internal Revenue Service Notices 2001-16 and 2008-111. Except as otherwise required by applicable law, Buyer and the Company Group shall (1) apply the "next day" rule under Treasury Regulation Section 1.1502-76(b)(1)(ii)(B) and any analogous provision for state and local income Tax purposes and (2) not make any ratable allocation election under Treasury Regulation Section 1.1502-76(b)(2)(ii) and any analogous provision for state or local income Tax purposes.

(E)     All Tax sharing agreements or similar agreements (excluding any agreement entered into in the ordinary course of business the primary focus of which is not Taxes) and all powers of attorney relating to Taxes, in each case, with respect to or involving the Company Group shall be terminated prior to the Closing and, after the Closing, the Company Group shall not be bound thereby or have any liability thereunder.

(F)     (1) If any Taxing Authority issues to any member of the Company Group, Buyer or any of their respective Affiliates a written notice of its intent to audit, examine or conduct a Proceeding, a written notice of its determination of an objection to an assessment with respect to Pre-Closing Tax Period (a "Tax Claim"), Buyer will give prompt notice to the Equityholder of such Tax Claim following receipt; provided, however, that no delay on the part of Buyer in notifying Equityholder will relieve Equityholder from any obligation under this Section 11, except to the extent such delay actually and materially prejudices the Equityholder.  (2) The Equityholder has the option to control, at its sole cost and expense, any Tax Claim relating a Pre-Closing Tax Period for which it is solely responsible pursuant to this Agreement ("**Equityholder Tax Claim**"), but Buyer shall have the right to participate in Equityholder Tax Claim at its own expense, and the Equityholder shall not settle, compromise and/or concede any portion of Equityholder Tax Claim that is reasonably likely to materially affect the Tax liability of any member of the Company Group for a Post-Closing Tax Period without the consent of Buyer, which consent shall not be unreasonably withheld, delayed or conditioned; provided, that, if the Equityholder declines the option to assume control of the conduct of any Equityholder Tax Claim within a reasonable period following the receipt by the Equityholder of notice of Equityholder Tax Claim, Buyer shall have the right to assume control of Equityholder Tax Claim (at the cost and expense of the Equityholder), but the Equityholder shall have the right to participate at its own expense in Equityholder Tax Claim at its own expense. Buyer will not enter into any settlement of, or otherwise compromise, any Equityholder Tax Claim, without the prior written consent of Equityholder, which consent will not be unreasonably withheld, delayed or conditioned. (3) Equityholder and Buyer shall jointly control and participate in all proceedings taken in connection with any Tax Claim relating to Taxes for which both would be responsible pursuant to this Agreement and shall each bear their own respective costs and expenses.  Neither Equityholder nor Buyer shall settle any such Tax Claim without the prior written consent of the other, which consent will not be unreasonably withheld, delayed or conditioned.   (4) Buyer shall control all other proceedings in respect of Taxes of the Company Group and Equityholder shall have no right to participate in any such proceedings.

(G)     The Equityholder shall be entitled to (i) any Tax refunds that are actually received by the Buyer or any member of the Company Group, and (ii) any amounts credited in lieu of a refund against any Tax to which the Buyer or any member of the Company Group becomes actually entitled to, in each case, that are attributable to Taxes of a member of the Company Group for a Pre-Closing Tax Period for which the Company Group economically borne such Taxes prior to the Closing and for which Equityholder would be responsible for under this Agreement (including any Taxes that result in a deduct to the Purchase Price), or  for which  Equityholder has indemnified the Buyer pursuant to Section 11.2(A)(4) (net of any Tax cost of the Buyer arising as a result thereof and any reasonable "out-of-pocket" cost incurred in preparing any claim for such refund).  The Buyer shall pay over to the Equityholder any such refund or credit, within five (5) days after receipt of such refund or within five (5) days of filing of the Tax Return reflecting such credit, except to the extent that such refund was reflected as an asset in Current Assets, as finally

determined under this Agreement. For avoidance of doubt, any refund of Transfer Taxes shall be allocated between Equityholder and Buyer in accordance with how the parties borne such Taxes under Section 11.6(B).

(H)    The Buyer, Equityholder, and each member of the Company Group agree that (i) the Transaction Tax Deductions shall be reported in a Pre-Closing Tax Period and shall be for the benefit of the Equityholder to the maximum extent allowable under applicable Law and (ii) the taxable period of each Company shall end at the end of the day on the Closing Date for U.S. federal income Tax purposes (and the Buyer shall make any election to include each Company in an affiliated group filing a consolidated U.S. federal income Tax Return as may be necessary to cause such taxable period to end at the end of the day on the Closing Date) and, to the extent permissible under applicable Laws, state and local income Tax purposes.

(I)    The Parties agree to allocate the Aggregate Purchase Price (and all other items required under the Code) among the Equity Interests of each of the Companies and the "Company" (as defined in the Naperville Purchase Agreement) in accordance with Schedule 11.6(I).  Neither Buyer, the Equityholder nor any of their Affiliates shall take any position (whether in Tax audits, or on Tax Returns, if required) that is inconsistent with such allocation. For the purposes of this Agreement, "Aggregate Purchase Price" shall mean the sum of (i) the Purchase Price (as defined herein) and (ii) the "Purchase Price" (as defined in the Naperville Purchase Agreement).

(J)    In the case of any taxable period that includes (but does not end on) the Closing Date (a "**Straddle Period**"), the amount of any Taxes based on or measured by income, withholding, sales, receipts, or payroll of the Company Group for the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the close of business' on the Closing Date and the amount of other Taxes of the Company Group for a Straddle Period that relates to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

## ARTICLE 12.
## MISCELLANEOUS

12.1.    Amendment and Waiver.

This Agreement may be amended and any provision of this Agreement may be waived; provided, that any such amendment or waiver (a) will be binding upon the Equityholder only if such amendment or waiver is set forth in a writing executed by the Equityholder, (b) will be binding upon the Companies only if such amendment or waiver is set forth in a writing executed by the Companies (which will also require the written approval of the Equityholder if such amendment or waiver relates to any post-closing obligations), and (c) will be binding upon Buyer only if such amendment or waiver is set forth in a writing executed by Buyer.  No course of dealing between or among any Persons having any interest in this Agreement will be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any Party under or by reason of this Agreement.

12.2. <u>Notices</u>.

All notices, demands and other communications given or delivered under this Agreement shall be given in writing to the address indicated below (or such other address as the recipient specifies in writing) and will be deemed to have been given when delivered personally, three (3) Business Days after mailed by certified or registered mail, return receipt requested and postage prepaid, or when delivery is guaranteed if sent via a nationally recognized overnight carrier, or when receipt is confirmed if sent via facsimile of email to the recipient with telephonic or email confirmation by the sending party.

To the Equityholder (or, prior to the Closing, to the Companies):

Omar Khan
1650 Highway 6 (# 170)
Sugar Land, Texas 77478
Email: omarkhan9095@yahoo.com

with a copy to (that will not constitute notice):

Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, Michigan 48226
Attention:  Evan Leibhan; Alexander Whang
Fax:  (313) 465-7472; (313) 465-7605
Emails:  eleibhan@honigman.com; awhang@honigman.com

To Buyer (or, after the Closing, to the Companies):

Cinemex USA Real Estate Holdings, Inc.
Av. Javier Barros Sierra No. 540
Torre 1 Piso 2, Col. Santa Fé
C.P. 01210
Mexico City, Mexico
Attn: José Leonardo Marti, Chief Executive Officer
Email: joselm@cinemex.net

with a copy to (that will not constitute notice):

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Attn: Jaime Mercado
Email: jmercado@stblaw.com

Any Party may change the address to which notices or other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

33439967.16

12.3.    Construction; Interpretation.

The term "this Agreement" means this Agreement together with all Schedules and Exhibits hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof. The headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement. The Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Legal Requirement or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document. Further, no party hereto, nor its respective counsel, shall be deemed the drafter of this Agreement for purposes of construing or enforcing the provisions hereof, and all provisions of this Agreement shall be construed according to their fair meaning and not strictly for or against any party, and no presumption or burden of proof will arise favoring or disfavoring any Person by virtue of its authorship of any provision of this Agreement. Unless otherwise expressly provided herein, any statute defined or referred to herein means such statute as from time to time amended, modified or supplemented, including by succession of comparable successor statutes. Any reference to any Legal Requirement shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Unless otherwise indicated to the contrary herein by the context or use thereof: (i) the words, "herein," "hereto," "hereof" and words of similar import refer to this Agreement as a whole, including the Schedules and Exhibits, and not to any particular section, subsection paragraph, subparagraph or clause contained in this Agreement; (ii) masculine gender shall also include the feminine and neutral genders, and vice versa; (iii) words importing the singular shall also include the plural, and vice versa; (iv) the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation"; (v) the words "party" or "parties" shall refer to parties to this Agreement; (vi) all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement; (vii) the words "writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form; (ix) references to any Legal Requirement, agreement or contract are to that Legal Requirement, agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof; (x) references to any Person include the successors and permitted assigns of that Person; (xi) references from or through any date mean, unless otherwise specified, from and including or through and including, respectively; (xii) the words "dollar" or "$" shall mean U.S. dollars; and (xiii) the word "day" means calendar day unless Business Day is expressly specified. If any action under this Agreement is required to be done or taken on a day that is not a Business Day, then such action shall be required to be done or taken not on such day but on the first succeeding Business Day thereafter. As used in this Agreement, the terms "knowledge" or "aware" with respect to one or more members of the Company Group or Equityholder will only include the actual conscious awareness (and shall in no event encompass constructive, imputed or similar concepts of knowledge), without any duty of inquiry, of Omar Khan and Ron Mock.

12.4.    Severability.

Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable Legal Requirement, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Legal Requirement, such

provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

12.5.   Entire Agreement; Assignment.

This Agreement, together with all Exhibits and Schedules hereto, as the same may from time to time be amended, modified, supplemented, or restated in accordance with the terms hereof, (a) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) shall not be assigned by any Party (whether by operation of law or otherwise), other than for collateral purposes, without the prior written consent of the Equityholder and Buyer.  Any attempted assignment of this Agreement not in accordance with the terms of this Section shall be void.

12.6.   Counterparts; Electronic Signatures.

This Agreement may be executed in one or more counterparts, each of which will be deemed an original but all of which taken together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

12.7.   Governing Law; Jurisdiction.

All issues concerning the Transaction Documents (unless otherwise expressly specified in a particular Transaction Document) will be governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of Delaware.  Each Party irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or for recognition and enforcement of any judgment in respect hereof brought by any other party or its successors or assigns may be brought and determined by the State or Federal District Court located in Fort Bend County, Texas, and each Party hereby irrevocably submits to the exclusive jurisdiction of the aforesaid court for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any action, suit or proceeding relating thereto except in such courts).  Each Party further agrees to accept service of process in any manner permitted by such court. Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure lawfully to serve process, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by Law, that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

33439967.16

12.8. <u>Expenses</u>.

Each party will be responsible for all costs and expenses incurred by such party in connection with the negotiation, preparation and entry into this Agreement and the consummation of the Closing. Transaction Expenses are to be paid as provided in this Agreement.

12.9. <u>Parties in Interest</u>.

Except as otherwise expressly provided in this Agreement, nothing in this Agreement is intended to confer on any Person other than the Parties and their respective successors and permitted assigns any rights or remedies under or by virtue of this Agreement.

12.10. <u>Schedules and Exhibits</u>.

All Exhibits and Schedules, or documents expressly incorporated into this Agreement, are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full in this Agreement. Any item disclosed in any Schedule referenced by a particular Section in this Agreement shall be deemed to have been disclosed with respect to every other Section in this Agreement if the relevance of such disclosure to such other sections is reasonably apparent. The specification of any dollar amount in the representations or warranties contained in this Agreement or the inclusion of any specific item in any Schedule is not intended to imply that such amounts, or higher or lower amounts or the items so included or other items, are or are not material, and no party shall use the fact of the setting of such amounts or the inclusion of any such item in any dispute or controversy as to whether any obligation, items or matter not described herein or included in a Schedule is or is not material for purposes of this Agreement. The inclusion of information in any of such Schedules hereto shall not be construed as an admission that such information is material to the Equityholder or any member of the Company Group. In addition, matters reflected in such Schedules are not necessarily limited to matters required by this Agreement to be reflected in such Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Any capitalized term used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning given to such term in this Agreement. The parties hereto acknowledge and agree that any disclosure related to SCG-N Inc., a Texas corporation, set forth in the Schedules will be treated as a disclosure to the representations and warranties set forth in the Naperville Purchase Agreement.

12.11. <u>Remedies</u>.

(A) Subject to the other terms and conditions of this Agreement, any and all remedies provided herein will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy. The Parties agree that irreparable harm, for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the Parties do not perform their respective obligations under the provisions of this Agreement (including failing to take such actions as are required of them hereunder to consummate the transactions contemplated by this Agreement) in accordance with their specific terms or otherwise breach such provisions. It is accordingly agreed that, prior to the valid termination of this Agreement pursuant to Section 9.1 and subject to the other terms and conditions of this

Agreement, the Parties shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including Buyer's obligations to consummate the transactions contemplated by this Agreement if it is required to do so hereunder), in each case without posting a bond or undertaking and without needing to prove damages, this being in addition to any other remedy to which they are entitled at law or in equity. The foregoing right shall include the right of the Equityholder to cause Buyer to cause the transactions contemplated by this Agreement to be consummated, in each case, if the conditions set forth in Section 8.1 have been satisfied or waived (other than conditions which by their nature cannot be satisfied until the Closing, but subject to the satisfaction or waiver of those conditions at the Closing). Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement on the basis that the other parties have an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or equity.

(B)     Following the Closing, except for the right to seek specific performance or injunctive relief, each Party acknowledges and agrees that the remedies set forth in <u>ARTICLE 11</u> shall constitute the sole and exclusive remedies for recovery by any of the Buyer Indemnitees for any claim arising out of or based on this Agreement or any Transaction Documents delivered by the Parties as part of the transactions contemplated hereby and thereby, including claims based upon any breach, inaccuracy, inadequacy or incompleteness of a representation or warranty of any other Party, or based on the failure of such other Party to perform any covenant, agreement or undertaking that the terms hereof or thereof required to be performed by such Party, and none of the Parties shall be entitled to a rescission of this Agreement or any such ancillary document, or to any further indemnification rights or claims or remedies of any nature whatsoever in respect thereof, all of which the Parties hereby waive.

12.12.  <u>Non-Recourse</u>.

All claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement or the other Transaction Documents, or the negotiation, execution or performance of this Agreement or the other Transaction Documents (including any representation or warranty made in or in connection with this Agreement or the other Transaction Documents or as an inducement to enter into this Agreement or the other Transaction Documents), may be made only against the entities that are expressly identified as parties hereto and thereto. No Person who is not a named party to this Agreement or the other Transaction Documents, including any past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or Representative of any named party to this Agreement or the other Transaction Documents ("**<u>Non-Party Affiliates</u>**"), shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any obligations or liabilities arising under, in connection with or related to this Agreement or such other Transaction Document (as the case may be) or for any claim based on, in respect of, or by reason of this Agreement or such other Transaction Document (as the case may be) or the negotiation or execution hereof or thereof; and each party hereto waives and releases all such liabilities, claims and obligations against any such Non-Party Affiliates. Non-Party Affiliates are expressly intended as third party beneficiaries of this provision of this Agreement.

33439967.16

12.13. <u>Waiver of Conflicts and Privileged Information</u>.

(A)     Each Party acknowledges that (a) one or more members of the Company Group, the Equityholder and/or their respective Affiliates have retained Honigman LLP (the "**Law Firm**") to act as their counsel in connection with the transactions contemplated by this Agreement (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the transactions contemplated hereby or thereby) as well as other past and ongoing matters, (b) Law Firm has not acted as counsel for any other Person in connection with the transactions contemplated by this Agreement and (c) no Person other than the Company Group, the Equityholder, or their respective Affiliates has the status of a Law Firm client for conflict of interest or any other purpose as a result thereof.  Buyer hereby (i) waives and will not assert, and will cause each of its Affiliates (including, after the Closing, the each member of the Company Group) to waive and not assert, any conflict of interest relating to Law Firm's representation after the Closing of the Equityholder or their respective Affiliates in any matter involving the transactions contemplated by this Agreement (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the transactions contemplated hereby or thereby), including in any litigation, arbitration, mediation or other proceeding, and (ii) consents to, and will cause each of its Subsidiaries (including, after the Closing, each member of the Company Group) to consent to, any such representation, even though in each case (x) the interests of the Equityholder or such Affiliates may be directly adverse to Buyer, the Company Group or their respective Affiliates, (y) Law Firm may have represented the Equityholder, the Company Group, or their respective Affiliates in a substantially related matter, or (z) Law Firm may be handling other ongoing matters for Buyer, the Company Group or any of their respective Affiliates.

(B)     Buyer agrees that, after the Closing, none of Buyer, any member of the Company Group or any of their Affiliates will have any right to access or control any of Law Firm's records or communications relating to or affecting the transactions contemplated by this Agreement (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the transactions contemplated hereby or thereby), which will be the property of (and be controlled by) the Equityholder.  In addition, Buyer agrees that it would be impractical to remove all Attorney-Client Communications from the records (including e-mails and other electronic files) of the Company Group.  Accordingly, Buyer will not, and will cause each of its Affiliates (including, after the Closing, the Company Group) not to, use any Attorney-Client Communications remaining in the records of the Company Group after the Closing in a manner that may be adverse to the Equityholder or any of their respective direct or indirect equity holders or Affiliates.

(C)     Buyer agrees, on its own behalf and on behalf of its Affiliates (including, after the Closing, the Company Group), that from and after the Closing (a) the attorney-client privilege, all other evidentiary privileges, and the expectation of client confidence as to all Attorney-Client Communications belong to the Equityholder and will not pass to or be claimed by Buyer, any member of the Company Group, or any of their Affiliates, and (b) the Equityholder will have the exclusive right to control, assert or waive the attorney-client privilege, any other evidentiary privilege, and the expectation of client confidence with respect to such Attorney-Client Communications.  Accordingly, Buyer will not, and will cause each of its Affiliates (including, after the Closing, the Company Group) not to, (x) assert any attorney-client privilege, other

evidentiary privilege, or expectation of client confidence with respect to any Attorney-Client Communication, except in the event of a post-Closing dispute with a Person that is not Equityholder or a direct or indirect equity holder or Affiliate thereof; or (y) take any action which could cause any Attorney-Client Communications to cease being a confidential communication or to otherwise lose protection under the attorney-client privilege or any other evidentiary privilege, including waiving such protection in any dispute with a Person that is not Equityholder or any of its direct or indirect equity holders or Affiliates. Furthermore, Buyer agrees, on its own behalf and on behalf of each of its Affiliates (including, after the Closing, the Company Group), that in the event of a dispute between the Equityholder, on the one hand, and any member of the Company Group, on the other hand, arising out of or relating to any matter in which Law Firm jointly represented both parties, neither the attorney-client privilege, the expectation of client confidence, nor any right to any other evidentiary privilege will protect from disclosure to the Equityholder or any of their direct or indirect equity holders or Affiliates any information or documents developed or shared during the course of Law Firm's joint representation.

12.14. <u>Parent Guarantee.</u>

(A)  As a material inducement for the Company Group to enter into this Agreement and the Equityholder to approve this Agreement, Parent hereby (a) absolutely, unconditionally and irrevocably guarantees to the fullest extent possible, as primary obligor and not merely as surety, the due and prompt payment and performance of all covenants, agreements, obligations, expenses and liabilities of Buyer under this Agreement and any other agreement or document executed in connection herewith and (b) Parent shall unconditionally and irrevocably waive (i) any right to revoke this guarantee, in whole or in part (including, without limitation, in respect of any waiver, amendment, assignment or modification of this Agreement authorized by Buyer or its permitted successors or assignees) and (ii) promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, protest or dishonor and any other notice with respect thereto, except to the extent otherwise provided in this Agreement. This guarantee is one of performance and payment, not merely collection, and a separate action or actions may be brought and prosecuted against Parent to enforce this guarantee, irrespective of whether any action is brought against Buyer or whether Buyer is joined in any such action or actions. Subject to the terms of <u>Section 12.14(C)</u>, this guarantee is a continuing one and shall remain in full force and effect until the indefeasible payment and satisfaction in full of Buyer's obligations, shall be binding upon Parent, its successors and assigns, and shall inure to the benefit of, and be enforceable by, the Company Group, the Equityholder and their respective successors and permitted transferees and assigns.

(B)  The representations and warranties set forth in <u>Sections 6.1</u> (substituting the Parent's entity type and jurisdiction of formation and disregarding the last sentence of such representation) through <u>6.8</u> and <u>6.9</u> and <u>6.10</u>, which are incorporated herein by reference mutatis mutandis, are, hereby made by Parent in its individually capacity by substituting the term "Buyer" with "Parent".

(C)  Parent's obligations pursuant to this <u>Section 12.14</u> shall automatically be released and of no further force and effect following the Closing.

*    *    *    *    *

70

## COMPANIES (CONTINUED)

SCG-WR LLC

By:_____

     Name: Omar Khan
     Title: President

SCG-CS INC.

By:_____

     Name: Omar Khan
     Title: President

SCGK INC.

By:_____

     Name: Omar Khan
     Title: President

SCG-SW INC.

By:_____

     Name: Omar Khan
     Title: President

SCG-WL INC.

By:_____

     Name: Omar Khan
     Title: President

## EQUITYHOLDER

_____

Omar Khan

[Signature Page to Equity Purchase Agreement]

**BUYER**

CINEMEX USA REAL ESTATE HOLDINGS,
INC.

By: _____

    Name: JOSE LEONARDO MARTI

    Title: REPRESENTATIVE

**PARENT**

CINEMEX HOLDINGS USA, INC.

By: _____

    Name: JOSE LEONARDO MARTI

    Title: PRESIDENT

[Signature Page to Equity Purchase Agreement]

EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OMAR KHAN, et al. | § | |
| | § | |
| vs. | § | Civil Action No. 4:20-cv-01178 |
| | § | |
| CINEMEX USA REAL ESTATE | § | Hon. Andrew S. Hanen |
| HOLDINGS, INC., et al. | § | |

**<u>MOTION TO DISMISS PLAINTIFFS' VERIFIED ORIGINAL COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUES.................................................................................1

SUMMARY OF THE ARGUMENT ...........................................................................1

STATEMENT OF FACTS ..........................................................................................2

    A.    The Bidding Process ...................................................................2

    B.    The March 2020 Equity Purchase Agreements ......................................3

    C.    The COVID-19 Crisis In The United States And Impact On The Movie Theater Industry ...............................................................................4

    D.    The Status Of The EPA...............................................................6

NATURE AND STAGE OF PROCEEDINGS ...........................................................7

LEGAL STANDARD..................................................................................................8

I.    PLAINTIFFS FAILED TO SATISFY CONDITIONS PRECEDENT TO CLOSING ...............................................................................................8

    A.    Plaintiffs Failed To Provide Reasonable Access To Property And Employees, As Required By Sections 7.2 And 7.9.....................................9

    B.    Plaintiffs Breached Their Obligation To Provide Truthful Representations And Warranties .................................................................12

II.    FRUSTRATION OF PURPOSE AND IMPOSSIBILITY EXCUSE CINEMEX'S PERFORMANCE ..........................................................................15

    A.    The Purpose Of The Agreements Has Been Frustrated By The Closures Of Plaintiffs' Business, And Thus Cinemex Is Not Obligated To Close.................15

    B.    Cinemex Has No Obligation To Close Because Performance Of The Agreements Is Impossible.................................................................18

CONCLUSION.............................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page**

### <u>Cases</u>

*Achaian, Inc. v. Leemon Family LLC*,
    25 A.3d 800 (Del. Ch. 2011) ......................................................................... 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................ 8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................ 8

*Bell Atl. Dir. Servs., Inc. v. Delaware Law Ctr., Inc.*,
    No. CRIM.A.1997-07-083, 2000 WL 33654061 (Del. Com. Pl. Dec. 14, 2000) ............... 18

*Chase Manhattan Bank v. Iridium Africa Corp.*,
    474 F. Supp. 2d 613 (D. Del. 2007) ............................................................... 16, 17

*Cuvillier v. Taylor*,
    503 F.3d 397 (5th Cir. 2007) ........................................................................... 8

*Greek Catholic Congregation of Borough of Olyphant v. Plummer*,
    12 A.2d 435 (Pa. 1940) .................................................................................. 16

*Kroblin Refrigerated Xpress, Inc. v. Pitterich*,
    805 F.2d 96 (3d Cir. 1986) ............................................................................. 17

*Little v. SKF Sverige AB*,
    No. H–13–1760, 2014 WL 710941 (S.D. Tex. Feb. 24, 2014) ............................... 8

*Martin v. Star Publishing Co.*,
    126 A.2d 238 (Del. 1956) ............................................................................... 18

*Mueller v. Marvel*,
    No. 03-07-110, 2004 WL 7325622 (Del. Com. Pl. Dec. 8, 2004) .......................... 18

*Munro v. Beazer Home Corp.*,
    No. CIV. U608-03-081, 2011 WL 2651910 (Del. Com. Pl. June 23, 2011) ............ 8, 10

*Novipax Holdings LLC v. Sealed Air Corp.*,
    No. N17C-03-1682 EMD CCLD, 2017 WL 5713307 (Del. Super. Ct. Nov. 28,
    2017) ........................................................................................................... 10

*R2 Invs. LDC v. Phillips*,
    401 F.3d 638 (5th Cir. 2005) ........................................................................... 8

## TABLE OF AUTHORITIES (CONT'D)

**Page**

### Cases

*Randall D. Wolcott, M.D., P.A. v. Sebelius*,
    635 F.3d 757 (5th Cir. 2011) ........................................................................ 8

*Rhines v. Alinas Constr. Techs., Ltd.*,
    No. C–11–262, 2011 WL 4688706 (S.D. Tex. Oct. 3, 2011) ................................ 2

*Sch. Dist. No. 16 of Sherman Cty. v. Howard*,
    98 N.W. 666 (Neb. 1904) ........................................................................... 16

*Texas Co. v. Hogarth Shipping Corp.*,
    256 U.S. 619 (1921) ................................................................................. 15

*Toscano v. United Parcel Service*,
    No. 4:14-CV-2680, 2015 WL 2089660 (S.D. Tex. Apr. 28, 2015) ........................ 8

*Unihealth v. U.S. Healthcare, Inc.*,
    14 F. Supp. 2d 623 (D.N.J. 1998) ................................................................ 15

*United States ex rel. Lam v. Tenet Healthcare Corp.*,
    481 F. Supp. 2d 673 (W.D. Tex. 2006) .......................................................... 2

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
    872 A.2d 611 (Del. Ch. 2005), *aff'd in part, rev'd in part on other grounds*, 901
    A.2d 106 (Del. 2006) ................................................................................ 15

### Other Authorities

Restatement Contracts § 454 (1932) ........................................................... 18

Restatement (Second) of Contracts § 265 (1981) .......................................... 16

## STATEMENT OF THE ISSUES

1.      Did Plaintiffs fail to state a claim for breach of contract where they failed to provide actual access to their property and employees until the date of closing and failed to truthfully represent that they have authority to operate their business, both of which are conditions precedent to closing?

2.      Did Plaintiffs fail to state a claim for breach of contract where the agreements presume the existence of an available, functioning business that will be sold, and thus the purpose of the agreements has been frustrated and performance is impossible?

## SUMMARY OF THE ARGUMENT

Plaintiffs bring a single claim for breach of contract on the theory that Defendants Cinemex Holdings USA, Inc. ("Cinemex Holdings"), and its parent company, Cinemex USA Real Estate Holdings, Inc. ("Cinemex Real Estate") (together, "Cinemex") cannot rely on the COVID-19 global pandemic to refuse an immediate closing of the sale of Plaintiffs' movie theater business. Yet Plaintiffs themselves rely on the pandemic to excuse their own failures to meet conditions precedent to the closing.  In particular, Plaintiffs were required to provide reasonable access to their properties and employees until closing.  They were also required to represent truthfully that they are authorized to operate their business until closing.  But both of these conditions precedent were not satisfied because governmental orders precluded access to the properties and employees before closing, and Plaintiffs do not have authority to operate their movie theaters.  The agreements do not treat a pandemic as an excuse for the failure to meet these conditions precedent, and there is certainly no basis to imply such an excuse for Plaintiffs while simultaneously refusing to recognize the impact of the pandemic on Cinemex's contractual obligations.  While Plaintiffs rely on the statement in the agreements that a pandemic is not a Material Adverse Effect, the requirement to provide access does not depend on the existence of a Material Adverse Effect.  And

1

while the requirement to provide truthful representations and warranties does mention Material Adverse Effect, it expressly disregards any limitations on Material Adverse Effect, which includes the pandemic limitation. Accordingly, because the conditions precedent to closing have not been satisfied, Cinemex did not breach the contract by refusing to proceed with the closing.

Furthermore, Plaintiffs cannot enforce the agreements based on the doctrines of frustration of purpose and impossibility. The simple fact, apparent from the agreements themselves, is that the parties expected to close the sale of functioning, available movie theaters from Plaintiffs to Cinemex. Whatever the parties thought about the prospect of a pandemic, they plainly did not envision an indefinite, government-enforced shutdown of the theaters that are the very subject of this sale. Thus, Cinemex did not breach the agreements because the shutdown of the movie theaters has frustrated the purpose of the agreements and has rendered several provisions of the agreement impossible.

## STATEMENT OF FACTS

For purposes of this motion to dismiss, we accept the factual allegations of the Complaint as true, and the relevant facts are described below.[1]

### A.   The Bidding Process

On or around December 19, 2019, Cinemex, Delaware corporations that own and operate movie theaters in the United States, received an initial process letter from Star Cinema Grill ("SCG"),[2] a Houston-based dine-in movie theater company owned by Plaintiff Omar Khan

---

[1]  This Court can also take judicial notice of facts not subject to reasonable dispute and matters of public record in the government orders and newspaper articles discussed below. *See, e.g.*, *United States ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006); *Rhines v. Alinas Constr. Techs., Ltd.*, No. C–11–262, 2011 WL 4688706, at *2 n.2 (S.D. Tex. Oct. 3, 2011).

[2]  SCG encompasses the following Plaintiff entities: S.C.G.C. Inc., S.C.G.M. Inc., SCG-B Inc., SCG-VP Inc., District Theaters Inc., SCG-WR LLC, SCG-CS Inc., SCGK Inc., SCG-SW Inc., SCGWL Inc., and SCG-N, Inc.

2

regarding a potential acquisition of SCG.  (Compl. ¶ 20; Ex. B.)  The parties engaged in a bidding process for approximately 10 weeks.  (Compl. ¶¶ 19-25.)

On or around March 3, 2020, Cinemex submitted a formal offer to purchase the 11 movie theaters owned by Mr. Khan ("SCG Theaters") to PJ Solomon, the investment bank hired by Plaintiffs.  (Compl. ¶¶ 19, 24.)  That same day, the parties began negotiating two equity purchase agreements (together, the "EPA").  (Compl. ¶ 24.)

### B.    The March 2020 Equity Purchase Agreements

On March 10, 2020, Cinemex entered into the EPA with SCG.  (Compl. ¶¶ 2, 31; Exs. A, F.)  The EPA related to Cinemex's purchase of the SCG Theaters (the "Transaction").  (Compl. ¶¶ 2, 31.)  Specifically, one Equity Purchase Agreement governs Cinemex USA's agreement to acquire the 10 SCG Theaters located in Texas (nine existing theaters and one currently under construction) and the other Equity Purchase Agreement governs Cinemex USA's agreement to acquire one SCG Theater located in Illinois.  (Compl. Exs. A, F.)

Having agreed to multi-million dollar agreements in a mere week, Cinemex bargained for robust closing conditions that would enable it to inspect the business to ensure that what it was buying was in fact as advertised.  (Compl. ¶ 36; Exs. A, F.)  Indeed, the EPA contains numerous conditions precedent to closing ("Closing Condition(s)").  Those conditions include requirements that (1) SCG grant Cinemex "reasonable access" and the right to inspect "all of the properties, assets, premises, books and records . . . and other documents and data related to" SCG (EPA § 7.2); (2) SCG grant Cinemex "reasonable access" to "each Corporate Employee,"[3] including to permit Cinemex to interview such employees (*id.* § 7.9); (3) SCG's representations and warranties are

---

[3]  The EPA defines "Corporate Employee[s]" to mean those employed by SCG-AH, Inc. (a corporation registered in Texas and based in the Houston area).

true at the time of the closing, including the representation that SCG was authorized to operate its business (*id.* § 5.16(B)); and (4) no "Material Adverse Effect" ("MAE") as defined in the EPA has occurred (*id.* § 8.1(E)).  (Compl. ¶¶ 36; Exs. A, F.)

**C.    The COVID-19 Crisis In The United States And Impact On The Movie Theater Industry**

In the days leading up to March 10, 2020, President Donald Trump repeatedly conveyed to the public that the effects of the COVID-19 outbreak would (and could) be limited.  These included the following statements:  (1) "No, I'm not concerned at all.  No, we've done a great job with it."  (March 7, to reporters);[4] and (2) "[W]e're prepared, and we're doing a great job with it.  And it will go away.  Just stay calm.  It will go away."  (March 10, to reporters following a meeting with Republican U.S. Senators).[5]

Only six days later, on March 16, 2020, the U.S. federal government (led by the Centers for Disease Control) issued a set of guidelines aimed at trying to slow the spread of COVID-19 (the "Spread Guidelines").[6]   The Spread Guidelines include avoiding eating or drinking in restaurants and bars.[7]  That same day, the local governments of the City of Houston and Harris County (which encompasses Houston and its surrounding areas) announced that, as of midnight that day, all bars and nightclubs had to close and restaurants could only offer delivery, take-out or

---

[4]   *See* Katie Rogers, "Trump Now Claims He Always Knew the Coronavirus Would Be a Pandemic," THE NEW YORK TIMES (March 17, 2020), https://www.nytimes.com/2020/03/17/us/politics/trump-coronavirus.html.

[5] *See* Kathryn Watson "A timeline of what Trump has said on coronavirus," CBS NEWS (Apr. 3, 2020), https://www.cbsnews.com/news/timeline-president-donald-trump-changing-statements-on-coronavirus/.

[6] *See* White House Statements & Releases, "The President's Coronavirus Guidelines for America" (Mar. 16, 2020), https://www.whitehouse.gov/briefings-statements/coronavirus-guidelines-america/.

[7] *Id.*

drive-through services.[8]  The next day, March 17, 2020 (at the latest), SCG announced that it would be closing all of the SCG Theaters "in accordance with local government direction and recommendations."[9]

On March 20, 2020, the State of Illinois issued an order directing people to remain in their homes except for "essential" activities, such as to purchase food from the grocery store or seek medical care, effective March 21.[10]  These orders are generally called "stay-at-home," "lockdown," or "shelter-in-place" orders.

On March 23, 2020, Galveston County (which borders Harris County and surrounding areas outside of Houston) issued a stay-at-home order.[11]  On March 24, 2020, the City of Houston, Harris County, and Fort Bend County (which also borders Harris County and encompasses cities outside of Houston) also issued such orders effective at midnight that day.[12]

On March 29, 2020, President Trump extended the Spread Guidelines, which were set to expire on March 31, by another 30 days (*i.e.*, until April 30).[13]  The next day, on March 30, 2020, the Governor of Texas announced that any persons traveling to Texas from other U.S. cities that

---

[8]  *See, e.g.,* KHOU 11, "County bars must close and restaurants now limited to pickup, delivery services" (Mar. 16 & 17, 2020), https://www.khou.com/article/news/coronavirus-update-schools-vaccine-texas-march-16-2020/285-932d74d7-b5f0-4781-9295-b048671ad7aa.

[9]  *See* Paul Takahashi, "Star Cinema Grill to temporarily close as movie theaters feel coronavirus impact," THE HOUSTON CHRONICLE (Mar. 17, 2020), https://www.houstonchronicle.com/business/article/Star-Cinema-Grill-to-temporarily-close-as-movie-15137543.php; Star Cinema Grill, "COVID-19 Update," https://www.starcinemagrill net (pop-up notification appearing on SCG's website).

[10]  Ill. Exec. Order No. 2020-10 (Mar. 20, 2020), *available at* https://www2.illinois.gov/documents/execorders/2020/executiveorder-2020-10.pdf.

[11]  *See, e.g.,* KHOU 11, "These Houston-area counties have issued stay-at-home orders" (Mar. 25 & 27, 2020), https://www.khou.com/article/news/health/coronavirus/coronavirus-texas-counties-stay-at-home-orders/285-c4b0f79b-90ec-48c1-bb84-bf4b9d7cc0d4.

[12]  *Id.*

[13]  *See* White House Press Briefing, "Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing" (Mar. 29, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-14/.

are considered "hot spots" for COVID-19 are required to self-quarantine for a period of 14 days.[14]
These cities include, among others, Chicago and Miami.[15]

      **D.      The Status Of The EPA**

      On March 24, 2020, Cinemex informed Plaintiffs that closing could not proceed because the following conditions had not been satisfied: (1) Cinemex's inspection of, *inter alia*, the SCG Theaters; and (2) Cinemex's ability to meet with Plaintiffs' Corporate Employees, including those managing the SCG Theaters. (Compl. ¶ 45.) Specifically, Cinemex's counsel sent an email to Plaintiffs' counsel explaining that Cinemex could not close because "[a]ttempting to close under these circumstances would imperil Cinemex personnel." (Compl. ¶ 45; Ex. H.)

      On March 26, 2020, Cinemex sent SCG a letter that further explained that two critical terms of the EPA had not been, and could not be, satisfied. (Compl. ¶ 47.) Cinemex reminded SCG that Section 3.1 of the EPA required that closing "shall take place . . . in Houston, Texas" and that a physical closing in Houston was required because Cinemex had not had the opportunity, either before the EPA was signed on March 10 or thereafter, to conduct a detailed inspection of the theaters. Cinemex further pointed out that the sellers could not satisfy the covenant in Section 7.2 of the EPA, requiring them to provide Cinemex with "reasonable access to and the right to inspect all of the properties, assets, [and] premises." (Compl. ¶ 52; Exs. A, F.)

---

[14] *See* Proclamation, Office of the Texas Governor, "Governor Abbott Issues Executive Order Mandating 14-Day Quarantine For Travelers Arriving From CA, LA, WA, Atlanta, Chicago, Detroit, and Miami" (Mar. 30, 2020), https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-mandating-14-day-quarantine-for-travelers-arriving-from-ca-la-wa-atlanta-chicago-detroit-and-miami ("WHEREAS, on March 26, 2020, Executive Order GA-11 imposed *a mandatory self-quarantine of 14 days for air travelers flying to Texas* from certain areas experiencing substantial community spread of COVID-19 . . . I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby add the following states and cities, effective at noon on March 30, 2020, to the list set forth in Executive Order GA-11 [listing California, Louisiana, Chicago and Miami, among others]") (emphasis added).

[15] *Id.*

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs filed the complaint (the "Complaint") on April 2, 2020, asserting a single count: breach of contract against Cinemex. (ECF No. 1.) In its prayer for relief, the Complaint sought (1) an order against Cinemex to specifically perform its obligations under the EPA and proceed to the Closing of the Transaction; (2) preliminary and permanent injunctive relief requiring Cinemex to close the Transaction as set forth in the EPA; (3) an order against Cinemex to pay any additional damages suffered by Plaintiffs as a result of Cinemex's alleged breach of the EPA, in an amount to be determined at trial; (4) an award of costs and attorneys' fees; and (5) other and further relief as the Court deems just and proper. (*Id.* at 20.)

On April 8, 2020, Plaintiffs filed (1) a motion for expedited injunctive relief and specific performance ("Expedited Injunctive Relief Motion") (ECF No. 6); and (2) a motion for accelerated briefing and hearing on the Expedited Injunctive Relief Motion ("Accelerated Briefing and Hearing Motion"). (ECF No. 8.)

On April 10, 2020, Cinemex filed a response to the Accelerated Briefing and Hearing Motion. (ECF No. 10.) On the same day, the Court held a telephonic hearing on the Accelerated Briefing and Hearing Motion, during which the Court granted Plaintiffs' motion in part, setting an accelerated briefing and hearing schedule, but extending the time for Cinemex's response and Plaintiffs' reply and permitting Cinemex an opportunity for a sur-reply. (ECF Nos. 11, 18.) Pursuant to the Court-ordered schedule, Cinemex filed its response to the Expedited Injunctive Relief Motion on April 17, 2020. (ECF No. 26.)

On April 21, 2020, the Court held the second telephonic hearing, the purpose of which was to discuss the forthcoming hearing on the Expedited Injunctive Relief Motion, which is scheduled to start on April 27. (ECF No. 21.)

On April 22, 2020, Plaintiffs filed a reply in support of their Expedited Injunctive Relief Motion. (ECF No. 34.) Cinemex will file its sur-reply on April 24, 2020.

## LEGAL STANDARD

Dismissal for failure to state a claim is appropriate "'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)). "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (internal quotation marks omitted). "[T]he factual allegations must allow for an inference of more than a sheer possibility that a defendant has acted unlawfully." *Little v. SKF Sverige AB*, No. H–13–1760, 2014 WL 710941, at *6 (S.D. Tex. Feb. 24, 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted). "The court should not strain to find inferences favorable to the plaintiffs or accept conclusory allegations, unwarranted deductions, or legal conclusions." *Toscano v. United Parcel Service*, No. 4:14-CV-2680, 2015 WL 2089660, at *1 (S.D. Tex. Apr. 28, 2015) (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005)) (internal quotation marks omitted).

## ARGUMENT

## I.   PLAINTIFFS FAILED TO SATISFY CONDITIONS PRECEDENT TO CLOSING

Under Delaware law, which governs the agreements here, *see* EPA § 12.7, if a condition precedent is not satisfied, then performance under a contract is not required, and there can be no claim for breach of contract. *See, e.g.*, *Munro v. Beazer Home Corp.*, No. CIV. U608-03-081, 2011 WL 2651910, at *5 (Del. Com. Pl. June 23, 2011). Here, Plaintiffs failed to meet the

conditions precedent to (a) provide reasonable access to property and employees, and (b) provide truthful representations and warranties that they are authorized to operate their business.

## A. Plaintiffs Failed To Provide Reasonable Access To Property And Employees, As Required By Sections 7.2 And 7.9

Based on their own allegations, Plaintiffs did not satisfy the conditions precedent that they provide reasonable access to property and employees.  Section 7.2 of the EPA states:  "From the date hereof [March 10, 2020] until the Closing . . . the [Plaintiffs] shall . . . afford [Cinemex] and its counsel, accountants and other authorized agents and representatives (collectively, 'Representatives') reasonable access to and the right to inspect all of the properties, assets, [and] premises . . . ."  EPA § 7.2.  Similarly, Section 7.9 states:  "From and after the date hereof [March 10, 2020] until Closing Date, the [Plaintiffs] shall provide [Cinemex] with reasonable access to each Corporate Employee . . . , and [Cinemex] may conduct interviews and discussions with such Corporate Employees regarding employment with [Cinemex]."  *Id.* § 7.9.  Thus, the EPA is unequivocal in requiring that Plaintiffs provide reasonable access to property and employees.

Cinemex did not have physical access to Plaintiffs' properties, assets, premises, and employees from March 10, 2020 until the closing date, which Plaintiffs allege to be March 26 (or April 10 as to SCG-N).  (Compl. ¶ 44.)  Indeed, physical access was impossible for most of that period (and remains impossible) because government orders shut down the movie theaters and required that all people stay at home for non-essential activities before those closing dates.  *See supra* notes 9, 10.  Plaintiffs do not allege otherwise.  Instead, Plaintiffs allege that Cinemex had physical access for some undefined *portion* of the time between the agreements were signed and the closing dates.  (Compl. ¶ 55); *see also* ECF No. 34 at 7 (arguing that Cinemex could have traveled to Houston on or before March 17, 2020).  However, this access for part of the time does not suffice under the plain language of the agreements.  The EPA requires that Plaintiffs provide

9

access "*until* the Closing," EPA § 7.2 (emphasis added), and "*until* Closing Date," *id.* § 7.9 (emphasis added).  Thus, access must be provided *throughout* the closing period and Plaintiffs did not provide it.[16]

The failure to meet these requirements constitutes a failure to satisfy a condition precedent to closing.  Under Section 8.1 of the agreements:

> The obligation of Buyer to consummate the purchase of the Equity Interests is subject to the satisfaction (or waiver by Buyer) of the following conditions as of the time of the Closing: . . . (B) The [Plaintiffs] will have performed and complied (or shall have cured any non-performance or non-compliance) with all of the covenants and agreements required to be performed by the [Plaintiffs], as the case may be, hereunder or under any of the Transaction Documents at or prior to the Closing."

EPA § 8.1(B).  Because Cinemex's obligation to close is "subject to" the "conditions" in Section 8.1, they are conditions precedent as a matter of law.  *See, e.g.*, *Novipax Holdings LLC v. Sealed Air Corp.*, No.: N17C-03-1682 EMD CCLD, 2017 WL 5713307, at *4 (Del. Super. Ct. Nov. 28, 2017) (interpreting a similar provision as a condition precedent to closing); *Munro*, 2011 WL 2651910, at *5 (noting that even more ambiguous language, like "if" and "provided that," is sufficient to create a condition precedent).  Sections 7.2 and 7.9 are, by their terms, two of the covenants that Plaintiffs were required to perform.  Thus, Cinemex had no contractual duty to consummate the purchase until Plaintiffs comply with (and cure non-compliance with) those requirements, which has not occurred.[17]

---

[16]   To the extent Plaintiffs rely on the word "reasonable" here to justify providing access only during part of the period before closing (ECF No. 34 at 7), this likewise fails because the "reasonable access" must be provided until the closing.  Thus, providing *no* access for much of the time before the closing does not suffice under the EPA.  In addition, while Plaintiffs now argue that Cinemex did not use commercially reasonable best efforts to bring about the closing (*id.* (citing EPA § 8.3)), Plaintiffs made no such allegation in their Complaint.  Indeed, there is no plausible basis to treat as commercially unreasonable Cinemex's demand to inspect the properties to be purchased before closing, and Cinemex's refusal to defy governmental orders to complete that inspection.

[17]   In their reply brief in support of their motion for expedited relief, Plaintiffs argue that the inability to inspect the theaters does not matter because it would not excuse performance (ECF No. 34 at 8), but they cite nothing in the EPA for this proposition because the EPA expressly makes the provision of access a condition precedent to closing.

To the extent Plaintiffs suggest that they did what they could given the limitations caused by the pandemic (Compl. ¶ 56), that argument is irrelevant under the agreements. There is nothing in the agreements to suggest that the failure to meet these conditions precedent is excused if Plaintiffs were not at fault. And unlike other provisions that require only "commercially reasonable efforts" to complete a particular requirement, *see* EPA § 7.1(A), there is no such limitation here; Plaintiffs "shall" provide the required access, *see id.* §§ 7.2, 7.9. Moreover, while the agreements state that a pandemic is not a defined "Material Adverse Effect," *id.* at 9, Section 8.1(B) makes the covenants in Article VII conditions precedent **without** requiring that a Material Adverse Effect also exists. Thus, the parties did not agree or suggest that a pandemic excused failures to meet these conditions precedent.

Plaintiffs' Complaint attempts to excuse their failure on this issue by positing that "reasonable access" does not include physical access. (Compl. ¶ 52.) However, access to property and people necessarily means being in the same place as the property and people. There is no plain meaning of "reasonable access" to properties and individuals such that a party can provide **no access** and instead offer to provide a video as a replacement for such access. And this makes sense because a party obviously would want to see in person the physical thing it is purchasing before completing the purchase. That is especially true here: as discussed *supra* at 3, Cinemex signed the agreements after only one week of negotiation and without inspecting the properties (including a movie theater under construction) only because it bargained for robust closing conditions entitling it to inspect all aspects of the business. A video from someone's smartphone

---

Whether and when closing could occur after the inspection would, of course, depend on what was found during the inspection.

is not what Cinemex bargained for, and it is more than reasonable for Cinemex not to spend $█
million based on a look via someone's camera phone.

Indeed, the EPA specifically refers to access to "premises," and access to premises—*i.e.*,
land and buildings—necessarily means that the party can actually walk onto the premises. Here,
Cinemex could not do so, as they were entitled to under the agreements as a prerequisite to closing.
Simply put, in the absence of a pandemic, there is no doubt that allowing only a video would not
be considered "access" to property and people, and as discussed above, the agreements do not
modify the access requirement for a pandemic.

### B. Plaintiffs Breached Their Obligation To Provide Truthful Representations And Warranties

Plaintiffs failed to satisfy the required conditions precedent for the additional and
independent reason that their representations and warranties were false at the time that closing was
set to occur. Section 5.16(B) states: "To the [Plaintiffs'] knowledge, the [Plaintiffs are] in
possession of, and at all times ha[ve] possession of, and immediately following the Closing will
hold, all . . . authorizations, . . . consents, . . . approvals and orders necessary to . . . operate its
properties, to carry on its Business (collectively, the '**Company Group Permits**')." EPA
§ 5.16(B). Plaintiffs also represented that the Company Group Permits are all "in full force and
effect," that "no event has occurred that . . . would reasonably be expected to result in the
revocation, suspension, lapse or limitation of any Company Group Permit," and that "no member
of the [Plaintiffs] has received any written notice to the contrary." *Id.* Thus, Plaintiffs represented
that they have authorization to operate their business, and that no event has occurred or written
notice received that would change that authorization.

Here, Plaintiffs do not have authorization to carry on their business. As explained *supra*
at 4-5, due to the government shut-down orders, Plaintiffs now cannot by law operate their theaters.

12

And they clearly are aware of the event causing that revocation of authority, and received notice of that revocation. Plaintiffs make no allegation to the contrary.

Moreover, it does not matter that the representations were true at the time they were made. As the EPA states, the "representations and warranties set forth in ARTICLE 4 and ARTICLE 5 will be true and correct . . . *as of the time of the Closing as though then made* (except those representations and warranties that address matters only as of a specified date . . . .)." EPA § 8.1(A)(i) (emphasis added). Since the representations at issue in Section 5.16(b) do *not* claim to address matters only as of a specific date, they therefore must be true and correct as of the closing date. And they were undisputedly not true and correct as of that date.

The falsity of the representations constitutes a failure of a condition precedent to the closing. The EPA states:

> The obligation of Buyer to consummate the purchase of the Equity Interests is subject to the satisfaction (or waiver by Buyer) of the following conditions as of the time of the Closing: (A) . . . (ii) each of the other representations and warranties set forth in ARTICLE 4 and ARTICLE 5 will be true and correct (in each case disregarding any limitations as to materiality or "Material Adverse Effect" therein) as of the time of the Closing as though then made . . . , except . . . where the failure of such representations and warranties to be true and correct would not, in the aggregate, have a Material Adverse Effect . . . .

EPA § 8.1(A)(ii).[18] Thus, under this provision, the truth of the representations and warranties at the time of closing is listed as a "condition[]" precedent to closing. The only exception is where the falsity of the representations and warranties would not have a Material Adverse Effect. Here, there is a Material Adverse Effect because the inability to operate the business constitutes a "change, development, event, occurrence, fact, circumstance or condition, that . . . has or is

---

[18]  Section 8.1(a)(i) refers to designated "Company / Equityholder Fundamental Representations" that are not at issue in this motion to dismiss.

reasonably likely to have (a) a material adverse effect upon the financial condition, business or results of operations of [Cinemex]." *Id.* at 9 (defining Material Adverse Effect).

Plaintiffs' response seems to be that there is no Material Adverse Effect because there is a limitation on Material Adverse Effect for pandemics and matters affecting the U.S. economy or Plaintiffs' industry as a whole. *See* Compl. ¶ 38; ECF No. 34 at 5. However, the limitations on Material Adverse Effect do not apply to representations and warranties. Instead, the EPA states (in language Plaintiffs ignore) that the representations and warranties must be true "***disregarding any limitations*** as to materiality or 'Material Adverse Effect' therein." EPA § 8.1(A)(ii) (emphasis added). Thus, the parties expressly chose not to limit Material Adverse Effect for purposes of treating the truthfulness of the representations as a condition precedent. And disregarding any limitations, there is no question that the falsity of the representations is material and has a Material Adverse Effect.

Furthermore, the limitations on Material Adverse Effect are also inapplicable here because those limitations concern only what can be "taken into account . . . in determining whether a Material Adverse Effect has occurred." EPA at 9. Here, Cinemex is not asking to "take into account" the pandemic or changes to the U.S. economy or the movie theater industry. Rather, Cinemex's argument relies solely on the representation itself that Plaintiffs have authorization to operate their business. The question is whether "the failure of such representations and warranties to be true and correct . . . have a Material Adverse Effect . . . ." EPA § 8.1(A)(ii). And the falsity of the representation that Plaintiffs have authorization to operate their business has a Material Adverse Effect regardless of whether the pandemic (or its effects) separately constitute a Material Adverse Effect. Indeed, any other interpretation would be nonsensical because Section 8.1(E) already makes the lack of any Material Adverse Effect a condition precedent to closing. Thus, for

Section 8.1(A)(ii) to have any meaning, it must be that the truthfulness of a representation itself constitutes a condition precedent even where the reason for its falsity does not separately constitute a Material Adverse Effect. *See Achaian, Inc. v. Leemon Family LLC*, 25 A. 3d 800, 808 n.38 (Del. Ch. 2011) (quotation marks omitted) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court.").

## II.     FRUSTRATION OF PURPOSE AND IMPOSSIBILITY EXCUSE CINEMEX'S PERFORMANCE

Plaintiffs fail to plead that Cinemex breached the EPA because the doctrines of frustration of purpose and impossibility excuse Cinemex's performance under the EPA.

### A.     The Purpose Of The Agreements Has Been Frustrated By The Closures Of Plaintiffs' Business, And Thus Cinemex Is Not Obligated To Close

As reflected in the Complaint and throughout the agreements, the principal purpose of the agreements was for Cinemex to become the owner of 11 *operating* movie theaters. (Compl. ¶ 2.) Less than a week later, however, the government issued unprecedented orders closing movie theaters for an indefinite period of time to attempt to stop the spread of COVID-19, substantially frustrating the principal purpose of the agreements. While frustration of purpose is not applied lightly, *see Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 621 (Del. Ch. 2005), *aff'd in part, rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006), this is the prototypical case for application of the doctrine. Where, as here, an unexpected government order makes a contract valueless or unfair to one party, courts around the country have applied frustration of purpose to excuse performance of an agreement. *See, e.g.*, *Texas Co. v. Hogarth Shipping Corp.*, 256 U.S. 619, 629-30 (1921) (excusing ship owner's performance where its ships were requisitioned for use in the British navy); *Unihealth v. U.S. Healthcare, Inc.*, 14 F. Supp. 2d 623, 635 (D.N.J. 1998) (excusing performance where the government ended its hospital billing system and where the

15

parties should have assumed that the billing rates under the system would fluctuate but not that the system would end); *Sch. Dist. No. 16 of Sherman Cty. v. Howard*, 98 N.W. 666, 666-67 (Neb. 1904) (where school was shut down by Board of Health due to smallpox outbreak, school district was released from paying teacher's wages).

Delaware law follows the general common law definition of this doctrine, such that frustration of purpose exists where there is a "(1) substantial frustration of the principal purpose of the contract; (2) that the nonoccurrence or occurrence of the frustrating event was a basic assumption upon which the contract was made; and (3) no fault on the part of the defendant." *Chase Manhattan Bank v. Iridium Africa Corp.*, 474 F. Supp. 2d 613, 620 (D. Del. 2007); *see also* Restatement (Second) of Contracts § 265, cmt. a (1981) ("First, the purpose that is frustrated must have been a principal purpose of that party in making the contract . . . Second, the frustration must be substantial . . . Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made . . ."). Based on Plaintiffs' own allegations and judicially noticeable facts, all three elements are satisfied here.

*First*, the principal purpose of the agreements has been substantially frustrated. The undisputed purpose of the agreements was to acquire a business, and that business is no longer operating, as the movie theaters have been shut by government order for the past month. "When people enter into a contract which is dependent for the possibility of its performance on the continual availability of a specific thing, and that availability comes to an end by reason of circumstances beyond the control of the parties, the contract is prima facie regarded as dissolved." *Greek Catholic Congregation of Borough of Olyphant v. Plummer*, 12 A.2d 435, 439 (Pa. 1940). There is no question that the purpose of an agreement to sell a functioning business has been substantially frustrated where, as here, the business cannot operate for an indefinite period of time.

16

Notably, Plaintiffs do not dispute this element in their reply in support of their motion for injunctive relief. (ECF No. 34 at 8-11.)

*Second*, the operation of the business was a basic assumption on which the agreements were made. Plaintiffs allege that the parties foresaw the possibility of a pandemic when they signed the agreements on March 10, 2020. (Compl. ¶¶ 37-39.) However, regardless of whether the parties foresaw the possibility of a pandemic, the parties did not foresee the extreme and unprecedented shutdown that has occurred. When the agreements were signed, the government suggested that the effects of the COVID-19 outbreak would (and could) be limited—all of the relevant governmental orders shutting down movie theaters and requiring people to stay at home (aside from essential activities) were issued after the agreements were signed. *See supra* at 4. Moreover, the agreements themselves establish that the parties did ***not*** foresee the possibility of government orders shutting down the U.S. economy and closing all theaters. As discussed above, the agreements presuppose that Cinemex can access the properties until closing, that Plaintiffs would have authority to operate their theaters at the time of closing, and that the closing would occur in Houston. None of these assumptions would make sense if the parties foresaw that the theaters would be closed and travel would be essentially impossible.

*Third*, Cinemex is not at fault for the frustration of purpose. To the extent Plaintiffs contend that Cinemex's refusal to close is through its own fault (Compl. ¶¶ 49-56), even assuming that were true, it is irrelevant on this issue. The question is not generally whether Cinemex is at fault, but whether its fault caused the frustration of purpose. *See, e.g.*, *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 102 (3d Cir. 1986) (cited in *Chase Manhattan Bank*, 474 F. Supp. 2d at 620). And Cinemex is clearly not responsible for government orders shutting down movie theatres, which is the basis for the frustration of the purpose of the agreements.

### B. Cinemex Has No Obligation To Close Because Performance Of The Agreements Is Impossible

Cinemex has no obligation to close because performance of the agreements is impossible due to travel restrictions and stay-at-home orders. Under the doctrine of impossibility, a promisor is released from liability for breach of contract when further performance is impossible. *Martin v. Star Publishing Co.*, 126 A.2d 238, 242 (Del. 1956). "The Restatement defines 'impossibility' as something that is impracticable because of extreme and unreasonable difficulty, expense, injury or loss." *Mueller v. Marvel*, No. 03-07-110, 2004 WL 7325622, at *3 (Del. Com. Pl. Dec. 8, 2004) (citing Restatement Contracts § 454 (1932)) (finding impossibility where a chicken house which was the subject of a lease collapsed because of age, thereby rendering the use of the building by defendant for storage and retrieval of products impossible). "The party must demonstrate that the obligation under the contract cannot be performed by any means." *Bell Atl. Dir. Servs., Inc. v. Delaware Law Ctr., Inc.*, No. CRIM.A.1997-07-083, 2000 WL 33654061, at *1 (Del. Com. Pl. Dec. 14, 2000). The Delaware Supreme Court recognizes cases of "impossibility due to domestic law." *Martin v. Star Publishing Co.*, 126 A.2d 238, 242 (Del. 1956) (citation omitted).[19]

Here, the conditions precedent are impossible to meet. It is impossible for Plaintiffs to satisfy their obligation to provide Cinemex with reasonable access to property and people, as discussed *supra* Part I.A. Moreover, even if Plaintiffs could provide such access, key personnel from Cinemex are located in Miami and cannot get to Houston given the stay-at-home orders in place and the self-quarantine requirement for travelers from Miami. *See supra* at 6. Indeed, impossibility is the only excuse Plaintiffs have for failing to provide the required access,

---

[19] The impossibility must also be "fortuitous" and not the result of the promisor's own volition. *Martin v. Star Publishing Co.*, 126 A.2d 238, 242 (Del. 1956). Impossibility, just like the frustration of purpose, was not foreseeable or the fault of Cinemex. While Plaintiffs suggest that Cinemex did not exercise commercially reasonable efforts to close (ECF No. 34 at 7), the Complaint does not allege (nor could it) that it would be commercially unreasonable to require a closing in the place chosen by the parties in the agreements.

notwithstanding that the parties supposedly anticipated the pandemic.  But if the impossibility of

complying with Plaintiffs' obligations and the unforeseeability of the impediment to compliance is

relevant, then it equally applies to Cinemex's obligations.  Accordingly, because it is impossible

to perform the agreements as written, Cinemex has no obligation to close.

## **CONCLUSION**

For the reasons set forth above, Cinemex respectfully requests that the Court grant this

Motion to Dismiss, and dismiss Count I of the Complaint with prejudice (or, in the alternative,

without prejudice).

Dated:      April 23, 2020                         Respectfully submitted,

/s/ Patricia B. Tomasco
Patricia B. Tomasco (attorney in charge)
Texas State Bar No. (01797600)
Federal ID No. (10521)
Email: pattytomasco@quinnemanuel.com

QUINN, EMANUEL, URQUHART &
SULLIVAN, LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
Telephone:      (713) 221-7010
Facsimile:      (713) 221-7100

/s/ Juan P. Morillo
Juan P. Morillo
*Pro Hac Vice* granted.
Email: juanmorillo@quinnemanuel.com

/s/ Derek L. Shaffer
Derek L. Shaffer
*Pro Hac Vice* granted.
Email: derekshaffer@quinnemanuel.com

/s/ Gabriel F. Soledad
Gabriel F. Soledad
*Pro Hac Vice* granted.
Email: gabrielsoledad@quinnemanuel.com

QUINN, EMANUEL, URQUHART &
SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone:      (202) 538-8000
Facsimile:      (202) 538-8100

*Attorneys for Defendants Cinemex USA Real Estate*
*Holdings, Inc. and Cinemex Holdings USA, Inc.*

## <u>CERTIFICATE OF CONFERENCE</u>

I certify that on April 22, 2020, I conferred with Jeff M. Golub and Nick Gorga, counsel for Plaintiffs, regarding the issues in this motion, and the parties could not agree that the pleading deficiency could be cured in any part by a permissible amendment offered by the pleading party.

/s/ Gabriel F. Soledad
By: Gabriel F. Soledad

## <u>CERTIFICATE OF SERVICE</u>

I certify that this motion has been served on counsel of record by the Court's ECF system on April 23, 2020.

/s/ Juan P. Morillo
By: Juan P. Morillo

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| OMAR KHAN, et al. | § |
| | § |
| vs. | §      Civil Action No. 4:20-cv-01178 |
| | § |
| CINEMEX USA REAL ESTATE | §      Hon. Andrew S. Hanen |
| HOLDINGS, INC., et al. | § |

**APPENDIX TO MOTION TO DISMISS PLAINTIFFS'
VERIFIED ORIGINAL COMPLAINT**

| TABLE OF CONTENTS | |
|---|---|
| **TAB** | **CASE** |
| A-1 | *Achaian, Inc. v. Leemon Family LLC*, 25 A.3d 800 (Del. Ch. 2011) |
| A-2 | *Bell Atl. Dir. Servs., Inc. v. Delaware Law Ctr., Inc.*, No. CRIM.A. 1997-07-083, 2000 WL 33654061 (Del. Com. Pl. Dec. 14, 2000) |
| A-3 | *Greek Catholic Congregation of Borough of Olyphant v. Plummer*, 12 A.2d 435 (Pa. 1940) |
| A-4 | *Little v. SKF Sverige AB*, 2014 WL 710941 (S.D. Tex. Feb. 24, 2014) |
| A-5 | *Martin v. Star Publishing Co.*, 126 A.2d 238 (Del. 1956) |
| A-6 | *Mueller v. Marvel*, No. 03-07-110, 2004 WL 7325622 (Del. Com. Pl. Dec. 8, 2004) |
| A-7 | *Munro v. Beazer Home Corp.*, No. CIV. U608-03-081, 2011 WL 2651910 (Del. Com. Pl. June 23, 2011) |
| A-8 | *Novipax Holdings LLC v. Sealed Air Corp.*, No. N17C-03-1682 EMD CCLD, 2017 WL 5713307 (Del. Super. Ct. Nov. 28, 2017) |
| A-9 | *Rhines v. Alinas Constr. Techs., Ltd.*, No. C–11–262, 2011 WL 4688706 (S.D. Tex. Oct. 3, 2011) |
| A-10 | *Sch. Dist. No. 16 of Sherman Cty. v. Howard*, 98 N.W. 666 (Neb. 1904) |
| A-11 | *Toscano v. United Parcel Service*, No. 4:14-CV-2680, 2015 WL 2089660 (S.D. Tex. Apr. 28, 2015) |
| A-12 | *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611 (Del. Ch. 2005), *aff'd in part, rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006) |

# APPENDIX A-1

25 A.3d 800
Court of Chancery of Delaware.

ACHAIAN, INC., on behalf of itself and
derivatively on behalf of Omniglow, LLC, Plaintiff,
v.
LEEMON FAMILY LLC, and
Ira Leemon, Defendants,
and
Omniglow, LLC, Nominal Defendant.

Civil Action No. 6261–CS.
|
Submitted: May 23, 2011.
|
Decided: Aug. 9, 2011.

**Synopsis**

**Background:** Member of limited liability company (LLC), which had owned 20% interest before buying another member's 30% interest, brought action against member owning a 50% interest, seeking dissolution of LLC on grounds that management was deadlocked 50/50. Defendant member filed motion to dismiss.

**Holdings:** The Court of Chancery, Strine, Chancellor, held that:

where LLC agreement required written consent of existing members in order for a transfer to confer the status of "member" on a person who was not already a member, plaintiff, who was already a member, was entitled to receive other owner's entire 30% ownership interest upon transfer, including voting rights; and

plaintiff stated valid claim for dissolution.

Motion to dismiss denied.

**Procedural Posture(s):** Motion to Dismiss.

**Attorneys and Law Firms**

**\*801** Herbert W. Mondros, Esquire, Stephanie Noble Tickle, Esquire, Margolis Edelstein, Wilmington, Delaware; Steven N. Leitess, Esquire, Gordon S. Young, Esquire,

Leitess Leitess Friedberg + Fedder PC, Baltimore, Maryland, Attorneys for Plaintiff.

William E. Manning, Esquire, James D. Taylor, Jr., Esquire, Charles T. Williams, III, Esquire, Michael J. Farnan, Esquire, Saul Ewing LLP, Wilmington, Delaware, Attorneys for Defendants.

OPINION

STRINE, Chancellor.

*I. Introduction*

Omniglow, LLC is a Delaware limited liability company engaged in the manufacture of chemiluminescent novelty items such as "glowsticks." When it was founded in 2005, Omniglow had a sole "Member," its "Parent" corporation. [1] As part of a planned spin-off in 2006, Parent sold Omniglow to three business entities. That resulted in Omniglow having three Members, [2] each owning the following Membership "Interests": (i) 50% were owned by the defendant Leemon Family LLC, a New York limited liability company controlled by its managing member, the individual defendant Ira Leemon (together, "Leemon"); (ii) 30% were owned by the non-party Randye M. Holland and Stanley M. Holland Trust, a revocable inter vivos trust controlled by non-parties Stanley and Randye Holland as trustees ("Holland"); and (iii) 20% were owned by the plaintiff Achaian, Inc., a Nevada corporation wholly owned by non-party William A. Heriot ("Achaian"). [3]

For two years, Holland and Leemon, together comprising 80% of the Interests, managed Omniglow's business with Achaian taking a passive role as an investor. In 2008, however, Leemon allegedly took sole control of Omniglow over the objection of both Achaian and Holland, and in contravention of Omniglow's "LLC Agreement" that vests managerial authority in the Members in proportion to their respective **\*802** Interests. [4] Holland, fed up with controversy, purported to transfer and assign its entire 30% Interest to Achaian in a January 25, 2010 "Purchase Agreement." [5] Achaian then filed this suit on March 10, 2011, claiming that it and Leemon are now deadlocked, 50/50, as to the management of Omniglow and therefore an order of dissolution is warranted under 6 *Del. C.* § 18–802 because it is no longer "reasonably practicable

to carry on [Omniglow's] business in conformity with [Omniglow's] [LLC] [A]greement." [6] Leemon has moved to dismiss the complaint under Rule 12(b)(6), arguing that Holland's assignment was only effective to give Achaian an additional 30% economic interest in Omniglow. Specifically, Leemon says that in order for Achaian to have received a 30% *Membership* Interest in Omniglow, the LLC Agreement required Leemon's consent to the assignment because, in its view, Achaian was in effect being readmitted as a Member with respect to its newly acquired 30% Interest.

This case therefore presents a single question of law: may one member of a Delaware limited liability company assign its entire membership interest, including that interest's voting rights, to another existing member, notwithstanding the fact that the limited liability company agreement requires the affirmative consent of all of the members upon the admission of a new member, or, must the existing member assignee be readmitted with respect to each additional interest it acquires after its initial admission as a member? In this opinion, I find that, consistent with the Delaware Limited Liability Company Act, an enabling statute whose primary function is to fill gaps, if any, in a limited liability company agreement, the answer to that question depends in the first instance on the specific provisions governing the transferability of Interests in Omniglow's LLC Agreement. When Omniglow's LLC Agreement is read as a whole, as it must be, [7] it allows an existing Member to transfer its entire Membership Interest, including voting rights, to another existing Member without obtaining the other Members' consent. Thus, Holland's assignment of its 30% Interest to an existing Member, Achaian, was effective to vest all of the rights associated with that Interest in Achaian, and Omniglow now has two coequal 50% Members.

## II. *The Relevant Provisions Of The LLC Agreement And The Parties' Competing Interpretations*

This motion presents a discrete question of law. Both parties believe that their dispute must be determined by reference to the terms of the applicable statute, the Delaware Limited Liability Company Act, and Omniglow's LLC Agreement. [8] Neither argues that there is any relevant parol evidence bearing on this dispute, especially because neither Achaian nor Leemon was involved in drafting the original LLC Agreement. [9]

To resolve this dispute, it is useful to start with what is now a mundane notion, which is that under the Act, the parties **\*803** to an LLC agreement have substantial authority to shape their own affairs and that in general, [10] any conflict between the provisions of the Act and an LLC agreement will be resolved in favor of the LLC agreement. [11]

That principle applies here. As Leemon stresses, the default provision of the Act dealing with the transfer of interests in an LLC states:

> A limited liability company interest is assignable in whole or in part except as provided in a limited liability company agreement. The assignee of a member's limited liability company interest shall have no right to participate in the management of the business and affairs of a limited liability company *except as provided in a limited liability company agreement .... Unless otherwise provided in a limited liability company agreement,* [a]n assignment of a limited liability company interest does not entitle the assignee to become or to exercise any rights or powers of a member [and instead only] entitles the assignee to **\*804** share in such profits and losses, to receive such distribution or distributions, and to receive such allocation of income, gain, loss, deduction, or credit or similar item to which the assignor was entitled, to the extent assigned.... [12]

Likewise, the Act provides that an assignee of a limited liability company interest "is admitted as a member of the limited liability company ... as provided in § 18–704(a) of this title [13] and at the time provided in and upon compliance with the limited liability company agreement...." [14]

Thus, it is clear that the default rule under the Act is that an assignment of **\*805** an LLC interest, by itself, does not entitle the assignee to become a member of the LLC; rather,

an assignee only receives the assigning member's economic interest in the LLC to the extent assigned. It is equally clear, however, that the default rule may be displaced by the provisions of an LLC agreement itself and that in the event of a conflict, the LLC agreement prevails. [15]

Here, Omniglow's LLC Agreement does contain specific provisions bearing on Interests in Omniglow and their transferability, namely §§ 7.1 and 7.2. In deciding the legal question surfaced by Leemon's motion to dismiss, [16] therefore, I must first look to those provisions. If the LLC Agreement allowed Holland to transfer and assign the voting power associated with its Membership Interest to Achaian, that ends the matter notwithstanding that the default provisions in the Act, if applicable, might lead to a different result.

For starters, Omniglow's LLC Agreement defines a Member's Interest as meaning "the *entire ownership interest* of the Member in [Omniglow]." [17] Two related sections of the LLC Agreement then deal specifically with the transfer of Interests. The first, § 7.1, allows a Member to transfer all or part of its Interest to any "Person," [18] at any time:

> 7.1. *Transfer of Interest.* [19] *[A] Member may transfer all or any portion of its Interest in [Omniglow] to any Person at any time.* If at any time such a transfer shall cause [Omniglow] to have more than one Member, then this [LLC] Agreement shall be appropriately amended to reflect the fact that [Omniglow] will then be treated as **\*806** a partnership for purposes of the [Internal Revenue Code [of 1986]. [20]

Section 7.1's permissive grant of free transferability, however, is subject to the express restriction contained in § 7.2, which provides:

> 7.2. *Admission of New Members.* *No Person shall be admitted as a Member of [Omniglow]* after the date of this [LLC] Agreement without the written consent of the Member and delivery to [Omniglow] of a written acknowledgement (in form and substance satisfactory to

the Member) of the rights and obligations of this [LLC] Agreement and [an] agreement [to] be bound hereunder. [21]

Certain undisputed facts are also relevant to decide the current motion. The parties agree that each of Leemon, Achaian, and Holland were admitted as Members in 2006. [22] The parties also agree that even though § 7.1 says that the LLC Agreement "shall be appropriately amended" in the event that Omniglow came to have more than one Member, [23] there was never any such amendment. [24] Notably, the parties also agree that despite the failure to amend the LLC Agreement, the reference in § 7.2 to the "written consent of the Member" must be read as now meaning "Members" affording any Member the right to object to the admission of a Person as a new Member. [25]

From these undisputed facts, the key contractual provisions in the LLC Agreement, and the default provisions of the Act, the parties draw starkly different conclusions.

For its part, Leemon argues that none of the provisions in the LLC Agreement clearly reverse the default rule under the Act, which is that "[a]n assignment of a limited liability company interest does not entitle the assignee to become a member or to exercise any rights or powers of a member," and instead only entitles the assignee to the economic interest of the assigning member. [26] Because, in Leemon's view, the LLC Agreement does not plainly provide that the assignee of an Interest will receive the voting rights along with the economic interest, Achaian only received the economic interest associated with Holland's 30% Interest and thus possesses only the original 20% voting power it received from Parent.

Alternatively, Leemon argues that the LLC Agreement itself unambiguously distinguishes between the transferability of a Member's economic interest (i.e., the right to share in Omniglow's profits, losses and other distributions) and that Member's voting rights (i.e., the right to manage). That is, Leemon says that although § 7.1 allows a Member to freely transfer its economic interest in Omniglow, § 7.2 **\*807** makes plain that a Member's voting rights can only be transferred with the express written consent of the existing Members. Were it otherwise, argues Leemon, and a Member was allowed to transfer *both* his economic *and* voting interest

Achaian, Inc. v. Leemon Family LLC, 25 A.3d 800 (2011)

Case 4:20-14695-LMU   Doc 56   Filed 10/22/20   Page 137 of 221
Case 4:20-14695-JMM   Doc 756-1   Filed 04/23/20   in TXSD   Page 6 of 89

under § 7.1 without first obtaining the consent of Omniglow's other Members, § 7.2's prohibition against the admission of a new Member without the written consent of existing Members would be "superfluous." [27] To avoid that result, Leemon says that § 7.2 applies to transfers or assignments of an Interest to existing Members, like Achaian. That is, Leemon suggests that although Achaian was "admitted as a Member" with respect to its original 20% Interest, § 7.2 requires Leemon's written consent in order for Achaian to have been "admitted as a Member" with respect to the additional 30% Interest it acquired from Holland. [28]

Achaian, for its part, admits that if Leemon is correct that the Act's default provisions it cites govern the transfer made by Holland to Achaian in the Purchase Agreement, "it is possible that the Court might find that Achaian did not acquire Holland's voting rights and does not hold a fifty percent full [I]nterest." [29] But, says Achaian, the LLC Agreement's specific provisions bearing on transferability trump the Act's default rules and permitted Holland to assign its voting rights to another existing Member, like Achaian. To that end, Achaian first points to the LLC Agreement's broad definition of Interest, which means "the *entire ownership interest* of the Member in [Omniglow]." [30] Achaian says that because § 7.1 allows a "Member [to] transfer all or any part of its Interest to any Person at any time," Holland was free to transfer its "entire ownership [I]nterest," including that Interest's voting rights, to Achaian in the Purchase Agreement. [31] What's more, says Achaian, § 7.2 is far from superfluous, as Leemon contends. Instead, § 7.2 has an important role to play when a Member wishes to assign his Membership Interest to a "Person" who is not already "admitted as a Member." [32] When a Person is already "admitted as a Member," Achaian says that § 7.2 has no relevance, and a Member need not be readmitted as to each subsequent Interest it acquires. [33]

## III. *Leemon's Motion To Dismiss Is Denied*

For the following reasons, I conclude that Achaian has the better of the argument. When read as a whole, as it must be, [34] the LLC Agreement provides that all of the rights accompanying an Interest—including the voting rights —in Omniglow may be transferred to an already existing Member of Omniglow without the written consent of the other Members. Read in complete context, the LLC Agreement makes Interests in Omniglow freely transferable subject only

to a limited proviso that requires the written consent of the existing Members in order for a transfer to confer the status of Member on a Person, who at the time of the transfer was not already a Member. Because Achaian was already a Member at the time of the Purchase Agreement and nothing in **\*808** the LLC Agreement requires that it be readmitted as a Member with respect to each additional Interest it acquires in Omniglow, it was entitled to receive the "entire ownership interest" owned by Holland, including that Interest's corresponding voting rights. [35]

I now explain that reasoning in more detail.

I start by noting that Achaian places substantial weight on the LLC Agreement's definition of Interest—"the entire ownership interest of the Member in [Omniglow]." [36] Although it might be read as a way to ensure that partial positions can be transferred without saying anything about whether the Interest transferred included voting rights, [37] the fact that § 7.1 already permits a Member to transfer "all or any portion of its Interest" casts doubt on that reading because that reading renders the LLC Agreement's specific definition of Interest unnecessary and superfluous. [38] That is, if "entire," as used to describe the extent of a Member's "ownership interest" in Omniglow serves only to confirm that a Member can, under § 7.1, transfer "all or any portion of its Interest" in the sense that a 60% Member may transfer any percentage up to and including its full 60% Interest, but does not speak at all as to what rights are included in that 60% Interest, the two provisions of the LLC Agreement would in effect be saying the same thing. It is instead preferable to accord the specific definition of Interest in the LLC Agreement independent meaning and significance. [39]

In that vein, given that the term "entire" is used only once in the LLC Act, in a vastly different context, [40] and is not a statutorily defined term, it is also reasonably susceptible to a reading, as Achaian urges, that is consistent with its plain meaning. [41] Under its plain meaning, entire would mean what it ordinarily does, as "[h]aving no part excluded or left out; [the] whole." [42] It is in this sense that Achaian **\*809** claims that "entire" must mean that a Member, like Holland, can transfer under § 7.1 "all or any portion of its Interest," i.e., all or any portion of its "*entire ownership interest ...* in [Omniglow]," [43] including the Member's voting rights. [44] That this is what entire is best read as meaning, however, need not be determined in isolation, and in candor only

Achaian, Inc. v. Leemon Family LLC, 25 A.3d 800 (2011)

Case 20-14695-LMI   Doc 756   Filed 10/22/20   Page 188 of 221
Case 4:20-cv-14695-LMI   Document 756   Filed 04/23/20 in TXSD   Page 7 of 89

becomes clear and unambiguous when read in full contractual context.[45]

To that point, it is only when the second sentence of § 7.1 and § 7.2 are considered that the LLC Agreement's broad definition of Interest emerges as unambiguously including all aspects of Membership in Omniglow, including managerial voting rights. The second sentence of § 7.1 provides that "[i]f at any time *such a transfer shall cause [Omniglow] to have more than one Member,* then this [LLC] Agreement shall be appropriately amended to reflect the fact that [Omniglow] will then be treated as a partnership for purposes of the [Internal Revenue] Code [of 1986]."[46] The second sentence of § 7.1 makes clear that a Member's Interest—i.e., its "entire ownership interest ... in [Omniglow]"[47]—includes every aspect of a Member's Interest, including the portion that confers the status of Member, in whom, under § 4.1 of the LLC Agreement, managerial authority is vested. If it were otherwise, and an Interest in Omniglow represented *only* a Member's economic interest, as Leemon argues, the second sentence of § 7.1 would seem to be unnecessary because in that case, an existing Member could not transfer or assign the voting rights included in its Interest to another Person such that as a result of such transfer or assignment, that Person could become a Member. In light of well settled principles of contract interpretation in Delaware,[48] the reading proffered by Leemon would tend to render the second sentence of § 7.1, to phrase it in a word favored by Leemon, superfluous.

Of course, the fact that § 7.1 seems to permit the free transfer of the entire Interest, including that Interest's associated voting rights, does not end the inquiry. Instead, I must look at what effect the section of the LLC Agreement addressing the admission of Members has, keeping in mind that the Act affords maximum contractual flexibility to provide in an LLC agreement the precise mechanism by which an assignee of a limited liability company interest may become a member.[49] As § 7.2 of the LLC Agreement provides in this case, "*[n]o Person shall be admitted as a Member of* [Omniglow] ... without the written consent of the Member[s]...."[50] As noted, Leemon does not contest the fact that Achaian, like Leemon, was admitted as a Member of Omniglow when Parent assigned and sold all of Omniglow's Interests to Leemon, Holland, and Achaian in 2006.[51] Instead, Leemon focuses on the specific 30% Interest that was transferred to Achaian under the Purchase **\*810** Agreement and argues that "Achaian has not been admitted as a substituted

[M]ember with respect to the 30% Interest, as provided by Section 7.2 of the LLC Agreement."[52]

But nothing in the text of § 7.2 suggests that once a Person has been admitted as a Member, she must be admitted again in order to acquire additional voting rights when she acquires additional Interests in Omniglow. The reason for § 7.2's check on § 7.1's free grant of transferability is most naturally read as a manifestation of the unremarkable idea that one gets to choose one's own business partners (or in the case of an LLC, one's co-members).[53] Leemon's argument relies on a very thinly sliced version of that, which is that once one chooses his initial co-members, one continues to hold a veto over how much additional voting power they may acquire. That is a strained extension of the traditional idea underlying partnerships and limited liability companies, and is not supported rationally by the LLC Agreement's text or by the context.

As it was, Leemon had already agreed in 2006 to become partners (or more properly, co-members) with Achaian and Holland in Omniglow's business. Thus, Leemon, as a 50% Interest holder, knew that Achaian and Holland could have voted together at any time to stymie Leemon from acting unilaterally. Leemon responds, however, that the LLC Agreement makes sure that if Holland and Achaian agreed to a transfer, in whatever direction, that vested all the voting power in one of them, the transferee had to be admitted as a Member for a second time—the first time being in 2006 when Parent sold its Interests to both Achaian, Holland and Leemon and approved their Membership.

The problem for Leemon is that nothing in the LLC Agreement supports Leemon's reading of it that would require an already admitted Member, like Achaian, to be become once, twice (or even three times) a Member each and every time that Member acquires an additional block of Interests.[54] By its plain terms, § 7.2 is directed at, and applies only to, a "*Person*" who is not yet "admitted as a Member."[55] Because Achaian **\*811** was already admitted as a Member at the time of Holland's 2010 transfer, § 7.2 has no application.[56] Nor has Leemon cited anything in the LLC Act, the Uniform LLC Act, or learned commentaries and treatises on alternative entities suggesting that such a serial admission scheme is standard practice. To the contrary, the Delaware LLC Act seems to contemplate a singular admission governed by the specific terms of the LLC agreement, providing that "[a]n assignee of a limited liability company interest *may become*

*a member ... as provided in the limited liability company agreement.*[57] To that point, Leemon's argument conflicts with the LLC Agreement's definition of a Member's Interest in Omniglow. That is, if § 7.2 requires, as Leemon argues, that Achaian be admitted as two Members, one with respect to each block of Interests it owns, the LLC Agreement's definition of Interest—"the *entire* ownership interest of *the Member* in [Omniglow]"—would make scant sense because in that case, a Member's Interest would not be its entire ownership interest in Omniglow, but, as in the case of Achaian, only a portion of it, the other portion also being owned by Achaian, albeit a "different" Achaian for purposes of Membership in Omniglow.

On the basis of the foregoing, I conclude that under the terms of the LLC Agreement, Holland was permitted, and did, transfer its entire 30% Interest to Achaian, including that Interest's voting rights. Thus, Achaian is entitled to the declaratory **\*812** judgment it seeks, namely that Omniglow currently has two Members[58]—Leemon and Achaian—each holding an identical 50% Membership Interest. The sole remaining issue is therefore whether Achaian has pled facts sufficient to support its application for judicial dissolution under 6 Del. C. § 18–802.

This court, when considering an application for judicial dissolution of an LLC with two coequal managers, has on several prior occasions analogized the situation to an application made under 8 *Del. C.* § 273 for a judicial dissolution of a joint venture corporation.[59] Thus, in order for a plaintiff seeking judicial dissolution to survive a motion to dismiss, the plaintiff must plead the recognized "three prerequisites for a judicial order of dissolution [under § 273]: 1) the corporation must have two 50% stockholders, 2) those stockholders must be engaged in a joint venture, and 3) they must be unable to agree upon whether to discontinue the business or how to dispose of its assets."[60] Achaian has met its pleading burden.

First, as Achaian pleads, I have now found that Omniglow has two coequal 50% Interest owners, each with an equivalent corresponding 50% right to manage Omniglow.[61]

Second, Achaian adequately pleads that the two Members are engaged in a joint venture, Omniglow. Although Leemon argues in its briefs that Achaian purchased Holland's 30% Interest in an effort to purchase a "phony deadlock,"[62] such extra-pleading factual contentions about Achaian's motivations, even if relevant, are inappropriate considerations at this procedural stage.[63]

Lastly, Achaian alleges that it and Leemon have been unable to agree on the management of Omniglow, and the LLC Agreement does not provide a "reasonable exit mechanism" or other provision to break the deadlock.[64] In fact, Achaian alleges that since wresting control of Omniglow in 2008, over the objection of both Achaian and Holland, Leemon has managed **\*813** Omniglow to the exclusion of both Achaian and Holland, who together at all relevant times represented 50% of Omniglow's Membership Interests.[65]

Thus, Achaian has pled facts sufficient to give rise to the inference that the management of Omniglow is deadlocked, and I therefore deny Leemon's motion to dismiss.

### IV. *Conclusion*

For the foregoing reasons, I grant Achaian's request for declaratory judgment. Leemon's motion to dismiss is DENIED. IT IS SO ORDERED.

**All Citations**

25 A.3d 800

## Footnotes

1    The Parent was Omniglow Corporation. Compl. ¶ 5.
2    In carrying out the sale, Parent waived the provision in Omniglow's limited liability company agreement, to be discussed below, that bars the admission of a new Member absent the written consent of the "Member," which at the time was just Parent. Compl. Ex. A ("Distribution and Assignment of Membership Interest" (January 26, 2006)) at 1.

Achaian, Inc. v. Leemon Family LLC, 25 A.3d 800 (2011)

Case 4:20-cv-14695-LVM Doc 756 Filed 10/22/20 Page 140 of 221
Case 4:20-bk-14695-LVM Doc 57 Filed 04/23/20 Ex. SED Page 9 of 89

3    *Id.* Although some of the actions alleged to have been taken were taken by individuals, for the sake of simplicity I group the individuals with their respective controlled entities.

4    Compl. Ex. A ("Limited Liability Company Agreement of ROG, LLC" (October 26, 2005)) § 4.1 ("LLC Agreement"). Omniglow's original name was ROG, LLC. Compl. ¶ 8.

5    Compl. Ex. B ("Membership Interest Purchase Agreement and Mutual Release" (January 25, 2010)) ("Purchase Agreement").

6    6 *Del. C.* § 18–802.

7    *Kuhn Const., Inc. v. Diamond State Port Corp.,* 990 A.2d 393, 396–97 (Del.2010) ("We will read a contract as a whole and we will give each provision and term effect....").

8    Tr. at 3 (Counsel for Leemon); *id.* at 18 (Counsel for Achaian).

9    Compl. ¶ 6.

10   *See Elf Atochem N. Am., Inc. v. Jaffari,* 727 A.2d 286, 290 (Del.1999) (quoting JAMES D. COX ET AL., CORPORATIONS § 1.12 at 1.37–.38 (1999)) ("The Act can be characterized as a 'flexible statute' because it generally permits members to engage in private ordering [in the LLC agreement] with substantial freedom of contract to govern their relationship, provided they do not contravene any mandatory provisions of the Act."); *see also* 2 R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS § 20.3 at 20–3 (2009) ("BALOTTI & FINKELSTEIN") ("The Act's basic approach ... [is] to furnish answers only in situations in which the members have not made provision in their limited liability company agreement."); ROBERT L. SYMONDS, JR. & MATTHEW J. O'TOOLE, SYMONDS & O'TOOLE ON DELAWARE LIMITED LIABILITY COMPANIES § 1.03[A][2] at 1–15 (2007) ("SYMONDS & O'TOOLE") ("As a safeguard to its essentially contract-based approach, the [Act] sets forth a number of default rules' ... [that] cover a variety of potential omissions in the limited liability company agreement."). Because "the LLC Act was based upon the Delaware Revised Uniform Limited Partnership Act ... [and] [o]verarching principles reflected in both of the statutes are, in many material respects, identical," "it is logical to conclude that, except where an analogy fails due to a fundamental difference between a Delaware limited partnership and an LLC ..., authorities decided under the [Limited Partnership] Act should be relevant in interpreting the LLC Act and in dealing with issues relating to LLCs." MARTIN I. LUBAROFF & PAUL M. ALTMAN, DELAWARE LIMITED PARTNERSHIPS § 13.1.2 at 13–2 (2010) ( "LUBAROFF & ALTMAN"); 2 BALOTTI & FINKELSTEIN §§ 20.1, 20.3 at 20–2, 20–3; *see also Elf,* 727 A.2d at 290–91 (observing that because "[t]he Delaware [LLC] Act has been modeled on the popular Delaware LP Act [,] ... its architecture and much of its wording is almost identical to that of the Delaware LP Act," and that as a result "observation[s] relating to limited partnerships appl[y] as well to limited liability companies...."). Like the LLC Act, the LP Act is an enabling statute whose default rules are designed to fill gaps in the limited partnership agreement. LUBAROFF & ALTMAN § 1.2 at 1–3 ("The [Limited Partnership] Act's basic approach is to permit partners to have the broadest possible discretion in drafting their partnership agreements and to furnish answers only in situations where the partners have not expressly made provision in their partnership agreement.") (citing various provisions of the Act).

11   *See* SYMONDS & O'TOOLE § 1.03[A][2] at 1–15 ("[e]ach default rule [in the Act] is a statutory provision that governs *only in the absence of an agreement among the members covering the particular point.* If the limited liability company agreement provides otherwise regarding the relevant subject matter, *the statutory provision does not control.*") (emphasis added); 2 BALOTTI & FINKELSTEIN § 20.3 at 20–3 ("Many of the Act's most fundamental provisions are expressly made subject to modification in a limited liability company agreement.") (citing various provisions of the Act); LUBAROFF & ALTMAN § 13.1.2 at 13–2 ("[The Act] expressly recognizes that provisions of [the Act] are subject to modification in ... a limited liability company agreement. In doing so, [the Act] use[s] the ... formulation of 'unless otherwise provided in a limited liability company agreement'....").

12   6 *Del. C.* § 18–702(a), (b)(2) (emphasis added).

13   6 *Del. C.* § 18–704(a) provides that an assignee of a limited liability company interest "may become a member ... [a]s provided in the limited liability company agreement; *or [u]nless otherwise provided in the*

Achaian, Inc. v. Leemon Family LLC, 25 A.3d 800 (2011)

Case 4:20-cv-01878-DMR Doc 7-56 Filed 10/22/20 Page 141 of 221
Case 4:20-cv-14695-LMJ Doc 7-56 Filed on 04/23/20 in TXSD Page 10 of 89

*limited liability company agreement,* upon the affirmative vote or written consent of all of the members of the limited liability company." (emphasis added).

14    6 *Del. C.* § 18–301(b)(2). There are likely two motivations for the statutory default rules in §§ 18–702, 18–704(a), and 18–301 concerning the assignment of a limited liability company interest and the assignee's possible (and subsequent) admission as a member of the LLC. The first is tax-related. *See generally* Daniel S. Kleinberger, *Two Decades of "Alternative Entities": From Tax Rationalization Through Alphabet Soup To Contract As Deity,* 14 FORDHAM J. CORP. & FIN. L. 445, 447–54 (2009) (observing that the emergence of LLCs and statutory rules, sometimes mandatory, that prevented the free alienability of LLC interests was part of states' early attempts "to create an entity that, as a matter of tax law, is classified as a partnership with each owner treated as a partner, but whose owners are shielded by state law from automatic personal liability," and that such default statutory rules have now been rendered largely unnecessary after the United States Treasury Department adopted the "check-the-box" federal income tax classification regime in 1997, under which an unincorporated entity, like a limited liability company, "is taxed as a partnership if it has two or more owners, or is disregarded for income tax purposes if it has one owner—unless it elects to be taxed as a corporation by 'checking the box.' "); *see also Elf,* 727 A.2d at 286 ("The wording and architecture of the Act is ... designed to achieve what is seemingly a simple concept—to permit persons or entities ('members') to join together in an environment of private ordering to form and operate the enterprise under an LLC agreement with tax benefits akin to a partnership and limited liability akin to the corporate form."); LARRY E. RIBSTEIN AND ROBERT R. KEATINGE, RIBSTEIN AND KEATINGE ON LIMITED LIABILITY COMPANIES § 7:4 (2011) ("RIBSTEIN & KEATINGE") (observing that "[m]andatory provisions [in LLC statutes] are no longer necessary to ensure that the firm will lack the corporate tax characteristic of free transferability in light of the recent elimination of these classification features in the 'check-the-box' tax classification rule," but noting that "while more LLCs may come to adopt corporate-type transferability, it seems unlikely that LLC statutes will eliminate restrictions on transfer of management rights *as a default rule* given the closely held nature of most LLCs.") (emphasis added). Omniglow's LLC Agreement itself recognizes the desirability of partnership tax treatment. *E.g.,* LLC Agreement § 7.1 ("If at any time [a transfer of an Interest] shall cause the Company to have more than one Member, then this Agreement shall be appropriately amended to reflect the fact that [Omniglow] will then be treated as a partnership for purposes of the [Internal Revenue] Code [of 1986]."). The second reason for the default rules in the Act regarding the transferability of interests may rest on the notion that one generally is entitled to select his own business associates in a closely held enterprise, like an LLC. *E.g.,* 68 C.J.S. *Partnership* § 1 (2011) ("A 'partnership' has been defined as a contractual relationship or a *voluntary association of two or more competent persons* to place their money, effects, labor, and skill or some or all of them in lawful commerce or business ....") (emphasis added); 46 AM.JUR.2D § 1 (2011) ("[A] joint venture is an association of persons *with the intent* ... to engage in and carry out a single business venture for joint profit."); *cf. Milford Power Co., LLC v. PDC Milford Power, LLC,* 866 A.2d 738, 760 (Del.Ch.2004) (observing that the LLC Act's default rules that draw a distinction between an LLC member's economic rights which are freely transferable and those aspects of membership, such as managerial rights, which are not freely transferable, "recognize[ ] that it is far more tolerable to have to suffer a new passive co-investor one did not choose than to endure a new co-manager without consent."); *Elf,* 727 A.2d at 286.

15    *Elf,* 727 A.2d at 291; 2 BALOTTI & FINKELSTEIN § 20.3 at 20–3; SYMONDS & O'TOOLE § 1.03[A][2] at 1–15; LUBAROFF & ALTMAN §§ 1.2 at 1–3, 13.12 at 13–2; *see also Arvida/JMB Partners, L.P. v. Vanderbilt Income and Growth Assocs., L.L.C.,* 1997 WL 294440, at *2 (Del.Ch. May 23, 1997) (noting that where the limited partnership agreement speaks to the issue of whether an assignment of an interest confers a voting interest in a limited partnership, the limited partnership agreement's unambiguous provisions control); *Monterey Investments, Inc. v. HealthCare Properties, L.P.,* 1997 WL 367038, at *1 (Del.Ch. June 26, 1997) ("I conclude that when the limited partnership agreement clearly distinguishes between, and delineates the requirements and procedures for, limited partner status as opposed to unit holder status, ... the status of the purchaser will be determined by the limited partnership agreement.").

Achaian, Inc. v. Leemon Family LLC, 25 A.3d 800 (2011)

Case 4:20-cv-01478-DLMI Doc 756 Filed 10/22/20 Page 142 of 221
Case 20-14695-LMI Document 877-1 Filed on 04/23/20 in TXSD Page 11 of 89

16    *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992) (citing *Aetna Cas. and Sur. Co. v. Kenner,* 570 A.2d 1172, 1174 (Del.1990)) ("The proper construction of any contract ... is purely a question of law."); *Allied Capital Corp. v. GC–Sun Holdings, L.P.,* 910 A.2d 1020, 1030 (Del.Ch.2006) (observing that because issues of contractual interpretation are questions of law, "a motion to dismiss is a proper framework for determining the meaning of contract language.").

17    LLC Agreement art. I (emphasis added).

18    The LLC Agreement defines "Person" as meaning "any natural person, partnership, joint venture, association, corporation, limited liability company, trust or other entity." *Id.*

19    "The titles of the Articles and the headings of the Sections of this [LLC] Agreement are for convenience of reference only, and are not to be considered in constructing the terms and provisions of this [LLC] Agreement." LLC Agreement § 10.5.

20    LLC Agreement § 7.1 (italicized emphasis added).

21    *Id.* § 7.2 (italicized emphasis added).

22    Tr. at 4 (Counsel for Leemon); Def. Op. Br. at 4; Tr. at 25 (Counsel for Achaian).

23    LLC Agreement § 7.1.

24    *Achaian, Inc. v. Leemon Family, LLC,* C.A. No. 6261–CS, at 11, 13, 14, 21 (Del. Ch. Mar. 28, 2011) (TRANSCRIPT) (Counsel for Leemon, Achaian); *see also* Compl. ¶ 8 ("The LLC Agreement was not, and has not been, amended.").

25    *Achaian, Inc. v. Leemon Family, LLC,* C.A. No. 6261–CS, at 11, 13, 14, 21 (Del. Ch. Mar. 28, 2011) (TRANSCRIPT) (Counsel for Leemon, Achaian); *see also* Compl. ¶ 8.

26    Def. Op. Br. at 9 (quoting 6 Del. C. § 18–702(b); citing *Lusk v. Elliott,* 1999 WL 644739, at *2 (Del.Ch. Aug. 13, 1999)).

27    *Id.* at 10.

28    *Id.* at 10–11.

29    Pl. Ans. Br. at 21 n. 9.

30    *Id.* at 20 (quoting LLC Agreement art. I) (emphasis added).

31    *Id.* at 18 (quoting LLC Agreement § 7.1).

32    LLC Agreement § 7.2.

33    Pl. Ans. Br. at 19–20.

34    *Kuhn,* 990 A.2d at 396–97.

35    LLC Agreement art. I.

36    *Id.*

37    In fact, that reading is buttressed by a default provision of the Act, 6 *Del. C.* § 18–702(a), which provides that "[a] limited liability company interest is assignable *in whole or in part* except as provided in a limited liability company agreement," but as noted, goes on to provide that unless the limited liability company agreement provides otherwise, such an assignment shall not include "the right to participate in the management of the [LLC's] business...." 6 Del. C. § 18–702(a) (emphasis added).

38    *NAMA Holdings, LLC v. World Market Ctr. Venture, LLC,* 948 A.2d 411, 419 (Del.Ch.2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court.") (citing *Majkowski v. Am. Imaging Mgmt. Serv.,* 913 A.2d 572, 588 (Del.Ch.2006)).

39    *Id.*

40    The only time the word "entire" or any form of it is found in the Act is in the section dealing with corrections to an LLC certificate of formation. 6 Del. C. § 18–211 ("The corrected certificate shall be specifically designated as such in its heading, shall specify the inaccuracy or defect to be corrected and shall set forth the *entire* certificate in corrected form.") (emphasis added).

41    *See, e.g., Lorillard Tobacco Co. v. Am. Legacy Found.,* 903 A.2d 728, 738 (Del.2006) ("Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.") (citations omitted).

42   THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 597 (4th ed. 2000); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 758 (G. & C. Merriam Company 1976) (defining entire to mean "with no element or part excepted: whole, complete...."); BLACK'S LAW DICTIONARY 477 (5th ed. 1979) (defining entire to mean "[w]hole; without division, separation, or diminution; unmingled; complete in all its parts....").

43   LLC Agreement art. I (emphasis added).

44   Pl. Ans. Br. at 20, 21, 24, 28.

45   *Kuhn,* 990 A.2d at 396–97.

46   LLC Agreement § 7.1 (emphasis added).

47   *Id.* art. I.

48   *Osborn ex rel. Osborn v. Kemp,* 991 A.2d 1153, 1159 (Del.2010) ( "We will not read a contract to render a provision or term 'meaningless or illusory.' ") (citations omitted).

49   6 Del. C. § 18–704(a)(1).

50   LLC Agreement § 7.2 (emphasis added).

51   *Achaian, Inc. v. Leemon Family, LLC,* C.A. No. 6261–CS, at 21 (Del. Ch. Mar. 28, 2011) (TRANSCRIPT) (Counsel for Leemon).

52   Def. Op. Br. at 11.

53   68 C.J.S. *Partnership* § 1 (2011); 46 AM.JUR.2D § 1 (2011); *cf. Milford Power Co.,* 866 A.2d at 760; *Elf,* 727 A.2d at 286.

54   *See* COMMODORES, *Three Times a Lady, on* NATURAL HIGH (Motown Records 1978) ("You're once, twice, three times a lady/And I love you....").

55   LLC Agreement § 7.2 (emphasis added). This is in stark contrast to the provisions of a materially different LLC agreement considered in a case cited by Leemon from outside this jurisdiction, *Ault v. Brady,* 37 Fed.Appx. 222 (8th Cir.2002) (applying Arkansas law). Importantly, unlike § 7.2 that expressly cabins its reach to "Persons" who are not "admitted as a Member," the applicable provision in the *Ault* case provided a blanket restriction on the transfer of a membership interest's attendant voting rights:

> *No member* shall sell, assign, transfer, pledge or encumber any interest in the Company without the prior written consent of the Manager and the other Members. *Any person* acquiring rights with respect to any interest in the Company ... *shall not be deemed a substituted Member* and shall be restricted to the right to receive any distributions made with respect to such interest. *Ault,* 37 Fed.Appx. at 225 (emphasis added). In holding that an already existing member received only the economic interest associated with the transferred interest, the Eighth Circuit observed that the above-quoted provision, unlike § 7.2 of the LLC Agreement at issue in this case, "does not expressly limit transfers covered by the provision to only non-member transfer[ees]. Instead, [it] states that *no* transfers shall be made without the consent of the members regardless of to whom the transfer is made, [and that the clause] applies to 'any person' acquiring rights, which clearly would include members and non-members alike." *Id.* (emphasis in original). Thus, *Ault* is of no relevance to this case other than for the proposition, implicitly recognized by the Eighth Circuit, that the precise provisions of a given limited liability company agreement control the question of what interests a member can transfer.

56   That § 7.2's restriction on transferability applies only to a Person who is not yet admitted as a Member does not, contrary to Leemon's argument, render § 7.2 superfluous. For instance, § 7.2's written consent requirement would clearly apply to the counterfactual situation in which Holland, instead of assigning its 30% Interest to Achaian (an existing Member), assigned that Interest to a non-Member. In the case where Holland assigned its Interest to the non-Member, § 7.2 would require both Leemon and Achaian's written consent as Members.

57   6 *Del. C.* § 18–704(a)(1) (emphasis added); *see also* 6 *Del. C.* § 18–301(b)(2) ("After the formation of a limited liability company, *a person is admitted as a member* of the limited liability company ... [i]n the case of an assignee of a limited liability company interest, as provided in § 18–704(a) of this title and *at the time provided in and upon compliance with the limited liability company agreement* ....") (emphasis added). The

Achaian, Inc. v. Leemon Family LLC, 25 A.3d 800 (2011)

Case 4:20-cv-01178-DMR  Document 8-11  Filed on 04/23/20 in TXSD  Page 13 of 89
Case 20-14695-LMI  Doc 756  Filed 10/22/20  Page 144 of 221

Uniform LLC Act and the Revised Uniform LLC Act are similarly focused on the specific terms of the LLC agreement. *See* RIBSTEIN & KEATINGE § 7:4 (citing REVISED UNIFORM LIMITED LIABILITY COMPANY ACT § 401 (2006)) (observing, under the Revised Uniform LLC Act, that "[a]fter formation of the LLC a person becomes a member *as provided in the operating agreement.* ...") (emphasis added); *see also* UNIFORM LIMITED LIABILITY COMPANY ACT § 503 (1995) ("A transferee of a distributional interest may become a member of a limited liability company if and to the extent that the transferor gives the transferee the right *in accordance with authority described in the operating agreement* or all other members consent.") (emphasis added). Thus, Leemon's citation in its briefs to a case interpreting a materially different provision in a different LLC agreement is unconvincing. *See Rowe v. Voyager Hospicecare Holdings LLC,* 2010 WL 2502878, at *5 (Kan.Ct.App. June 18, 2010) (applying Delaware law) (holding, on the basis of a provision in an LLC agreement that provided that "[a]n assignee of any Units or other interests in the Company of a Member ... shall become a substituted Member ... *if and only if* the assignor gives the assignee such right *and the Board has granted its prior written consent to such assignment* ...," that absent the Board's consent, the assignee did not become a Member, but instead only received the Units' corresponding economic interest) (emphasis added).

58   Holland, upon the execution of the Purchase Agreement, ceased to be a Member of Omniglow. *See* 6 *Del. C.* § 18–702(b)(3) ("Unless otherwise provided in a limited liability company agreement: *[a] member ceases to be a member* and to have the power to exercise any rights or powers of a member *upon assignment of all of the member's limited liability company interest.*") (emphasis added).

59   *See, e.g., Vila v. BVWebTies,* 2010 WL 3866098, at *7 (Del.Ch. Oct.1, 2010); *Haley v. Talcott,* 864 A.2d 86, 94 (Del.Ch.2004) (analogizing to 8 *Del. C.* § 273 in the court's consideration of an application for judicial dissolution of an LLC with two coequal members); *see also In re Silver Leaf, L.L.C.,* 2005 WL 2045641, at *10 n. 82 (Del.Ch. Aug. 18, 2005) (citing *Haley* for the proposition that where an LLC has two deadlocked owners, the court should analogize to 8 *Del. C.* § 273); *Homer C. Gutchess 1998 Irrevocable Trust v. Gutchess Cos., LLC,* 2010 WL 718628, at *1 (Del.Ch. Feb. 22, 2010) (same).

60   *Haley,* 864 A.2d at 94.

61   Compl. ¶¶ 10–11.

62   Def. Op. Br. at 11; *see also id.* at 1, 7.

63   *See Malpiede v. Townson,* 780 A.2d 1075, 1082 (Del.2001) ( "The complaint ordinarily defines the universe of facts from which the trial court may draw in ruling on a motion to dismiss.... [T]he Court of Chancery may not resolve material factual disputes; instead, the court is required to assume as true the well-pleaded allegations in the complaint.").

64   *E.g., Haley,* 864 A.2d at 88; *Silver Leaf,* 2005 WL 2045641, at *11 ("Silver Leaf is no longer able to carry on its business in a reasonably practicable manner. The vote of the members is deadlocked and the [LLC] Agreement provides no means around the deadlock....").

65   Compl. ¶¶ 13, 24–26.

---

# APPENDIX A-2

Bell Atlantic Directory Services, Inc. v. Delaware Law Center, Inc., Not Reported in A.2d...

2000 WL 33654061

2000 WL 33654061
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Common Pleas of Delaware.

BELL ATLANTIC DIRECTORY SERVICES,
INC., A Delaware Corporation, Plaintiff,

v.

DELAWARE LAW CENTER, INC.,
a Delaware Corporation, Defendant.

No. CRIM.A.1997-07-083.
|
Submitted Nov. 30, 2000.
|
Decided Dec. 14, 2000.

**Attorneys and Law Firms**

Edward T. Ciconte, Esquire, Ciconte, Roseman &
Wasserman, Wilmington, DE, for plaintiff.

Arlen Mekler, Esquire, Wilmington, DE, for defendant.

DECISION AFTER TRIAL

ALEX J. SMALLS, Chief Judge.

 **\*1** Bell Atlantic Directory Services, Inc. (hereinafter
"Bell") brings this action against Delaware Law Center, Inc.
(hereinafter "Law Center") to collect a debt for services
rendered totaling $38,270.09 plus cost and interest. On
November 30, 2000 trial was held and the Court reserved
decision. This is the Court's decision after trial.

At trial, the parties stipulated that the amount of damages due
for unpaid bills was $38,270.09. The sole issue at trial was
liability.

The facts which led to this dispute indicate that Arlen Mekler,
the attorney representing the Delaware Law Center, Inc.
(hereinafter "Law Center"), entered into a contract with
Bell Atlantic Directory Services, Inc. (hereinafter "Bell")
on or about August 2, 1995 (hereinafter "the Contract").
The contract provided for advertisement of Mekler's legal
practice in their yellow page directory for 1996. Mekler had

in previous years placed advertisements for his legal practice
in Bell's directory.

At the time of the contract, Mekler was under investigation by
the Delaware Board of Professional Responsibility. Mekler
testified that while this investigation was ongoing, at no
time did he anticipate he would be suspended from the practice
of law. However, on November 1995, the Delaware Supreme
Court suspended Mekler for a period of one year commencing
January 1, 1996. Mekler testified he spoke with the Bell by
contacting them at their billing phone number located in the
directory numerous times in December 1995 and the first
few months of 1996. He was attempting to have his business
phone forwarded to another attorney. He testified at no time
did Bell mention his unpaid advertising bill.

As a result of Mekler's inability to practice law in the State
of Delaware for 1996, he defends this action against the Law
Center on the grounds of impossibility of performance and
frustration of purpose. To avail itself of this defense, the
Law Center must carry the burden of proving by affirmative
evidence that its performance under the contract is rendered
impossible by an act of God, law or the other party. 17
*Am.Jur. 2nd,* "Contracts" § 673. To be released, the party must
demonstrate that the obligation under the contract cannot be
performed by any means. *Martin v. Star Pub. Co .,* Del.Supr.,
126 A.2d 238 (1956).

Bell responds by stating that the suspension of Mekler was
both conceivable at the time of the contract and a result
of his own voluntary actions. Further, the Law Center is a
corporation that has in the past published legal materials and
conducted the Delaware Bar Review course. Mekler at the
time of the contract was one of a number of attorneys involved
in the corporation. Mekler's testimony confirmed that in 1995
the Law Center was in the process of developing materials
to publish books on legal subject matters. He contributed to
these publications, but was not the sole author. Therefore,
the facts appear to indicate that the Law Center was able to
perform some services in 1996, even if not legal services.

 **\*2** Rebecca Lepone, assistant manager for Bell, testified
they first realized there was a problem with Mekler's account
April 1996. She stated they were informed by Mekler
that he had been suspended from the practice of law in
Delaware and would be unable to make payments on the
advertisement. However, the deadline for determining which
advertisement would be placed in the 1996 directory takes

place approximately in October 1995, because the book is printed and distributed in November and December.

Bell argues that Mekler and the Law Center are not the same party and the suspension of Mekler does not relieve the Law Center of its obligation. Bell attempts to hold Law Center liable for the debt, not Mekler as an individual. In response to Mekler's defense of impossibility and frustration of purpose, Bell argues the business of the Law Center is not rendered impossible, for it continues to function despite Mekler's suspension.

In response, Law Center agrees with Bell's position that it and Mekler are separate parties, and directs the Court's attention to the contract itself. The contract indicate an agreement between Bell and Arlen Mekler, Esquire, for advertisement services in the 1996 edition of the Bell directory (see Plaintiff's Exhibit # 4). The contract makes no mention of the Law Center, nor does the ad refer to the Law Center. The agreement is signed by Mekler, in his individual capacity.

Mekler signed the contract, and there was no indication that he signed as an agent or principal of the Law Center. The standard in this jurisdiction is that courts will give the language of a contract its ordinary meaning. *Phillips Home Builders v. The Travelers Ins. Co.,* Del.Supr., 700 A.2d 127, 129 (1997). Since the Law Center is not a party to nor referred to in the contract between Bell and Mekler, and does not, based upon the evidence, receive any services from the advertisement, there is no basis to hold it liable for the charges. Additionally, there was no evidence introduced that Mekler participated in the formation of the contract on behalf of the Law Center. This conclusion is supported by the language of advertisement (see Plaintiff's Exhibit # 3). The advertisement refers to Mekler's various specialties in the practice of law. The advertisement does not mention the Law Center or its businesses in any aspect. Mekler's involvement in the Law Center does not make the Law Center a party to the contract such that it would impose liability without specific reference.

Accordingly, I find and enter judgment for the Defendant Delaware Law Center, Inc.

SO ORDERED this 14th day of December, 2000.

**All Citations**

Not Reported in A.2d, 2000 WL 33654061

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX A-3

Case 4:20-14695 bMl - Doc 756 - Filed 10/22/20 - Page 149 of 221
Greek Catholic Congregation of Borough of Olyphant v. Plummer, 338 Pa. 373 (1940) Case 4:20-14695-bMl Doc 756 Filed 10/22/20 Page 18 of 89
12 A.2d 435, 127 A.L.R. 1008

338 Pa. 373

Supreme Court of Pennsylvania.

GREEK CATHOLIC CONGREGATION
OF BOROUGH OF OLYPHANT

v.

PLUMMER et al.

March 25, 1940.
|
As Amended on Reargument April 15, 1940.

**Synopsis**

Appeal No. 16, January term, 1940, from judgment of Court of Common Pleas, Lackawanna County, No. 794, May term, 1938; Lewis, Judge.

Action in trespass by the Greek Catholic Congregation of the Borough of Olyphant against Emma A. Plummer, executrix of Edward E. Cannon, deceased, and others, to recover damages for mining and removing coal from plaintiff's land. From a judgment for defendants, plaintiff appeals.

Affirmed.

**\*374  \*\*436**  Argued before SCHAFFER, C. J., and MAXEY, DREW, LINN, STERN, BARNES, and PATTERSON, JJ.

**Attorneys and Law Firms**

**\*375**  O'Malley, Hill, Harris & Harris, Walter L. Hill, all of Scranton, for appellant.

Valentine L. Fine and William J. Fitzgerald, both of Scranton (Kelly, Fitzgerald & Kelly, of Scranton, of counsel), for appellees.

**Opinion**

MAXEY, Justice.

Plaintiff brought an action in trespass against defendants for the recovery of damages for the mining and removal of coal from plaintiff's land.

The statement of claim avers that defendants mined and dug from plaintiff's land, without the latter's consent, 25,472 tons of coal of the value of $12,736, knowing the same to be upon plaintiff's land, and removed and converted the coal to their own use, and did the mining through their agent, the Wilson Coal Company, to which defendants had made a lease dated May 1, 1931, and, in addition to making the lease, defendants aided and abetted their agent, and participated in the mining of the coal, and required their agent to account therefor to them and to pay over proceeds thereof to them, and that they received and retained such proceeds. Plaintiff claimed treble damages of $38,208, with damages for detention thereof.

The affidavit of defense raised questions of law in that the mining was not done by defendants but by their lessee, under the terms of the contract of May 1, 1931.

The court below held that the agreement 'constituted a sale of the defendants' interest in the coal therein described' and that plaintiff's statement of claim did not set froth a cause of action, and entered judgment in favor of defendants. This appeal followed.

The lease between Emma A. Plummer, executrix, heir and devisee under the will of Edward E. Cannon, deceased, et al., and the Wilson Coal Company, set forth that 'the Lessors have demised, leased and to mine let unto the Lessee, all their right, title and interest in and to the remaining coal [in certain veins] lying and being  **\*376**  in and under that part of the Samuel Callender Tract.' The tract containing the coal demised was described as 'a division of the Edward London Warrant and situate in the Borough of Blakely, County of Lackawanna'. Its boundaries are stated but its acreage is not. As to the tenure, it was provided that the lessee would 'remove all the coal therefrom which can be mined, stripped and removed by a diligent and energetic prosecution of the business'. The lease further provides: 'It is understood and agreed that this lease is given and accepted subject to any failure of title to any part of said coal or otherwise, and that said Lessee, its successors and assigns, assume sole and entire responsibility in the mining of the coal hereunder, without any liability in the lessors under any circumstances whatsoever.' The lease then provides for the payment of rent and royalty based upon the tonnage of coal taken out.

**\*\*437**  It is the contention of the defendants that the relationship between them and the Wilson Coal Company is that of grantor-grantee and that the lease referred to above was in legal effect a quit-claim deed to such coal. The defendants gave no warranty as to their title to the coal described in the lease, but, on the other hand, the lease expressly stipulated, as above noted, that 'it is given and accepted subject to any failure of title.' It is clear that this agreement of lease constituted a sale of the coal in the veins leased until 'all the coal' was removed: Hosack v. Crill, 204 Pa. 97, 53 A. 640.

12 A.2d 435, 127 A.L.R. 1008

The coal of whose mining plaintiffs complain was the coal whose ownership was decided by this court in Greek Catholic Congregation of Olyphant v. Wilson Coal Co., 329 Pa. 341, 198 A. 841. That there was a substantial dispute as to the ownership of this coal is indicated by the litigation which gave rise to that case. The question of ownership hinged on an interpretation of a deed from Samuel Callender to Newell Callender, dated January 16, 1850. When the lease of May 1, 1931, was made, both parties to it understood that the question of Lessors' **\*377** title was in dispute. If Samuel Callender, the grantor in the 1850 deed to his son, Newell Callender, died seised of a reversionary interest in the coal in question, the Wilson Coal Company obtained a good title to the coal when it secured its lease from those who claimed under Samuel Callender, i. e. the defendants here. It was not until our decision on March 21, 1938 that it became judicially established that Samuel Callender did not die seised of a reversionary interest in the coal in question and that therefore the Wilson Coal Company had no title to the coal it mined under color of the 1931 lease's authority.

In view of the substantial dispute as to the ownership of the coal in controversy, there is no question as to the good faith of the Lessor in this matter. The coal which was later adjudged to belong to the plaintiffs in this action was only a portion of the acreage of coal subject to the 1931 lease. Since this lease was in effect, if not in form, a quit-claim deed, the question before us comes down to this: Is the grantor in a quit-claim deed liable for trespasses committed by his grantee on the property subject to the deed after it is established that the grantor held no title to the property quit-claimed?

Both on reason and authority this question must be answered in the negative. Quit-claim deeds, long known to the law, are used when a party wishes to sell or otherwise convey an interest he may think he has in land but does not wish to warrant his title. It does not purport to convey anything more than the interest of the grantor at the time of its execution. 16 Am.Jur. p. 560, sec. 219: 'The distinguishing characteristic of a quitclaim deed is that it is a conveyance of the interest or title of the grantor in and to the property described, rather than of the property itself.' If persons who in good faith believe that they have title to real estate or possibility of title to real estate cannot convey whatever right or title they have in such real estate without being answerable in trespass should it later be decided that they had no **\*378** title and the person to whom the conveyance was made exercised an owner's right in the property, the use of quit-claim deeds will be greatly curtailed. Their long continued employment indicates that they serve

a useful purpose and, except for compelling reasons, courts should not impose on the grantors in quit-claim deeds such obligations as would check the employment of such deeds. There is nothing in a quit-claim deed which should incite the grantor therein to commit a trespass by exercising dominion over property he did not own. If there is any doubt of his ownership, he proceeds at his own peril and not at the peril of the party who quit-claimed to him. He is supposed to know the law, and the law is that 'a quitclaim deed is one which purports to convey, and is understood to convey, nothing more than the interest or estate of which the grantor is seised or possessed, if any, at the time'. 18 C.J. p. 156, sec. 32.

In the few instances where the question has arisen, courts have taken the view that 'one who merely sells property to which he has no title is not liable for trespasses committed by his vendee'. 63 C.J. p. 934, sec. 77.

It is settled law in this Commonwealth that the Lessor of a coal mine is not responsible in trespass for the negligent mining by his lessee which results in damage to the surface. In Hill v. Pardee, 143 Pa. 98, 22 A. 815, this court held that in such a case the disturbance of a right of surface support is a tort for which the party which did the mining and not the Lessor was responsible. In Offerman v. Starr, 2 Pa. 394, 44 Am.Dec. 211, this court said **\*\*438** in an opinion by Chief Justice Gibson: 'Respondeat superior is inapplicable to an owner of land, for acts of negligence in a business not conducted by him and for his account. What had these defendants to do with the direction of the business or the coal when it was mined? Lewis covenanted to sink the slope, erect the engine, to take out a certain number of tons each year, according to the most approved method of mining, and carry it to the landing; and to pay a certain sum per ton for it. So **\*379** far the defendants had nothing to do with the business, but to receive their rent. But they reserved a right to visit and examine the manner in which the business should be carried on in the mine; and to resume the possession should the tenant refuse to furnish statements of the amount taken out, or pay the rent. These clauses do not constitute a reservation of the possession or a right to interfere with the direction of the business. The right of visit was to enable them to see whether the tenant was performing his engagements, in order to found process against him if he were breaking them; and the right to resume the possession was to put an end to the business altogether. The lease was analogous in all respects to the lease of a farm with a clause of re-entry for bad farming, or non-payment of rent. On no principle, then, could the acts of Lewis be imputed to his lessors'.

12 A.2d 435, 127 A.L.R. 1008

Appellant cites two Pennsylvania cases in which the Lessor was held liable for damage caused by its lessee: Dundas v. Muhlenberg's Executors, 35 Pa. 351, and Telford Coal Co. v. Prothero et al., 24 Pa. D. & C. 183. The court below correctly determined that the facts in those cases were not applicable to the facts in this case. In the former case, this court, in an opinion by Chief Justice Lowrie, said: 'The charge of the court was in substance that, in order to entitle the plaintiff to recover against the defendants, it must appear, not only that they were landlords of Bittinger, who took out the coal, *but also that they participated in the act of going into the plaintiffs' land to get it.* We think this instruction is quite accurate, and is sustained by most familiar authorities.' This court said further: '*Such being the facts found by the jury* [all italics supplied], the defendants are trespassers with Bittinger; * * * and, the tort being waived, may be sued in assumpsit for the value of the coal taken.' In the second case cited by appellant, which is a lower court case, the lessors actually supervised and directed the removal of the coal and were personally present when it was being removed. The court stated in *380 that case: 'The mining operations were carried on under the directions of W. B. Prothero, and after his death under the directions of Harry B. Prothero. The engineer in charge during all the operations was L. R. Owen, who was acting for the lessors. One of the lessees testified that no map was ever furnished, but that the work was directed by the engineer and the Protheros. Harry B. Prothero was in the mine frequently when the plaintiff's coal was being mined.' The difference between the facts in those two cases and the facts in the case at bar obvious. The defendants in those cases participated directly in the torts. In the instant case there was no such participation. Mere collection of 'rents and royalties' as a part of the purchase price does not constitute a participation in the mining.

The allegations in plaintiff's statement of claim and which are quoted in paragraph two of this opinion as to defendants' mining and digging from plaintiff's land and 'aiding and abetting' the mining by the Wilson Coal Company would sufficiently plead a cause of action, were it not based (as we understand from the argument of appellant's counsel [1] it is based) on the lease itself, which lease is attached to plaintiff's statement. The language of the lease warrants no such conclusion, and therefore we must treat the allegation of defendants' 'mining and digging' coal and 'aiding and abetting their agent, the Wilson Coal Company' in doing so as mere legal conclusions and not as averments of facts.

*381 Appellant cites section 158, 'Comment I', p. 363, of Restatement of Torts. In this 'comment' it is set forth that 'if the actor **439 has commanded or requested a third person to enter land in the possession of another, the actor is responsible for the third person's entry if it be a trespasser.' It is self-evident that one who merely quit-claims his right, title and interest (if any) in land to another for a consideration does not come within the description of an actor who 'commands or requests' a third person to enter another's land. When A quit-claims to B he is not 'intentionally causing' B to commit a trespass on the land in respect to which A quit-claimed whatever title or interest (if any) he had. If B proceeds to exercise dominion over that land, he does so at his own peril, and if it is shown that A had no title or interest in the land he quit-claimed, B's quit-claim deed is no defense to an action of trespass nor does that deed make A a joint tort-feasor with B. In Robinson v. Vaughton & Southwick, 34 Eng.Com.Law Rep. 718, it was held that if A gives B leave to go on a field, in which A has no right and B goes there, this will not make A liable as a co-trespasser with B.

In the case of Power v. Foley, Newfoundland Reports, 1897-1903, p. 540, the Supreme Court of Newfoundland held, in an opinion by Justice Emerson: 'A mere sale of property, to which a man has no title, does not of itself carry with it a cause of action against the seller, even though the purchaser subsequently trespasses on and converts the property to his own use. It must first be proved that the defendants actually took possession of the property in question, or exercised actual dominion over it, or delivered it to the trespassers in some other manner than by the mere delivery of a document purporting by its alleged construction to convey a title. In order to fasten a liability on defendants in this action for legal damage, * * * these defendants must have actually by themselves, or their agents or servants, wilfully trespassed upon the plaintiff's property, and taken *382 down the house and converted the goods to their own use, or wrongfully deprived the plaintiff of them. Has this been proved?' This question was answered in the negative. The following cases were cited: England v. Cowley, L.R. 8 Ex. 126, and Owen v. Legh, 3 B. & Ald. 470.

Appellant contends that the defendants were trespassers because they put the lessee 'under legal obligation to mine the plaintiff's coal.' This obligation arose, so it is argued, from the fact that the lessee 'covenanted and agreed to work the veins demised' continuously and to remove 'all the coal therefrom which can be mined by a diligent and energetic prosecution of the business.'

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   3

12 A.2d 435, 127 A.L.R. 1008

The answer to this contention is that the provision in the lease as to diligent mining is subject to the condition that the title of the lessors does not fail. The lease (as already noted herein) was expressly 'given and accepted subject to any failure of title to any part of said coal'. Failure of title to the coal ipso facto terminated the lessee's agreement to mine it. There is in the law the doctrine of 'frustration,' which holds that under the implied condition of the continuance of a contract's subject matter, the contract is dissolved when the subject matter is no longer available. In Nitro Powder Co. v. Agency of Canadian Car & Foundry Co., 233 N.Y. 294, 135 N.E. 507, 508, Judge Pound said: 'When people enter into a contract which is dependent for the possibility of its performance on the continual availability of a specific thing, and that availability comes to an end by reason of circumstances beyond the control of the parties, the contract is prima facie regarded as dissolved.' See also Clarksville Land Co. v. Harriman, 68 N.H. 374, 44 A. 527, and Howell v. Coupland, 1 Q. B. 258. In the leading English case of Tamplin Steamship Co., Ltd., v. Anglo-Mexican Pet. Products Co., Ltd., 2 A. C. 397, it is said at 403: 'A court can and ought to examine the contract and the circumstances in which it was made, not of course to vary, but only to explain it, in order to see **\*383** whether or not, from the nature of it the parties must have made their bargain on the footing that a particular thing or state of things would continue to exist. And if they must have done so, then a term to that effect will be implied, though it be not expressed in the contract.'

In the lease now under review what the lessors said to the lessee, in effect, was this: 'We do not guarantee title to the coal we are quit-claiming. If the title proves to be good, you are obligated to mine the coal diligently,' etc. It was reasonably assumed that if the title failed, the owner of the coal would take appropriate action to stop its mining. The lease provisions quoted by appellant were *not* either commands, directions or incitements to commit trespasses upon another's property. These provisions were subject to the limitation **\*\*440** that when title failed the lease became inoperative.

Appellant also contends that because the defendants sent a mining engineer into the mine from time to time to inspect and report to the lessor on the mining operations, they 'aided and abetted and participated in the mining and digging out of the said coal as fully and effectually as they individually could have done had they been present in person.' In making this contention the appellant is asking this court to attribute to a well recognized custom in respect to mining 'leased'

coal a legal significance the custom does not have. Lessors of coal, whose remuneration depends on the tonnage mined, are properly vigilant in seeing to it that none of the coal is wasted by reckless, unskilful mining and to this end they customarily reserve the right to inspect the workings either by themselves or by a competent mining engineer. That such a provision does not make the lessor a 'director' of the mining operation was expressly held by this court in Offerman v. Starr, 2 Pa. 394, 44 Am.Dec. 211, supra. In Miles v. Pennsylvania Coal Co., 217 Pa. 449, 66 A. 764, 10 Ann.Cas. 871, this court held that a provision giving the lessor the right to enter the workings for inspection of the **\*384** mining 'does not change the character of the instrument', i. e., the coal lease.

The case of McCloskey et al. v. Powell et al., 123 Pa. 62, 16 A. 420, 421, 10 Am.St.Rep. 512, cited by appellant, is easily distinguishable from the case at bar. In that case there was no quit-claim deed involved. Certain dealers in cherry timber sent their agent, Ryder, into Elk County to purchase such timber. Ryder found two tracts of cherry timber supposedly owned by Powell. The latter promised to have his lines run. The line as run included a large part of the grove of cherry timber which Ryder wanted, but the true line excluded the whole of it. Powell advised Ryder that a survey had been made and the cherry found to be on his land. Powell then sold on a contract all the merchantable cherry, etc., timber standing on two tracts of land including '260 acres west of the true line'. The timber was removed under the contract and Powell was paid for it. The owners brought an action in trespass q. c. f. against Powell et al. At the trial the court below refused this request of plaintiffs: 'If the jury believe from the evidence that [the defendant] Powell procured the west line of his lands to be so run and marked as to include some two hundred and sixty acres of the land belonging to the plaintiffs, * * * and caused said line * * * to be pointed out as his line * * * [that] he Powell would be liable to the plaintiffs as a co-trespasser.' This court, in reversing the court below, said: '[Powell] caused the line to be pointed out, and said, in legal effect: 'This land is mine. These timber trees are mine. I will sell them to you, and you shall cut and remove them, and pay me ten dollars per thousand feet for the cherry as it now stands on the stump.' * * * The mistake was Powell's * * *. He sold what he did not own, and took pay for it. He put his vendees on the ground to cut the trees. By his contract he authorized and directed the work done under it. * * * The point should have been affirmed.' The difference between the facts in that case and those in this case are obvious.

The judgment is affirmed.

12 A.2d 435, 127 A.L.R. 1008

**All Citations**

338 Pa. 373, 12 A.2d 435, 127 A.L.R. 1008

## Footnotes

1    In appellant's paper book appears the following statements: 'The defendants acted in concert with the mining company in making the lease and in requiring accounting and payment of proceeds of mining. They not only requested or procured or incited their lessee to do the mining but put their lessee under legal obligation to them to mine the plaintiff's coal, and to pay them royalties thereon, and they received and retained the royalties. * * * The case is not at all one of non-participation, for the participation was as real and substantial and remunerative as if it had been physical.'

End of Document                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX A-4

2014 WL 710941
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

Donald E. LITTLE, Plaintiff,
v.
SKF SVERIGE AB, et al., Defendants.

Civil Action No. H–13–1760.
|
Feb. 24, 2014.

**Attorneys and Law Firms**

Donald Edward Little, Lakeway, TX, pro se.

Alejandro Salicrup, David Richman, Evan Wainhouse Davis, Pepper Hamilton LLP, Philadelphia, PA, John Kevin Spiller, William A. Worthington, Strasburger Price LLP, Houston, TX, for Defendants.

**ORDER**

GRAY H. MILLER, District Judge.

**\*1** Pending before the court are (1) the Magistrate Judge's Memorandum and Recommendation (Dkt.37) (hereinafter "M & R") recommending that Defendants SKF Sverige AB and SKF International AB's Motion to Dismiss (Dkt.19) and Defendant SKF USA Inc.'s Motion to Dismiss (Dkt.27) be GRANTED; and (2) a motion to amend filed by Plaintiff Donald E. Little (Dkt.41). After considering the M & R, motions, related filings, and applicable law, the court is of the opinion that the M & R should be ADOPTED and the motion to amend should be DENIED.

**I. M & R**

With regard to the M & R, neither Defendants nor Plaintiff Donald E. Little filed objections to the M & R. The court finds that the M & R is well reasoned and accurately concludes (1) that the court cannot exercise general or specific jurisdiction over SKF Sverige AB and SKF International, and (2) that Little failed to allege facts sufficient to state a claim against SKF USA Inc. for misappropriation of trade secrets,

defamation, and fraud. The M & R therefore is ADOPTED in its entirety. Little's claims against SKF Sverige AB and SKF International AB are hereby DISMISSED for lack of personal jurisdiction. Little's claims against SKF USA Inc. are hereby DISMISSED WITH PREJUDICE for failure to state a claim.

**II. MOTION TO AMEND**

Subsequent to the M & R, Little filed a motion to amend. Dkt. 41. The court has reviewed the proposed third amended complaint and finds that allowing amendment would be futile, as the proposed third amended complaint does not adequately correct the deficiencies noted in the M & R. [1] *See* Dkt. 41–1. Accordingly, Little's motion to amend (Dkt.41) is DENIED.

**III. CONCLUSION**

Little's motion to amend (Dkt.41) is DENIED. The M & R (Dkt.37) is ADOPTED in its entirety. Little's claims against SKF Sverige AB and SKF International AB are hereby DISMISSED for lack of personal jurisdiction. Little's claims against SKF USA Inc. are hereby DISMISSED WITH PREJUDICE for failure to state a claim. Since the SKF Sverige AB, SKF International AB, and SKF USA Inc. are the only defendants Little has served in this lawsuit, the court will enter a final judgment concurrently with this order.

**MEMORANDUM AND RECOMMENDATION**

NANCY K. JOHNSON, United States Magistrate Judge.

Pending before the court [1] are Defendants SKF Sverige AB and SKF International AB's Motion to Dismiss (Doc. 19) and Defendant SKF USA Inc.'s ("SKF USA") Motion to Dismiss (27). The court has considered the motions, the responses thereto, all other relevant filings, [2] and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that both motions be **GRANTED.**

**I. Case Background**

Plaintiff Donald E. Little filed this lawsuit against six purported corporate entities that belong to the SKF group of

companies seeking money damages for theft of trade secrets, fraud, and defamation.[3]

Non-party AB SKF ("SKF") is a publicly traded Swedish company and the parent company of the SKF Group.[4] SKF owns one hundred percent of the shares in Defendants SKF USA and SKF International AB.[5] Defendant SKF International AB owns one hundred percent of the shares in Defendant SKF Sverige AB.[6]

**\*2** In 2002 and 2003, Defendants SKF International AB and SKF Sverige AB (collectively, the "Swedish Defendants") entered into a series of contracts with Rolls–Royce AB for the design, development, and sale of bearings for integration into the "Mermaid" pod propulsion system utilized in cruise ships.[7] According to Plaintiff, Mermaid pod malfunctions resulted in multiple lawsuits by cruise ship owners against Rolls–Royce companies.[8] Plaintiff alleges that Rolls–Royce contracted with him for legal services to assist in the company's defense of these lawsuits.[9] Plaintiff claims that, in this capacity, he undertook an investigation into the cause of the pod malfunctions and, in so doing, developed trade secrets relating to the roller bearing system installed in the Mermaid pods.[10]

Plaintiff filed this action on March 22, 2013, in state court in Harris County, and an amended petition on April 4, 2013, alleging that all six defendants "misappropriated Plaintiff's trade secrets in a number of ways, including coercion, deception, defamation, conspiracy and fraud."[11] Plaintiff further claimed that the defendants "committed fraud and strong armed [Rolls–Royce AB] counsel ... to state in a settlement agreement that [Rolls–Royce AB] (Plaintiff) misappropriated the patent claims developed by Plaintiff."[12] Lastly, Plaintiff alleged that the defendants "defamed [P]laintiff by written agreement that [Rolls–Royce AB] had misappropriated SKF intellectual property via Plaintiff."[13]

The Swedish Defendants and SKF USA are the only entities that Plaintiff has attempted to serve.[14] The Swedish Defendants filed a special appearance and moved to quash service and dismiss in state court on June 13, 2013.[15] On June 17, 2013, the Swedish Defendants removed the case on the basis of diversity jurisdiction.[16]

The Swedish Defendants filed a motion to dismiss on August 19, 2013.[17] Plaintiff filed a response on September 16, 2013, and the Swedish Defendants replied on September 23, 2013.[18] SKF USA filed a motion to dismiss on November 22, 2013.[19] Plaintiff filed a response on January 22, 2014, and SKF USA replied on January 29, 2014.[20]

## II. The Swedish Defendants' 12(b)(2) Motion to Dismiss

The Swedish Defendants move to dismiss Plaintiff's suit for lack of personal jurisdiction.

### A. *Legal Standard for Personal Jurisdiction*

The Federal Rules of Civil Procedure ("Rules") authorize a court to dismiss an action against a defendant when the court lacks personal jurisdiction over that defendant. *See* Fed.R.Civ.P. 12(b)(2). On a motion to dismiss decided without the benefit of an evidentiary hearing, the plaintiff bears the burden of establishing a prima facie case in support of jurisdiction. *Johnston v. Multidata Sys. Int'l Corp.,* 523 F.3d 602, 609 (5th Cir.2008).

The district court may receive "any combination of the recognized methods of discovery," including affidavits, interrogatories, and depositions to assist it in the jurisdictional analysis. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.,* 517 F.3d 235, 241 (5th Cir.2008) (internal quotation marks omitted). The court resolves all conflicts in the evidence in favor of the plaintiff and accepts as true all of the plaintiff's uncontroverted allegations. *Johnston,* 523 F.3d at 609.

**\*3** A federal court has personal jurisdiction over a nonresident defendant if the forum state's long-arm statute confers jurisdiction and if jurisdiction is consistent with due process under the United States Constitution. *Johnston,* 523 F.3d at 609. In Texas, the long-arm statute permits personal jurisdiction to the full extent allowed by the Due Process Clause. *Id.*

> The Due Process Clause ... permits the exercise of personal jurisdiction over a nonresident defendant when (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice."

*Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir.1999) (quoting *Int'l Shoe Co. v. Wash.,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Minimum contacts are established with a state by a defendant whose "conduct and connection" with that state are significant enough that the defendant "should reasonably anticipate being haled into court" in that state. *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 379 (5th Cir.2002) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). The defendant must "purposely avail[ ] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Nuovo Pignone, SpA,* 310 F.3d at 379 (quoting *Burger King Corp.,* 471 U.S. at 475). Unilateral activity on the part of the plaintiff will not satisfy this requirement. *Hydrokinetics, Inc. v. Alaska Mech., Inc.,* 700 F.2d 1026, 1028 (5th Cir.1983) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

A federal court may exercise general or specific jurisdiction. "[C] ontinuous and systematic general business contacts" are grounds for the exercise of general jurisdiction over a nonresident defendant for any cause of action regardless of whether the claim arose from specific activity within the forum. *Luv N' care, Ltd. v. Insta–Mix, Inc.,* 438 F.3d 465, 469 (5th Cir.2006) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 9, 415, 104 S.Ct. 1868, 80 L.Ed.2d 404). "The continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and forum." *Johnston,* 523 F.3d at 609 (quoting *Submersible Sys., Inc. v. Perforadora Cent., S.A.,* 249 F.3d 413, 419 (5th Cir.2001) (internal quotation marks omitted).

Alternatively, specific jurisdiction may exist if the asserted cause of action "aris[es] out of or [is] related to the defendant's contacts with the forum." *Luv N'care,* 438 F.3d at 469 (citing *Helicopteros,* 466 U.S. at 414 n. 8). In the Fifth Circuit, courts apply a three-prong test in deciding whether specific jurisdiction exists, considering, "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *McFadin v. Gerber,* 587 F.3d 753, 759 (5th Cir.2009).

**B.** *Analysis*

**\*4** The Swedish Defendants argue that Plaintiff failed to establish that they had sufficient contacts with Texas to justify either general or specific jurisdiction.

### 1. *General Jurisdiction*

In his amended petition, Plaintiff asserted that the Swedish Defendants had "subjected [themselves] to jurisdiction in the courts of Texas by virtue of engaging in, and/or carrying on a business or business venture in this state with Plaintiff." [21] Plaintiff claimed that "Defendants have extensive, systematic and continuous contacts with and dealings in the State of Texas," and that "SKF has an office specifically call the SKF Solution Factory in this state." [22]

The Swedish Defendants contest these claims in their motion to dismiss, providing testimony that they are headquartered in Sweden and organized under the laws of Sweden; neither lease nor own real property or any other assets in Texas; maintain no facilities in Texas; have no employees who work in Texas; are not registered to conduct business in Texas; have never advertised in Texas; have never designed, developed, or manufactured products in Texas; have never sold products to customers in Texas on a regular basis, if at all; and have no subsidiaries or divisions in Texas. [23]

Plaintiff responds that "[t]he SKF group is the largest bearing manufacturer in the world," and "numerous ... companies in the State of Texas ... sell SKF products." [24] Plaintiff adds that he "can interact with SKF's website and has a login number." [25] Plaintiff claims that SKF USA has previously brought suit in Texas federal courts. [26]

Plaintiff does not distinguish between the corporate entities that belong to the SKF group of companies. Plaintiff has failed to demonstrate that any contacts SKF or SKF USA may have with Texas may be imputed to the Swedish Defendants. "As a general rule, ... the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated." *Freudensprung v. Offshore Tech. Servs.,* 379 F.3d 327, 346 (5th Cir.2004); *see also Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1160 (5th Cir.1983) ("[S]o long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other.").

Little v. SKF Sverige AB, Not Reported in F.Supp.3d (2014)

2014 WL 710941

Case 4:20-14695-DMI-18 Doc756 Filed 10/22/20 Page 158 of 221
Case 4:20-cv-14695-DMI Doc756 Filed on 04/23/20 in TXSD Page 27 of 89

Overcoming the presumption of corporate separateness requires "proof of control by [one corporation] over the internal business operations and affairs of another corporation to make the other its agent or alter ego, and thus fuse the two together for jurisdictional purposes." *Freudensprung,* 379 F.3d at 346 (alteration in original) (quoting *Hargrave,* 710 F.2d at 1160) (internal quotation marks omitted). In determining whether this burden has been met, courts consider the following nonexhaustive factors: (1) the amount of stock owned by the parent of the subsidiary; (2) whether the entities have separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether the parent exercises complete control over the subsidiary's general policies or daily activities. *Hargrave,* 710 F.2d at 1160.

**\*5** Plaintiff has failed to allege, let alone adduce any evidence demonstrating, that the *Hargrave* factors compel the conclusion that SKF or the other SKF entities controlled the Swedish Defendants. Accordingly, the contacts of SKF and SKF USA with Texas may not be attributed to the Swedish Defendants in order to support the exercise of general jurisdiction.

In his response, Plaintiff also claims that, "[o]n information and belief, it is believed SKF distributors in Texas order parts from SKF Sweden by computer communication."[27] Plaintiff provides no support for this allegation, which is directly contradicted by testimony provided by the Swedish Defendants. This unsubstantiated contention is insufficient to support the exercise of general jurisdiction over the Swedish Defendants.

### 2. *Specific Jurisdiction*

In addition to the assertion of general jurisdiction discussed above, Plaintiff asserts that the Swedish Defendants' contacts with Texas related to the present litigation justify haling them before this court. Plaintiff contends that specific jurisdiction is proper because propulsion systems equipped with SKF bearings are housed in cruise ships that "operate[ ] out of the Texas port of Galveston"; drafts of the allegedly defamatory settlement agreement were "sent between Sweden, Miami and Austin"; a contract between Plaintiff and a third party "MARIN" was executed in Texas; and the "drafting and development of many of the trade secrets" took place in Texas.[28]

Neither Plaintiff's unilateral activities, such as the work he allegedly performed developing trade secrets in Texas, nor his execution of a contract with a third party are contacts that can be attributed to Defendant. *See Hydrokinetics, Inc.,* 700 F.2d at 1028.

Plaintiff has failed to introduce competent evidence regarding his allegation that cruise ships incorporating SKF products operate out of Texas. Regardless, this contention alone provides no basis for inferring that the Swedish Defendants could "reasonably anticipate[ ] being haled into court" in Texas. *Luv N' care,* 438 F.3d at 470 (citing *World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)); *see also McFadin,* 587 F.3d at 759 ("The defendant must not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person." (quoting *Electrosource, Inc., v. Horizon Battery Techs., Ltd.,* 176 F.3d 867, 871–72 (5th Cir.1999)) (internal quotation marks omitted)).

Plaintiff's claim that drafts of the allegedly defamatory settlement agreement were sent to Austin is likewise insufficient to support the exercise of specific jurisdiction over the Swedish Defendants. To support personal jurisdiction against a defaming defendant, the Fifth Circuit requires that the "forum be the focal point of the story." *Clemens v. McNamee,* 615 F.3d 374, 379 (5th Cir.2010) (quoting *Calder v. Jones,* 465 U.S. 783, 788–89, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)) (internal quotation marks omitted). In *Clemens,* the Fifth Circuit held that the plaintiff had failed to make a prima facie showing that Texas was the focal point of allegedly defamatory statements because the statements did not concern activity in Texas and they were neither made in Texas nor directed to Texas residents any more than residents of any other state. *See id.* at 380. Plaintiff has introduced no evidence that the allegedly defamatory statements concerned activity in Texas, were made in Texas, or were directed to Texas residents.

**\*6** The court finds that Plaintiff has failed to meet his prima facie burden of establish that the court has personal jurisdiction over the Swedish Defendants. The court need not reach the Swedish Defendants' additional arguments for dismissal.

### III. SKF USA's 12(b)(6) Motion to Dismiss

SKF USA moves to dismiss Plaintiff's suit for failure to state a claim.

#### A. *Legal Standard for Failure to State a Claim*

Pursuant to Rule 12(b)(6), dismissal of an action is appropriate whenever the pleading, on its face, fails to state a claim upon which relief can be granted. When considering a motion to dismiss, the court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts. *Harold H. Huggins Realty, Inc. v. FNC, Inc.,* 634 F.3d 787, 803 n. 44 (5th Cir.2011).

A complaint need not contain "detailed factual allegations" but must include sufficient facts to indicate the plausibility of the claims asserted, raising the "right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Plausibility means that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. A plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555. In other words, the factual allegations must allow for an inference of "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678.

#### B. *Analysis*

SFK USA argues that dismissal is proper because Plaintiff has failed to allege facts sufficient to state claims for misappropriation of trade secrets, defamation, or fraud.

#### 1. *Misappropriation of trade secrets*

To establish a cause of action for trade secret misappropriation under Texas law, a plaintiff must show: (1) a trade secret existed; (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (3) use of the trade secret without authorization from the plaintiff. *See Wellogix, Inc. v. Accenture, L.L.P.,* 716 F.3d 867, 874 (5th Cir.2013). "A trade secret is any formula, pattern, device or compilation of information used in one's business, and which gives an opportunity to obtain an advantage over competitors who do not know or use it." *Taco Cabana Intern., Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1123 (5th Cir.1991).

The facts pled in Plaintiff's amended petition do not make out a plausible claim for trade secret misappropriation against SKF USA. Plaintiff fails to articulate how SKF USA allegedly acquired, discovered, or made use of a trade secret. Instead, Plaintiff makes conclusory statements such as "SKF relied on Plaintiff's trade secrets in misappropriating [P]laintiff's trade secrets," and "SKF misappropriated Plaintiff's trade secrets in a number of ways, including coercion, deception, defamation, conspiracy, and fraud." [29] Such pleading is insufficient under *Twombly*. *See In re Superior Air Parts, Inc.,* 486 B.R. 728 (Bankr.N.D.Tex.2012) (dismissing trade secret misappropriation claim that failed to allege facts supporting claim that defendant obtained alleged trade secrets by improper means). The court concludes that Plaintiff has failed to state a claim for trade secret misappropriation against SKF USA.

#### 2. *Defamation*

**\*7** To establish a cause of action for defamation under Texas law, a plaintiff who is a private individual must show that the defendant: "(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting negligently with regard to the truth of the publication." *Nasti v. CIBA Specialty Chem. Corp.,* 492 F.3d 589, 596 (5th Cir.2007) (citing *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998)). Defamation claims must also "specifically state the time and place of the publication." *Watkins v. Tex. Dep't of Crim. J.,* 269 F. App'x 457, 465 (5th Cir.2008) (unpublished) (internal quotation marks omitted). A statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury or to impeach that person's honesty, integrity, or virtue. *Abbot v. Pollock,* 946 S.W.2d 513, 519 (Tex.App.-Austin 1997, writ denied).

Plaintiff alleges no facts in support of his claim that "SKF ... defamed [P]laintiff by written agreement that [Rolls–Royce AB] had misappropriated SKF intellectual property via Plaintiff." [30] Plaintiff fails to plead the alleged defamatory statement, the time or place of publication, and the author of the statement. Accordingly, Plaintiff's cause of action for defamation cannot survive SKF USA's motion to dismiss. *See Roebuck v. Dothan Sec., Inc.,* 515 Fed. App'x 275, 280 (5th Cir.2013) (affirming dismissal of defamation claim for failure to state a claim because plaintiff "failed to set forth

any specific allegations regarding the alleged defamatory communications in his complaint"); *Shaunfield v. Bank of Am.,* No. 3:12–CV–3859–B, 2013 WL 1846885, at \*3 (N.D.Tex. Apr.24, 2013) (dismissing claim upon finding that plaintiff "ha [d] not made sufficient allegations as to the substance of the allegedly defamatory statements and, therefore, ha[d] failed to adequately allege that he [was] entitled to relief from [defendant] on his defamation claim.").

### 3. *Fraud*

Under Texas law, the elements of a fraud cause of action are: "(1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result." *Herrmann Holdings Ltd. v. Lucent Tech. Inc.,* 302 F.3d 552, 563 n. 3 (5th Cir.2002).

Fraud claims are subject to a heightened pleading standard under Rule 9(b), which provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). Rule 9(b) "requires, at a minimum, that a plaintiff set forth the who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Steury v. Cardinal Health, Inc.,* 625 F.3d 262, 266 (5th Cir.2010) (internal quotation marks omitted).

**\*8** Plaintiff offers only a conclusory statement in support of his fraud claim, asserting that "SKF committed fraud and strong armed [Rolls–Royce] counsel defending the Mermaid Pod lawsuit to state in a settlement agreement that [Rolls– Royce AB] (Plaintiff) misappropriated the patent claims developed by Plaintiff." [31] This unelaborated reference to "fraud" does not satisfy the requirements of Rule 9(b). Plaintiff's fraud claim fails to state a claim against SKF USA.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that the Swedish Defendants and SKF USA's motions be **GRANTED.**

The court is aware that, while this matter was pending, Plaintiff attempted to amend his complaint. That complaint was struck for Plaintiff's failure to comply with Rule 15(a). The court has reviewed this complaint in light of its finding that Plaintiff has failed to state claims for trade secret misappropriation, defamation, and fraud against SKF USA. The court finds that this amended complaint would not have corrected the pleading deficiencies discussed above. Because the court has no confidence that Plaintiff can state facts that would support its claims against SKF USA, the court does not grant Plaintiff the opportunity to file an amended complaint. The court may reconsider this recommendation if Plaintiff alleges, in timely filed objections, specific facts that would support a claim against SKF USA.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Rule 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this *31st* day of January, 2014.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 710941

### Footnotes

1  Little attempts to assert the "who, what, when, where, and how of the alleged fraud" in his amended pleading. *See* Dkt. 37(M & R) (noting that Little offered "only a conclusory statement in support of his fraud claim"

and thus failed to satisfy the elements of fraud); Dkt. 41–1 (proposed third amended complaint) (specifically discussing facts under the headings "who, what, when, where, how, and why"). However, while Little presents facts that could satisfy the questions, who, what, when, where, how, and why, the alleged facts fail to come together in a cohesive fashion to actually satisfy the elements of a fraud cause of action.

1   This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 14.

2   SKF USA complaints that Plaintiff's response to its motion was untimely. The court will consider it despite its untimeliness.

3   *See* Doc. 1–5, Ex. B3 to Swedish Defs.' Notice of Removal, Pl.'s Am. Orig. Pet.

4   *See* Doc. 19–1, Ex. 1 to Swedish Defs.' Mot. to Dismiss, Aff. of Erik Wiksten ¶ 3.

5   *See id.*

6   *See id.*

7   *See* Doc. 19–2, Ex. 2 to Swedish Defs.' Mot. to Dismiss, Aff. of Par Malmberg ¶ 2.

8   *See* Doc. 1–5, Ex. B3 to Swedish Defs.' Notice of Removal, Pl.'s Am. Orig. Pet. ¶¶ 6, 10, 32, 34

9   *See id.* ¶ 6.

10  *See id.* ¶¶ 6, 10, 19.

11  *Id.* ¶ 16; Doc. 1–4, Ex. B2 to Swedish Defs.' Notice of Removal, Pl.'s Orig. Pet.

12  Doc. 1–5, Ex. B3 to Swedish Defs.' Notice of Removal, Pl.'s Am. Orig. Pet. ¶ 16

13  *Id.*

14  *See* Doc. 19–1, Ex. 1 to Swedish Defs.' Mot. to Dismiss, Aff. of Erik Wiksten ¶ 5; Doc. 25, Req. for Issuance of Summons as to SKF USA.

15  *See* Doc. 1–6, Ex. B4 to Swedish Defs.' Notice of Removal, Swedish Defs.' Special Appearance, Mots. to Quash Service and to Dismiss for Forum Non Conveniens, and Orig. Answer.

16  *See* Doc. 1, Swedish Defs.' Notice of Removal

17  *See* Doc. 19, Swedish Defs.' Mot. to Dismiss.

18  *See* Doc. 23, Pl.'s Resp. to Swedish Defs.' Mot. to Dismiss; Doc. 24, Swedish Defs.' Reply to Pl.'s Resp. to Swedish Defs.' Mot. to Dismiss.

19  *See* Doc. 27, SKF USA's Mot. to Dismiss.

20  *See* Doc. 31, Pl.'s Resp. to SKF USA's Mot. to Dismiss; Doc. 34, SKF USA's Reply to Pl.'s Resp. to SKF USA's Mot. to Dismiss.

21  Doc. 1–5, Ex. B3 to Swedish Defs.' Notice of Removal, Pl.'s Am. Orig. Pet. ¶ 5.

22  *Id.*

23  *See* Doc. 1–6, Ex. B4 to Swedish Defs.' Notice of Removal, Aff. of Eva Karlsson ¶¶ 2–8; Doc. 1–6, Ex. B4 to Swedish Defs.' Notice of Removal, Aff. of Per Thoren ¶¶ 2–8.

24  Doc. 23, Pl.'s Resp. to Swedish Defs.' Notice of Removal, pp. 3–4.

25  *Id.* p. 5.

26  *See id.* p. 4

27  *Id.* p. 5.

28  *See id.* pp. 5–6.

29  Doc. 1–5, Ex. B3 to Swedish Defs.' Notice of Removal, Pl.'s Am. Orig. Pet. ¶¶ 29, 61.

30  *Id.* ¶ 63.

31  *Id.* ¶ 62.

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 20-14695-LMI Doc 756 Filed 10/22/20 Page 162 of 221

APPENDIX A-5

11 Terry 181
Supreme Court of Delaware.

Joseph H. MARTIN, Appellant,

v.

STAR PUBLISHING COMPANY, a
corporation of the State of Delaware, Appellee.

Oct. 25, 1956.

**Synopsis**

Suit by former owner of capital stock of newspaper publishing
company to recover agreed compensation as advisor in
conduct of company's business under written contract of
employment by company for 400 weeks with option given
former owner to continue such employment for additional 120
weeks. From a decision of the Superior Court of New Castle
County, granting defendant's motion for summary judgment,
plaintiff appealed. The Supreme Court, Southerland, C. J.,
held that voluntary discontinuance of business by publishing
company did not constitute such impossibility of performance
or frustration of purpose as would discharge contractual
obligation to pay agreed compensation during option period
and that continuance of such business could not be implied as
an additional condition of such obligation.

Decision reversed and order granting summary judgment
vacated and cause remanded with instructions and for further
proceedings not inconsistent with opinion.

**240   *182** Appeal from a decision of the Superior
Court of New Castle County granting defendant's motion for
summary judgment. Reversed and remanded.

**Attorneys and Law Firms**

Russell J. Willard, Jr., and Clarence W. Taylor, Hastings,
Lynch & Taylor, Wilmington, for appellant.

William E. Taylor, Jr., Wilmington, for appellee.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL,
JJ., sitting.

**Opinion**

**183** SOUTHERLAND, Chief Justice.

The principal question in this case is whether the doctrine of
impossibility or 'frustration' excused the defendant from its
contractual obligations to the plaintiff.

The facts are these:

Prior to October 3, 1946, Joseph H. Martin, plaintiff below,
was the president and owner of all the capital stock of Star
Publishing Company, the principal business of which was the
printing and publishing in the City of Wilmington of The
Sunday Star, a weekly newspaper.

On October 3, 1946, Martin entered into an agreement with
J. Edwin Carter for the sale of the business. This agreement
was the genesis of a later contract sued on in this case.

The October 3, 1946 agreement has given rise to a series of
law suits, and the end is not yet. Various aspects of the matter
have been three times before this Court. For its prior opinions
see the following cases: Star Publishing Co. v. Martin, 47 Del.
585, 95 A.2d 465; Star Publishing Co. v. Martin, 48 Del. 106,
95 A.2d 835; Bayard v. Martin, Del., 101 A.2d 329.

By the agreement of October 3, 1946, Martin sold to Carter all
his shares of stock in the Star for the sum of $105,500, payable
in installments and evidenced by a series of promissory notes
the last of which will mature February 1, 1957. These notes
include a power of attorney to confess judgment.

Paragraph 9 of the contract of October 3 provided in part:

'Carter will cause The Star Publishing
Company, upon final settlement, to retain
Martin as an advisor in the conduct
of its printing and publishing business,
such employment to be for the lifetime
of said Joseph H. Martin, Sr. Martin
hereby agrees to act in such capacity
and hold himself available at reasonable
times to perform his said duties.
The consideration for such contracted
employment shall be $40,000.00 payable
at the rate of $100.00 a week for the
first four hundred weeks from and   *184
after October 7, 1946, until the full
amount of $40,000.00 shall have been
paid to Martin, his heirs, administrators,
executors or nominees; and further that
if Martin shall be living and able and
willing to perform his duties hereunder

Martin shall continue to receive the sum of $100.00 a week for a period of 120 weeks.'

The four-hundred-week period we shall refer to as 'the first period'; the one-hundred and twenty-week period as 'the renewal period'.

Although these provisions were cast in the form of an employment agreement, it is quite clear that, at least so far as concerns the first period, the contract was little more than a means of paying Martin for the sale. Even if he died during this period his estate was to continue to receive the payments. Moreover, it is also clear that as concerns the renewal period the payment of the additional $12,000 was conditioned only upon his being alive and able to perform his duties.

**241** On November 15, 1946, in compliance with the covenant in paragraph 9 above quoted, Star entered into an agreement with Martin reciting the facts about the sale and providing in substance as follows:

1. The Star retained and employed Martin as an adviser 'in the conduct of its printing and publishing business.'

2. Martin agreed to perform the duties of advisor at reasonable times upon one week's notice from Star on every occasion when his services were demanded.

3. The Star agreed to pay to Martin or his estate $40,000 in weekly installments of $100 each for four hundred weeks, beginning from October 7, 1956. It was further provided:

> 'Said installments shall be due and payable irrespective of the extent or value of the services performed by Martin and irrespective of whether or not Martin is able to perform the above stated duties during any part or any of the period covered by the installments.'

*185** Paragraph 5 of the contract provides:

> 'Upon the expiration of the aforementioned period of four hundred

weeks beginning from and October 7, 1946, if Martin shall be living and able and willing to continue to perform the duties stated above, Martin shall have an irrevocable option to continue his employment and retainer as described in paragraphs 2 and 3 hereof for a period of one hundred and twenty weeks from the date on which Martin shall exercise such option or for such lesser period as Martin may be able to perform such duties, during which period The Star Publishing Company shall pay to Martin the sum of One Hundred Dollars ($100.) per week, payable weekly; irrespective of the extent or value of the services performed by Martin. Said option herein granted to Martin shall be exercised by him within thirty days from the date of expiration of the aforementioned four hundred week period by the mailing of written notice of the exercise of such option to The Star Publishing Company at 305–309 Shipley Street, Wilmington, Delaware.'

This is the agreement sued upon.

The contract of November 15 does little more than to spell out the provisions of paragraph 9 of the contract of October 3, 1946. The $40,000 is to be paid whether Martin lives or dies, or whether he is able to perform any services whatever. The payments during the renewal period are expressly conditioned only (1) upon the exercise by Martin of the option, and (2) upon his being alive and able to perform his duties, if any, during the period. The advisory service in the renewal period, as in the first period, is to be rendered only upon demand at every time when Star desires such service; and the payments in the renewal period, as in the first period, are due 'irrespective of the extent or value of the services performed by Martin'. Hence, although the provisions relating to the renewal period have some aspects of an employment agreement, they also, like the provisions for the first period, provide a means for giving Martin additional compensation for the sale of his business.

*186** The Star discontinued its business on April 18, 1954 and thereafter declined to make any payments on the contract. Martin brought an action to recover the remaining payments

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

due under the first period. This is not the suit before us. The trial court appears to have held that as to the first period the voluntary cessation of Star's business did not excuse Star from its contractual obligation to make the payments. This decision is not here questioned.

On June 1, 1954, some days before the end of the first period, Martin gave written notice of his exercise of the option granted to him by paragraph 5 of the November 15 agreement. Star refused payment and **242 the present suit was brought. Cross motions for summary judgment were filed. The court granted Star's motion. The trial judge held that the continued existence of Star's business was an implied or constructive condition of Star's obligation under paragraph 5; that the non-existence of the business made performance thereunder by Star excusably impossible; and that Star was therefore discharged from liability from the payments during the renewal period. Martin appeals.

*Was the continued existence of the Star's business an implied condition of its liability to Martin for the payments during the renewal period?*

In answering this question in the affirmative the trial judge first reviewed the principles of law relating to the defense of impossibility of performance. He then held that in the circumstances of this case it was reasonable to presume that when the contract was made both parties assumed that the defendant's business would be in existence when the time for performance in the renewal period arrived. He accordingly held that the existence of that business at such time was an implied condition of the contract.

With the statement of the general principles of the law in the court's opinion we are in accord. The doctrine of impossibility or 'frustration' has been evolved 'from the court's sense of justice'. 6 Williston on Contracts', § 1937. The classes of cases **187 to which the rule is applicable are stated by Williston as follows:
'(1) Impossibility due to domestic law;

'(2) Impossibility due to the death or illness of one who by the terms of the contract was to do an act requiring his personal performance;

'(3) Impossibility due to fortuitous destruction or change in character of something to which the contract related, or which by the terms of the contract was made a necessary means of performance.

'The fourth class of cases, to which allusion was made above as standing on more debatable ground, comprises cases where impossibility is due to the failure of some means of performance, contemplated but not contracted for.

'The fifth class does not strictly fall within the boundaries of impossibility. Performance remains entirely possible, but the whole value of the performance to one of the parties at least, and the basic reason recognized as such by *both* parties, for entering into the contract has been destroyed by a supervening and unforeseen event.'

In applying the law the courts have attempted to square the result with the principles of contract law by finding 'an implied condition' in the contract. It is increasingly recognized that in this field of the law the so-called implied condition is a fiction—an effort 'at rationalizing a judicial process'. 6 Corbin on Contracts, § 1331. See the English authorities cited in note 61 to the text.

It is unnecessary for us to review the development of this rule or attempt to delimit its scope, since we are clearly of the opinion that the rule has no application to the case before us. We find no decision, either in the opinion of the court below or in the Star's brief, holding the rule to be applicable to a case in which the unforeseen event or the destruction of *188 the subject matter of the contract is the voluntary act of the promisor in closing down his business. The event that creates the impossibility must be a fortuitous one. See the quotation from Williston, above, and see § 1959 in which the author says: 'It is only fortuitous impossibility that excuses from liability * * *'.

In 6 Corbin on Contracts, § 1329, it is said:

> 'In all the cases holding that the promisor was discharged from duty by **243 impossibility of performance or frustration of purpose, it has been assumed that the promisor was not himself the responsible cause of the impossibility or frustration.'

A corporation is not excused from performance of an agreement to pay money because it voluntarily dissolves or discontinues its business. There may be cases in which enforced dissolution of a corporation will relieve it of

obligations of a personal character under a contract. Tenner v. Retlaw Dev. Corp., 163 Misc. 248, 295 N.Y.S. 31.

'If, however, the corporation involuntarily dissolves itself, or winds up its business, even such a contract [where the obligation is personal in character], though made impossible of performance, is made so by the act of the corporation, and it or its assets are liable for its failure to fulfill its obligations'. 6 Williston, § 1960.

A fortiori, where the obligation is merely to pay money, as here, the corporation remains liable.
Star voluntarily chose to discontinue its business, presumably for financial reasons. Impossibility originating in financial incapacity is no excuse. 6 Williston on Contracts, § 1960.

There is ample authority that a contract to pay for services to be rendered over a specified period is not discharged by the voluntary cessation of business of the employer. Tiffin Glass Co. v. Stoehr, 54 Ohio St. 157, 43 N.E. 279 (voluntary dissolution); **189 Merchants Life Ins. Co. v. Griswold, Tex.Civ.App., 212 S.W. 807 (voluntary amendment of charter precluding continuation of certain type of business); St. Louis & Denver Land & Mining Co. v. Tierney, 5 Colo. 582 (voluntary discontinuance of certain type of business); Madden v. Jacobs, 52 La.Ann. 2107, 28 S. 225 (voluntary cessation of business); MacGregor v. Union Life Ins. Co., 8 Cir., 121 F. 493 (discontinuance of business by insurance company is no defense to suit on five-year contract with agent).

In Baumer v. Franklin County Distilling Co., 6 Cir., 135 F.2d 384, 388, it was held that a contract with a salesman to push a certain brand of whiskey was not discharged because the distilling company elected to withdraw the brand from the market. The Court said:

'No specific provision that the appellee should remain in the distilling business was necessary to entitle appellant to rely upon the implied obligation inherent in appellee's promise to supply the K. Taylor brand during the three-year life of the contract. An agency contract, terminable at will, is not to be deduced from the terms of the contract itself, or by necessary implication from its setting.

On the contrary, the contract expressly provided for performance by both parties of their several obligations throughout a course of three years' time. It has long been established law that one, who, by his own action has rendered himself incapable of performing a contract, may not successfully plead impossibility of performance in defense of his breach.'

See also Brearton v. De Witt, 252 N.Y. 495, 170 N.E. 119; and compare Gamble v. Penn Valley Crude Oil Corp., Del.Ch., 104 A.2d 257 (voluntary dissolution of corporation no defense to action for damages on stock option contract).

We have examined all the cases cited in the opinion of the trial court and in the brief for Star. None of them is in point. Duff v. Trenton Beverage Co., 4 N.J. 595, 73 A.2d 578, is a case of impossibility because of illegality. Gouled v. Holwitz, 95 N.J.L. 277, 113 A. 323, is a case of frustration by destruction by **190 a third party of the subject matter of the contract. Greek Catholic Congregation v. Plummer, 338 Pa. 373, 12 A.2d 435, 127 A.L.R. 1008 is a case **244 of discharge 'by reason of considerations beyond the control of the parties'. Tamplin Steamship Co. Ltd. v. Anglo-Mexican Pet. Products Co. Ltd., 2 AC 397 [1916], involves a seizure by the Admiralty of a ship under charter party. Housing Authority v. East Tennessee, etc., 183 Va. 64, 31 S.E.2d 273, involves the failure of a nearby supply of natural gas caused by no fault of either party. Lagenberg v. Guy, 77 Cal.App. 664, 247 P. 621, turns on the language of the contract itself.

We are accordingly constrained to disagree with the court's conclusion that the doctrine of impossibility or frustration availed to defeat Martin's action on the contract.

However, the opinion below may be read as holding that even if the defense of impossibility is not applicable, yet an implied term or condition may be read into the contract, i. e., that the language of the agreement, in the light of the situation of the parties, discloses an intention that Star was not to be liable to Martin during the renewal period if it had no business to offer him and therefore no occasion for his services.

Of course, there are cases in which a necessary term of a contract, omitted through inadvertence, may be supplied by the court from principles of law. If no time for performance is fixed, the court will imply a reasonable time, or if a contract fails to provide specifically for the payment of goods sold, a

50 Del. 181, 126 A.2d 238

promise to pay will be implied, and the like. See 17 C.J.S., Contracts, § 328, and cases cited. These are cases in which a court may confidently say that it has merely effectuated the intention of the parties. But no such case is made here.

There is no language in the contract justifying the inference that anything was omitted. Moreover, the provisions for payment over a specified period, conditioned only on Martin's life and capacity, are inconsistent with the term sought to be implied. As the court said of the contract before it in the Baumer case, **\*191** supra, a contract terminable at will is not to be deduced from the terms of this contract or its setting. One usual test for implying a term omitted from a contract is a determination by the court that the parties would certainly have agreed to it had it been proposed. See Cousins Inv. Co. v. Hastings Clothing Co., 45 Cal.App.2d 141, 113 P.2d 878, 882. How can we say that Martin would have agreed to such a condition if Star had proposed it? Against the background of this contract it seems most unlikely, because the provisions for the payments were, as we have said, a means by which Star itself paid Martin additional consideration for the sale.

It is said there is no reason for the distinction between the provisions respecting the first period and the provisions respecting the renewal period if the continued existence of Star's business was not to be implied as a condition of Star's liability. This does not follow. Martin's age was a sufficient reason for the distinction. It was not strange that the parties should stipulate for the payment of $40,000 over a period of four hundred weeks as an absolute obligation and an additional $12,000 only if Martin continued to live and was able to render services. At all events that is the bargain they made. Indeed, the contract of October 3 contained a clause that the payments were to be made during Martin's lifetime, although this clause is inconsistent with subsequent clauses. The contract sued upon resolves this ambiguity in favor of Star, but in our opinion does nothing more than to make the obligation during the renewal period dependent upon the conditions expressly set forth, and upon nothing more.

The court below held, correctly we think, that there was no implied term that the Star continue its business for Martin's benefit; but we think that there is likewise no implied term that Star's obligation to **\*\*245** Martin should cease merely because it chose to discontinue its business.

In any view of the case we are of the opinion that the implied condition cannot be read into the contract.

**\*192** Our holding on this point requires us to consider a second contention on behalf of Star made below and renewed here. Because of his holding on the first contention, it was unnecessary for the trial judge to consider it.

It is contended that Martin's exercise of his option under paragraph 5 of the November 15th contract was legally ineffective because given prior to June 10, 1954, the date of the expiration of the first period. Paragraph 5 of the contract quoted above provides that Martin shall exercise his option 'within thirty days from the date of the expiration of the Star's four hundred week period \* \* \*'. This means, says Star, that the notice must be given *after* the date of such expiration and a notice given before such expiration is ineffectual.

The notice given by Martin was in the following language:

> 'I hereby exercise my irrevocable option as provided in that paragraph of our agreement to continue my employment and retainer. I am ready and able to comply with its terms and ask that I be paid therefore $100 a week for 120 weeks beginning with the week of June 20, 1954 and payable on the subsequent Wednesday of each week until the agreement ends.'

We think that the natural interpretation of the notice is that Martin elected to exercise the option as of the date he specified, i. e., 'beginning with the week of June 20, 1954'. The legal effect was the same, it seems to us, as if Martin had dated and mailed his letter on the first day of the week of the weekly period referred to—presumably June 20, 1954. However the reference to the week may be interpreted, the effective renewal date falls within the thirty-day period prescribed by the contract, and hence the notice was a compliance with its terms. Star's argument to the contrary is based on the assumption that Martin's letter is to be construed as giving notice of a renewal to commence with the date of his letter. Since this assumption is erroneous, the contention fails. Likewise falls with it the further contention that Martin must be alive at the time of actually **\*193** giving the notice. Its legal effect was conditioned upon his being alive at the time of the effective date of the exercise of the option. Since he was alive at that time the notice was valid.

50 Del. 181, 126 A.2d 238

It follows that the decision below must be reversed and the order of the trial court granting summary judgment must be vacated.

In remanding the cause to the court below, we should add that an examination of the pleadings shows that our decision does not terminate this litigation. Star has pleaded defenses other than those we have passed upon, and it will be open to Star to press any or all of such other defenses as it sees fit.

The cause is remanded to the Superior Court of New Castle County with instructions as above set forth and for further proceedings not inconsistent with this opinion.

**All Citations**

11 Terry 181, 50 Del. 181, 126 A.2d 238

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   6

# APPENDIX A-6

2004 WL 7325622
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Common Pleas of Delaware,
IN AND FOR SUSSEX COUNTY.

Jerry MUELLER, Appellant/Defendant Below,
v.
Harold MARVEL, Appellee/Plaintiff Below.

C.A. No. 03–07–110
|
Submitted October 26, 2004
|
Decided December 8, 2004

**Attorneys and Law Firms**

Jerry Mueller, Pro Se, Appellant/Defendant

James C. Reed, Esquire, counsel for Appellee/Plaintiff

**DECISION AFTER TRIAL**

Kenneth S. Clark, Jr.

*1  On October 9, 2004 a trial *de novo* was held in the above-captioned matter, on appeal from the Justice of the Peace Court. This is the Court's findings and decision.

**FACTS**

At all times relevant to this matter, Appellant–Defendant Jerry Mueller ("Defendant") owned real property in this County improved by a two-story chicken house no longer used to grow chickens. Appellee–Plaintiff Harold Marvel ("Plaintiff") is a farmer who grew hay and straw. The parties entered into a one-year, oral contract sometime in the late spring of 2000, for Plaintiff's use of the two-story chicken house to store hay and straw, which Plaintiff offered for sale to his customers. The annual rent for use of the building was $1,000.00. Plaintiff began storing hay and straw in the chicken house in the late spring of 2000. He paid the annual rent for the 2000–2001 year on January 27, 2001.

The Defendant allowed the Plaintiff to continue storing and selling hay and straw at the chicken house the following year, through the summer of 2001. The Plaintiff paid the rent for the 2001–2002 year on April 8, 2002.

The Plaintiff continued to store and sell hay and straw at the chicken house through the summer of 2002. As of August 26, 2002, the Plaintiff had not yet paid his annual rent for the 2002–2003 year.

In July 2002 the structure of the chicken house began to significantly lean and collapse in parts. The sides buckled and caved in between floors. In the center of the building the roof collapsed and was resting on the hay and straw stored on the second floor. The Defendant became concerned with the safety of the structure, since Plaintiff continued to send his customers, unescorted, into the building to retrieve purchased product. In July and early August, the Defendant spoke to Plaintiff at least twice and expressed his concerns, and requested that Plaintiff remove his product from the building and cease sending customers into the building to purchase hay and straw. Plaintiff did not remove the product, and continued to send customers into the building. In early to mid August the Defendant placed yellow tape and a "No Trespassers" sign at the entrance of the chicken house.

On August 26, 2002, the Defendant hand-delivered a letter to the Plaintiff's wife and to the Plaintiff's residential mailbox. It stated that the lease agreement was terminated and that the building would be demolished on August 27, 2002. The letter gave Plaintiff permission to remove his hay and straw from the premises on August 27th "upon payment of the rent due." On the same day, the Plaintiff hired a demolition crew to tear down the chicken house. On August 27, 2002 the demolition began.

Plaintiff did not remove the product prior to the commencement of the demolition. Defendant testified it was his intention to continue storing the product on his property during and after the demolition to enable Plaintiff to retrieve the hay and straw, and that the demolition was planned in such a way to permit the Plaintiff to remove the material. After the first day of demolition work, however, and after many months of drought, it rained non-stop for the next eight days. Some of the hay and straw was damaged by water. After the rains, Plaintiff removed less than half of the hay and straw, and claims that the balance was unusable. Plaintiff claims he lost 3,753 bales of hay, at $4.00 per bale, and 3,554 bales of straw, at $2.50 per bale. Plaintiff filed suit

against Defendant for damages, claiming Defendant breached the rental agreement by unilaterally terminating the lease and demolishing the building. Defendant counterclaimed for damages, claiming, *inter alia*, that Plaintiff's negligence and misuse of the structure caused it to collapse, creating an immediate danger to Defendant and Plaintiff's employees and customers.

## DISCUSSION

### *Applicable Law*

**\*2** The facts establish that in mid–2000 the parties entered into an oral, annual commercial lease, as defined in 25 *Del. C.* § 6102(1).The Residential Landlord Tenant Code is not applicable in this case. *See, Lloyd Walsh, Inc. v. M.C. Holdings Co.*, 2001 WL 1555960, *3 (Del. Com. Pl. 2001). Under the provisions of the Landlord–Tenant Code in effect at the time the subject lease was entered into, a rental agreement for a commercial rental unit is excluded from the Code. 25 *Del. C.* § 5101(b). The statute also provides that all legal rights and remedies related to a commercial rental unit are governed by general contract principles. Id. Therefore, the questions before this Court will be decided under Delaware contract law. To be successful under general contract law, the Plaintiff has the burden of proving that the Defendant breached the contract by a preponderance of the evidence. *Guthridge v. Pen–Mod, Inc.*, 239 A.2d 709, 713 (Del. Super. 1967).

### *Validity of the Lease Agreement in August 2002*

The parties agree that the lease agreement was valid for the 2000–2001 and 2001–2002 years. However, Defendant contends that the agreement was no longer in effect in August, 2002, because the Plaintiff had not paid the 2002–2003 annual rent by August. In the late spring of 2000, the Plaintiff orally agreed to pay $1,000.00 per year to the Defendant for use of the chicken house. No exact beginning date of this oral lease was established at trial, but the Plaintiff testified that he had the chicken house cleaned out just prior to storing hay and straw in the structure. The cleaning invoice indicates that occurred on June 8–9, 2000. Thus, the Court infers that the agreement took effect shortly before June 8, 2000. According to the testimony of both the Plaintiff and the Defendant, the Plaintiff stored hay and straw in the building continuously until the chicken house was destroyed on August 26, 2002.

Copies of two checks in the amount of $1,000.00 from the Plaintiff to the Defendant were admitted in evidence. The Plaintiff testified that the first check, dated January 27, 2001, represented payment for the 2000–2001 lease period. He also testified that the second check, dated April 8, 2002, represented payment for the 2001–2002 year.

The facts before the Court indicate that the parties engaged in an oral, bare-bones agreement. The parties agreed only on an annual rental price and the purpose for which the chicken house would be used. They did not specify when or how the rent would be paid. Because the agreement itself is void of a payment date, this Court must look to the parties' course of conduct to determine when the 2002–2003 rent became due.

The only consistent characteristic of the payments received for the 2000–2001 and 2001–2002 years is that the payments were not made at the beginning of the lease period; rather they were made near the end of the lease term, and prior to the harvesting and storage of the next crop. The Defendant accepted these payments both years. The course of conduct between the parties establishes that rent payable at the end of each lease period. Since the rent was not past due on August 26, 2002, the lease had not terminated for non-payment of rent.

### *Breach of Contract*

The Defendant testified that he became increasingly concerned about the condition of the chicken house through the month of August 2002. After his requests that Plaintiff remove the product from the collapsed building went unheeded, Defendant delivered a letter to the Plaintiff unilaterally terminating the lease agreement on August 26, 2002.

A unilateral attempt to terminate a contract is a repudiation. *Rochdale Village, Inc. v. Public Service Employees Union*, 605 F.2d 1290, 1297 (2nd Cir. 1979). If the contract does not provide a right to unilaterally terminate the contract then the repudiation does not terminate the contract, it breaches the contract. Id. The agreement at issue did not provide any right for either party to unilaterally terminate the contract. Therefore, the Defendant's repudiation on August 26, 2002 constituted a breach of the contract.

**\*3** The Court finds, however, that Plaintiff has failed to meet his burden of proof as to the amount of damages with

sufficient specificity. Plaintiff was unable to establish by a preponderance of the evidence the amount of hay and straw remaining in the chicken house as of August 27, 2002. It is clear from the evidence that Plaintiff permitted his customers to come, unescorted, to the chicken house and remove hay and straw, and that such activity had occurred all summer. Further, the Court is not convinced by the testimony and evidence as to the amount of straw and hay Plaintiff removed after the demolition of the chicken house, or the amount of hay and straw rendered unusable, if any. Finally, Plaintiff gave conflicting evidence regarding the price he sold his product for at the end of August, 2002. In order to prevail upon his claim, Plaintiff must meet his burden of proof as to the amount of his damages. He has failed to do so; the Court may not speculate as to Plaintiff's damages. The Court cannot reasonably infer or approximate the amount of Plaintiff's damages with any degree of certainty from the evidence presented. *Pioneer Hi–Bred Int'l v. Holden Found. Seeds*, 35 F.3d 1226, 1245 (8 th Cir. 1994); *Del. Express Shuttle v. Older*, 2002 Del. Ch. LEXIS 124, at 59–60. Plaintiff's claim therefore must be denied.

*Impossibility Defense*

Even if Plaintiff had sufficiently proven the amount of his damages, the Court finds that Defendant was excused from further performance under the contract. Defendant's allegations of the collapse and unsafe condition of the chicken house raised in his pleadings amount to an asserted defense of impossibility. A promisor is released from liability for breach of contract when further performance is impossible. Under Delaware law, this defense is applicable only when the impossibility of performance is caused by a fortuitous event and not by an act of the promisor's own volition. *Martin v. Star Publishing Co.,* 126 A.2d 238, 242 (Del. 1956). The Restatement defines "impossibility" as something that is impracticable because of extreme and unreasonable difficulty, expense, injury or loss. *Restatement Contracts* § 454 (1932).

The Delaware Supreme Court has noted different classes of impossibility or frustration. One class is, "impossibility due to fortuitous destruction or change in character of something to which the contract related, or which by the terms of the contract was made a necessary means of performance." *Martin* at 242,. Although the *Martin* court did not find that the stated class applied, in dicta, the court acknowledged the validity of the class. *Id.*

Section 460(2) of the Restatement of Contracts explains the class of impossibility that relates to the fortuitous destruction of something that is material to the contract. The Restatement provides that where the existence of a specific thing is necessary for performance of a promise in the bargain, and that thing is materially deteriorated, the parties are discharged from their duty to perform. *Id.* The Restatement explains that when the essential thing is materially deteriorated, the promisor is discharged from his obligation to perform, unless the promisee remains ready and willing to render in full the agreed exchange for that part of the performance that remains possible. *Id.* However, even if the promisee remains willing to perform, the promisor may still be discharged from his obligation if the deterioration would make performance by him materially more burdensome. *Id.*

To determine whether the defense of impossibility applies to this case, the Court will consider three elements: first, whether the chicken house was necessary for the performance of the promise between the Defendant and the Plaintiff; second, whether the chicken house was materially deteriorated; and third, whether fortuitous circumstances rendered the chicken house materially deteriorated.

As the actual object of the lease, the chicken house obviously was necessary for the performance of the contract. The chicken house had materially deteriorated, to the point of collapse, at the time of the breach. Pictures submitted by the Defendant, dated August 26, 2002, provide the Court with a visual image of the structure's severe dilapidation. Defendant testified that the building had collapsed some time in July 2002, and over a short period of time. Plaintiff testified that the building had become so unstable that it collapsed in the center portion, and that he would be unable to remove approximately one half of the hay and straw stored in the structure due to its condition. Finally, it is clear from the testimony and evidence that Plaintiff continued to send customers to retrieve straw and hay from the building, despite Defendant's warnings about the unsafe condition of the building. The Court is not in need of expert testimony to find the building was unsafe for invitees to enter. A two-story building with buckled and caved-in sides and a collapsed roof held up only by the straw and hay stored inside it is clearly unsafe for continued use and occupation. Although Plaintiff may have wished to continue using the collapsed building, such use would have made Defendant's continued performance under the contract materially more burdensome due to his potential liability for personal injury damages to

Plaintiff's customers. Consequently, the Court finds that the second element of the impossibility defense is satisfied.

**\*4** The final element requires the Court to consider whether the material deterioration was the result of a fortuitous circumstance. The evidence supports a finding that it was fortuitous circumstances, and no action or inaction of Defendant, that caused the structure's collapse. Evidence submitted by both parties indicates the building was old, and at the end of its useful life, and in fact was being used by Plaintiff for a use other than that for which it was designed. The evidence indicates the building collapsed suddenly due to its age and the Plaintiff's contracted use of the building. Thus, fortuitous circumstances caused the material deterioration of the chicken house. The Court finds that further performance under the lease by Defendant, i.e., the provision of the rented building for storage of Platinff's product and retrieval of that product by Plaintiff's customers, was rendered impossible by the collapse of the building.

### *Counterclaim*

In his counterclaim, Defendant alleges that Plaintiff's negligence and "misuse" of the building caused its collapse. Defendant seeks $9,907.00 in damages as his costs in demolishing the building, as well as damages for "pain and suffering of mental anguish and duress." After review of the evidence, the Court finds that Defendant failed to meet his burden of proof as to any element of his counterclaim. Although the building may have collapsed from Plaintiff's use

of the building in storing thousands of bales of straw and hay on both floors, that is exactly the use the parties anticipated in their contract. Plaintiff failed to establish any other "misuse" or negligence on the part of Plaintiff, or any related causation as to the collapse of the building. Plaintiff's counterclaim is denied.

### CONCLUSION

The lease contract between the parties was valid and effective as of August 26, 2002. The Defendant's termination letter dated that same day constituted a repudiation of the contract between the parties. Thus, the Defendant breached the contract. However, Plaintiff has failed to prove its damages with specificity. Further, the Defendant is excused from any liability stemming from the breach because further performance was rendered impossible by the prior collapse and unsafe condition of the building. Therefore, judgment is entered in favor of Defendant, and against Plaintiff on Plaintiff's claim. Defendant failed to meet his burden of proof as to his counterclaim. Therefore, judgment on the counterclaim in entered in favor of Plaintiff, and against Defendant. Each party shall bear his own costs.

**IT IS SO ORDERED.**

### All Citations

Not Reported in A.2d, 2004 WL 7325622

---

Case 20-14695-LMI Doc 756 Filed 10/22/20 Pages174 of 221

APPENDIX A-9

Munro v. Beazer Home Corp., Not Reported in A.3d (2011)

Case 20-14695-LMI Doc 756 Filed 10/22/20 Page 175 of 221
Case 4:19-cv-04349-KAW Document 73-9 Filed on 04/23/20 in TXSD Page 44 of 89

2011 WL 2651910
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Common Pleas of Delaware,
Sussex County.

Timothy J. MUNRO, Plaintiff

v.

BEAZER HOME CORPORATION,
Kenwood Development LLC,
Kenneth S. Woodring, Defendant(s).

Civil No. U608–03–081.
|
Submitted: May 5, 2011.
|
Decided: June 23, 2011.

**Attorneys and Law Firms**

Dean A. Campbell, Esquire, counsel for Plaintiff.

Charles J. Brown, Esquire, counsel for Beazer Homes.

David N. Rutt, Esquire, counsel for Kenneth Woodring.

**DECISION AFTER TRIAL**

ROSEMARY BETTS BEAUREGARD, Judge.

 **\*1** Plaintiff Timothy Munro brings this action for damages alleging that defendants promised to connect his property to the Fenwick Island Sewer District and failed to do so. In addition to breach of contract against all parties, Munro brings an action in fraud against Defendant Kenneth Woodring and an action in *quantum meruit* against Defendant Beazer Homes Corporation. Both defendants deny liability or, in the alternative, assert the other is liable. Finally, the parties stipulate that Woodring's sole proprietorship, Kenwood Development Co., is a nominal party only and that Woodring assumed personal liability for all Kenwood contracts material to the litigation.

There are essentially two issues: (1) Was Woodring or Beazer contractually obligated to connect Munro's home to the Fenwick Island Sewer District; and (2) if so, did Munro suffer any damages?

At the conclusion of the trial on this matter, the Court reserved decision and requested that the parties submit their closing arguments in writing. After carefully reviewing the parties' submissions, the Court finds in favor of Munro and Beazer and against Woodring for the reasons stated herein.

**FACTUAL BACKGROUND**

Woodring is a Maryland-based real estate developer who, during the late 1990s, operated in Sussex County, Delaware. Woodring, with the help of two third-party investors, purchased a parcel of land now known as Ashley Manor for approximately $300,000.

The Ashley Manor parcel is located northwest of Fenwick Island, a popular beach community. Woodring and his investors purchased the parcel with the intention of developing it into a large residential community, complete with a community pool and club house. [1] As for the prospective residents, Woodring envisaged their "average age ... [to be] between 65 and 75. Not the type of people to be running thru [sic] the woods ..."; that is to say, Woodring intended to create a relaxing retirement community by the beach. [2]

Before Woodring could begin construction of the Ashley Manor development, however, he needed to rezone the parcel. At the time of its purchase, Ashley Manor sat in an agricultural residential district. This would not suit the large retirement community planned by Woodring. [3] Thus, Woodring and his landscape architects submitted an application to the Sussex County Council to rezone the Ashley Manor parcel into a high density residential district. [4]

Woodring's application was a partial success. The Sussex County Council agreed to rezone the Ashley Manor parcel into a high density residential district on the condition that Woodring connect it and adjacent properties to the Fenwick Island Sanitary Sewer District. [5] Satisfaction of this condition required the approval of adjacent landowners whose properties were served by privately owned septic systems. [6]

Woodring's architects first proposed to accomplish the necessary connection through a series of subterranean easements. Pursuant to this proposal, Woodring planned to run eight-inch diameter pipes from the Ashley Manor parcel in a southeasterly direction across adjacent properties and, ultimately, connect the pipes to a pump station within the Sewer District. One of these planned easements would run through the property of Timothy Munro. [7]

 *2  Munro did not share Woodring's desire to bring sewer services to the area. It was Munro's view that his new septic system capably served his needs and he did not want to pay any additional expenses associated with a sewer connection. Moreover, Munro feared that the future residents of Ashley Manor would trespass across his land by way of the proposed easement toward a convenience store located across the street. Accordingly, Munro objected to Woodring's initial plan. [8]

In response, Woodring submitted a new proposal that avoided the need for an easement across Munro's property. [9] The new proposal, however, did not avoid the annexation of Munro's property into the Sewer District. Thus, Woodring still required Munro's acquiescence to the plan. [10]

The rezoning was vital to Woodring's success with the Ashley Manor project. Woodring, therefore, approached Munro to gain his approval. After some negotiation, Munro agreed to remove this objection of Woodring's second proposal as consideration for the first of two agreements ("first contract"):

> In consideration for your cooperation in the expansion of the sewer district, we hereby agree to be responsible for any monetary impact this may have on your property. This would include Front Foot Benefit Charges, increase in property taxes and *if required,* connection fees and cost of sewer service.
>
> Sussex County allows for exemptions for sewer connections under certain circumstances. Kenwood Development Co. [i.e., Woodring's sole proprietorship] accepts the responsibility for filing any documents if an exemption is required.
>
> This agreement will be for a period of 10 years from date of sewer services availability. [11]

Pursuant to this agreement, Munro sent a letter to Sussex County Council and removed his objection to Woodring's

second proposal. [12]  Woodring, however, never sought an exemption on behalf of Munro.

Despite his contractual obligation to withhold his opposition to the Sewer District expansion, Munro renewed his objection less than one year later at a public hearing. [13]  Evidently, Munro still had concerns, perhaps *new* concerns, regarding the expansion of the Sewer District. The Council, therefore, reserved its decision on Woodring's second proposal and provided Woodring and Munro an opportunity to discuss possible solutions. The parties' negotiations produced a second agreement ("second contract"):

> As we discussed ... the expansion of the sewer district will eliminate the possibility in the future for you to construct a replacement LPP septic system to serve your personal residence. This letter is offered to confirm an agreement we discussed as follows:
>
> **At such time that Ashley Manor residential planned community is constructed, and the gravity sewer piping is installed ... to serve Ashley Manor, a small diameter force main will be installed from [the gravity sewer] to your residence. The force main as currently envisioned will be approximately one (1) inch in diameter ... The cost of installation of the force main will be borne entirely by the Ashley Manor developer. [14]**

 *3  In a subsequent letter, Woodring assured Munro that the foregoing agreement incorporated the original contract. [15]

Munro, thereafter, removed his second objection to Woodring's proposal. As a result, the Sussex County Board adopted a resolution to expand the Sewer District to include Ashley Manor and, incidentally, the Munro property. [16]

Despite his success in securing all the necessary approvals for the Ashley Manor development, Woodring could not maintain ownership of the project long enough to see construction begin. A business dispute between Woodring and his investors required the intervention of the Court of Chancery which resolved the conflict by ordering a partition of the property. As a result, Woodring and his fellow investors entered into negotiations with Beazer, a home builder and dealer.

Beazer ultimately agreed to purchase Ashley Manor from Woodring and his investors for $4,275,000. The Agreement

Munro v. Beazer Home Corp., Not Reported in A.3d (2011)

Case 20-14695-LMI Doc 756 Filed 10/22/20 Page 137 of 221
Case 4:20-cv-01793-DMR Document 7-31 Filed on 04/23/20 in TXSD Page 46 of 89

of Sale contained a Due Diligence Clause whereby Beazer reserved the right to walk away freely if dissatisfied with the information provided by Woodring. The parties twice executed amendments to the agreement which, together, extended the due diligence period to over 100 days. [17]

During this time, Woodring provided Beazer access to a series of private business documents. These documents included a federal wetlands delineation and boundary survey, a series of preliminary site plans, letters associated with an environmental impact study, letters concerning zoning approval, agreements with a local water company, and a copy of minutes from the Sussex County Council hearing wherein the Council approved the expansion of the Sewer District. [18] To the Court's knowledge, the copy of these minutes is the only document that gives mention of Munro. The minutes do not document any obligation to connect Munro to the Sewer District.

In addition, Beazer had access to any publicly accessible information concerning the Ashley Manor development held by State agencies. A memorandum drafted by Woodring's architects and provided to Beazer during the due diligence period recommended that "[a]dditional research should be undertaken at the Sussex County Planning and Zoning Department, Sussex County Engineering Department, Delaware Department of Transportation, Sussex Conservation District, Natural Resources Conservation Services, DNREC, and the Office of The State Fire Marshall." [19]

The Court heard testimony that information held by these agencies contained references to the Munro–Woodring contracts. Despite the architects' recommendations, Beazer did not inspect these public resources.

After the due diligence period expired, but before settlement, Beazer assigned the Agreement of Sale to Beazer's general contractor, Ashley Manor, LLC, which ultimately settled on the property. Prior to closing, Woodring and his investors assigned "all their rights, title, and interest in all Plans and other Development Data prepared by and/or acquired by and utilized by Seller's engineer ... to secure the approval of the Preliminary Site Plan ..." [20]

**\*4** Ashley Manor, LLC began construction of the retirement community sometime after settlement and, in the process, connected it to the Sewer District. At this time, however,

the subcontractor responsible for Ashley Manor's sewer connection refused to connect Munro.

Munro contacted his counsel in this case soon after it became apparent that Ashley Manor's subcontractor did not intend to connect Munro's property to the Sewer District. Munro's councel, thereafter, dispatched a letter to both Beazer and Woodring demanding assurance that the parties intend to honor the Munro–Woodring contracts by performing a sewer connection and by paying any economic impact incurred to Munro associated with the Sewer District expansion. [21]

In response, then-councel for Beazer denied any knowledge of the Munro Woodring contracts and indicated that it had no intention of performing any obligation undertaken by Woodring. [22] Woodring, likewise, denied any liability for the Munro–Woodring contracts. Instead, Woodring stated that Beazer assumed his prior obligations at the time of its purchase of the Ashley Manor development. [23]

At the present time, Munro's property remains unconnected to the Sewer District. Although the Court heard some testimony that it is possible for Munro to obtain an exemption from Sussex County's requirement that residents living within the Sewer District connect to the sewer, neither Munro nor any of the defendants have applied for one. Woodring, however, testified that he is ready to do so now. Even so, such exemptions are discretionary with Sussex County Council and not guaranteed. Moreover, it is clear that, even with an exemption, Munro would be required by the County to purchase a sewer connection should his septic system fail in the future.

In light of the foregoing, Munro alleges that Woodring undertook a contractual obligation to connect his home to the Sewer District and failed to do so. Alternatively, Munro argues that Beazer assumed Woodring's obligation in connection with its purchase of the Ashley Manor development. Both defendants deny liability or, in the alternative, assert that the other is liable. In addition, Munro argues that, even if Beazer did not assume a contractual obligation to connect Munro to the Sewer District, it is liable for the unjust benefit it incurred through Woodring's alleged breach. Finally, Munro brought an action against Woodring for common law fraud. The Court, however, did not hear any evidence concerning this claim. Munro's fraud claim is, therefore, dismissed at this time.

## ANALYSIS

### Breach of Contract

The first issue is whether the two contracts, when read together or independently, impose an enforceable contractual obligation on Woodring to connect Munro to the Sewer District. The defendants argue that the first contract is not presently enforceable because, although it does impose such an obligation, that obligation was conditional on Munro's need to connect to the Sewer District in the first instance. The Court finds instead that Woodring waived the alleged condition through both his conduct and by express promise.

**\*5** Delaware courts adhere to the objective theory of contracts. Unless a contract is ambiguous or there exists a suggestion of mistake, fraud, or duress, our courts give effect to the contract as it is written and understood by a reasonable third-party. [24] In doing so here, the Court looks only to the plain meaning of the terms found within the four corners of the agreement. [25]

In the first contract, Woodring expressly assumed liability "for any monetary impact" the sewer expansion had on Munro's property, including "connection fees and costs of sewer service ... for 10 years from date of sewer service availability." [26] The Court finds that it was reasonable for Munro to expect, based on this language, that Woodring assumed a contractual obligation to connect Munro's property to the sewer. The additional term "if required," however, raises a supplemental issue as to whether the parties intended to make this obligation conditional.

Express language in a contract that qualifies a promise to perform upon the happening of a stated event creates what is known as a condition precedent. [27] A condition precedent is an event that, although not certain to occur, must occur before performance under a contract becomes due. [28] Courts interpret language such as "if," "as soon as," or "provided that" as the express creation of a condition. Even if such language is used and a condition precedent is created, it may be waived when a party conducts itself in such a way that evidences such an intention. [29] Consideration is not necessary to support a waiver if the condition precedent is inserted into the contract for the waiving party's benefit. [30]

The Court finds that the parties' inclusion of the phrase "if required" is sufficient for the creation of a condition precedent. Further, a reasonable interpretation of the condition is that Woodring's performance obligation arises *only if* Sussex County deems Munro's sewer connection necessary. This interpretation of the condition is supported by the language of the contract itself: "Sussex County allows for exemptions for sewer connections under certain circumstances. Kenwood Development Co. [i.e., Woodring's sole proprietorship] accepts the responsibility for filing any documents if an exemption is required." [31]

Woodring argues, however, that the condition precedent has not been satisfied because Sussex County has yet to require Munro to connect to the sewer. Notwithstanding this contention, the Court finds that Woodring waived the condition precedent in two ways:

First, Woodring's conduct following execution of the contract evidences his intent to waive the condition. Woodring "accept[ed] the responsibility for filing any documents if an exemption is required." [32] Woodring and his architects learned that an exemption was required only a few months after the execution of the contract upon receipt of a letter from the Sussex County Engineering Department which stated precisely that. [33] Despite this understanding, Woodring testified that he did not bother to file the necessary exemption application with Sussex County until faced with the present litigation. If Woodring intended to secure the benefit of the condition precedent, he would have followed through with the exemption application process and made certain that a sewer connection was unnecessary.

**\*6** Second, Woodring expressly waived the condition precedent through the language of the second agreement. That agreement provides that "[a]t *such time* that the Ashley Manor residential planned community is constructed, and that the gravity sewer piping is installed along Route 20 to serve Ashley Manor, a small diameter force main *will be* installed from the Route 20 gravity sewer to your residence." [34] The language "[a]t such time" and "will be" effectively eliminate the function of the condition.

Beazer contends that the second agreement should be disregarded because it is a modification of the initial contract and lacks valid consideration. Specifically, Beazer posits that the purported consideration for the modification was Munro's promise to withhold his objection to the Sewer District

Munro v. Beazer Home Corp., Not Reported in A.3d (2011)

Case 4:20-cv-14695-LMI Doc 756 Filed 10/22/20 Page 179 of 221
Case 4:20-cv-14695-LMI Doc 756 Filed 04/23/20 in TXSD Page 48 of 89

expansion. Beazer argues that Munro had a preexisting duty that arose from the first contract to withhold his objection and such past consideration cannot supply new consideration for a subsequent modification.

While it is true that the modification is unenforceable because it is supported only by past consideration, lack of consideration does not bar enforcement of a waiver. Woodring inserted the condition into the initial contract for his benefit —it served as a means by which Woodring could avoid performance. His unconditional promise to undertake the sewer connection, regardless of whether or not a sewer connection was required, effectuates an express waiver of this benefit.

Accordingly, the Court finds that Woodring owed Munro an enforceable obligation to connect Munro's home to the sewer.

### Cross–Claim

Woodring contends that Beazer assumed responsibility for honoring the MunroWoodring contracts and, therefore, is the true party liable for breach. Specifically, Woodring submits that a buyer operating under a due diligence clause has an affirmative duty to discover the unperformed prior obligations of the seller and that the buyer assumes any liability after the due diligence period expires, regardless of whether such prior obligations were discovered. In support of this contention, Woodring cites *Homan v. Turoczy.* [35]

In *Homan,* the Chancery Court dismissed the plaintiffs' claim of equitable fraud because the plaintiffs failed to satisfy the reasonable reliance element of the claim. The plaintiffs alleged that the defendant omitted material information in connection with the sale of his business. The court reasoned that the information sought by plaintiffs would have been disclosed had they engaged in serious due diligence investigation. The court concluded that the plaintiffs' purchase of the defendant's business without conducting such an investigation was commercially unreasonable.

Woodring asserts that the *Homan* opinion stands for the principle that due diligence investigations must be done in a commercially reasonable manner and that the buyer under these circumstances is responsible for any liability after purchase that arises as a consequence of not doing so. The Court does not agree.

*7 The *Homan* court's analysis of commercial reasonableness in connection with due diligence investigations is limited to whether a buyer who brings an equitable fraud claim reasonably relied on the seller's representations. *Homan* does not impose an affirmative duty to uncover the outstanding obligations of the seller to which the buyer is not in privity of contract.

Thus, the real inquiry here is whether Beazer's conduct placed it in privity with Munro. There are several means by which a third-party, such as Beazer in this case, can establish privity with the contracting parties: assignment and delegation, a third-party beneficiary relationship, or agency. Of these means of privity, Woodring seriously asserts only that he assigned the Munro–Woodring contracts to Beazer.

Woodring submits as evidence of assignment a document entitled "Assignment to Plans and Development Data" ("Assignment"). In that document, Woodring purportedly assigned to Ashley Manor, LLC "all ... rights, title, and interest in all Plans and other Development Data prepared by and/or acquired by and utilized by Seller's engineer ... to secure the approval of the Preliminary Site Plan ..." Even assuming that this assignment to Ashley Manor, LLC is enforceable against Beazer as well, the Court does not find that this assignment contemplates the Munro–Woodring contracts.

An assignment is the transfer of rights or property. [36] Thus, one can assign only rights through an assignment-not a duty to perform a personal obligation. [37] A delegation, conversely, is "a transaction by which a party to a contract arranges to have a third party perform the party's contractual duties." [38]

The above quoted language does not suggest that the parties intended to *delegate* to Beazer an obligation to perform the Munro–Woodring contracts. It appears to the Court only that Woodring intended to assign Ashley Manor, LLC certain proprietary information—nothing more. Moreover, the Court cannot reasonably interpret "Plans and other Development Data prepared by and/or acquired by and utilized by Seller's engineer ... to secure the approval of the Preliminary Site Plan ..." to include copies of the MunroWoodring contracts. While the contracts may have been integral to the approval of the "Preliminary Site Plan," the Court finds that, had Woodring intended to delegate a personal service contract, it would have done so expressly.

**Munro v. Beazer Home Corp., Not Reported in A.3d (2011)**

Case 4:20-cv-14695-LMI...Doc 756...Filed 10/22/20...Page 80 of 221
Case 20-14695-LMI...Doc 756...Filed 04/23/20...Page 49 of 89

In addition, an assignee of rights is not bound to perform the assignor's duties and obligations associated with those rights unless the assignee expressly agrees to do so.[39] There is no language in the Assignment or the Agreement of Sale that convinces the Court that Beazer expressly assumed any obligation to connect Munro to the Sewer District.

Accordingly, the Court does not find that an effective delegation of the Munro Woodring contracts occurred.

### *Quantum Meruit*

Finally, Munro asserts a claim of *quantum meruit* against Beazer. *Quantum meruit* is "a quasi-contract claim that allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid."[40]

**\*8** The Court finds that Munro's *quantum meruit* claim lacks merit because Munro could not have reasonably expected that Beazer, an entity whose future participation in the Ashley Manor development project was unknown to Munro at the time of his performance, would ultimately pay him for his act of removing his opposition to the Sewer District. Moreover, even had Beazer known of the Munro–Woodring contracts, it would have no reason to know that Munro expected Beazer to pay him for his performance. After extensive review of the trial testimony and exhibits submitted by the parties, the Court finds nothing that would serve to put Beazer on notice that Woodring failed to perform his part of the Munro–Woodring contracts and that Munro expected Beazer to pay for his service of removing his objection.

Accordingly, the Court finds that Munro failed to meet his burden for *quantum merit.*

### Damages

As discussed above, Woodring owed Munro an obligation to connect Munro's property to the sewer. Woodring breached this obligation by repudiating the contract.[41] Accordingly, Woodring must pay Munro damages.

The standard measure for damages recoverable for breach of contract is the expectation interest of the non-breaching party.[42] To be entitled to expectation damages, the plaintiff

"must show that the injuries suffered are not speculative or uncertain, and that the Court may make a reasonable estimate as to an amount of damages."[43] This requires proof of damages to a reasonable certainty.[44]

Delaware recognizes the affirmative defense of failure to mitigate damages. "As an affirmative defense, it is necessary for the defendant to specially plead plaintiff's failure to mitigate damages."[45] Failure to timely raise an affirmative defense constitutes a waiver of the right to do so.[46]

Based on the first contract, which the Court found to be enforceable, Munro reasonably expected Woodring to pay for any economic impact the expansion of the Sewer District had on his property. The parties stipulate that this includes System Connection Charges, Permit Fees, Service Charges, and Sewer Assessment Charges. These charges and fees amount to $7,413.

In addition, the Court finds that the first contract also contemplates the actual construction of the sewer connection. At trial, Munro's expert plumber testified that such a connection will cost Munro $14,300.[47]

In defense of these damages, the defendants allege that Munro could have mitigated damages by applying to Sussex County Council for an exemption from its requirement that residents within the Sewer District must connect to the sewer. However, the defendants failed to raise the affirmative defense of failure to mitigate damages during the pleading stages of this litigation. Because affirmative defenses must be specially pleaded or else waived, the Court must treat the defendants' failure to plead the defense as a waiver.

The Court is convinced after hearing the evidence and submissions of the parties, that Munro has proven his reasonable damages in the amount of $21,713.00.

### CONCLUSION

**\*9** For the foregoing reasons, the Court finds that Plaintiff has proven its claim of breach of contract against Defendant Woodring by a preponderance of the evidence. Therefore, judgment is entered against Woodring in the amount of $21,713.00, together with pre-and post-judgment interest at the legal rate of 5.75 percent plus costs. The Court finds in

Munro v. Beazer Home Corp., Not Reported in A.3d (2011)

Case 20-14695-LMI Doc 756 Filed 10/22/20 Page 181 of 221
Case 4:19-cv-11708-LVP Document 7-30 Filed 04/23/20 in TXSD Page 50 of 89

favor of Defendants Kenwood Development Co. and Beazer Homes Corporation on this claim.

The Court finds that Plaintiff has failed to prove its remaining claims by a preponderance of the evidence. Accordingly, judgment is entered in favor of Defendant Woodring on Plaintiff's claim for fraud. Additionally, on Plaintiff's claim for *quantum meruit,* judgment is entered in favor of Defendant Beazer Homes Corporation.

Finally, the Court finds that Defendant Woodring failed to prove its cross-claim against Defendant Beazer Homes Corporation. Therefore, judgment is entered in favor of Defendant Beazer Homes Corporation on that claim.

**IT IS SO ORDERED,**

**All Citations**

Not Reported in A.3d, 2011 WL 2651910

## Footnotes

| | |
|---|---|
| 1 | Woodring ex. 4. |
| 2 | Munro ex. A. |
| 3 | Munro ex. B. |
| 4 | Munro ex. B. |
| 5 | Munro ex. B. |
| 6 | Woodring ex. 3. |
| 7 | Woodring ex. 3. |
| 8 | Munro ex. A. |
| 9 | Woodring ex 4. |
| 10 | Woodring ex. 5. |
| 11 | Munro ex. C. |
| 12 | Munro ex. D. |
| 13 | Munro ex. E. |
| 14 | Munro ex. F (emphasis in original). |
| 15 | Munro ex. F. |
| 16 | Munro ex. E. |
| 17 | Woodring ex. 9. |
| 18 | Woodring ex. 15. |
| 19 | Woodring ex. 15. |
| 20 | Woodring ex. 13. |
| 21 | Munro ex. G. |
| 22 | Munro ex. H. |
| 23 | Munro ex. I. |
| 24 | *Osborn ex rel. v. Kemp,* 991 A.2d 1154, 1159 (Del.2010). |
| 25 | *Id.* |
| 26 | Munro ex. C. |
| 27 | 17A Am.Jur.2d Contracts § 455. |
| 28 | Restatement (Second) of Contracts § 224 (1981). |
| 29 | *Pouls v. Windmill Estates, LLC,* 2010 WL 2348648 (Del.Super. June 10, 2010). |
| 30 | *Id.* at n. 9; *see also,* 17A Am.Jur.2d Contracts S 637. |
| 31 | Munro ex. C. |
| 32 | Munro ex. C. |
| 33 | Woodring ex. 5. |

34    Munro ex. F (emphasis added).

35    *2005 WL 2000756 (Del. Ch. Aug. 12, 2005).*

36    Black's Law Dictionary 128 (8th ed.2004).

37    *Reserves Dev. LLC v. Crystal Properties, LLC,* 986 A.2d 362, 370 (Del.2009), reargument denied (Jan. 6, 2010).

38    Black's Law Dictionary 459 (8th ed.2004).

39    *Chrysler v. Airtemp Corp.,* 426 A.2d 845, 852 (Del.Super.1980).

40    *Petrosky v. Peterson,* 859 A.2d 77, 79 (Del.2004).

41    Restatement (Second) of Contracts §§ 251 and 253 (1981).

42    *E.I. Dupont de Nemours and Co. v. Pressman,* 679 A.2d 436, 445 (Del.1996).

43    *LaPoint v. AmerisourceBergen Corp.,* 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007) *aff'd sub nom. Amerisourcebergen Corp. v. LaPoint,* 956 A.2d 652 (Del.2008).

44    *Id.*

45    *Tanner v. Exxon Corp.,* 1981 WL 191389 (Del.Super.Ct. July 23, 1981).

46    *Fletcher v. Ratcliff,* 1996 WL 527207 (Del Super. Aug. 6, 1996) *aff'd,* 690 A.2d 466 (Del.1996).

47    Woodring disputes Munro's expert's belief that two-inch diameter sewer discharge lines are necessary to complete the connection. Instead, Woodring suggests that one-inch lines are adequate. Because Woodring did not submit any expert testimony in rebuttal of Munro's expert plumber, the Court must again find in favor of Munro on this issue.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX A-:

2017 WL 5713307
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Delaware.

NOVIPAX HOLDINGS LLC
and Novipax LLC, Plaintiffs,
v.

SEALED AIR CORPORATION, Cryovac,
Inc., Sealed Air Corporation (US), and
Sealed Air (Canada) CO./CIE, Defendants.

C.A. No.: N17C–03–1682 EMD CCLD
|
Submitted: September 25, 2017
|
Decided: November 28, 2017

*Upon Defendants' Motion to Dismiss, **DENIED**.*

### Attorneys and Law Firms

Jeffrey Moyer, Esquire, Richard P. Rollo, Esquire, Travis
S. Hunter, Esquire, Richards, Layton & Finger, P.A.,
Wilmington, Delaware and Robert M. Hoffman, Esquire,
Michael J. Chiusano, Esquire, James C. Bookhout, Esquire,
Andrews Kurth Kenyon LLP, Dallas, Texas. Attorneys for
Novipax Holdings LLC and Novipax LLC.

Kenneth J. Nachbar, Esquire, John P. DiTomo, Esquire,
Barnaby Grzaslewicz, Esquire, Morris, Nichols, Arsht &
Tunnell LLP, Wilmington, Delaware and Robin L. Cohen,
Natasha Romagnoli, Esquire, McKool Smith P.C., New York,
New York. Attorneys for Sealed Air Corporation, Cryovac,
Inc., Sealed Air Corporation (US), and Sealed Air (Canada)
Co./CIE.

Eric M. Davis, Judge

### I. INTRODUCTION

**\*1** This breach of contract and fraud case is assigned to
the Complex Commercial Litigation Division of this Court.
This civil action arises out of a sale and purchase of a North
American foam tray and absorbent pad business. Plaintiffs
Novipax Holdings LLC and Novipax LLC (collectively,

"Novipax"), the purchasers, allege that Defendants Sealed Air
Corporation, Cryovac, Inc., Sealed Air Corporation (US), and
Sealed Air (Canada) (collectively, "Sealed Air") intentionally
misled and induced Novipax to purchase the business based
on omissions, concealments, and material misrepresentations.
Novipax now brings an action against Sealed Air. Through
a complaint filed on or about March 31, 2017 (the
"Complaint"), Novipax asserts claims for: Fraud, Fraudulent
Inducement, and Willful or Intentional Misrepresentations
(Count I), Breach of Asset Purchase Agreement (Count
II); Breach of Transition Services Agreement (Count III);
Declaratory Judgment and Setoff (Count IV); and Unjust
Enrichment (Count V).

Sealed Air has filed its Motion to Dismiss (the "Motion to
Dismiss"). Through the Motion to Dismiss, Sealed moves to
dismiss Counts I–V for failure to state a claim upon which
can be granted. For the reasons set forth below, the Court will
**DENY** the Motion to Dismiss.

### II. RELEVANT FACTS [1]

#### A. THE FOAM TRAY AND ABSORBENT PAD INDUSTRY

According to the Complaint, there are two types of foam trays
in the industry—barrier and non-barrier foam trays. [2] Barrier
foam trays provide an airtight package that extends the shelf
life of meat, poultry, seafood, and other protein products. [3]
Barrier foam trays are sold to processors, who then package
the food in the barrier foam trays and sell the packaged food to
retail outlets like Walmart. [4] Non-barrier foam trays are more
of a "commodity product sold directly to customers for over-
wrapped applications." [5]

Absorbent pads are used in conjunction with both barrier
and non-barrier foam trays. [6] Absorbent pads are designed
to absorb product fluids in order to create a more attractive
presentation of the product to consumers. [7]

#### B. SEALED AIR SELLS ITS BARRIER FOAM TRAY AND PAD BUSINESS

Sealed Air owned and operated a food tray business that sold
rigid trays, foam trays, and absorbent pads to food handlers
and processors. [8] In 2013, Sealed Air attempted to sell its
foam tray and pads business, which at that time included

European and South American assets. [9] During the initial sale process, Sealed Air was purportedly receiving bids of over $300 million. [10] Sealed Air, however, was unable to close a sale at that price. [11]

**\*2** In the summer of 2014, Sealed Air initiated a second sale process, this time for the North American assets only. [12] Sealed Air sought to sell its North American foam tray and pads business, but not its rigid tray business. [13] On September 16, 2014, Novipax bid $152.5 million for the foam tray and pad business (the "Business").

Sealed Air conducted its first management presentation to Novipax on October 21, 2014. [14] At this meeting, Sealed Air disclosed to Novipax that the Business's largest customer, Tyson, might demand a price concession in order to continue purchasing foam trays and pads. [15] Sealed Air therefore asked all remaining bidders, including Novipax, for new bids reflecting the valuation impact of Tyson's demand. [16] On November 4, 2014, Novipax reduced its bid to $80 million.

On February 11, 2015, Novipax and Sealed Air entered into an Asset Purchase Agreement (the "APA") for the Business. [17] Novipax and Sealed Air also executed a Transition Services Agreement (the "TSA"). Novipax closed its purchase of the Business on April 1, 2015 (the "Closing"). [18]

### C. THE APA
The APA defines the parties as: (i) Sealed Air Corporation, referred to as the "Parent"; (ii) Cryovac, Inc., (iii) Sealed Air Corporation (US), and (iv) Sealed Air Corporation (Canada), referred to with the Parent as the "Sellers"; and (iii) DankPak LLC [19], referred to as the "Buyer." For internal consistency, unless quoting the language of the APA, the Court will refer to the "Sellers" as "Sealed Air," and the Court will refer to the "Buyer" as Novipax.

As part of the sale and purchase of the Business, the APA imposes certain disclosure duties and alike on Sealed Air and Novipax. This includes representations and warranties and affirmative and negative covenants.

### i. Sealed Air's Representations and Warranties
Article IV of the APA specifies Sealed Air's representations and warranties. [20] Section 4.5 requires Sealed Air to represent

and warrant about changes related to the Business. [21] Under Section 4.5, Sealed Air represents and warrants that:

> (a) there has not been any Material Adverse Effect, (b) the Business has been operated in the Ordinary Course in all material respects ... (d) except as set forth on <u>Section 4.5</u> of the Disclosure Schedule, there has not been any action by any Seller that, if taken during the period from the date of this Agreement through the Closing Date, would constitute a breach of Section 6.1(a), (f), (g), (i), or (l). [22]

Material Adverse Effect is defined as "any change, event, circumstance, condition, or effect that is materially adverse to ... (ii) the condition (financial or otherwise), assets, business, operations, or results of operations of the Business." [23] Ordinary Course is defined as the ordinary and usual course of normal day-to-day operations consistent with past practice. [24]

Section 4.6(b) requires Sealed Air to represent and warrant regarding possible changes to certain Material Contracts. [25] Under Section 4.6(b), Sealed Air represents and warrants that:

> **\*3** There is not any existing material default or event of material default, or any event which, with or without notice or lapse or time or both, would constitute a material default under any Material Contract by any Seller, or, to the Knowledge of Parent, by any other party thereto. No Seller has received any notice of the intention of any party to terminate any such Material Contract. [26]

The Material Contracts are listed in Section 4.6(a) to the Disclosure Schedule and include the supply agreements with

certain customers of the Business such as Tyson, Perdue, and Cargill. [27]

Section 4.7 then requires Sealed Air to represent and warrant about Purchased Assets, specifically that the Purchased Assets "constitute the rights, assets, and services required to conduct the Business following the Closing." [28] Purchased Assets include tangible and intangible assets of the Business, including Sealed Air's goodwill. [29]

Finally, Section 4.18 requires Sealed Air to make certain representations related to the Business's Major Customers. [30] Under Section 4.18, Sealed Air represents and warrants that "in the last 12 months, no Major Customer has provided written notice to Sellers of its intention to terminate its relationship with any Seller with respect to the Business, whether as a result of the Transaction or otherwise." [31] The Major Customers are the ten largest customers of the Business (in terms of dollar volume of purchases from Sellers) and are defined on Section 4.18 of the Disclosure Schedule and include Tyson, Perdue, and Cargill. [32]

Article IV of the APA concludes by providing a disclaimer about Sealed Air's representations and warranties—that neither Sealed Air nor any of its representatives or alike made any other representation or warranty, express or implied, other than those provided in Article IV. [33]

### ii. Novipax's Representations and Warranties

Article V of the APA sets forth Novipax's representations and warranties. [34] Under Section 5.7, Novipax must represent and warrant that it has conducted a financial investigation of the Business, which includes Novipax's "own estimate of the value of the Business and the Purchased Assets. [35] Section 5.7 also requires Novipax to represent and warrant that:

> Buyer has received certain estimates, budges, forecasts, plans and financial projections (collectively, "Forward Looking Statements"). There are uncertainties inherent in the Forward Looking Statements, and Buyer is familiar with such uncertainties. Buyer is taking full responsibility for

making its own evaluation of the adequacy and accuracy of all Forward Looking Statements (including the reasonableness of the assumptions underlying the Forward Looking Statements). [36]

Section 5.7 also required Novipax to represent and warrant that:

> Buyer is not relying on any representations, warranties, omission or covenants of Sellers or any of their Representatives (including any financial statements not expressly covered in Section 4.4, any projections, and the information contained in the confidential information memorandum, management presentation and other due diligence materials made available to Buyer) except as expressly set forth in this Agreement and any Seller Related Agreement executed and delivered to any Buyer Party pursuant to this Agreement. [37]

### iii. The Covenants

**\*4** Article VI of the APA places certain affirmative and negative covenants on the parties before the Closing. [38] As it related to Sealed Air's operation of the Business, Section 6.1 states that:

> Sellers shall conduct the Business in all material respects in the Ordinary Course and, to such extent, use reasonable best efforts to preserve intact its current business organization and the goodwill of the Business ... maintain its existing relationships

with customers, suppliers, vendors, distributors, agents ... including the Major Customers and Major Suppliers ... Sellers shall maintain all of the Purchased Assets in their current condition, ordinary wear and tear excepted. [39]

Section 6.1 further places negative covenants on Sealed Air's operation of the Business:

Sellers shall not do any of the following with respect to the Business without the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned, or delayed):

(a) breach any material obligation or duty imposed upon a Seller by any applicable Law;

(b) except in the Ordinary Course, make any purchase, sale, or disposition of any Purchased Asset

(c) except in the Ordinary Course, (i) amend or terminate any Assumed Contract or (ii) materially amend or terminate any material business arrangements [40]

Section 6.3(b) then places affirmative duties on Sealed Air and Novipax related to party communications. [41] Section 6.3 states that:

Parent and Buyer shall give written notice to the other promptly upon becoming aware of (i) any representation or warranty contained in this Agreement becoming untrue or (ii) the failure of any party to comply with or satisfy in any respect any covenant, condition, or agreement to be complied with or satisfied by it under this Agreement. [42]

Article VII makes compliance with the foregoing representations, warranties and covenants a condition precedent to the Closing. [43] Sections 7.2 and 7.3 state that the obligations of Novipax and Sealed Air to effect the Closing

shall be subject to the fulfillment of the representations, warranties, and covenants contained in the Agreement. [44]

### iv. Indemnification Rights

Article IX provides indemnification rights to Sealed Air and Novipax. [45] Under Sections 9.1 and 9.2, Sealed Air and Novipax are entitled to indemnification for all losses arising from breach of any representation or warranty or breach or non-fulfillment of any covenant in the APA. [46] Section 9.3, however, places limits on these indemnification rights. [47] Section 9.3(b) requires the indemnifying party to receive notice of the indemnification claim within certain timeframes:

A party otherwise liable for indemnification under this Article IX (an "Indemnifying Party") shall have no liability for and Indemnification Claim under Section 9.1(a) or 9.2(a) unless such Indemnifying Party shall have received a Claim Notice with respect thereto on or before the following applicable deadline: (A) for a claim relating to a Core Representation or a claim that involves fraud, at any time after Closing ... (C) for any other claim, the eighteen (18) month anniversary of the Closing Date. [48]

**\*5** Section 9.3(h) then provides that:

From and after the Closing, the indemnification rights provided by this Article IX shall constitute the sole and exclusive remedy of the Indemnified Parties for any breach of representation, warranties, covenants, or agreements contained in this Agreement or any Closing Instrument; provided, however, that nothing herein shall limit (i) any claim based on fraud, willful misrepresentation or willful

breach, or (ii) any party's right to seek specific performance, injunctive relief, or other equitable remedies. [49]

Finally, Article X, Section 10.3 affirms that the APA and the other instruments and agreements contemplated by the APA "constitute the entire agreement amount the parties and supersede any prior understanding, agreement, or representations by or among the parties. [50]

## D. THE TSA

Novipax and Sealed Air executed the TSA concurrently with the APA. The only parties to the TSA are Sealed Air Corporation and Novipax LLC.

The TSA specifies certain transition services that Sealed Air must provide to Novipax following the Closing. [51] For example, Service Schedule 1, A requires Sealed Air to work to maintain its relationship with customers of the Business as of the Closing. [52] In addition, Service Schedule 1, B requires Sealed Air to provide sales administration support for: (i) formula pricing for U.S. customers, and (ii) U.S. barrier foam tray pricing and rebate management. [53]

In the event of a dispute or an alleged breach of the TSA, the parties agreed under Section 5.15 to engage in good faith negotiations to resolve the dispute. [54] Specifically, Section 5.15 provides that:

> In the event of a dispute or alleged breach of the Agreement by either Party, the Parties agree to engage in a good faith effort and negotiation in an attempt to resolve the dispute or alleged breach. In the event that this initial negotiation is not successful, the parties agree to elevate the dispute or alleged breach to the executive level of each Party, and the senior executives of each Party agree to negotiate in good faith and attempt to arrive at a mutual resolution of such dispute or alleged breach. In the event that this discussion is unable to resolve the

controversy within a reasonable period of time, the Parties may then pursue their respective remedies pursuant to applicable Law and in accordance with Section 10.6 of the [APA]. [55]

## E. NOVIPAX MAKES CERTAIN DISCOVERIES AFTER CLOSING

Following the Closing, Sealed Air gave Novipax access to its pre-acquisition e-mails pursuant to the terms of the APA and the TSA. [56] Through such e-mails, Novipax contends that it discovered various representations and discussion about the Business that were contrary to the representations in the APA. [57]

### i. Sealed Air failed to disclose material information about the Business

**\*6** Novipax claims that Sealed Air knew of material information relevant to the value of the Business but failed to disclose it to Novipax. [58] Specifically, Novipax alleges that Sealed Air knew that: (i) major customers were migrating, or preparing to migrate, to rigid trays; (ii) barrier foam trays were not cost advantaged relative to rigid trays; and (iii) the cost for customers to shift from barrier foam trays to rigid trays was *de minimus*. [59]

In early December 2014, Bimal Kalvania (VP & GM Rigids & Absorbents) sent an e-mail to others at Sealed Air chastising them for working to switch Cargill (one of its clients) from foam trays to rigid trays, stating, "it will confirm their worst fears that [foam] is changing to [rigid] ... we can expect buyers to walk away or deeply discount the valuation/price for the business." [60] In another e-mail, Sealed Air decided to withhold information about then on-going customer negotiations with Cargill for a 2% foam tray price reduction because disclosing it "could put the deal at risk." [61]

### ii. Sealed Air concealed material information about the Business

Novipax also alleges that Sealed Air concealed material information about the Business, mainly the Business's customer base. [62] While Sealed Air disclosed Tyson's demand for a price reduction, Sealed Air purportedly

concealed facts undermining the value of the Perdue and Cargill businesses. [63]

On March 2, 2015, Perdue advised Sealed Air of its intent to transition its foam business to rigid trays sometime in "the middle of April." [64] In an e-mail dated March 3, 2015, Sealed Air confirmed that it "[l]ooks like Perdue is planning on moving all of its foam trays to a solid barrier rigid tray mid-April." [65] Another e-mail dated March 4, 2015 included a statement from Perdue that orders for two of the barrier foam trays "will taper down beginning the week of March 23 rd ." [66] Despite acknowledging that this information likely had to be disclosed to Novipax, Sealed Air's in-house counsel claimed there was no "legal obligation" to notify Novipax and left it up to Sealed Air's VP of Global Mergers to inform Novipax. [67] Sealed Air supposedly never notified Novipax.

As noted above, Novipax contends that Sealed Air concealed the potential loss of Cargill before the APA was signed. [68] In Mr. Kalvani's December 14, 2014 e-mail, he instructed sales teams to stop attempting to switch Cargill from soft to rigid trays because it could undermine the transaction with Novipax since the Cargill business "represents more than 33% of barrier trays." [69] Sealed Air also discussed Cargill's request for a 2% price reduction on barrier foam for the next contract cycle based on the fact that the price of rigid trays was becoming competitive with the price of foam trays. [70] In an internal e-mail pertaining to the 2% reduction, Sealed Air's Jackie Anderson stated that it "must disclose anything above $150,000 P&L change to the Business," and confirmed that the Cargill P&L change would have exceeded $300,000. [71] Rather than disclose the facts undermining the value of Cargill, Sealed Air concealed the information to preserve the deal—"having this discussion with [Buyer] could put the deal at risk as we already have difficult conversations about Tyson RFP." [72]

### iii. Sealed Air provided false assurances about the Business

**\*7** Finally, Novipax alleges that Sealed Air made false assurances about the Business after execution of the APA and before the Closing. [73] First, Sealed Air purportedly misrepresented that the Business constituted a viable, sustainable product line which was protected from competing packaging, including Sealed Air's rigid tray business. [74] In the Confidential Information Memorandum, provided

pursuant to Section 6.4 of the APA, Sealed Air stated that "foam will remain the material of choice going forward due to consumer preference, pricing advantages, and the significant capital investment required to upgrade equipment to other resin-based packaging solutions." [75] Sealed Air's management presentation also confirmed that "foam is the resin of choice," that "switching to rigid trays negatively impacted retailer sales," and that "foam trays are more cost effective than rigid trays." [76]

Novipax discovered numerous e-mails from Sealed Air's Regional Sales Manager Scott Mauer admitting that foam trays were not as cost advantageous as originally believed. Mr. Mauer stated that "to move from foam to solid is not too expensive ... around $2000–2,500 for a single lane," and that for certain processing machines "no changes are required" to switch from foam to rigid trays. [77] Mr. Mauer also stated that the estimate provided to Novipax of the cost to convert production lines was "significantly high" and "much higher than would actually occur," and acknowledged that he may have "misled the decision" and caused Novipax to believe that "foam barrier trays don't have serious competition." [78]

Second, Novipax alleges that Sealed Air provided the false assurance that it would preserve and protect the value of the Business to be transitioned to Buyer. Novipax contends that Sealed Air breached the representations and warranties under Article IV by migrating the Business's Major Customers to non-Business products, failing to conduct the Business in the Ordinary Course, and amending material business arrangements. Novipax points to the fact that Sealed Air helped transition Perdue from the Business's barrier foam trays to its retained rigid trays. Novipax also argues that Sealed Air knew Cargill planned to perform testing on rigid tray replacement and confirmed that Cargill would use Sealed Air's rigid tray product.

Finally, Novipax contends that Sealed Air provided the false assurance that it would advise Novipax if it breached a representation or covenant between the signing and the Closing pursuant to Section 6.3 of the APA. Instead, in March of 2015, Sealed Air provided notice of certain *de minimus* inaccuracies under Section 6.3, but did not disclose any of the inaccuracies surrounding foam trays and rigid trays, the Business, and the Business's customer base. The closing certificate provided before the Closing did not disclose any of the foregoing inaccuracies or material changes. [79]

## F. NOVIPAX INITIATES THIS CIVIL ACTION AGAINST SEALED AIR

Based on these discoveries, Novipax filed the Complaint against Sealed Air principally for fraud. The Complaint also asserts claims for breach of the APA and TSA, unjust enrichment, and declaratory judgment.

On May 16, 2017, Sealed Air moved to dismiss Counts I–V and filed Defendants' Opening Brief in Support of Motion to Dismiss. Novipax filed Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Dismiss (the "Opposition") on July 21, 2017. On August 15, 2017, Sealed Air filed Defendants' Reply Brief in Further Support of their Motion to Dismiss (the "Reply").

The Court heard argument on the Motion to Dismiss, the Opposition and the Reply on August 25, 2017. At this hearing, the Court also heard argument on the Motion for a Protective Order to Stay Discovery, filed by Sealed Air and the Opposition to Defendants' Motion for Protection Order and to Stay Discovery, filed by Novipax. By Order dated July 21, 2017, the Court temporarily stayed discovery, but must decide at the hearing whether a further stay is required pending resolution of the Motion to Dismiss.

## IV. PARTIES' CONTENTIONS

### A. Sealed Air's Contentions

 **8** Sealed Air argues that the Complaint must be dismissed in its entirety because Novipax failed to comply with certain contractual prerequisites to litigation. Sealed Air next contends that the individual claims in Counts I–V fail to state cognizable causes of action. On the fraud claim, Sealed Air claims that the non-reliance and integration provisions of the APA—Sections 4.20, 5.7, and 10.3—bar Novipax from claiming it relied on extra-contractual representations or warranties. Sealed Air also argues that the fraud claim is not pleaded with particularity and fails to demonstrate that the damages are separate from the breach of contract damages. On the breach of contract claims, Sealed Air contends that the Complaint fails to allege any act that constitutes a breach of the APA or the TSA. On the equitable claims, Sealed Air alleges that the claim for unjust enrichment fails because it arises out of the parties' contractual relationship. Finally, Sealed Air claims that Novipax is not entitled to declaratory judgment negating the APA's requirement with respect to alternative dispute resolution ("ADR").

### B. Novipax's Contentions

Novipax argues that there are no contractual prerequisites that bar this civil action. On the fraud claim, Novipax contends that the non-reliance and integration provisions do not unambiguously bar a fraud claim and that Section 9.3(h) in fact expressly permits a fraud claim. Novipax also asserts that the fraud damages are separate from the breach of contract damages. On the breach of contract claim, Novipax claims that the Complaint asserts numerous breaches of the APA, specifically Sections 4.5, 4.18, 6.1, and 6.3(b). As to the equitable claims, Novipax contends it may bring an unjust enrichment claim as an alternative remedy based on the theory that no contract exists because of Sealed Air's fraud. Finally, Novipax argues that it is entitled to declaratory judgment as to its right to offset the damages in this suit from the Closing Net Working Capital, and that this determination can only be made by this Court.

## V. STANDARD OF REVIEW

Upon a motion to dismiss, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[80] However, the Court must "ignore conclusory allegations that lack specific supporting factual allegations."[81]

## V. DISCUSSION

### A. SEALED AIR HAS NOT DEMONSTRATED THAT THERE ARE PROCEDURAL OR TIME BARS THAT REQUIRE DISMISSAL OF THIS CIVIL ACTION IN ITS ENTIRETY

Sealed Air first argues that the lawsuit must be dismissed because Novipax has not complied with certain contractual prerequisites to litigation set forth in the APA and TSA.

### i. Sealed Air's construction of Article IX of the APA is not the only reasonable construction as a matter of law

Sealed Air first argues that Novipax did not provide appropriate Claim Notice (as defined in the APA) that

Sealed Air breached a representation or warranty as required by Section 9.4 of the APA. Section 9.4, under Article IX "Indemnification," provides that "any claim for indemnification under this Article IX shall be brought and asserted by Buyer or Parent ... by delivering written notice of such claim to the Indemnifying Party." [82] Section 9.4 clarifies that the Claim Notice must set forth the facts giving rise to the claim and, in the event of any claim for indemnification against Sealed Air, Novipax must provide Sealed Air access to its books and records. [83] Sealed Air asserts the Claim Notice was insufficient and that it was not provided access to Novipax's books and records and seeks to dismiss the entire Complaint on this basis.

**\*9** Under this same theory, Sealed Air also seeks to dismiss the breach of contract and equitable claims because Novipax did not provide Sealed Air notice of those claims within eighteen months as required under Section 9.3(a). Section 9.3(a) clarifies that no party shall be liable for an indemnification claim unless it has received notice of the claim within certain timeframes—for a fraud claim, the party must receive notice "at any time after Closing" and for "any other claim" within the "eighteen (18) month anniversary of the Closing Date." [84] Sealed Air contends it did not receive notice of the claim until Novipax filed the Complaint on March 31, 2017—long after the time to serve notice expired on October 1, 2016.

In response to the above arguments, Novipax contends that Sections 9.4 and 9.3(a) do not apply because they are under Article IX, which is entitled "Indemnification." Moreover, the language in Sections 9.4 and 9.3(a) are conditioned on a claim for indemnification. Novipax contends these indemnification provisions do not apply to this case or its claims because Novipax is not seeking indemnification. In fact, the Complaint does not mention indemnification or seek a declaration from the Court as to its right to indemnification. Instead, Novipax asserts fraud, willful misrepresentation, willful breach, and equitable claims, which are exempt from Article IX under Section 3.9(h). [85] Therefore, Novipax argues that the requirements in Sections 9.4 and 9.3(a) do not impose any prerequisites to litigation.

In deciding a motion under Rule 12, the Court cannot choose between two differing reasonable interpretations of a contract. Rather, dismissal is proper only if the defendant's interpretation is the *only* reasonable construction as a matter of law. Here, the language of the APA is reasonably susceptible to different interpretations, as illustrated by the above discussion. [86] The Court, therefore, must resolve any ambiguity in favor of Novipax *at this stage* in the litigation and, on this basis, cannot grant the Motion to Dismiss on this basis.

### ii. Sealed Air does not demonstrate that Section 5.15 is a clear and unambiguous condition precedent that bars all claims in this case

Sealed Air next argues that Novipax did not engage in pre-litigation negotiation as required under Section 5.15 of the TSA. Section 5.15 provides that in the event of a dispute relating to an alleged breach of the TSA, the parties agree to engage in good faith negotiation to resolve the dispute. [87] If, however, the parties cannot resolve their dispute, "the Parties may then pursue their respective remedies pursuant to applicable Law and in accordance with Section 10.6" of the APA. [88] Section 10.6 of the APA permits the parties to pursue legal action for any dispute arising out of the APA. [89] Therefore, Sealed Air argues that the negotiations mentioned in Section 5.15 of the TSA are a condition precedent to litigation under Section 10.6 of the APA.

**\*10** Novipax argues that Section 5.15 does not bar the claims in this case because the APA does not require negotiation prior to filing a lawsuit. [90] Moreover, Novipax contends Section 5.15 cannot be incorporated into the APA because Section 5.15 contains limiting language that it applies only to a dispute or alleged breach of "this Agreement," which is defined as the TSA. [91] In addition, Section 5.15, or any other provisions of the TSA, cannot be incorporated in the APA because the parties to the two agreements are different—the APA is between all defendants in this case and the TSA is just between Novipax and Sealed Air.

Sealed Air does not demonstrate that Section 5.15 operates as a clear and unambiguous condition precedent to filing this civil action. In fact, this condition precedent is not reaffirmed or included in Article VII of the APA, entitled "Conditions Precedent." [92] Novipax in turn provides an alternative reasonable interpretation of Section 5.15. Therefore, the Court cannot dismiss the civil action in its entirety.

However, neither party addresses the fact that Novipax brings a claim specifically for breach of the TSA. While it is still unclear whether Section 5.15 is an unambiguous condition precedent, Novipax's argument seems to be that Section

5.15 applies *only* to claims for breach of the TSA. If this is the argument, then Count III may be the grounds for a counterclaim by Sealed Air. In any event, it is not a procedural bar to the litigation (like a mandatory mediation or arbitration provision).

## B. THE COMPLAINT ASSERTS A VIABLE CLAIM FOR FRAUD

Sealed Air next argues that the fraud claim must be dismissed because it is barred by the non-reliance and integration provisions of the APA. Sealed Air also argues that the fraud claim is not pleaded with particularity and fails to demonstrate that the damages are separate from the breach of contract damages.

### i. The non-reliance provision limits fraud claims to written representations in the APA

Sealed Air first argues that the Court should dismiss the fraud claim because it is barred by the non-reliance and integration provisions of the APA. According to Sealed Air, these provisions bar Novipax from claiming it reasonably relied on any alleged misrepresentation or omission by Sealed Air outside of those representations and warranties specified in the APA.

Article IV of the APA pertains to Sealed Air's representations and warranties about the Business. Section 4.5 requires Sealed Air to represent and warrant that there has not been any Material Adverse Effect, that the Business has been operated in the Ordinary Course, and that it has not taken any action before the Closing that would constitute a breach of the covenants provided in Section 6.1.[93] Section 4.6(b) then requires Sealed Air to represent and warrant that there is no material default of any Material Contract and that Sealed Air has not received notice of any party's intention to terminate any such Material Contract, which includes supply agreements with certain key customers of the Business.[94] Finally, Section 4.18 requires Sealed Air to represent and warrant that "in the last 12 months, no Major Customer has provided written notice to Sellers of its intention to terminate its relationship with any Seller with respect to the Business, whether as a result of the Transaction or otherwise."[95]

Sealed Air relies principally on the purported non-reliance and integration provisions Sections 4.20, 5.7, and 10.3 of the APA to make its argument. Section 4.20 provides that, except

as set forth in Article IV (the representations and warranties of Sealed Air):

> **\*11** [N]ONE OF THE SELLERS, THEIR RESPECTIVE AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES MAKE OR HAVE MADE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF SELLERS, THEIR RESPECTIVE AFFILIATES OR THE BUSINESS.[96]

Section 5.7, under the heading "Representations and Warranties of Buyer" reaffirms this same principle:

> Buyer is not relying on any representations, warranties, omission or covenants of Sellers or any of their Representatives (including any financial statements not expressly covered in Section 4.4, any projections, and the information contained in the confidential information memorandum, management presentation and other due diligence materials made available to Buyer) except as expressly set forth in this Agreement and any Seller Related Agreement executed and delivered to any Buyer Party pursuant to this Agreement.[97]

Finally, Section 10.3 provides that the APA and accompanying Schedules, Exhibits, and Annexes and other agreement contemplated by the APA "collectively constitute the entire agreement among the parties and supersede any

prior understanding, agreement, or representations by or among the parties." [98]

Sealed Air argues that these provisions preclude all of the alleged misrepresentations and omissions cited in the Complaint because they all occurred prior to closing or outside the Agreement. For example, Sealed Air alleges that Novipax's reliance on statements in the management presentations and Confidential Information Memorandum is expressly barred by the language of Section 5.7. Sealed Air relies on a number of Delaware cases to argue that these express non-reliance provisions bar any claim based on extra-contractual fraudulent misrepresentations. [99]

In response, Novipax argues the Sections 4.20, 5.7, and 10.3 do not bar the fraud claim because Section 9.3(h) expressly preserves fraud claims. As previously discussed, Section 9.3(h), in the Article entitled "Indemnification," provides that the indemnification rights provided by Article IX shall be the "sole and exclusive remedy" for any breach of representations, warranties, or covenants in the APA. [100] However, Section 9.3(h) qualifies that remedy by stating, "nothing herein shall limit (i) any claim based on fraud, willful misrepresentation, or willful breach, or (ii) any party's right to seek ... other equitable remedies." [101]

Novipax relies on *Anvil Holding Corp. v. Iron Acquisition Co. Inc.* [102] to argue that its fraud claim is cognizable in spite of the non-reliance provisions. [103] In *Anvil*, the Delaware Court of Chancery declined to dismiss a fraud claim based on the non-reliance provisions of an agreement for two reasons. [104] First, the *Anvil* court found that the non-reliance provisions did not unambiguously demonstrate that *both parties* disclaimed reliance on extra-contractual statements. [105] Instead, the non-reliance provisions at issue merely stated that neither the seller nor any of its representatives was making extra-contractual representations. [106] Second, the *Anvil* court found that the "exclusive remedies" clause, in which the parties agreed to reserve all rights to claims based on fraud, preserved the fraud claim. [107] The exclusive remedies provision thus provided further evidence that the parties intended that fraud claims could be based on extra-contractual representations. [108]

**\*12** Novipax also relies on *Airborne Health, Inc. v. Squid Soap LP.* [109] In *Airborne*, the Delaware Court of Chancery

found that an asset purchase agreement did not contain a non-reliance provision that barred a fraud claim. [110] The *Airbone* court found that an integration clause could not form the basis for a non-reliance provision because that clause was standard in most contracts and did not contain any language resembling anti-reliance. [111] The *Airbone* court also found that the exclusive remedy provision preserved the fraud claim and that, absent any limit on that fraud claim through a non-reliance provision, extra-contractual representations were allowed. [112]

The facts of this case lie somewhere in between *Anvil* and *Airborne*. Here, unlike *Anvil* and *Airborne* both parties expressly represented in Sections 4.20 and 5.7 that they were not relying on any extra-contractual representations. [113] Section 10.3 is a standard integration clause that should not be considered a non-reliance provision. However, as in *Anvil* and *Airborne*, the parties also included an exclusive remedies provision and expressly provided that fraud and other equitable claims were reserved. In this instance, the non-reliance provision likely places a limit on the types of fraud claims that can be brought to those based on written representations in the APA. As *Airborne* explained, "when drafters specifically preserve the right to assert fraud claims, they must say so if they intend to limit that right to claims based on written representations in the contract." [114] Therefore, *at this stage of the proceedings*, the Court finds that the parties preserved a fraud claim in Section 9.3(h), but limited that fraud claim through the non-reliance provisions in Section 4.20 and 5.7 to written representations in the APA.

### ii. As alleged, the representations relied upon are intra-contractual, however, to the extent that Novipax is relying on extra-contractual representations, those are barred by the non-reliance provisions

Novipax's alternative argument is thus that Sections 4.20, 5.7, and 10.3 do not bar the fraud claim because each of the representations it relied upon were intra-contractual or based on the written representations in the APA. A fraud claim can be based on representations found in a contract. [115] However, as discussed more fully below, the allegations of fraud must be separate from the breach of contract claim. [116] Allegations that are focused on *inducement* to contract are separate and distinct conduct. [117]

Here, Novipax alleges that Sealed Air fraudulently induced it into closing the transaction. In making this argument,

Novipax relies on the representations, warranties, and covenants contained in Sections 4.5, 4.18, 6.1, and 6.3. Under these sections, Sealed Air represented, warranted, and covenanted to perform certain functions related to the Business and to make certain disclosures about the Business prior to the Closing. For example, Sealed Air represented that it has operated the Business in the Ordinary Course and that there has not been any Material Adverse Effect. [118] Additionally, Sealed Air represented that no Major Customer had provided written notice of its intent to terminate the relationship with the Business for any reason. [119] Moreover, Sealed Air covenanted to conduct the Business in "all material respects in the Ordinary Course" and to use its best efforts to "preserve intact its current business organization" and "maintain its existing relationships with customers, suppliers, vendors, distributors, and agents having business dealing with them." [120] Finally, Sealed Air covenanted to provide written notice to Novipax if any representation became untrue or if it failed to comply with any of its covenants." [121]

**\*13** Despite these representations, Novipax alleges that Sealed Air affirmatively worked to harm the Business by helping certain customers migrate from foam trays to rigid trays. [122] Novipax alleges that Sealed Air concealed its conduct, as well as information regarding the viability of the Business and customers such as Tyson and Perdue's intent to switch from foam to rigid trays. [123] Instead of alerting Novipax to this change, however, Sealed Air represented in the closing certificate that all of the representations and warranties contained in the APA are true and correct as of the date of the closing certificate. [124] Sealed Air also represented that it performed in all material respects the covenants and agreements in the APA. [125] Therefore, Novipax contends that the representations in the APA, and Sealed Air's attestation to those representations, fraudulently induced Novipax into closing the transaction.

The facts of this case are similar to the facts in *Abry Partners V, L.P. v. F & W Acquisition, LLC*. [126] In *Abry*, the parties entered into a Stock Purchase Agreement (the "Agreement") for the buyer's purchase of a portfolio company. [127] The Agreement contained several representations and warranties about the company's financial statements. [128] After the parties entered into the Agreement, the buyer discovered that the financial statements prior to the Agreement were fraudulently manipulated by the buyer. [129] The Court of

Chancery refused to dismiss the fraudulent inducement claim, finding that the "financial statements were represented and warranted in the Agreement and were therefore intended to induce the Buyer to sign the Agreement and close the sale to purchase the Company." [130]

Here, Novipax points to representations in the APA about how Sealed Air was to conduct the Business and about the financial viability of the Business before the Closing, including the Business's Major Customers. However, after the parties closed the transaction, Novipax learned that those representations were false, and that Sealed Air did not correct the misrepresentations before the Closing in an attempt to induce Novipax into closing the transaction. This is sufficient to support a claim for fraudulent inducement at this stage in the litigation.

To the extent, however, that Novipax is relying on extra-contractual misrepresentations, those misrepresentations are barred by the non-reliance provision, as well as, other express provisions in the relevant agreements. [131] It appears that Novipax is relying on certain statements made by Sealed Air outside the APA. In paragraphs 51–57 of the Complaint, Novipax cites to false assurances provided by Sealed Air that the Business constituted a viable, sustainable product line. [132] However, Novipax doesn't allege that these representations are contained in the APA. Rather, Novipax relies on representations made by Sealed Air in the Confidential Information Memorandum and the management presentation. [133] Both of these documents are expressly excluded under the non-reliance provision in Section 5.7.

### ii. The Fraud Claim is pleaded with the requisite particularity including the claim for damages

Sealed Air also attacks the fraud claim on the basis that it is not pleaded with particularity and is not separate from the breach of contract damages.

As to the first argument, it is abundantly clear that the Complaint pleads fraud with the requisite particularity, and this opinion will not highlight each specific fraud allegation made. Generally, however, the Complaint alleges that: Defendants made material misrepresentations, [134] that Novipax justifiably relied on those misrepresentations, [135] that Sealed Air knew the representations were false or made them recklessly and with the intent to deceive Novipax, [136] that Novipax was fraudulently induced into

the transaction, [137] and that Novipax suffered damages as a result. [138]

 **\*14** As to the second argument, Sealed Air argues that Novipax is attempting to "bootstrap" its fraud claim to a breach of contract claim because the fraud damages are not separate and apart from the breach of contract damages. Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's action. [139] The damages allegations, however, may not simply rehash the damages allegedly caused by breach of contract. [140] Moreover, plaintiff cannot "bootstrap a claim of breach of contract into a claim for fraud by alleging that a contracting party never intended to perform its obligations." [141] In other words, plaintiff cannot adequately state a fraud claim merely by adding the term "fraudulently induced" to a claim for breach of contract. [142]

Here, at this point, the Court does not find that Novipax is trying to "bootstrap" a fraud claim to a breach of contract claim. In fact, the principal claim in the Complaint is for fraud and fraudulent inducement that renders the APA void. The breach of contract claim is an alternative remedy. Novipax alleges that it obtained contractual representations and covenants to ensure that the Business, including stability of customers, still existed at the Closing. [143] Sealed Air, however, purportedly misrepresented and concealed information regarding the viability of the Business, including obstacles to customers converting to rigid trays, and Sealed Air's facilitation of customer migration to rigid trays, before the Closing in order to induce Novipax to purchase the Business. [144] These allegations, if true, go beyond a mere intention not to comply with the terms of the Agreement. As such, at this juncture, the fraud claim is different from the breach of contract claim.

While the two claims are different, Seal Air is correct that Novipax pleads damages that are similar for both claims. [145] However, Novipax prays for rescission of the transaction or recessionary damages, which is a remedy for fraud. [146] This Court has twice held that a claim for rescission or recessionary damages separates a fraudulent inducement claim from breach of contract damages. [147] Nonetheless, if discovery demonstrates that Novipax's damage claims for breach of contract and fraud are the same, the Court can revisit the issue prior to a trial.

## C. THE COMPLAINT ASSERTS FACTS WHICH, IF TRUE, SUPPORT A CLAIM FOR BREACH OF THE APA AND TSA

Sealed Air next seeks to dismiss the breach of contract claims. Sealed Air argues that Novipax has not alleged any facts that demonstrate that Sealed Air breached any provision of the APA and TSA. This is not true.

Similar to the basis for Novipax's fraud claim, Novipax argues that Sealed Air breached the representations, warranties, and covenants in Sections 4.5, 4.18, 6.1, and 6.3 of the APA. As it relates to the representations, the Complaint alleges that Sealed Air breached the representation in Section 4.5 that there has not been any Material Adverse Effect and that the Business has been operated in the Ordinary Course. [148] The Complaint cites to e-mails from several Sealed Air employees acknowledging that customer preference is moving away from foam trays and that the cost to convert specialty production lines from foam trays to rigid trays was *de minimus.* [149] In addition, the Complaint alleges that Sealed Air breached Section 4.18 when it represented that in the last 12 months, no Major Customer had provided written notice to Sealed Air of its intent to terminate its relationship with any Seller with respect to the Business. [150] The Complaint alleges that Sealed Air knew of Cargill and Perdue's intent to migrate away from foam trays, but that this intent was never disclosed to Novipax. [151]

 **\*15** As it relates to the covenants, the Complaint alleges that Sealed Air breached Section 6.1 because it was not "Ordinary Course" to migrate the Business's customers such as Cargill and Perdue to non-Business products. [152] Moreover, this conduct did not amount to Sealed Air's "reasonable best efforts to preserve intact the Business" or Sealed Air's maintenance of "existing relationships with customers," including the Major Customers such as Cargill and Perdue. [153] In addition, the Complaint alleges that Sealed Air breached the covenant in Section 6.1 by failing to "maintain all of the Purchased Assets" in their current condition. [154] The Complaint contends that Sealed Air breached this covenant because it actively transitioned patronage to their rigid tray business, which harmed the Business and devalued the goodwill that Novipax acquired. [155]

Novipax Holdings LLC v. Sealed Air Corporation, Not Reported in A.3d (2017)
Case 4:20-cv-14695-LMM Doc 756 Filed 10/22/20 Page 196 of 221 Page 65 of 89
2017 WL 5713307

Finally, as it relates to the TSA, the Complaint asserts minimal, but sufficient facts to support breach of the TSA. The Complaint alleges that under the TSA, Sealed Air agreed to provide specific transition services to Novipax after the Closing so that Novipax could receive the full benefit of its Purchased Assets. [156] The TSA sets forth Sealed Air's commitment to assist in maintaining existing customer relationships in Service Schedule 1, A and to provide sales administrative support for formula pricing and U.S. barrier foam tray pricing in Service Schedule 1,B. [157] Based upon Sealed Air's conduct and its statements in various e-mails of Sealed Air employees, Sealed Air breached these provisions of the TSA, specifically by attempting to improperly transition barrier foam trays to the rigid trays sold by Seller. [158]

The Court need not address each allegation in support of the breach of contract claims. At this stage in the litigation, the Court must accept all well-pleaded allegations as true. Sealed Air can argue that its conduct did not breach the APA or TSA, but Novipax alleges that Sealed Air's pattern of conduct before the Closing demonstrates that Sealed Air *did* breach the APA and TSA. The Court must construe these allegations and the inferences to be drawn therefrom in the light most favorable to Novipax. In doing so, the Court finds that the allegations, if true, support a claim for breach of contract, specifically Sections 4.5, 4.18, 6.1, and 6.3 of the APA and Schedule I, A, and Schedule I, B of the TSA. Therefore, the Court will not dismiss Counts II and III for breach of contract. As discussed previously, however, the claim for breach of the TSA may be barred by Novipax's failure to engage in pre-litigation negotiation as provided in 5.15, but the briefing is not clear on this point.

### D. THE EQUITABLE CLAIMS FOR UNJUST ENRICHMENT AND DECLARATORY JUDGMENT ARE, AT THIS TIME, COGNIZABLE

As a final argument, Sealed Air seeks to dismiss the equitable claims for unjust enrichment and declaratory judgment.

#### i. The unjust enrichment claim is a viable alternative remedy at this stage in the litigation

Sealed Air argues that Novipax cannot recover for unjust enrichment because the APA governs the relationship between the parties. In other words, Sealed Air argues that Novipax cannot maintain both a cause of action for breach of contract and unjust enrichment. Sealed Air is correct;

however, Novipax is asserting the two claims as alternative, not parallel, claims for relief. [159] The principle claim in this case is for fraud and fraudulent inducement. Sealed Air argues that this fraudulent inducement renders the APA void. A claim for unjust enrichment may thus proceed under the theory that no valid contract exists. The breach of contract claim is an alternative theory of relief. Therefore, the Court will not dismiss the unjust enrichment claim, but Novipax must eventually decide under what theory it wishes to proceed—fraud and unjust enrichment or breach of contract.

#### ii. The declaratory judgment claim is appropriate based on the relief sought in this case

**\*16** Novipax seeks declaratory judgment as to the purchase price adjustment mentioned in Sections 3.3 and 3.4 of the APA. Specifically, Novipax seeks a declaration that there is no remaining claim by Sealed Air for any adjustment amount due to Sealed Air. Alternatively, should the claim remain, Novipax seeks a declaration that it is entitled to a set off its damages in this case with any working capital obligation that Novipax might owe Sealed Air.

Sealed Air argues that declaratory judgment as to setoff is improper because any disagreement pertaining to working capital adjustments must be resolved by an accounting referee under Section 3.4(d) of the APA. Sealed Air contends that declaratory judgment is improper because it would negate Section 3.4(d)'s requirement that these disputes be resolved via binding ADR.

Section 3.3. states that at the Closing, Novipax will pay Sealed Air an amount equal to $80,000,000, which is the purchase price. [160] The purchase price, however, may be adjusted by adding the Estimated Working Capital Adjustment to that amount. [161] The Estimated Working Capital Adjustment equals the difference between the Closing Net Working Capital and the Base Net Working Capital. [162] At least three days prior to the Closing, Sealed Air must deliver to Novipax a certificate setting forth Sealed Air's calculation of this Estimated Working Capital Adjustment, which shall be used to determine the Adjusted Purchase Price payable at the Closing. [163] If, however, Novipax disputes Sealed Air's calculation of the Closing Net Working Capital, Novipax may deliver to Sealed Air a certificate setting forth its calculation of the closing Net Working Capital. [164]

If Sealed Air then contests in good faith Novipax's calculation, it may deliver notice to Novipax of its calculation of the Closing Net Working Capital. [165] If after all this, Sealed Air and Novipax still disagree on the amount, they must retain an accounting referee to resolve all disputed items or amounts and to calculate the Closing Net Working Capital. [166]

Novipax argues that Section 3.4(d) does not bar the declaratory judgment claim because Novipax is seeking to rescind the APA. In other words, Sealed Air's fraud vitiates its right to rely on any provision of the APA to bar Novipax's claims. Since the Court is permitting the fraud claim to go forward, the declaratory judgment claim is also cognizable at this time.

While not argued by the parties, it does not appear that Novipax's request for declaratory judgment even implicates Sections 3.3 and 3.4. Novipax appears to seek a declaration only as to Sealed Air's right to make a claim for an adjustment amount. If true, then this is an issue for the Court to determine in the first instance. This is not a dispute between the parties over the Closing Net Working Capital that must be resolved by an account referee.

## V. CONCLUSION

For the reasons set forth above, the Court will **DENY** the Motion to Dismiss. The Court understands this to be a large sales transaction between sophisticated parties. Those parties were represented by quality lawyers. The various agreements were extensively negotiated and the provisions, even ones characterized as "boilerplate," have to be enforced as intended by the parties when they negotiated the sales transaction. The Court believes that appropriate discovery should allow the parties to narrow the issues in this case leading up to dispositive motions and/or trial.

**All Citations**

Not Reported in A.3d, 2017 WL 5713307

## Footnotes

1   Unless otherwise indicated, the following are the Relevant Facts as alleged in the Complaint. For purposes of the Motion to Dismiss, the Court must view all well-pleaded facts alleged in the Complaint as true and in a light most favorable to Novipax. *See, e.g., Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad., LLC*, C.A. No. 09C–09–136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).

2   Compl. ¶ 24.

3   *Id.* ¶ 25.

4   *Id.* ¶ 26.

5   *Id.* ¶ 27.

6   *Id.* ¶ 28.

7   *Id.*

8   *Id.* ¶ 3.

9   *Id.* ¶ 41.

10  *Id.*

11  *Id.*

12  *Id.* ¶ 42.

13  *Id.* ¶ 4.

14  *Id.* ¶ 44.

15  *Id.*

16  *Id.* ¶ 45.

17  *Id.* ¶ 19.

18  *Id.* ¶ 20.

Novipax Holdings LLC v. Sealed Air Corporation, Not Reported in A.3d (2017)

Case 20-14695-LMI Doc 756 Filed 10/22/20 Page 198 of 221
Case 4:20-cv-03489 Document 37-14 Filed on 04/22/20 in TXSD Page 67 of 89

2017 WL 5713307

19    DankPak LLC was the former name of Novipax Holdings LLC, the holding company for the other Novipax
      entity. *See* Compl. Ex. A. Asset Purchase Agreement p. 1. Exhibit A to the Complaint will be cited to as "APA
      § ___" or "APA p. ___" if no section is specified.

20    *See* APA Art. IV.

21    *Id.* § 4.5.

22    *Id.*

23    *Id.* p. 9.

24    *Id.* p. 10.

25    *Id.* § 4.6.

26    *Id.*

27    *Id.* § 4.6 to the Disclosure Schedule.

28    *Id.* § 4.7.

29    *Id.* p. 11.

30    *Id.* § 4.18.

31    *Id.*

32    *See* § 4.18 of Disclosure Schedule.

33    *Id.* § 4.20.

34    *See id.* Art. V.

35    *Id.* § 5.7

36    *Id.*

37    *Id.* § 5.7.

38    *See id.* Art. VI.

39    *Id.* § 6.1.

40    *Id.* § 6.1 (a)-(c).

41    *Id.* § 6.3(b).

42    *Id.*

43    *See id.* Art. VII.

44    *Id.* §§ 7.2(a)-(b), 7.3(a)-(b).

45    *See id.* Art. IX.

46    *Id.* §§ 9.1(a)-(b), 9.2(a)-(b).

47    *Id.* § 9.3.

48    *Id.* § 9.3(a).

49    *Id.* § 9.3(h).

50    *Id.* § 10.3.

51    *See* Compl. Ex. B, Transition Services Agreement p. 1. Exhibit B to the Complaint will be cited to as "TSA §
      ___", "TSA Sch. ___", or "TSA p. ___" if no section is specified.

52    TSA Serv. Sch. 1, A.

53    *Id.* Serv. Sch. 1, B.

54    *Id.* § 5.15.

55    *Id.*

56    Compl. ¶ 1; *see also* APA § 6.4(b).

57    Compl. ¶ 5.

58    *Id.* ¶ 47.

59    *Id.*

60    *Id.* ¶ 48.

61    *Id.* ¶ 49.

62    *Id.* ¶¶ 87–89.

63    *Id.* ¶ 92.

64    *Id.* ¶ 93

Case 4:20-cv-14695-bLMI Doc 756 Filed 10/22/20 Pages 99 of 221
Novipax Holdings LLC v. Sealed Air Corporation, Not Reported in A.3d (2017)
Case 1:18-cv-11403-ALC Document 87-18 Filed 04/24/20 in TXSD Page 68 of 89
2017 WL 5713307

| | |
|---|---|
| 65 | *Id.* |
| 66 | *Id.* ¶ 95. |
| 67 | *Id.* ¶¶ 97–99. |
| 68 | *Id.* ¶ 104. |
| 69 | *Id.* |
| 70 | *Id.* ¶ 105. |
| 71 | *Id.* ¶ 106. |
| 72 | *Id.* ¶ 109. |
| 73 | *Id.* ¶ 51. |
| 74 | *Id.* |
| 75 | *Id.* ¶ 53. |
| 76 | *Id.* ¶ 55 |
| 77 | *Id.* ¶ 58. |
| 78 | *Id.* ¶¶ 59–63. |
| 79 | *Id.* |
| 80 | *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy,* No. 09C–09–136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010). |
| 81 | *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998). |
| 82 | APA § 9.4. |
| 83 | *Id.* |
| 84 | *Id.* § 9.3(a). |
| 85 | *Id.* § 9.3(h) (explaining that indemnification rights under Article IX are the exclusive remedy for breach of any representation or warranty in the APA, but clarifying that "nothing herein shall limit (i) any claim based on fraud, willful misrepresentation or willful breach, or (ii) any party's right to seek ... other equitable remedies"). |
| 86 | *Eni Holdings, LLC v. KBR Group Holdings, LLC*, 2013 WL 6186326, at *6 (Del. Ch. Nov. 27, 2013) ("Faced with a question of contract interpretation on a motion to dismiss, [the Court] must determine whether the contractual language at issue is unambiguous. If so, [the Court] must give effect to its meaning. If, however, the contractual language is reasonably or fairly susceptible to different interpretations, [the Court] must resolve the ambiguity in favor of the non-moving party."). |
| 87 | TSA § 5.15 |
| 88 | *Id.* |
| 89 | *See* APA § 10.6. |
| 90 | *See id.* |
| 91 | *See* TSA p. 1. |
| 92 | *See* APA Art. VII. |
| 93 | *See id.* § 4.5. |
| 94 | *Id.* § 4.6(b). |
| 95 | *Id.* § 4.18. |
| 96 | *Id.* § 4.20. |
| 97 | *Id.* § 5.7. |
| 98 | *Id.* § 10.3. |
| 99 | *See e.g.*, *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35 54–55 (Del. Ch. 2015) (Representation-limiting language defines the universe of information on which the contracting party relied. If the contract says the buyer only relied on the representations in the four corners of the agreement, then that is sufficient). |
| 100 | APA § 9.3(h). |
| 101 | *Id.* |
| 102 | 2013 WL 2249655, at *1 (Del. Ch. May, 17, 2013). |
| 103 | *Anvil,* 2013 WL 2249655, at *1. |

2017 WL 5713307

| | |
|---|---|
| 104 | *Id.* at *8. |
| 105 | *Id.* |
| 106 | *Id.* |
| 107 | *Id.* |
| 108 | *Id.* |
| 109 | 984 A.2d 126 (Del. Ch. 2009). |
| 110 | *Airborne*, 984 A.2d at 140–41. |
| 111 | *Id.* at 141. |
| 112 | *Id.* |
| 113 | *See* APA §§ 4.20, 5.7. |
| 114 | *Airborne*, 984 A.2d at 141. |
| 115 | *ITW Glob. Invest. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, 2015 WL 3970908, at *5 (Del. Super. June 24, 2015). |
| 116 | *Id.* at *6. |
| 117 | *Id.* |
| 118 | APA ¶ 4.5. |
| 119 | *Id.* ¶ 4.18. |
| 120 | *Id.* ¶ 6.1. |
| 121 | *Id.* ¶ 6.3(b). |
| 122 | Compl. ¶¶ 52–64. |
| 123 | *Id.* |
| 124 | *See id.* Ex. W. |
| 125 | *Id.* |
| 126 | 981 A.2d 1032. |
| 127 | *Abry*, 981 A.2d at 1034–35. |
| 128 | *Id.* |
| 129 | *Id.* at 1038–40. |
| 130 | *Id.* at 1051. |
| 131 | *See ITW Glob. Invest. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, 2015 WL 3970908, at *5 (Del. Super. June 24, 2015) (permitting a fraudulent inducement claim based on representations contained in the parties' agreement, but excluding a fraudulent inducement claim based on representations made outside the agreement). |
| 132 | Compl. ¶¶ 51–57. |
| 133 | *Id.* ¶¶ 53–56. |
| 134 | *See e.g.,* Compl. ¶¶ 5, 6, 32, 33, 46–53, 55, 57–59, 65, 66, 68, 71, 94, 103, 104, 110, 118–20, 125, 135, 136, 155. |
| 135 | *Id.* ¶¶ 112–16, 121, 122, 127, 128, 147, 165. |
| 136 | *Id.* ¶¶ 29, 47–50, 58–62, 68, 71–73, 76, 77, 90, 91, 96–99, 102–09, 111, 112, 118–20, 125, 126, 133. |
| 137 | *Id.* ¶¶ 86, 101, 116, 119, 121,122, 165. |
| 138 | *Id.* ¶¶ 167, 170, 171. |
| 139 | *ITW Glob. Invest. Inc.,* 2015 WL 3970908, at *5. |
| 140 | *Id.* |
| 141 | *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010). |
| 142 | *Id.* |
| 143 | Compl. ¶¶ 30–40, 66–86 |
| 144 | *Id.* ¶¶ 47–50, 54–64, 87–91, 92–114, 117 –124. |
| 145 | *See id.* ¶¶ 167, 175, 179. |
| 146 | *See id.* VI.3. |

147   *See ITW Glob. Invest. Inc.*, 2015 WL 3970908, at *6 ("Count I for fraud must be dismissed because it pleads damages that are simply a "rehash" of the breach of contract damages. Because Count II for fraud in the inducement pleads damages for rescission or rescissory damages, the Court will not address Count II."); *see also EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *6 (Del. Super. Mar. 21, 2017) (finding that plaintiff's count for fraud in the inducement is materially identical to the breach of contract complaint and rejecting plaintiff's reliance on *ITW* because plaintiff pleads neither for rescission or rescissory damages as did the *ITW* complaint).

148   Compl. ¶¶ 71–73.

149   *Id.* ¶¶ 47–49; 71 –74.

150   *Id.* ¶¶ 78–80.

151   *Id.* ¶¶ 80–82.

152   *Id.* ¶ 66.

153   *Id.*

154   *Id.* ¶ 67.

155   *Id.*

156   *Id.* ¶ 40.

157   *Id.* ¶¶ 40, 145.

158   *Id.* ¶¶ 145–147.

159   *Avantix Labs, Inc. v. Pharmion, LLC*, 2012 WL 2309981, at *9 (Del. Super. June 18, 2012).

160   APA § 3.3.

161   *Id.*

162   *Id.* p. 6.

163   *Id.* § 3.4(a).

164   *Id.* § 3.4(b).

165   *Id.* § 3.4(c).

166   *Id.* § 3.4(d).

---

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX A-;

Rhines v. Salinas Const. Technologies, Ltd., Not Reported in F.Supp.2d (2011)

Case 4:20-14695-DbMJ Doc 756 Filed 10/22/20 Page 203 of 221

2011 WL 4688706
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Corpus Christi Division.

Dexter C. RHINES, Plaintiff,
v.
SALINAS CONSTRUCTION
TECHNOLOGIES, LTD., Defendant.

Civil Action No. C–11–262.
|
Oct. 3, 2011.

**Attorneys and Law Firms**

Stephen J. Chapman, Chapman Law Firm, Corpus Christi, TX, for Plaintiff.

Kala S. Dumont, Gaul and Dumont, San Antonio, TX, for Defendant.

*ORDER DENYING RULE 12(b)(4)
AND 12(b)(5) MOTION TO DISMISS*

NELVA GONZALES RAMOS, District Judge.

**\*1** Defendant Salinas Construction Technologies, Ltd. ("Salinas") has filed its "Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(4) and 12(b)(5)" (D.E.9) complaining that, while Defendant has actually received summons and the complaint for this case twice, Plaintiff has failed to properly effectuate service in order to confer on this Court personal jurisdiction over Salinas.

In particular, with respect to service that was accomplished on September 19, 2011, [1] Salinas complains that: (1) service was effectuated by Joe R. Perez, Perez Service Company, which is not an "authorized person" to serve summons because he is not the clerk of the court; and (2) the proof of service does not reflect who was served or the date of service. A review of the proof of service shows that service was on "Salinas Construction Technologies, Ltd.; Registered Agent Daniel Salinas" on "9/19/11." Defendant admits that it received summons on this date. Thus the complaint regarding the alleged lack of content in the proof of service is overruled.

Defendant's remaining complaint requires a determination of whether the only "authorized person" who can effectuate service on a partnership by mail is the clerk of the court. It is clear that, under Federal law, "Any person who is at least 18 years old and not a party may serve a summons and complaint." Fed.R.Civ.P. 4(c). This includes Joe R. Perez and Perez Service Company. However, Defendant suggests that this Federal provision does not apply because Texas law governs service on a partnership such as this Defendant. Fed.R.Civ.P. 4(h) (referencing Rule 4(e)(1), which provides for "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located ....").

Defendant Salinas asserts that, under Texas law, only the clerk of the court is permitted to serve a summons and complaint by certified mail. For this argument, Salinas cites Tex.R. Civ. P. 103 and 106(a), along with *Jernigan v. Jernigan,* 2010 WL 3768076 (S.D.Tex.2010). This Court disagrees with Salinas' interpretation of Texas law and the *Jernigan* opinion.

Judge Rosenthal, in *Jernigan,* very simply held that under Texas law, the Plaintiff, *personally,* was not authorized to effectuate service—the same rule as applies under Federal Rule of Civil Procedure 4(c)(2), which prohibits a *party* from serving a summons and complaint. Nothing in that holding restricts a private process server from serving a summons and complaint by certified mail.

Tex.R. Civ. P. 106(a) prescribes the method of service to include certified mail, return receipt requested, by those authorized to effectuate service under Tex.R. Civ. P. 103. Rule 103 permits service by "any person authorized by law" and "any person certified under order of the Supreme Court." Under 28 U.S.C. § 2072(a), the Supreme Court of the United States is empowered to promulgate rules of procedure to govern legal proceedings in the Federal courts. Federal Rule of Civil Procedure 4(c)(2), being such a rule, thus constitutes the designation of a person over the age of 18 who is not a party as a "person authorized by law" to effectuate service. Thus the process server in this case would be properly authorized under Texas Rule of Civil Procedure 103(1) and 103(2) to effectuate service by certified mail as permitted by Texas Rule 106.

**\*2** Additionally, the Court takes judicial notice of the website [2] of the Supreme Court of Texas, which lists those who have been certified to serve process as permitted by Rule 103(3). That website lists Joe R. Perez, Perez Service

Rhines v. Salinas Const. Technologies, Ltd., Not Reported in F.Supp.2d (2011)

Case 4:20-14695-DMI Doc 756 Filed 10/22/20 Page 204 of 221
Case 4:18-cv-01385 Document 33-2 Filed on 06/04/20 in TXSD Page 73 of 89

Company ("Perez") as a certified process server.[3] Thus Perez's service of summons and complaint by certified mail, return receipt requested, complies with Texas law and Federal law and confers on this Court personal jurisdiction over Defendant Salinas.

Defendant Salinas, however, argues that the provisions and structure of Tex.R. Civ. P. 103 must be read as restricting the power to effectuate service by certified mail to the clerk of the court. Construction of a Texas rule of procedure starts with the express language of the rule or statute. *See Galbraith Eng'g Consultants, Inc. v. Pochucha,* 290 S.W.3d 863, 867 (Tex.2009); *In re Christus Spohn Hosp. Kleberg,* 222 S.W.3d 434, 437 (Tex.2007). The Court applies the plain or literal meaning of the text unless a different meaning is supplied by legislative definition or is apparent from the context, or the plain meaning leads to absurd results. *Marks v. St. Luke's Episcopal Hosp.,* 319 S.W.3d 658, 663 (Tex.2010); *In re Christus Spohn Hosp. Kelberg,* 222 S.W.3d at 437.

The plain language of Texas Rule of Civil Procedure 103 does not say that other authorized persons cannot effectuate service by certified mail. Instead, it provides for the clerk to be an additional "authorized person" to effectuate a party's service only if the method of service is by certified mail, registered mail, or by publication. In other words, it does not authorize parties to send the clerk to hunt down those evading service in order to obtain personal service upon them. The rule states:

> Process—including citation and other notices, writs, orders, and other papers issued by the court—may be served anywhere by (1) any sheriff or constable or other person authorized by law, (2) any person authorized by law or by written order of the court who is not less than eighteen years of age, or (3) any person certified under order of the Supreme Court. Service by registered or certified mail and citation by publication must, if requested, be made by the clerk of the court in which the case is pending. But no person who is a party to or interested in the outcome of a suit may serve any process in that suit ....

Tex.R. Civ. P. 103. The first sentence does not restrict the method of service that the three categories of authorized persons may use. The method of service is supplied by Tex.R. Civ. P. 106. Rule 106's reference to Rule 103 is only for the purpose of determining who is "authorized." Furthermore, Rule 103 is rather expansive in permitting the three itemized categories of authorized persons to effectuate service "anywhere."

The second sentence, "Service by registered or certified mail and citation by publication must, if requested, be made by the clerk of the court in which the case is pending" does not *ipso facto* eliminate the three preceding options. Rather, it gives a party a fourth option—the right to call upon the clerk to effectuate service, but only if the request is to serve by certified mail, registered mail, or by publication. In the event of such a request, the clerk is required by this rule to comply with the request.

**\*3** If the second sentence were intended to modify the first sentence rather than add a new option, one would expect it to be prefaced by language indicating that the following language was to be applied as an exception to the preceding language. Furthermore, there is no public interest to be served by Defendant Salinas' interpretation of Rule 103 to restrict all certified mail to be served by the clerk and the clerk only. Defendant has not cited any authority for that interpretation and none has been found by this Court.

Defendant Salinas' interpretation would create an unnecessary conflict between Texas Rules of Civil Procedure 103 and 106. Rule 106 provides the method for service, which includes certified mail. Rule 103 provides the persons authorized to effectuate service. To interpret Rule 103 to restrict the method of service permitted under Rule 106 is to create an internal inconsistency. Defendant Salinas' interpretation would also lead to an absurd result. If service by certified mail, which is clearly permitted in Texas as incorporated into the Federal rules by Fed.R.Civ.P. 4(e)(1), must be effectuated by the "clerk of the court in which the case is pending," then the Texas rule would be purporting to prescribe the duties of the Federal clerk. The Federal clerk cannot be governed by the Texas state legislature.

The Court holds that the September 19, 2011 service of summons and complaint by Perez on Defendant Salinas was accomplished pursuant to an authorized means by an authorized person. Thus Defendant's complaint under Fed.R.Civ.P. 12(b)(5) ("insufficient service of process")

Rhines v. Salinas Const. Technologies, Ltd., Not Reported in F.Supp.2d (2011)

Case 4:20-cv-14695-LMI Doc 756 Filed 10/22/20 Page 205 of 221 in TXSD Page 74 of 89

is without merit. Defendant has not complained that the summons or the copy of the complaint, which it received, was in improper form. So Defendant has not stated a claim under Fed.R.Civ.P. 12(b)(4) ("insufficient process").

For the reasons set forth above, Defendant's "Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(4) and 12(b) (5)" (D.E.9) is DENIED.

ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4688706

## Footnotes

1    While Defendant also complains about service by regular mail on September 7, 2011, the Court assumes without deciding for purposes of argument that this first attempt at service, which utilized more informal means, was deficient. Thus the Court focuses on the second attempt.

2    Government websites are presumptively reliable and subject to judicial notice. *E.g., Kitty Hawk A ircargo, Inc. v. Chao,* 418 F.3d 453, 457 (5th Cir.2005).

3    See http://www.courts.s tate.tx.us/psrb/docs/Statewide_ Authorized_Servers.htm.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX A-32

Case 4:20-cv-14695-DML... Doc 756... Filed 10/22/20... Page 207 of 221... Page 76 of 89

5 Neb. (Unof.) 340
Supreme Court of Nebraska.

SCHOOL DIST. NO. 16 OF SHERMAN COUNTY

v.

HOWARD.

Feb. 17, 1904.

**Synopsis**

Commissioners' Opinion. Department No. 3. Error to District Court, Sherman County; Gutterson, Judge.

"Not to be officially reported."

Action by Henry Howard against School District No. 16 of Sherman County. Judgment for plaintiff. Defendant brings error. Reversed.

**Attorneys and Law Firms**

**\*666** H. M. Mathew, for plaintiff in error.

Aaron Wall and R. J. Nightingale, for defendant in error.

**Opinion**

DUFFIE, C.

Howard was employed by the school district as a teacher for the period of nine months at $50 per month, the district to furnish the services of a janitor. After eight months of the term had expired, the school was closed by order of the board of health of the village of Ashton on account of the prevalence of smallpox, and Howard, although ready and willing to complete his contract, was unable to do so in consequence of such order. In this action he sues the school district for one month's wages, and also for money advanced by him to pay for janitor services, which the district failed to furnish. The district offered to confess judgment for the sum of $16, the amount claimed by Howard on account of payment for janitor services, but defended against his claim for one month's wages upon the ground that the district was prevented from fully carrying out its contract by order of the board of health. Judgment went in favor of Howard, and the district has taken error to this court.

Plaintiff in error insists that full performance of the contract on the part of the district was rendered impossible by law, and

**\*667** asserts that under such circumstances it is not liable. It is clearly settled by innumerable authorities that whenever a contract which was possible and legal at the time it was made becomes impossible by act of God, or illegal by an ordinance of the state, the obligation to perform it is discharged. Baylies v. Fettyplace, 7 Mass. 325; Vol. 9, Cyc. Law & Pro. 629. No contract can be carried into effect which was originally made contrary to the provisions of law, or which, being made consistently with the rule of law at the time, has become illegal by virtue of some subsequent law. This is so well settled and so thoroughly understood by the profession that a citation of authorities is unnecessary. It is not claimed that the board of health did not have authority to close the school, or that the order was illegal in any respect. This being so, that order, so long as it remained in force, was a valid legal prohibition against the continuance of the school, and the district, by force of law, was unable to complete its contract. Had the board of health failed to act, and had the school been closed by the district on its own motion, then the rule contended for by the defendant in error, and followed in the case of Dewey v. Union School District (Mich.) 5 N. W. 646, 38 Am. Rep. 206, and Libby v. Inhabitants of Douglas (Mass.) 55 N. E. 808, might be invoked. But the action of the district in closing the school was not voluntary. It was the act of the law, which the district and all others were compelled to obey. In Baylies v. Fettyplace, supra, it was held that, where the law interposes to prevent the performance of a contract, but such prohibition is temporary only, the parties are not excused from its performance after the law has ceased to operate. Whether this rule should apply to a contract for personal services in all cases we are not called upon to determine; but, even if it should be applied in this case, the district would still not be in default, as it offered to allow the defendant in error to teach the remaining months of his term after the order of the board of health had been recalled.

Defendant in error calls attention to section 5440, Comp. St. 1903, which provides that, if a school be closed on account of epidemic sickness or the destruction of the schoolhouse, the district nevertheless may draw its proper share of the state apportionment; and it is argued that, as the funds received by the district from this apportionment can be used only in payment of teacher's wages, the law contemplates payment of the teacher during the time a school may be closed. We cannot agree that such is a proper construction of the statute. In our opinion, the law allows the payment of the usual state apportionment to a district under the conditions mentioned that the district may not suffer loss from a cause over which it has no control, and in order to allow it to make up for the time lost by the closing of the school, if the directors see fit,

School Dist. No. 16 of Sherman County v. Howard, 5 Neb. (Unof.) 340 (1904)

98 N.W. 666

Case 4:20-cv-14695-LMJ Doc 756 Filed 10/22/20 in DKS06 Page 77 of 89

by providing for a longer or an extra subsequent session of the school.

We think the court was wrong in finding for defendant in error, and recommend that the judgment be reversed, and the case dismissed.

KIRKPATRICK and LETTON, CC., concur.

PER CURIAM.

The conclusions reached by the Commissioners are approved, and, it appearing that the adoption of the recommendations made will result in a right decision of the cause, it is ordered that the judgment of the district court be reversed, and the case dismissed.

**All Citations**

5 Neb. (Unof.) 340, 98 N.W. 666

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 2

APPENDIX A-33

Case: 20-14695 Date Filed: 10/22/20 Page: 210 of 221
Case 4:49-cv-40482-LMJ Doc 756 Filed 04/23/20 in DKS-10 Page 79 of 89
Toscano v. United Parcel Service, Not Reported in F.Supp.3d (2015)
2015 WL 2089660

**2015 WL 2089660**
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

Edward J. TOSCANO, Plaintiff,

v.

UNITED PARCEL SERVICE, Defendant.

Civil Action No. 4:14–CV–2680.
|
Signed April 28, 2015.

**Attorneys and Law Firms**

Jeffrey Thomas Michalczak, Michalczak PLLC, New York,
NY, for PLaintiff.

Shannon Brown Schmoyer, Schmoyer Reinhard LLP, San
Antonio, TX, for Defendant.

*MEMORANDUM AND ORDER*

KEITH P. ELLISON, District Judge.

**\*1** Pending before the Court is Defendant's Partial Motion to
Dismiss Plaintiff's First Amended Complaint. (Doc. No. 27.)
Defendant seeks dismissal of Plaintiff's race, color, national
origin, and age discrimination and retaliation claims. For the
reasons stated herein, Defendant's Motion is **GRANTED.**

**I. BACKGROUND**
Plaintiff filed the instant suit on September 17, 2014.
(Complaint, Doc. No. 1.) Defendant filed a Partial Motion
to Dismiss (Doc. No. 4), on which the Court held a hearing
January 29, 2015. In that prior Motion, Defendant argued
that Plaintiff had failed to exhaust his administrative remedies
with regard to claims for race and color discrimination and
retaliation. Plaintiff responded that he had not known the facts
supporting his claims for race and color discrimination and
retaliation when he filed his initial Charge of Discrimination
with the EEOC, and thereafter filed a subsequent Charge of
Discrimination. (Doc. No. 17.) However, Plaintiff received a
Dismissal and Notice of Rights in response to his subsequent
Charge, which stated that the EEOC would close its file on
the second Charge because it was not timely filed. (Doc.
No. 17–1 at 2.) In response to Defendant's Partial Motion to

Dismiss, the Court allowed Plaintiff the opportunity to amend
his Complaint to allege facts that would support equitable
tolling of the time limit for filing a Charge with the EEOC
with regard to his race and color discrimination and retaliation
claims.

**II. LEGAL STANDARD**
A court may dismiss a complaint for a "failure to state a claim
upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). "To
survive a Rule 12(b)(6) motion to dismiss, a complaint 'does
not need detailed factual allegations,' but must provide the
plaintiffs grounds for entitlement to relief-including factual
allegations that when assumed to be true 'raise a right to relief
above the speculative level.' " Cuvillier v. Taylor, 503 F.3d
397, 401 (5th Cir.2007) (quoting Bell Atl. Corp. v. Twombly,
550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).
That is, a complaint must contain sufficient factual matter
that, if it were accepted as true, would "state a claim to relief
that is plausible on its face." Ashcroft v. Iqbal, 556 U.S.
662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting
Twombly, 550 U.S. at 570). A claim has facial plausibility
"when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable
for the misconduct alleged." Id. (citing Twombly, 550 U.S at
556). The plausibility standard "is not akin to a 'probability
requirement,' ' though it does require more than a "sheer
possibility" that a defendant has acted unlawfully. Id.

Ultimately, the question for the court to decide is whether the
complaint states a valid claim when viewed in the light most
favorable to the plaintiff. The court must accept wellpleaded
facts as true, but legal conclusions are not entitled to the same
assumption of truth. Iqbal, 556 U.S. at 678 (citation omitted).
The court should not "strain to find inferences favorable to the
plaintiffs" or "accept 'conclusory allegations, unwarranted
deductions, or legal conclusions.' " R2 Investments LDC v.
Phillips, 401 F.3d 638, 642 (5th Cir.2005) (quoting Southland
Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 361
(5th Cir.2004)). The court should not evaluate the merits of
the allegations, but must satisfy itself only that plaintiff has
adequately pled a legally cognizable claim. United States ex
rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 376 (5th
Cir.2004).

**III. ANALYSIS**
**\*2** "Employment discrimination plaintiffs must exhaust
administrative remedies before pursuing claims in federal
court. Exhaustion occurs when the plaintiff files a timely

charge with the EEOC and receives a statutory notice of right to sue." *Taylor v. Books A Million, Inc.,* 296 F.3d 376, 378–79 (5th Cir.2002) (citing *Dao v. Auchan Hypermarket,* 96 F.3d 787, 788–89 (5th Cir.1996)). In states like Texas, which have an agency with the authority to grant or seek relief relating to unlawful employment practices, the plaintiff must file the charge of discrimination no later than 300 days after the act of discrimination occurred. *Hixson v. Houston Indep. Sch. Dist.,* No. 4:09–CV–3949, 2011 WL 1655581, at *3 (S.D.Tex. May 2, 2011) (Ellison, J.). *See also* 29 U.S.C. § 626(d)(1)(B); *Julian v. City of Houston,* 314 F.3d 721, 725–26 (5th Cir.2002). Plaintiffs must exhaust each alleged Title VII violation. *Taylor v. Texas S. Univ.,* No. 4:12–CV–01975, 2013 WL 5410073, at *4 (S.D.Tex. Sept.25, 2013) (Ellison, J.) *aff'd,* 569 F. App'x 193 (5th Cir.2014).

"For the purpose of Title VII exhaustion, filing deadlines are akin to statutes of limitation, and dismissal under Rule 12(b)(6) is appropriate 'where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like.' " *Garrison v. Texas S. Univ.,* No. CIV .A. H–11–2368, 2011 WL 4457374, at *4 (S.D.Tex. Sept.21, 2011) (Ellison, J.) (quoting *Jones v. Alcoa, Inc.,* 339 F.3d 359, 366 (5th Cir.2003)). Thus, dismissal is appropriate here if (1) it is evident from Plaintiffs Amended Complaint that he did not file a Charge of Discrimination within the prescribed time frame, and (2) his Amended Complaint does not present a basis for an exception such as equitable tolling. *Id.*

According to Plaintiff's Complaint, he filed two separate Charges of Discrimination with the EEOC. The first of these Charges, filed April 26, 2010, was timely; the second Charge, filed December 30, 2014, was not timely. The timely-filed Charge alleged discrimination and retaliation based on disability, claims that are not addressed by Defendant's Partial Motion to Dismiss. However, the remainder of Plaintiff's claims-discrimination and retaliation based on race, color, national origin, and age-were addressed only in the Charge that was filed outside of the 300–day window for timely filing. Those untimely claims must be dismissed unless Plaintiffs Amended Complaint raises some basis for an exception to the administrative exhaustion requirement.

Like a statute of limitations, the time limit for filing a charge of discrimination with the EEOC is subject to waiver, estoppel, and equitable tolling. *Garrison,* 2011 WL 4457374, at *3 (quoting *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)). Plaintiff has argued that equitable tolling should be applied to allow his claims to proceed. (Doc. No. 29.) Equitable tolling "is a narrow exception" to "be applied sparingly." *Phillips v. Leggett & Platt, Inc.,* 658 F.3d 452, 457 (5th Cir.2011) (internal quotation marks omitted). The employee has the burden of demonstrating entitlement to equitable tolling. *Id.* at 458. The Fifth Circuit recognizes three general grounds for equitable tolling in this context: "(1) a pending action between parties in the wrong forum; (2) the plaintiff's unawareness of the facts supporting his claim because defendant intentionally concealed them; and (3) the EEOC's misleading the plaintiff about his rights." *Id.* at 457; *see also Branch v. CEMEX, Inc.,* No. CIV.A. H–11–1953, 2012 WL 2357280, at *10 (S.D.Tex. June 20, 2012) (Rosenthal, J.) *aff'd,* 517 F. App'x 276 (5th Cir.2013).

**\*3** Plaintiff has not pled facts sufficient for his claims of discrimination and retaliation based on race, color, national origin, and age to fall within the grounds the Fifth Circuit recognizes for equitable tolling. There is no other pending action between the parties, and Plaintiff has not alleged that either the Defendant or the EEOC misled him or concealed any facts. Plaintiff's claims for discrimination and retaliation based on race, color, national original, and age must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Partial Motion to Dismiss (Doc. No. 27) is **GRANTED.** Plaintiff's claims for discrimination and retaliation based on race, color, national origin, and age are **DISMISSED.** The Court notes that Plaintiff's claims for discrimination and retaliation based on disability remain.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 2089660

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX A-34

Wal–Mart Stores, Inc. v. AIG Life Ins. Co., 901 A.2d 106 (2006)

Case 4:20-cv-14695-LMJ   Doc 756   Filed 10/22/20   Page 213 of 221   Case 4:20-14695-LMJ   Doc 756   Filed on 04/23/20 in DCSJ   Page 82 of 89

901 A.2d 106
Supreme Court of Delaware.

WAL–MART STORES, INC., a Delaware
corporation, and Wachovia Bank of
Georgia, N.A., in its capacity as Trustee
of the Wal–Mart Stores, Inc. Corporation
Grantor Trust, Plaintiffs Below, Appellants,

v.

AIG LIFE INSURANCE COMPANY, a Delaware
corporation; Hartford Life Insurance Company, a
Connecticut corporation; Westport Management
Services, Inc., a Delaware corporation; International
Corporate Marketing Group, LLC, a Delaware
limited liability company; National Benefits
Groups, Inc., dba Marsh Financial Services, a
Minnesota corporation; Seabury & Smith, Inc., a
Delaware corporation; Marsh, Inc., a Delaware
corporation; and Marsh & McLennan National
Marketing Corporation, now known as J & H
Marsh & McLennan Private Client Services, Inc., a
Delaware corporation, Defendants Below, Appellees.

No. 172,2005.
|
Submitted: March 8, 2006.
|
Decided: June 6, 2006.

**Synopsis**
**Background:** Policyholder brought action against life
insurers, their representatives, and brokers to recover for
fraud, breach of contract and fiduciary duty, and unjust
enrichment after deductions based on corporate-owned life
insurance (COLI) policies were retrospectively disallowed
and policyholder's insurable interest in lives of employees
was challenged. The Court of Chancery, New Castle County,
granted motion to dismiss suit as time barred. Policyholder
appealed. The Supreme Court, 860 A.2d 312, reversed and
remanded. On remand, the Court of Chancery, Lamb, Vice
Chancellor, 872 A.2d 611, granted motions to dismiss for
failure to state a claim. Policyholder appealed.

**Holdings:** The Supreme Court, Berger, J., held that:

the failure of the COLI plans to provide tax benefits entitled
policyholder to no relief on theories of commercial frustration
or mutual mistake;

brokers owed no fiduciary duty to policyholder;

insurers were not partners or joint venturers with policyholder
and owed no fiduciary duty;

policyholder stated common-law and equitable fraud claims;

it failed to state claims for breach of contract or negligence.

Affirmed in part, reversed in part, and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**\*109** Court Below: Court of Chancery of the State of
Delaware, in and for New Castle County, C.A. No. 19875.
Upon appeal from the Court of Chancery. **AFFIRMED IN
PART; REVERSED IN PART** and **REMANDED.**

**Attorneys and Law Firms**

Robert K. Payson, and Gregory A. Inskip, of Potter, Anderson
& Corroon, L.L.P., Wilmington, DE; Michael Y. Horton
(argued), and David S. Cox, of Morgan, Lewis & Bockius,
L.L.P., Los Angeles, CA; and Paul A. Zevnik, of Morgan,
Lewis & Bockius, L.L.P., Washington, DC, of counsel, for
Appellants.

Richard D. Heins, and Carolyn S. Hake, of Ashby &
Geddes, Wilmington, DE, and James F. Jorden (argued),
of Jorden Burt, L.L.P., Washington, DC, for Appellee AIG
Life Insurance Company; R. Franklin Balotti, Lisa A.
Schmidt, Michael R. Robinson, and Catherine G. Dearlove,
of Richards, Layton & Finger, P.A., Wilmington, DE, and
Barry A. Chasnoff (argued), of Akin, Gump, Strauss, Hauer
& Feld, L.L.P., San Antonio, TX, for Appellees Hartford Life
Insurance Company and International Corporation Marketing
Group; Edward P. Welch, Seth M. Beausang, and James A.
Whitney, of **\*110** Skadden, Arps, Slate, Meagher & Flom,
L.L.P., Wilmington, DE, and Marco E. Schnabl, of Skadden,
Arps, Slate, Meagher & Flom, L.L.P., New York City, for
Appellees Marsh Financial Services, Seabury & Smith, Inc.,
Marsh, Inc., and Marsh & McLennan National Marketing
Corporation, formerly known as J & H Marsh & McLennan
Private Client Services; and Elizabeth A. Wilburn, and Alisa
E. Moen, of Blank Rome, L.L.P., Wilmington, DE, and Roger

Wal-Mart Stores, Inc. v. AIG Life Ins. Co., 901 A.2d 106 (2006)

Case 4:20-cv-14695-LMJ   Doc 756   Filed 10/22/20   Page 214 of 221
Case 4:20-cv-14695-LMJ   Document 376   Filed on 04/23/20 in TXSD   Page 83 of 89

F. Cox (argued), of Blank Rome, L.L.P., Philadelphia, PA, for Appellee National Benefits Group, Inc.

Before HOLLAND, BERGER, JACOBS and RIDGELY, Justices, and HERLIHY, Judge,[1] constituting the Court en Banc.

**Opinion**

BERGER, Justice:

In this appeal, we consider whether the Court of Chancery correctly decided that appellants' Amended Complaint must be dismissed for failure to state a claim. The complaint purports to state several different claims arising out of appellants' purchase of corporate-owned life insurance (COLI) policies that were supposed to generate significant tax benefits. In fact, the COLI policies did not generate tax benefits and appellants allegedly suffered more than $100 million in damages. We conclude that the complaint adequately alleges a claim of fraud. The complaint adequately pleads that appellees sold appellants a product that was an economic sham designed to create enormous tax deductions. They did so knowing that their product was flawed, and without disclosing that those flaws jeopardized the favorable tax treatment that formed the basis of the deal. Accordingly, we reverse.

Factual and Procedural Background

What follows is a recital of the well-pled facts from the complaint.[2] Wal–Mart Stores, Inc. is a retail sales company with more than one million employees. From 1993 to 1995, Wal-Mart purchased COLI policies for approximately 350,000 employees as part of a plan to provide for its employees and generate revenues, primarily through tax deductions. In 1996, legislation prospectively eliminated most of the tax benefits associated with COLI plans. Shortly thereafter, the Internal Revenue Service started enforcement actions seeking to disallow pre–1996 tax deductions taken in connection with other companies' COLI plans. The IRS also challenged Wal–Mart's COLI program, and Wal–Mart suffered a substantial tax liability when it settled with the IRS in 2002. In addition, Wal–Mart was sued by its employees, and their estates, claiming that Wal–Mart had no "insurable interest" in the lives of its employees and that it should disgorge the death benefits it received.

In September 2002, Wal–Mart and a trust created as part of the COLI program filed this action against: a) AIG Life Insurance Company and Hartford Life Insurance Company (the "Insurers"); b) Westport Management Services, Inc. and International Corporate Marketing Group, LLC (the "Insurers' Representatives"); and c) National Benefits Group, Inc., Seabury and Smith, Inc., Marsh, Inc., and Marsh & McLennan National Marketing Corporation (the "Brokers"). The seven count Amended Complaint purports to **\*111** state claims for unjust enrichment, breach of fiduciary duty, equitable fraud, breach of contract, negligence, statutory consumer fraud, and declaratory relief.

For many years, businesses have purchased COLI policies for their top executives as "key man" insurance. During the 1980s, the insurance industry developed the idea of selling COLI policies for large numbers of employees. These broad-based COLI programs, unlike the original key man insurance programs, were designed to provide significant profit to the corporate policyholder through tax deductions. As structured, the corporate policyholder would pay a substantial premium in the first three years, and borrow back approximately 90% of the premium at a relatively high interest rate. The corporate policyholder then would take a tax deduction for the interest payments. Since Internal Revenue Code § 264 does not permit policy premiums to be paid through policy borrowing during years four through seven, the COLI plans provided for "loading dividends" or partial policy surrenders and cash withdrawals to cover most of the premiums for those years. Upon the death of an insured employee, the corporation, or the beneficiary it designated, would receive the policy payment. Thus, through a relatively small investment of cash, the corporation would get the benefit of a large tax deduction on its loans and the cash value of the COLI policies would accumulate interest tax free. In 1993 Wal–Mart began exploring the possibility of investing in a broad-based COLI plan. Wal–Mart hired Brokers, who were experts in COLI plans, to assist the company in soliciting proposals from insurance companies, evaluating the proposals, and negotiating terms and conditions on behalf of Wal–Mart. Insurers' Representatives presented proposals for Insurers' COLI plans, and Brokers advised Wal–Mart to select AIG and Hartford. Brokers also advised Wal–Mart to use a Georgia grantor trust to establish the situs for the COLI policies. This was important because for the policies to be recognized as life insurance, the beneficiary must have an "insurable interest" in the employee whose life is being insured. Legislation in Georgia expressly provided that companies have an insurable interest in all of their employees.

Before purchasing any COLI policies, Wal–Mart sought and received assurances from appellees that the program was designed to eliminate or minimize the potential adverse impact of future tax law changes. One Broker allegedly assured Wal–Mart that, in the "worst case" scenario, Wal–Mart would only lose $283,000. In addition, both Insurers represented that their products were designed to comply with the requirements of IRC §§ 7702 and 264, for purposes of qualifying as life insurance policies and qualifying for interest deductions, respectively. In sum:

> The AIG Life and Hartford Life COLI plans were designed, promoted, sold, and purchased with the understanding, by all parties, that (i) the plans were constructed to conform to, and would be administered in accordance with, standard accounting, actuarial and operating principles in the life insurance industry, (ii) the plans would be financed through favorable tax treatment and, if such favorable tax treatment changed, the plans would be modified so as to eliminate or minimize adverse financial consequences to Wal-Mart, and (iii) Wal-Mart possessed an "insurable interest" in the associates covered by the plans, in conformance with the insurance laws of the State of Georgia. [3]

**\*112** As noted above, in 1996 Congress passed a statute that effectively eliminated the tax benefits of COLI plans. In response, Wal–Mart began unwinding its COLI plans, and its COLI policies were surrendered and cancelled in 2000. Over the next two years, Wal–Mart suffered an adverse ruling in a class action claiming that Wal–Mart had no insurable interest in the lives of its employees, and it also settled a dispute with the IRS that resulted in the disallowance of most of its pre–1996 COLI interest deductions. Shortly before filing this law suit, Wal–Mart allegedly learned, among other things, that:

1) the policy loan interest rates were substantially higher than any other insurance product loan rate and had been

questioned by the New York Insurance Department as well as industry insiders;

2) the "loading dividends" were not consistent with usual dividends paid in the insurance industry, either in terms of timing, amount, or internal accounting; and

3) the Connecticut Insurance Department determined that the loading dividend was not really a dividend, but a premium refund, which would not be eligible for a tax deduction.

Wal–Mart alleges that it reasonably relied on appellees' representations that they had accurately and completely described all material facts relating to the COLI plans, and that Wal–Mart would not have purchased the COLI policies had it known the true facts.

Appellees moved to dismiss the Amended Complaint. The trial court granted their motion, holding that the claims were barred by the applicable statute of limitations. [4] This Court reversed, stating that Wal–Mart had alleged facts from which one could reasonably infer that the statute of limitations was tolled until October 1999. [5] After remand, the trial court again granted appellees' motion to dismiss, this time for failure to state a claim on which relief could be granted. [6]

### Discussion

The standard of review in this appeal is the same as it was for the last:

> This Court reviews *de novo,* for errors of law, the dismissal of a complaint under Court of Chancery Rule 12(b)(6). Under Rule 12(b)(6), the facts alleged in the complaint are taken as true and all inferences are viewed in the light most favorable to the non-moving party.... A dismissal of the claims will be upheld only if it appears from the well-pleaded allegations of the complaint that the plaintiffs would not be entitled to relief under any set

of facts that could be proven to support the claims asserted. [7]

### Count 1—Unjust Enrichment and Restitution

Wal–Mart alleges that one of the COLI plans' fundamental purposes was to provide tax benefits to the company. The COLI plans failed in that fundamental purpose and Wal–Mart suffered substantial losses. Appellees, by contrast, profited by their involvement in promoting and selling the COLI plans. Wal–Mart alleges that it would be unjust to allow appellees to retain their profits, and asks the trial court to impose a constructive trust on the money Wal–Mart paid them.

**\*113** We agree with the trial court that Wal–Mart failed to state a claim under the doctrine of commercial frustration. First, that doctrine excuses future performance under a contract:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or circumstances indicate the contrary. [8]

Wal–Mart does not seek relief from any future performance under the COLI plans.

Second, Wal–Mart assumed the risk that its tax deductions would be allowed and that it had an insurable interest in all of its employees. The Amended Complaint repeatedly acknowledges the disclosed risks associated with the COLI plans, as well as Wal–Mart's interest in minimizing those risks, [9] and there are no allegations suggesting that the parties agreed to shift the risks to the appellees. Thus, Wal–Mart cannot recover under a theory of commercial frustration (or mutual mistake). [10]

### Count 2—Breach of Fiduciary Duties

Wal–Mart alleges that appellees were fiduciaries because of their expertise with respect to COLI plans, their representations to Wal–Mart, and their knowledge that Wal–Mart was relying on their expertise. Wal–Mart also alleges that appellees breached their fiduciary duties by failing to disclose material information concerning the COLI plans. Wal–Mart argues on appeal that these allegations are sufficient to state a claim for breach of fiduciary duty because: i) Brokers were acting as WalMart's agents; and ii) Insurers were acting as partners with Wal–Mart.

The Court of Chancery properly rejected Wal–Mart's fiduciary duty claims. As the trial court noted:

> Fiduciary relationships have often been described as "special relationships," for good reason. Generally, "[a] fiduciary relationship is a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another." [11]

Agents are fiduciaries when they are authorized to "alter the legal relations between the principal and third persons ..." [12] Although Wal–Mart argues that Brokers were its agents, the Amended Complaint does not allege that Brokers had the authority to act on behalf of Wal–Mart, either by purchasing COLI policies or by otherwise committing Wal–Mart to an investment plan. The Court of Chancery looked beyond the "agent" label and examined the nature of the relationship as **\*114** alleged in the Amended Complaint. We agree with the trial court's analysis and its conclusion:

> The court is mindful of the fact that normal business dealings (such as that of an insurance broker and its client) can sometimes take on certain aspects of a fiduciary relationship, as, for example, where the broker agrees to act as agent for the customer with power to bind the customer contractually. At the same time, however, ... it is vitally important that the exacting standards of fiduciary duties not be extended to quotidian commercial relationships....

> In this light, while Wal–Mart alleges that it placed trust in the broker-defendants, it does not allege sufficient facts that, if proven to be true, demonstrate that its relationship with the broker-defendants went beyond that occurring in normal commercial transactions....

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

First, there is no alignment of interests between Wal–Mart and the broker-defendants ... Wal–Mart was trying to avoid paying the taxes it owed, while the broker-defendants were trying to make money by brokering the sale of the COLI policies ...

Second, Wal–Mart does not allege any facts from which the court could reasonably infer that the broker-defendants exerted control or domination over Wal–Mart....

Third, Wal–Mart does not allege facts from which the court could infer self-dealing....

In sum, the relationship that is alleged to have existed between Wal–Mart and the broker-defendants was merely a normal, arm's-length business relationship.[13]

Wal–Mart's contention that the Insurers are fiduciaries likewise finds no support in the Amended Complaint. It is settled law that the relationship between an insurer and an insured generally is not fiduciary in character.[14] Wal–Mart acknowledges this principle, but argues that this relationship was atypical. Wal–Mart contends that it partnered with the Insurers in a joint venture where both parties would profit from Wal–Mart's borrowing. The Amended Complaint makes it clear, however, that the parties' interests were not aligned. Insurers allegedly profited from selling the COLI plans through loan spread, mortality gains, premium loadings, and investment earnings.[15] Wal–Mart, by contrast, expected to profit from the COLI policies through tax deductions.[16] In sum, the Amended Complaint alleges no facts from which one could infer that the parties were partners, or joint venturers. Thus, the breach of fiduciary duty claim fails.

Count 3—Equitable Fraud

Wal–Mart claims that all appellees knew or should have known, but failed to disclose, material information about the risk that the COLI plans would not achieve their intended tax benefits because of the structural flaws in those plans. Among other things, Wal–Mart alleges that:

> [C]ertain state insurance regulators had disapproved COLI plans, such as those sold to Wal–Mart ... based on concerns relating to tax treatment, insurable interest, and deviations

from acceptable accounting, actuarial, and operating **\*115** principles in the life insurance industry ... [T]he AIG Life and Hartford Life COLI plans were designed and administered in a fashion that deviated from acceptable accounting, actuarial, and operating principles in the life insurance industry, with respect to the simultaneous "netting" out of premium and interest payments by way of partial withdrawals from policy cash values ... loading charges to cover insurance company expenses ... payment of dividends ... timing of dividend payments ... source of dividends ... manner in which loan interest rates were calculated[17] ...

These deviations from standard industry practice allegedly increased the risk that the COLI plans would fail, as they did, under the tax law in effect at the time Wal–Mart bought the policies. Wal–Mart claims that it sought assurances from appellees about the tax risks; that it reasonably relied on appellees to fully disclose all material information; and that had Wal–Mart known that the COLI plans were flawed in the manner alleged, it would not have purchased the policies. Finally, Wal–Mart alleges substantial damages as a result of the COLI plans' failure to produce tax benefits.

To state a claim for common law fraud, a party must allege:

1) a false representation, usually one of fact ...;

2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;

3) an intent to induce the plaintiff to act or to refrain from acting;

4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

5) damage to the plaintiff as a result of such reliance.[18]

Equitable fraud differs from common law fraud in one respect—the defendant need not know that the representation

is false. [19]  Although an expression of opinion cannot form the basis of a fraud claim, "the mere fact that a material statement is in the form of an opinion, or of an estimate, is not necessarily conclusive as to whether it must be treated as such ..." [20]  Thus:

> Even though the language of a representation concerns only legal consequences and is in the form of an expression of opinion, it may, as in the case of any other statement of opinion, carry with it by implication the assertion that the facts known to the maker are not incompatible with his opinion or that he does know facts that justify him in forming it.... When the recipient does not know the facts, he may justifiably rely upon these implied assertions and recover on the basis of a misrepresentation of implied fact. [21]

Similarly, a statement that is "facially true ... may constitute an actionable misrepresentation if it causes a false impression as to the true state of affairs, and the actor fails to provide qualifying information to cure the mistaken belief." [22]

**\*116**  The Amended Complaint alleges that appellees misrepresented the viability of the COLI plans by failing to inform Wal–Mart that the plans deviated from industry standards, and that those deviations had prompted regulators to question or disapprove similar plans. These are misrepresentations of implied fact—implied in light of appellees' representations that the COLI plans were "designed" or "intended" to comply with the requirements of I.R.C. §§ 7702 and 264. In addition, a Broker allegedly advised Wal–Mart that its maximum exposure under a "worst case" scenario would be $283,000. That statement may be classified as an "estimate" or "opinion," since no one can provide absolute assurance as to future events. Nonetheless, it is the type of opinion that suggests the reasonable belief that it was based on facts known to the maker. Thus, such a statement can form the basis for an equitable fraud claim as well.

Appellees argue that this claim must be dismissed, if for no other reason, because Wal–Mart did not rely on their representations. They point to a Letter of Understanding (LOU) executed by Wal–Mart, which states:

> [Wal–Mart] has reviewed with its own legal and tax advisors all present and future implications of its ownership of the [COLI] Policies, including, but not limited to, the tax consequences of loans and/or withdrawals from the Policies and the deductibility thereof, and that it has not relied upon any representations of AIG Life or any employee, broker or agent of AIG Life in that regard.

The trial court also questioned Wal-Mart's ability to seek relief in light of this provision. We do not view the LOU as dispositive. It is an agreement with AIG Life, not with all appellees. Moreover, this provision states only that Wal–Mart relied on its own tax advisors in analyzing the risks of using COLI policies as a tax shelter, and did not rely on AIG Life "in that regard." It does not, by its terms, state that Wal–Mart was absolving AIG Life of liability for material misrepresentations as to the structural flaws in its product.

**Count 4—Breach of Contract**

Wal–Mart alleges that appellees failed to fulfill their contractual obligations and breached their covenant of good faith and fair dealing by failing to disclose material information about the COLI plans. The Amended Complaint, however, does not identify any express contractual obligation that was breached. As for the alleged breach of the implied covenant of good faith and fair dealing:

> [T]his Court has recognized the occasional necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled. This quasi-reformation, however, should be [a] rare and fact-intensive exercise, governed solely by issues of compelling fairness. Only when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of ... had they thought to negotiate with respect to that matter may a party invoke the covenant's protections. [23]

**Wal–Mart Stores, Inc. v. AIG Life Ins. Co., 901 A.2d 106 (2006)**

Case 4:20-cv-14695-LMJ Doc 756 Filed 10/22/20 Page 219 of 221
Case 20-14695-LMJ Doc 756 Filed on 04/23/20 in DE.31.9 Page 88 of 89

As noted above, Wal–Mart has not identified any express contract provision that was breached. Nor has Wal–Mart identified any implied contract term that it would have the trial court read into the contract. Accordingly, this count fails to state a claim upon which relief may be granted.

**\*117 Count 5—Negligence against Brokers**

Wal–Mart alleges that Brokers held themselves out as professionals with special expertise in all aspects of COLI plans, and that therefore Brokers had a duty to exercise the care and skill of a "reasonably prudent business man in the insurance brokerage and consulting business ..."[24] Brokers allegedly failed to exercise that level of skill and diligence, thereby causing Wal–Mart substantial losses.

As the trial court noted, this claim appears to be another version of the rejected breach of fiduciary duty claim, but with a different label. To the extent that Wal–Mart is alleging a legally different claim based on negligence, the Amended Complaint fails to identify either the conduct that constituted a breach of the standard of care, or the manner in which that conduct proximately caused Wal–Mart injury. Accordingly, we conclude that this claim fails.

**Count 6—Delaware Consumer Fraud Act**

Wal–Mart's statutory claim is based on the same misrepresentations and failure to disclose discussed in connection with the equitable fraud claim. The statutory claim fails, however, because it requires that the unfair practice occur "in part or wholly within this State."[25] The Amended Complaint does not allege that any of the conduct at issue took place in Delaware.

**Count 7—Declaratory Relief**

Wal–Mart's final claim seeks a declaration that appellees are responsible for any losses it may incur in connection with the failed COLI plans. Wal–Mart argues that, as a matter of judicial economy, the trial court should adjudicate the parties' responsibility for damages arising from the "insurable interest" litigation against the company. The Court of Chancery viewed this claim as one for indemnification, and held that it is premature inasmuch as there are no judgments

against Wal–Mart at present. We agree for the reasons stated by the trial court.[26]

Finally, there remains a question as to whether Wal–Mart's fraud claim may be heard in the Court of Chancery. There is no fiduciary relationship between the parties, and Wal–Mart seeks damages as its remedy. Although Wal–Mart characterizes its claim as one for equitable fraud, we conclude, for the reasons discussed above, that the Amended Complaint adequately alleges the elements of common law fraud as well. The parties did not address the possibility that only the fraud claim would survive, although the trial court noted:

> [E]quitable fraud does not swallow common law fraud because it can only be applied in those cases in which one of the two fundamental sources of equity jurisdiction exists: (1) an equitable right founded upon a special relationship over which equity takes jurisdiction, or (2) where equity affords a special remedy (e.g. rescission or cancellation).[27]

We decline to resolve this question of equitable jurisdiction in the first instance. The Court of Chancery will be able to consider this matter and, if appropriate, transfer this claim to the Superior Court.

**\*118 Conclusion**

Based on the foregoing, the decision of the Court of Chancery dismissing this action for failure to state a claim is affirmed in part and reversed in part. This matter is remanded for further proceedings in accordance with this opinion. Jurisdiction is not retained.

**All Citations**

901 A.2d 106

# Footnotes

1    Sitting by designation pursuant to Art. IV, § 12 of the Delaware Construction and Supreme Court Rules 2 and 4.

2    On a motion to dismiss the complaint under Court of Chancery Rule 12(b)(6), the well-pled facts are assumed to be true and are reviewed in the light most favorable to the plaintiffs. *In re Tri–Star Pictures, Inc.,* 634 A.2d 319, 326 (Del.1993).

3    Amended Complaint, ¶ 45.

4    *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 2004 WL 405913 (Del.Ch. Mar. 2, 2004).

5    *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312 (Del.2004).

6    *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 872 A.2d 611 (Del.Ch.2005).

7    *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d at 318.

8    Restatement (Second) Contracts § 265 (1981).

9    *See, e.g.:* Amended Complaint, ¶¶ 4 ("COLI plans [promoted] ... as a commonplace, low-risk means of generating annual positive cash flow...."); 40 ("Wal–Mart recognized that continued favorable tax treatment was essential to the viability of the plans...."); 42 (Wal–Mart purchased COLI policies in reliance on "advice, recommendations, and assurances provided by the defendants...."); 44 ("The 'final projections' that accompanied the issuance of the first block of AIG Life policies ... projected positive cash flow ... of more than $9,000,000,000.... Without [the deductibility of interest payments], the COLI plan projected to produce a *loss* of nearly $2,000,000,000 over its life.") (Emphasis in original.)

10    *See* Restatement (Second) Contracts § 154 (1981).

11    *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 872 A.2d at 624 (citations omitted).

12    Restatement (Second) Agency § 12 (1958); *O'Malley v. Boris,* 742 A.2d 845 (Del.1999).

13    *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 872 A.2d at 627–28 (citations omitted).

14    *Corrado Bros., Inc. v. Twin City Fire Ins. Co.,* 562 A.2d 1188, 1192 (Del.1989).

15    Amended Complaint, ¶ 27.

16    Amended Complaint, ¶ 44.

17    Amended Complaint, ¶ 80.

18    *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983).

19    *Id.*

20    *E. States Petroleum Co., Inc. v. Universal Oil Products Co.,* 3 A.2d 768, 775 (Del.Ch.1939).

21    Restatement (Second) Torts § 545 (1977), Comment c.

22    *See Norton v. Poplos,* 443 A.2d 1, 5 (Del.1982) (where the Court described different types of misrepresentations in its consideration of the innocent misrepresentation at issue.)

23    *Dunlap v. State Farm Fire and Cas. Co.,* 878 A.2d 434, 442 (Del.2005) (internal quotation marks omitted).

24    Amended Complaint, ¶ 104.

25    6 Del. C. § 2512.

26    *See Dana Corp. v. LTV Corp.,* 668 A.2d 752, 755 (Del.Ch.1995).

27    *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 872 A.2d at 629.

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OMAR KHAN, et al. | § | |
| | § | |
| vs. | § | Civil Action No. 4:20-cv-01178 |
| | § | |
| CINEMEX USA REAL ESTATE | § | Hon. Andrew S. Hanen |
| HOLDINGS, INC., et al. | § | |

**ORDER GRANTING MOTION TO DISMISS PLAINTIFFS'**
**<u>VERIFIED ORIGINAL COMPLAINT WITH PREJUDICE</u>**

Upon the motion of Cinemex USA Real Estate Holdings, Inc. and Cinemex Holdings, USA, Inc. for entry of an order dismissing the Plaintiffs' Verified Original Complaint; and this Court having reviewed and considered the Motion to Dismiss, and the record in this matter, and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

The Motion to Dismiss is granted in its entirety with prejudice.

Signed:

_____

THE HONORABLE ANDREW S. HANEN
UNITED STATES DISTRICT COURT JUDGE