

**ORDERED in the Southern District of Florida on January 26, 2021.**

**Laurel M. Isicoff**
**Chief United States Bankruptcy Judge**

_Tagged Opinion_

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

IN RE:                                   CASE NO. 20-14695-BKC-LMI

CINEMEX USA REAL ESTATE          Chapter 11
HOLDINGS, INC, et al.,            Jointly Administered

Debtors.
_____/

## MEMORANDUM OPINION ON COBB LAKESIDE'S
## MOTION TO COMPEL COMPLIANCE WITH SECTION 365(d)(3)

This matter came before the Court for final hearing on August 21, 2020 on

the _Motion to Compel Compliance with Section 365(d)(3)_ filed by Cobb Lakeside,

LLC (ECF #366) (the "Motion to Compel"). On October 13, 2020, this Court

1

entered its *Order Granting in Part and Denying in Part Cobb Lakeside's Motion to Compel Compliance with 11 U.S.C. §365(d)(3)* (ECF #707) (the "Order"), finding, for the reasons stated on the record and outlined below, that there is no administrative claim for unpaid rent for the period March 20, 2020 through June 4, 2020, but there is an administrative claim for unpaid rent from June 5, 2020 forward.[1]

## FACTS

Cinemex USA Real Estate Holdings, Inc. ("Cinemex Real Estate"), Cinemex Holdings USA, Inc. ("Cinemex Holdings"), and CB Theater Experience LLC ("CB Theater" and, with Cinemex Real Estate and Cinemex Holdings, the "Debtors") filed Voluntary Chapter 11 Petitions in this Court on April 25, 2020, and April 26, 2020 (the "Petition Date"). The Debtors are in the movie theater business and operated 41 movie theaters across 12 states. At the time of filing, the Debtors, collectively, were party to 41 unexpired real property leases for where they operate upscale dine-in movie theaters. One of those leases (the "Lakeside Lease") is between the Debtor CB Theater as Lessee and Cobb Lakeside, LLC ("Lakeside") as Lessor.  The Lakeside Lease relates to a movie theater property (the "Lakeside Theater") located at the Lakeland Village Shopping Center in Lakeland, Florida.

---

[1] The Court read its ruling into the record at a hearing on October 2, 2020. *See* Transcript of 10/2/2020 Hearing (ECF #694). This memorandum opinion reduces that oral ruling to writing (with some additions and clean-up). However, neither the substance nor the conclusion of that ruling has been altered.

## PROCEDURAL HISTORY

Immediately after the bankruptcy cases were filed, the Debtors sought authority to reject several leases and, with respect to the balance of the leases, sought to delay or excuse payment of rent. The Debtors filed *Debtors' Emergency Motion for Entry of an Order (I) Extending Time for Performance of Obligations Arising Under Unexpired Real Property Leases; (II) Establishing Temporary Case Administration Procedures; and (III) Granting Related Relief* (ECF #92) (the "Original Rent Motion").[2]

In the Original Rent Motion, the Debtors sought to delay payment of administrative rent for a period of sixty days as authorized by 11 U.S.C. §365(d)(3). Further, the Debtors requested that all lease payments be suspended completely. The Debtors argued that, while section 365(d)(3) "requires a debtor to satisfy all postpetition obligations under an unexpired lease of nonresidential real property until the date of rejection,"[3] for a variety of reasons under non-bankruptcy law based on the terms of the leases, the "takings doctrine," impossibility of performance, and frustration of purpose, the Debtors had no postpetition obligation under their leases to pay rent while the theaters were ordered closed due to the COVID-19 pandemic.

At the conclusion of the first hearing on the Original Rent Motion, the Debtors agreed to provide a detailed brief detailing which leases, and under

---

[2] A hearing on the Original Rent Motion was continued several times with respect to various landlords with whom the Debtors were negotiating rent concessessions. However, Lakeside did not agree to these extensions.

[3] *In re CHS Electronics, Inc.,* 265 B.R. 339, 344 (Bankr. S.D. Fla. 2001).

which theories, the Debtors believed their rent payment obligations were suspended (the "Rent Suspension Brief").[4] The Rent Suspension Brief divided the unexpired leases into several categories, identifying with respect to each lease the basis for the Debtors' request for suspension of lease payments.[5] CB Theater identified the equitable doctrines of impossibility of performance and frustration of purpose as its justification for suspension of payments under the Lakeside Lease from March 20, 2020 when Florida Governor Ron DeSantis closed the movie theaters in Florida, until the theaters actually reopened. CB Theater argued that performance under the Lakeside Lease was impossible during the time theaters were ordered to close completely and that the purpose of the Lakeside Lease was frustrated by the COVID-19 pandemic and the closure orders, which not only shut down the Debtors' operations, but also caused the cessation of movie production, and therefore, no new movie titles were released.

CB Theater also sought excused rent, or reduced rent, when, once reopened, capacity in the Lakeside Theater was limited to fifty percent occupancy.[6] CB Theater argued that the purpose of the Lakeside Lease remained frustrated due to the lack of new movie title releases and the public's reluctance

---

[4] *Brief In Support of Debtors' Motion Abating Performance of Obligations Under Unexpired Real Property Leases* (ECF #299).

[5] The Debtors cited to the "takings" clauses contained in their leases, the doctrines of impossibility and frustration of purpose, and force majeure clauses contained in their leases as grounds for suspension of the Debtors' rent obligations under the respective leases.

[6] Governor DeSantis closed all movie theaters on March 20, 2020 by Executive Order No. 20-70. On June 5, 2020, by Executive Order No. 20-139, movie theaters were allowed to reopen at fifty percent capacity, except in Miami-Dade, Broward, and Palm Beach counties, where theaters remained closed.

to go to theaters amidst the COVID-19 pandemic, and that rent should be abated until the *full* reopening of movie theaters.

In addition to objecting to any continuance of the Original Rent Motion, Lakeside filed its Motion to Compel arguing that CB Theater should be compelled to pay all rent due under the Lakeside Lease from the Petition Date forward. Lakeside argued that the doctrines of impossibility and frustration of purpose did not apply once CB Theater was able to reopen at fifty percent capacity, and argued that the provisions of the Lakeside Lease did not excuse the requirement to pay rent for acts of God and governmental action.[7]

## ANALYSIS[8]

The Lakeside Lease is governed by Florida law. Florida law recognizes both the doctrine of impossibility of performance and the doctrine of frustration of purpose with respect to contract obligations. "Impossibility of performance refers to those factual situations, too numerous to catalog, where the purposes, for which the contract was made, have, on one side, become impossible to perform." *Home Design Ctr.--Joint Venture v. Cty. Appliances of Naples, Inc.*, 563 So. 2d 767, 770 (Fla. 2d DCA. 1990) (internal quotations omitted); *See also* 11 Fla. Jur. 2d *Contracts* §261 ("A party that contracts absolutely and unqualifiedly to do something that is possible to be accomplished must make the promise good unless performance is rendered actually impossible by an 'Act of God,' the law,

---

[7] The Debtors' *Third Amended Chapter 11 Plan of Reorganization* (ECF #772) (the "Plan") was confirmed on November 25, 2020 (ECF #936). The Lakeside Lease was assumed by the Debtors by the terms of Article V.A. of the Plan.

[8] The following constitute this Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52 made applicable to this proceeding by Fed. R. Bankr. P. 7052.

or another party. Under Florida contract law, the defense of impossibility may be asserted in situations where the purposes for which the contract was made have, on one side, become impossible to perform."); *Cook v. Deltona Corp.,* 753 F.2d 1552, 1558 (11th Cir. 1985) (In determining whether, under the doctrine of impossibility of performance, a supervening event excuses the performance of a contract party, the court should not "pass on the relative difficulty caused by a supervening event, but [] ask whether that supervening event so radically altered the world in which the parties were expected to fulfill their promises that it is unwise to hold them to the bargain.").

"Frustration of purpose refers to that condition surrounding the contracting parties where one of the parties finds that the purposes for which [it] bargained, and which purposes were known to the other party, have been frustrated because of the failure of consideration, or impossibility of performance by the other party." *Home Design Ctr.,* 563 So. 2d at 770*; see also Equitrac Corp. v. Kenny, Nachwalter & Seymour, P.A.*, 493 So. 2d 548, 548 (Fla. 3d DCA 1986) (holding, in a per curiam opinion, that because "the purpose for which the subject contract was formed became entirely frustrated . . . due to no fault of either party . . . . the contract was rendered unenforceable based on the doctrine of frustration of purpose.").

Florida law recognizes the difference between these two court-created doctrines:

> Impossibility of performance refers to the nature of the thing to be done, and not to the ability of the party to perform what the party has agreed to do. Impossibility of performance concerns those factual situations where the purposes for which the contract was

> made have, on one side, become impossible to perform. In contrast,
> frustration of purpose arises when one of the parties finds that the
> purposes for which he or she bargained, and which purposes were
> known to the other party, have been frustrated because of the failure
> of consideration or impossibility of performance by the other party.

11 Fla. Jur. 2d *Contracts* §262.

Irrespective of whether performance is impossible or the purpose frustrated, the defenses are usually not available "if the relevant business risk was foreseeable at the inception of the agreement and could have been the subject of an express contractual agreement." *Home Design Ctr.,* 563 So. 2d at 769. "As a general rule, a contract is not invalid, nor is the obligor discharged from its binding effect, because the contract turns out to be difficult or burdensome to perform." *Id.* at 769-70.

The issue presented to the Court is whether and to what extent CB Theater should be excused from any payment obligations under the Lakeside Lease, and for how long. Should CB Theater be able to suspend in full the payment of rent until it chooses to reopen the Lakeside Theater? Should CB Theater be able to suspend in full the payment of rent while the theaters were shut down by order of Governor DeSantis? And if CB Theater is obligated to pay rent upon the suspension of the government orders, which allowed the Lakeside Theater to reopen (albeit at reduced capacity) on June 5, 2020, how much rent, if any, should CB Theater be obligated to pay from June 5, 2020 on?

CB Theater argues that it is entitled to the relief sought for several reasons: when Governor DeSantis ordered all movie theaters to close, it was impossible for CB Theater to operate a movie theater, as required by the Lakeside Lease; the

purposes of the Lakeside Lease were frustrated by the COVID-19 pandemic itself – because even after movie theaters were reopened in Florida (albeit at reduced attendance) few people wanted to attend, and movie studios curtailed all new movie releases.[9] In sum, CB Theater argues, not unfairly, "neither of the parties assumed the risk of states ordering the closure of movie theaters in the face of an unprecedented global virus transmission." And CB Theater argues it should still not have to pay rent once Florida allowed the theater to reopen at fifty percent capacity because "opening the theater, even at 50% capacity, is a futile act" as the COVID-19 pandemic is keeping people home and the studios from releasing movies to theaters. For all those reasons, CB Theater argues, it is not required to pay rent until it fully reopens the Lakeside Theater.

Lakeside counters that Governor DeSantis authorized movie theaters to reopen at fifty percent capacity as of June 5, 2020, and CB Theater's decision not to reopen on that date does not mean that CB Theater *could not* open on that date. Thus, not only was it *possible* for CB Theater to perform its obligations under the Lakeside Lease, the *purpose* of the Lakeside Lease – to operate a movie theater – was not frustrated. CB Theater's determination that it can only show "first run" movies is not a provision of the Lakeside Lease or the underlying ground lease. Basically, Lakeside argues, CB Theater's decision to delay reopening was a financial decision, and *that* does not excuse performance under either doctrine. More importantly, Lakeside argues, Article 59 of the Lakeside

---

[9] Those "first run" movies the Debtors describe as "the lifeblood of the Debtors' high-quality movie experience."

8

Lease does not excuse the requirement to pay rent for acts of God and governmental action, and therefore, although Lakeside agreed to delay rental payments for the first sixty days postpetition, CB Theater must now pay rent owing from the Petition Date, including that which accumulated during the closure.

Lakeside does not dispute that it was impossible for CB Theater to operate the movie theater while the shutdown orders were in place. Thus, with respect to rent accruing during the government ordered shutdown, the only issue is whether it was foreseeable at the time the Lakeside Lease was made that this shutdown would occur. The answer is "yes" and "no." Clearly the events that caused the shutdown were not foreseeable. However, the Lakeside Lease contemplated that parties might not be able to perform their obligations under the Lakeside Lease due to acts of God or governmental action.  Article 59, titled "Effect of Unavoidable Delays," states

> If either party to this Lease, as the result of any (i) strikes, lockouts or labor disputes, (ii) inability to obtain labor or materials or reasonable substitutes therefor, (iii) the inability to obtain materials or labor at reasonable prices due to the occurrence of a hurricane or other nature disaster or due to terrorism; (iv) **acts of God, governmental action**, condemnation, civil commotion, fire or other casualty, **or (v) other conditions similar to those enumerated in this Section beyond the reasonable control of the party obligated to perform** (other than failure to timely pay monies required to be paid under this Lease), fails punctually to perform any obligation on its part to be performed under this Lease, then such failure shall be excused and not be a breach of this Lease by the party in question, but only to the extent occasioned by such event.

(emphasis added). And so, according to the Lakeside Lease, the failure to operate the Lakeside Theater (an obligation under the Lakeside Lease) is excused due to

the shut down orders.  Because there is a contractual provision that excuses CB Theater's performance while the theater was shut down by government order, it is unnecessary for the Court to apply the doctrine of impossibility of performance.[10]

The Court now turns to the period after June 5, 2020. The purpose of the Lakeside Lease is to operate a movie theater. After June 5, 2020 it was, as Lakeside points out, possible for CB Theater to operate a movie theater. Therefore, there was no frustration of purpose.

But CB Theater argues that the cost of reopening makes reopening *impracticable.* "The Debtors' projections show that at 50% capacity coupled with increased costs of providing appropriate personal protective equipment and enforcement of social distancing rules will result in negative operating income. . . . Because the major movie studios will not release new titles until mid-to-late-August, the Debtors anticipate overwhelming downward pressure on top-line revenue."[11]  CB Theater argues that impracticability as well as impossibility are covered by the doctrine of frustration of purpose, citing to *Hopfenspirger v. West,* 949 So. 2d 1050, 1054 (Fla. 5th DCA 2006) ("The doctrine [of 'frustration of purpose'] is not limited to strict impossibility, but includes 'impracticability' due to unreasonable expense."). However, the Florida court case[12] to which the *Hopfenspirger* court refers in support of this proposition, that frustration of

---

[10] CB Theater is not the original Lessee under the Lakeside Lease.  The original Lessee was Cobb Theatres III, LLC. CB Theater assumed the Lakeside Lease on September 22, 2017. *See Lease Assignment and Assumption Agreement* (ECF #586-1)
[11] *See Declaration of Jose Leonardo Marti* (ECF #380).
[12] *Equitrac Corp,* 493 So. 2d 548.

purpose includes impracticability due to unreasonable expense, says no such thing. In *Valencia Center, Inc v. Publix Super Markets, Inc.,* 464 So. 2d 1267, 1269 (Fla. 3d DCA 1985) the court *did* write that "impossibility of performance can include extreme impracticability of performance" but the court noted that "courts are reluctant to excuse performance that is not impossible but merely inconvenient, profitless, and expensive to the lessor."

CB Theater expressed a second concern – "operating a theater in the middle of a pandemic with increasing transmission rates and increasing cases per capita requires consideration of potential claims against the Debtors' bankruptcy estates and the potential for administrative claims for post-petition tort liability for which there may be no insurance coverage."[13] But this concern is belied by the fact that the Debtors have now, in fact, reopened movie theaters notwithstanding that there is still an ongoing pandemic, and therefore this concern, while legitimate, does not frustrate the Debtors' ability to reopen theaters. Debtors' concerns about the health and safety of its employees and the audiences is laudable and reasonable, but addressing those concerns clearly is one of timing and not ability, as there are many businesses that have had to figure out how to reopen under the safety concerns and restrictions, and they, like the Debtors at this point, have figured out how to do so.

There is no question that the COVID-19 pandemic was completely unforeseeable (although a slow down in audience attendance or a dearth of new releases is not), and certainly not the fault of either contract party. But, once the

---

[13] *See Declaration of Jose Leonardo Marti* (ECF #380).

Lakeside Theater was allowed to reopen, it was possible for CB Theater to reopen; CB Theater chose not to do so for what appears, based on the Marti declaration, to be primarily economic concerns. Therefore CB Theater's performance under the Lakeside Lease from June 5, 2020 on is not excused under the doctrine of frustration of purpose.

Now to the payment obligations. Lakeside argues that the phrase in Article 59 of the Lakeside Lease  "other than the failure to timely pay monies" means that the obligation to pay rent is not excused or delayed by acts of God or government orders, and therefore full rent from the Petition Date is due and payable. However, Article 59 is not the force majeure clause of the Lakeside Lease; it appears to be an excuse of breach provision. Article 8, titled "Beginning Construction; Delivery by Landlord" appears, notwithstanding its title, to be the force majeure clause.  That provision states "[i]f the performance by Landlord or Tenant of **_any_** of its obligations under this Lease is delayed by reason of "<u>Force Majeure</u>", the period for the commencement or completion thereof shall be extended for a period equal to such delay." (emphasis added). The Lakeside Lease definition of force majeure includes "acts of God" and "governmental restrictions" and, "any other act over which the performing party has no control, excluding financial ability of the performing party."

The Court does not agree with Lakeside's interpretation of Article 59.  The parenthetical "other than the failure to timely pay monies" is part of romanette (v) – the "other conditions" phrase.  Were the failure to pay money not an obligation to be excused, that parenthetical would have appeared in the latter

12

part of the sentence – probably after "fails punctually to perform any obligation. . . ." This interpretation of Article 59 is consistent with its counterpart, Article 8 of the Lakeside Lease, which makes it clear that the failure to pay rent falls under the "any other act" clause. Article 8 addresses the remedy for failure to pay rent due to those acts of God or government restrictions – the obligation is extended.

Therefore, the Court finds that CB Theater was excused from paying rent until the Lakeside Theater was allowed to reopen. But will CB Theater ever be obligated to pay the rent that accrued during the closure period? Article 8 of the Lakeside Lease states "the period for the commencement or completion thereof shall be extended for a period equal to such delay." Thus the Lakeside Lease provides[14] that the time of non-performance (not being able to operate a movie theater and pay rent) will be added to the end of the lease term, and along with that extension, the obligation to pay the rent. Consequently there is no rent due for the period of closure, but the term of the Lakeside Lease (unless that lease is rejected) is extended by the amount of time the movie theater was closed.[15]

What about the rent on and after June 5, 2020? CB Theater submits that, while it believes it should be entitled to complete rent relief until it fully reopens the Lakeside Theater, CB Theater argues that at a minimum it should only have to pay fifty percent of the rent until full reopening is allowed. In support of this argument, CB Theater cites to *In re Hitz Restaurant Group,* 616 B.R. 374 (Bankr.

---

[14] As the Court noted at the hearing, the Lakeside Lease is not a well drafted document.

[15] Because CB Theater assumed the Lakeside Lease, the Court was not required to determine whether the extended lease payments could be included as part of the rejection damages, since arguably, the extended payments could be considered "unpaid rent due under such lease." 11 U.S.C. §502(b)(6).

N.D. Ill. 2020). In that case, the court found that the Illinois closure orders triggered a force majeure clause under the lease at issue, but further held that, because the debtor was able to operate take out and delivery, the debtor would need to pay some kind of proportional rent.[16] However, in this case, the force majeure clause, as the Court has already found, excused all payment of rent during the closure, but adds on time to the end of the lease.  And there is nothing in the *Hitz* case that fashioned a payment remedy in the event of frustration of purpose.[17]

These times have not been easy for most people.  And while some have had the good fortune to be able to continue to work during this unprecedented health crisis, others have not been as fortunate.  The burden on businesses that rely on the public such as theaters, restaurants, bars, hotels and the travel industry, as well as their landlords, have been hit particularly hard.  And for the most part, the affected parties have tried to negotiate a resolution that is painful but practical to insure that "on the other side" there will be something left. An example where these obstacles could not be overcome is the Pier 1 bankruptcy – where the failure – for whatever reasons – of the parties to come to a resolution resulted in a complete closure of the business.[18]

---

[16] Because the text of the relevant lease's entire force majeure clause was not included in the opinion, it is not clear if the lease specifically provided a remedy. This Court presumes that it did not, and that the court tried to fashion an equitable remedy that recognized the debtor's ability to generate *some*  revenue, and therefore at least some obligation to pay rent.

[17] Even were the Court inclined to refer to the *Hitz*  case as guidance in fashioning an equitable remedy regarding the payment of rent after the Lakeside Theater was able to reopen, it declines to do so. The Court has ruled that CB Theater is not entitled to invoke the equitable doctrine of frustration of purpose with respect to the time period on and after June 5, 2020, and thus, it is not necessary to determine an appropriate remedy.

[18] *In re Pier 1 Imports, Inc.*, 615 B.R. 196 (Bankr. E.D. Va. 2020).

But in the absence of agreed upon resolution, we are left with the resolutions that parties have bargained for in their contracts, or, where appropriate, the equitable remedies that common law has fashioned.

In looking at those sources of resolution, and for the reasons outlined at the hearing and in this Memorandum Opinion, this Court ruled at the hearing that

(1) CB Theater is not required to pay Lakeside rent for the time that the Lakeside Theater was closed.

(2) To the extent the Lakeside Lease is not rejected, the lease term is extended for an amount of time equal to the time the Lakeside Theater was closed under state law.

(3) As for the balance of the lease payments, that is, from June 5, 2020 forward, those are payable in full and, therefore, are unpaid administrative expenses.

(4) Going forward, CB Theater will be required to make the full lease payments in accordance with the terms of the Lakeside Lease until the lease is rejected, or the parties come to other terms.[19]

# # #

---

[19] As the Court noted at the hearing, this ruling is specific to the Lakeside Lease, Florida law, and this theater. The circumstances regarding full closure and reopening may differ from lease to lease and certainly from state to state. Therefore, the Court wants to make clear that parties should not assume that the findings and the holdings of this particular dispute will necessarily translate to litigation involving other leases.

Copy furnished to:
Jason A. Weber, Esq.

*Attorney Weber is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*